E-FILED
Wednesday, 15 December, 2004  03:22:49 PM
Clerk, U.S. District Court, ILCD

Tierney. All the recipients of Judge Vahle's letter commonly knew of Bob Tierney's reporting of Powers' misconduct.

55. Although the Vahle Letter was addressed and mailed to the Quincy High School Athletic Director, copies of the Vahle Letter were also mailed to Dr. Michael Anderson, nominal superintendent of the School District, and Mr. Paul Koscielski, the principal of Quincy Senior High School.

56. The Vahle Letter also included a handwritten note from Vahle to Superintendent Michael Anderson stating: "Mike " for your information. Call with any questions. Chet."

57. In his capacity as a sitting Judge, Vahle sent a copy of his letter to Dr. Anderson and Principal Koscielski, in order to specifically discredit and damage Bob Tierney and Ann Tierney, in the eyes of senior school district administrators who were Powers' direct supervisors. Vahle cast the Tierneys in the shadow of false light, in order to quash any investigation of Powers' misconduct, and to discourage and prevent any changes to the high school swim program and the coaching "status" of Powers. Vahle was well aware of Ann Tierney's position of authority with the Quincy School District, and of her reporting of Powers' misconduct.

58. Speaking from his *"professional viewpoint"* as a sitting Judge, Vahle made false and misleading statements to the School District regarding Powers' conduct and actions. Vahle knew that Powers used a false pretext in order to engage in improper physical contact with female juveniles, while alone with them in the Vahle's basement, without parental knowledge and consent, and that the parents and students had complained about the "massages". As a Judge, Vahle also knew that Powers' fondling of minor females represented at least a prima facie case of Battery, which is both a civil and criminal offense. Vahle also knew that Powers' operation of the high school swim program at Sheridan was improper.

59. Speaking from his *"professional viewpoint"* as a sitting Judge, Vahle implemented his threat to *"discourage anyone from attempting to change the program or the coach"*. Vahle made false and misleading statements to three (3) Public School District Administrators, regarding Powers' conduct and actions. Vahle made these false and misleading statements in order to discredit, damage, intimidate, and retaliate against the Tierneys, interfere with the Tierney's' right to petition the government, suppress the School District's investigation of Powers' misconduct, to intimidate other witnesses regarding Powers' misconduct and improper

20



operation of the high school swim program, and to prevent any changes to the high school swim program or the coaching "status" of Powers.

60. The Vahle Letter, written on judicial stationary from a "professional viewpoint", was written at a time when Vahle sat as an associate judge with the power to hear disputes concerning the Tierneys, the School District, and all of the other individuals involved in this case. Vahle, a member of Sheridan, used the power and weight of his judicial office on his judicial stationary, to cover-up the misconduct of Powers and Sheridan, and to help Sheridan maintain operational control of a traditional public function.

61. The actions of Vahle alleged herein were committed while Vahle was acting under the authority of his office conferred by state law. Vahle's conduct also establishes another symbiotic relationship between Sheridan and a State actor.

62. While the Vahle Letter constitutes action under color of state law, it is also a breach of the ethical standards applicable to the conduct of judges in the State of Illinois and outside Vahle's judicial authority and jurisdiction. Vahle's actions represents the abuse of public office by a sitting judge in order to aid parties in a matter in which the Illinois 8th Circuit Court had no interest or standing. No case or controversy involving the Plaintiff and the Tierney Family and the subject of the Vahle letter ever existed before Judge Vahle or any or judicial officer of the Circuit Court of the Eighth Judicial Circuit, or any other court of the State of Illinois. [10]

63. After Gorman's meeting with Vahle, and immediately after receiving Vahle's letter, Gorman and the School District engaged in deliberate indifference by refusing to conduct any investigation of the "massages", and the other misconduct by Powers, despite the fact that Gorman and the School District knew Vahle had made false and misleading statements about

---

[10] Illinois Supreme Court Rules / Conduct of judges
RULE 62 CANON 2
A Judge Should Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.
A Judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
A Judge should not allow the judge's family, social, or other relationships to influence the judge's judicial conduct or judgment.
A judge should not lend the prestige of judicial office to advance the private interests of others; nor should a judge convey or permit others to convey the impression that they are in a special position to influence the judge.
A judge should not testify voluntarily as a character witness.

21



Powers misconduct, and about the events that occurred in the Vahle home. The School District not only turned a "blind eye" to Powers misconduct, but also ratified Vahle's deception.

64. The School District and Gorman, while funneling confidential information and the *Schildt Report* to third parties at Sheridan, refused to share with the Tierneys or other parents of the girls who were massaged, any information from the *Schildt Report* or any information about the School District's mock investigation of the misconduct by Powers.

65. The District and Gorman disclosed the confidential *Schildt Report* and other confidential information concerning the Tierneys' reporting of Powers' misconduct to other third parties, including Defendant Schnack, other Sheridan Board members, and CLUB members.

66. All Sheridan Board members initially signed affidavits stating that they had personal knowledge that "Mr. and Mrs. Tierney" had reported Powers misconduct to the Quincy School Board. However, during Hearings in State Court in June 2002, at least two (2) Sheridan Board members retracted some of their statements reflected in these affidavits.[11]

67. The disclosure of this and similar information to Sheridan Board members was a willful and wanton violation of 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act* (FERPA), and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and caused damage and harm to the Plaintiffs.

68. In the space of just 25 days between March 28, 1999, and April 21, 1999, Schnack, Vahle, Meyer, Citro, and Gorman, engaged in a coordinated campaign of collusion, conspiracy, retaliation, and intimidation, by engaging in the following acts;

   a. On March 28, 1999, Schnack (who was also Powers' personal attorney) was elevated to membership on the Sheridan Board, despite his numerous conflicts of interests.

   b. On March 29, 1999, one day after becoming a Sheridan Board member, Schnack mailed a letter to School attorney Gorman (Gorman was also acting as the de-facto School District Superintendent per the instructions of School Board President, Citro). In response to the complaints about Powers misconduct with Meryl Tierney, Schnack made false statements about Meryl Tierney's swimming activities at Sheridan in order to discredit the Plaintiffs and suppress any investigation of Powers. Schnack also attempted to renew the School Districts

---

[11] Per the testimony of two Sheridan Board members at a Hearing in the 8th Circuit Court of Illinois on June 25, 2002. This Hearing was held in conjunction with litigation pursuant to Complaint 2002-L-12, in State Court between the Plaintiffs and Sheridan Swim Club, Inc., et al.



22

          contracts with both Powers and Sheridan, by offering *"advantageous"* benefits and incentives to the District if the contracts could be renewed.

c.     On <u>April 12,</u> 1999, Vahle sent a letter to the High School Athletic Director, the Principal of the High School, and to the Superintendent of the School District, on the letterhead of the Circuit Court of the 8th Judicial Circuit of the State Of Illinois. To reaffirm the official, judicial nature of his letter, Vahle emphasized that he was writing from a "partly professional viewpoint." The letter accused the Tierneys of "spreading rumors and innuendo about the coach and his program" and making "paranoid misrepresentations and falsehoods". Vahle also stated his intent was to "discourage anyone from attempting to change the program of the coach". Vahle's letter was intended to discredit and retaliate against the Tierneys, suppress any investigation of Powers' misconduct, and intimidate witnesses to Powers misconduct.

d.     On <u>April 14,</u> 1999, Schnack made a motion to the Board of Directors of Sheridan to summarily *"suspend"* the Tierneys from Sheridan. Schnack made false and misleading allegations against the Tierneys. The minutes of the board meeting disclose that he made the motion after an allegation by Meyer accusing the Tierneys of "trying to get Rick Powers fired as the Quincy High swim coach." The motion was second by the Adams County States' Attorney, Barney Bier. Schnack's statements and actions were intended to discredit and retaliate against the Tierneys and suppress any investigation of Powers' misconduct. Schnack also failed to inform the Sheridan Board he was acting as Powers' personal attorney.

e.     On <u>April 15,</u> 1999, Sheridan sent the Tierneys a letter wherein Sheridan declared the Tierney membership was *"terminated"*, declared the Tierneys would be *"considered trespassers"* if found on Sheridan property, and barred the Tierneys from ever setting foot on the Sheridan property *"for any function whatsoever"*. This ban prevented Meryl Tierney and all members of her family from attending all swim team functions at Sheridan that were otherwise open to the public. The letter gave no reason for Sheridan's actions. Sheridan engaged in State action and retaliation against a School District Dean of Students, her family, and the Captain of the High School Girls Swim team, without providing any due process to the Tierneys.

f.     On <u>April 18,</u> 1999, within days of the Vahle Letter and the Sheridan Expulsion Letter, and in response to the reports of Sheridan's retaliation, the School District and school board president Citro, personally retaliated against the Tierneys, and engaged in this conduct while acting under color of state law. This retaliation consisted of, without limitation, Citro's attempt to intimidate the Tierneys by falsely telling Bob Tierney that Powers could sue the Tierneys because of the Tierney's' reporting of Powers' misconduct. Citro claimed to be describing information given to him by an "uninvolved attorney".



23

g. On <u>April 21</u>, 1999, *de-facto* school Superintendent, Gorman, made a report to the School Board concerning Powers and the High School Swim Program. In response to Gorman's comments, the School Board hatched a scheme to cover-up Powers misconduct and Sheridan's retaliation, and to renew the contracts of Powers and Sheridan without a vote in public session. This action was taken to retaliate against the Tierneys and suppress any investigation of Powers' misconduct and Sheridan's retaliation.

69. The School District, Citro, and Gorman, refused to take any action or even discuss with the Tierneys, Sheridan's expulsion of the Tierneys. Citro refused to discuss with the Tierneys the investigation of Powers. The District turned a *blind eye* to Sheridan's retaliation against the Tierneys for reporting Powers misconduct.

70. In May 1999, the School District and Gorman refused to discuss or take any action concerning Sheridan barring the Tierneys from attending a Quincy High School Girls swim team meeting, which took place at Sheridan Swim club under the direction, control, and authority of Powers, who was acting within the course and scope of his employment and under color of state law.

71. Citro, Gorman, and school board vice-president, Dennis Koch, retaliated against the Tierneys by refusing to conduct an investigation in the manner mandated by written School District Policy. The School Board dropped all investigation activities of Powers after the *Schildt Report* was turned over to Gorman and Citro.

72. Citro, Koch, and Gorman, retaliated against the Tierneys by refusing to conduct an investigation of the "massages" and retaliation in the manner mandated by Illinois Statutes and *Title IX*.

73. The School District, acting through Gorman, Citro, and other Board members Koch and Kirlin, retaliated against the Tierneys by having the School District Board consider a false evaluation of Powers.

74. On June 9, 1999, acting in response to the encouragement, collusion, and coercion of Schnack, Vahle, Citro, Gorman, the Quincy School District retaliated against the Tierneys, and renewed Powers' employment contract during an executive session meeting of the school board. This meeting had allegedly been called in order to discuss the "massages" and other incidents of Powers misconduct as alleged in ¶ #25, and to discuss Sheridan's retaliation against the Plaintiff and the Tierney Family. At the meeting, Board vice-president Koch, specifically



24

refused to allow information from the *Schildt Report* released to the Plaintiff and other parents who were present at the meeting.

75. On June 9, 1999, acting in response to the encouragement, collusion, and coercion of Schnack, Vahle, Citro, Gorman, the School District retaliated against the Tierneys, and secretly renewed the School District's contract with Sheridan, despite the fact that Sheridan had banned the QJHS Senior Dean of Students, her family, and the captain of the High School swim team, from attending "any function whatsoever" at Sheridan Swim Club, and despite the fact that Sheridan stated that the Tierneys would be "considered trespassers", if they attempted to attend any functions at Sheridan, or were even found on Sheridan property.

76. During this meeting, Board vice-president Koch also specifically refused to take any action or even discuss with the Plaintiff and the other parents, Sheridan's retaliation against the Tierney Family, and the banishment of the Tierney Family from school functions and facilities at Sheridan Swim Club. [12]

77. The School District ratified the misconduct of Powers and Sheridan. The District was deliberately indifferent to, and turned a blind eye to the misconduct of Powers and the retaliation by Sheridan, and to the hostile, educational environment at Sheridan, thus breaching the constitutionally protected rights of the Tierneys. The District also refused and/or failed to report the "massages" to the Illinois Department of Children and Family Services.

78. No State or Federal law provides a cloak of immunity that allows School District officials "discretion" to violate the constitutionally protected rights of the Plaintiff and the Tierney Family. No State of Federal law provides a cloak of immunity that allows School District officials "discretion" to ignore their obligation to abide by Statutes such as *Title IX* and The Illinois Abused and Neglected Child Reporting Act. [13]

---

[12] Board member Koch was subsequently elevated to the Presidency of the School Board.

[13] Per the Federal Register Part VII, Department of Education, Office of Civil Rights: / Vol 62, No. 49 / March 13, 1997, pg. 12043:
"Finally, a school should take steps to prevent any further harassment and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against a person who filed a complaint on behalf of a student, or against those who provide information as witnesses. At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquires to see if there have been any new incidents or any retaliation."



25

79. On June 16, 1999, during an executive session meeting of the school board, Citro, Kirlin, and Gorman attempted to avoid the question of whether Powers should be terminated for the conduct alleged in ¶ #25, and decided without a public vote by the School District Board. The Board was prevented from doing so when another School District Board member demanded a vote in public session. A vote on the termination of Powers' employment was subsequently held during the public session meeting of the Board of Directors of the School District. The Board specifically refused to terminate Powers due to his conduct referred to in ¶ #25.

80. On June 24, 1999, the Tierney Family filed a lawsuit in Federal Court, Springfield Division, against the Quincy School District, Richard Powers, Sheridan Swim Club, and the Sheridan Board.

**IV    Events and Causes of Action which Occurred after the Plaintiffs Filed the Initial Complaint in Federal Court** [14]

81. After the Tierneys filed a lawsuit in Federal Court, the Plaintiffs engaged in free speech before public sessions of the Quincy School Board on issues of public concern regarding the improper operation of the Quincy high school swim program. The Tierneys also petitioned several State agencies, including the IHSA, for redress of grievances. The Tierneys also engaged in free speech on issues of public concern with the Illinois High School Association (IHSA) and investigators from the Illinois Department of Children and Family Services (DCFS). The Tierney's' free speech concerned possible violations of School District and Illinois High School Association rules, violations of student rights, sexual harassment and inappropriate sexual conduct involving minors, and other items, were all matters of public concern.

82. After the Tierneys filed a lawsuit in Federal Court, Powers continued to violate IHSA and School District rules and regulations at the start of the 1999/00 school year. Powers was acting within the course and scope of his employment and under color of state law. The

---

[14] After the Federal Court dismissed Sheridan as a state actor in October 2001, the Plaintiffs filed an amended Complaint in Case #99-3149 against the remaining Defendants, Quincy School District and Richard Powers, for causes of action under *Title VII, Title IX, Section 1983 & 1985*, after the EEOC/ U.S. Department of Justice issued a Notice of Right-to-Sue Letter on behalf of Ann Tierney for causes of action under *Title VII*, which occurred between August 1999 and August 2001. The Illinois Educational Labor Relations Board (IELRB) has also filed a lawsuit in State Court against the Quincy School District for Unfair Labor Practices regarding the actions taken against Ann Tierney during the 2000/2001 school year, and for breach of a collective bargaining agreement.



School District again turned a "blind eye" to Powers misconduct. The IHSA subsequently began an investigation of Powers and the Quincy High School Swim Program.

83. Beginning with the 1999/2000 school year, the School District and School Board engaged in joint action with Sheridan and ratified the campaign of harassment and retaliation directed against the Plaintiffs by School District employees and agents (See ¶¶ 153-212). These actions reaffirmed the symbiotic relationship, nexus, and conspiracy between the School District and Sheridan Swim Club since they were actions inconsistent with non-affirmation of the misconduct of the above named Defendants and individuals. By these actions, the District accepted responsibility and liability for the acts of misconduct directed against the Tierneys by employees and agents of the District, which were performed on behalf of the District, and/or at the direction of policy-making agents of the School District. These overt and covert acts and omissions include but are not limited to the following:

    a. Engaging in deliberate indifference to the hostile educational environment at Sheridan, and to Powers' wrongful operation of the Quincy High School during the fall 1999 High School swim season;

    b. Threatening to expel a School District Board member from School Board meetings unless he "disassociated" himself from the Tierneys. This Board member had also voted against rehiring Powers;

    c. Obstructing and suppressing the IHSA investigation of the Quincy High School Swim Program by authorizing legal action against the IHSA.

    d. Disseminating false and misleading statements to the press by senior school district officials regarding the IHSA investigation of the high school swim program;

    e. Violating School District policy by unlawfully divulging information from an internal School District/IHSA investigation to Sheridan members and officials during a meeting at Sheridan;

    f. Targeting the Plaintiffs for retaliation and harassment by unlawfully divulging information about the Plaintiff's confidential conversations with the IHSA;

    g. Engaging in deliberate indifference and turning a *blind eye* to the harassing, obscene phone calls made to the Plaintiffs by Sheridan officials, members, and School District employees;

    h. Granting to Sheridan members and officials, unprecedented private access to Quincy School District Board members during an executive session of the School Board, in order to secretly coordinate with the School District, the hiring of the next Quincy High School Swim Coach who would also be hired as a Sheridan swim coach.

    i. <u>Again,</u> secretly *entwining* Schnack and other Sheridan officials and CLUB members in the internal School District personnel and policy-making process of recruiting, interviewing, and hiring a new coach for the Quincy High School Swim Program.

27

j.  Agreeing to hire, and hiring, the next Sheridan coach as the new Quincy High School swim coach for the 2000/2001 school year in return for free use of Sheridan facilities;
k.  Renewing the contracts with Sheridan Swim Club and Sheridan Swim Team;
l.  Rewarding school district employee, Debbie Olson, with extra duties, responsibilities, and compensation, while concurrently engaging in punitive and discriminatory action against Ann Tierney in the workplace, which included denying her career advancement and reducing her professional duties and compensation;
m.  Paying for Debbie Olson's legal expenses in defending her against a civil lawsuit after the Olsons were also named as defendants in the Federal complaint #99-3149, while Sheridan in turn, paid Doug Olson's legal fees.

84. No State or Federal law provides a cloak of immunity that allows School Boards and/or School District officials "discretion" to violate the constitutionally protected rights of the Plaintiffs and ratify, or turn a *blind eye* to criminal acts by school employees and agents. The District was deliberately indifferent to acts of retaliation by school personnel and agents, against school employees, students, and their families who reported incidents of improper conduct by a school employee. Both Federal and State laws specifically prohibits any retaliation against employees for reporting acts of sexual harassment and/or other misconduct by school district employees.

85. The Quincy School District has subjected Ann Tierney to a relentless, systematic campaign of retaliation, harassment, and age and sex discrimination in the workplace. Prior to and during the 1999/2000 school year, these acts include but are not limited to:

a.  Designating a School District employee to monitor her activities;
b.  Attempting to remove some of her employment responsibilities as Dean of Students;
c.  Requiring Ann Tierney to perform the duties of a higher paying job (Assistant Principal/Athletic Director) without a commensurate increase in pay;

86. Prior to and during the 2000/2001 school year, these acts include but are not limited to:

d.  Preventing Ann Tierney from career advancement to other administrative positions; confirmed by an admission by the School District that her career advancement in the School District was ended;
e.  Refusing to provide her with the customary information about job openings in the School District;
f.  Intercepting her personal letters asking to apply for job openings and diverting the letters to School attorney, Gorman;

28

g. Refusing to interview and/or promote her to job openings in the School District for which she was qualified while promoting other School District employees with inferior credentials, work records, and experience.

h. Removing some of her employment responsibilities as Dean of Students during the 2000/2001 school year;

i. Isolating and ostracizing her from her assigned job responsibilities during the 2000-2001 school year;

j. Denying her the opportunity to attend mandatory professional growth activities at staff development workshops at the 2000 Illinois Dean's Conference in the November 2000;

k. Utilizing the grievance procedure of the collective bargaining agreement to attempt to have School District attorneys interrogate Plaintiff Ann Tierney, about the issues in the pending Federal lawsuit.

87. Prior to and during the 2000/2001 school year, these acts include but are not limited to:

l. Reducing Ann Tierney's compensation and removing some of her professional duties for the 2001/2002 school year.

m. Discriminating against Ann Tierney in the hiring and selection process for assigning professional responsibilities at Quincy Junior High School during the 2001-2002 school year.

n. On Friday, <u>January 18, 2002</u>, at the direction of the School Board and acting under instructions from the School District's attorney of record in this lawsuit, Superintendent Joe Bocke, caused to be hand delivered to Ann Tierney during the school day, a letter directing her to appear for an interview during the next business day of January 22, 2002, before a Mr. Gerald Kretmar, an attorney from St. Louis, Mo., purportedly to cooperate in an investigation into allegations of harassment in the workplace. In fact, Mr. Kretmar was an attorney retained by the School Board at the direction of its attorney of record in the Federal lawsuit, and the "interview" was a pretext to obtain a statement from a party by extra-judicial means when the Court has yet to enter a scheduling order. There have also been prior attempts by the School District's attorneys to coerce and manipulate Ann Tierney into submitting to questioning about issues in the Federal lawsuit.



29

V   Conduct And Occurrences Complained Of In This Complaint Involving Defendants Sheridan Swim Club, And Sheridan Board Members

A.   Description of Sheridan Swim Club and the Genesis of the Symbiotic Relationship between Sheridan and the Quincy School District, which was set in motion in January 1997. [15]

88.   Sheridan was originally incorporated as a Not-for-profit corporation, but according to Sheridan Board minutes, at some point in time prior to April 1999, Sheridan began operating and representing itself as a For-profit corporation. Sheridan has sold shares to CLUB members under the representation that Sheridan was a For-profit Corporation. Sheridan is tinged with public stature since any member of the public can join the Sheridan Swim Team and the Sheridan Swim Team Booster Club without becoming a member of the Club. Members of the public can also take swim lessons at Sheridan and utilize CLUB facilities without even joining Sheridan Swim Team or the Club. Furthermore, according to the Sheridan Club By-Laws, any member of the public can utilized the Club facilities for year-round or summer time use, without becoming a Shareholder in the Club. Only Shareholders can vote for Board members, yet Shareholders can maintain their voting rights without paying the yearly dues required of persons who actually utilize the facilities.

89.   Sheridan Swim Club is also tinged with public stature since it is the site of, and controls a, *traditional public functions,* otherwise open to the public (as a matter of law) for participants and spectators alike. Sheridan is a member of the River Country swim league comprised of area YMCA's and municipal park district pools. In most years, Sheridan is the host site for this swim league's conference championship meet, which is open to the public. For the past several years, Sheridan has hosted an international swim meet every summer, which is

---

[15] In February 2000, a Rule 16 Scheduling Conference was held and Discovery was authorized and the deposition of Defendant Powers was scheduled. However, Powers left the country 1 day before his deposition, and his whereabouts are unknown. After an Amended Complaint was filed, the Plaintiffs were denied any general Discovery. In March 2001, a second Rule 16 Scheduling Conference was subsequently ordered by the District Court, but the Conference was arbitrarily cancelled by the District Court on its own initiative, in order to limit the scope of Discovery the Plaintiffs could conduct regarding Sheridan's Motion for Summary Judgment. The District Court did not order a Rule 16 Scheduling Conference again until July 2002.

sanctioned by USA Swimming Inc. This swim meet is otherwise open to the public, and on occasion, even has foreign nationals in attendance. The foreign participants are not U.S. citizens.

90. The Plaintiffs maintained year-round membership status in Sheridan Swim Club since 1986. The Plaintiffs are also shareholders in this corporation with specific shareholder property rights such as notice, fair hearing. These due process rights are further enhanced since Sheridan controls and operates a *traditional public function* whose activities and events are open to the public.

91. Sheridan is a member Club of Illinois Swimming Inc. and USA Swimming Inc. USA Swimming Inc. is the National Governing Body for swimming in the United States of America and is the organizational body behind the US Olympic Swim Team. USA Swimming Inc. has affiliated Local Swimming Committees (LCS) and member Clubs in all 50 states. Illinois Swimming Inc. is a Local Swimming Committee for USA Swimming Inc.. Sheridan Swim Club is within the geographical boundaries of Illinois Swimming Inc. The Sheridan Swim Team is registered with, and pays dues to Illinois Swimming Inc., and USA Swimming Inc. Members of the Sheridan Swim Team register with, and pay dues to Illinois Swimming Inc. and USA Swimming Inc. in order to compete as a Sheridan Swim team member in meets which are sanctioned by USA Swimming Inc. However, the team is an organization of the CLUB under the control of the Sheridan Board of Directors, which has the power to review the activities of the Swim Team.

92. Sheridan Swim Club also has an agency relationship with an Illinois public school district. As an agent of a Public School District, Sheridan is obligated to comply with the *Illinois School Code* 105 ILCS 5/24-24) et seq., and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act* (FERPA). Sheridan Swim Club also meets the definition of a "recreational facility" according to the provision of *The Illinois Abused and Neglected Child Reporting Act*, 325 ILCS 5/1 et seq.

93. Two (2) School District employees have served as President of the Sheridan Board over the past 10 years. Another School District employee has simultaneously served as President of the Sheridan Swim Team Booster Club and as President of the Quincy High School Swim Team Booster Club. At least one Quincy School District employee has been on the Sheridan Board every year for the past 10 years. In some years, 2 or more School District employees have been Sheridan Board members.

94. The other swim team to use Sheridan facilities is the Quincy High School swim team. Prior to the 1998/99 school year, the Quincy school district occasionally used Sheridan as the site for swim meets. High school swim team practices were held at the local YMCA and full-time Quincy School District teachers coached both the Girls and Boys high school swim teams.

95. In 1997, the Sheridan Board began a campaign to force the Quincy School District into entering into an "alliance' and "marriage" with Sheridan. This campaign had two objectives:

   a. Sheridan's primary goal was to gain operational control and authority over a traditional public function - the Quincy High School Swim Program, and to operate the high school swim program for the benefit of Sheridan Swim Club and/or for the benefit of the Sheridan Swim Team.
   b. Sheridan's secondary goal was to have the Quincy Public School District financially subsidize the operating expenses of Sheridan Swim Club and/or the Sheridan Swim Team.

96. Sheridan Board President Schnack, a local attorney, orchestrated and spearheaded this campaign while acting in his capacity as a Sheridan Board member. In the process of implementing this "marriage", the following events occurred:

   a. In January 1997, the Sheridan Board of Directors informed the Quincy School District that unless certain changes were made regarding the Quincy school district personnel who controlled and operated the high school swim program, and unless the District also agreed to enter into a contract with Sheridan, it would be highly unlikely that Sheridan would allow the School District to use Sheridan facilities for high school swim meets and other activities, as in years past. Defendant Schnack was the Sheridan Board President at this time.

   b. In July 1997, Defendants Schnack, Anderson, and another CLUB member, secretly approached Quincy School Superintendent, Dr. Anderson with an unauthorized proposal for a "marriage" between Sheridan and the Quincy School District. This "marriage" proposal was based on the pre-condition that the School District allow Sheridan take over the entire [QHS swim] program and release the current QHS swim coach. Schnack and Anderson made false representations that they spoke for both Sheridan Swim Club, and for the parents and students of the QHS swim team. None of these Sheridan officials had any children on the QHS swim team or even in Quincy High School.

   c. In conjunction with this matter, Dr Anderson and several other senior school district officials also hosted a meeting with approximately a dozen other Sheridan members, QHS students, and their parents. This meeting was held to discuss the

32

operation of the QHS Swim Program. Plaintiff, Bob Tierney was a member of this group of parents.

d.  Following these meetings, the Quincy School District entered into a *symbiotic relationship* and *nexus* with Sheridan Swim Club, prior to and during the 1997/98 school year. This symbiotic relationship and "marriage" was consummated almost one (1) year before the School District entered into any contractual agreement with Sheridan to use the Sheridan facilities, and mutually agreed to hire the same individual as the new Sheridan swim coach and as the Quincy High School swim coach.

e.  In July 1997, Quincy School Superintendent, Dr. Michael Anderson, acting as the policy-making agent of the School District in the course and scope on his apparent authority under color of state law, drafted and implemented a plan titled "Swimming Proposal", whereby the School District would entwine Sheridan in the internal control, direction, and operation of the Quincy High School Swim Program. *(A true and correct copy of this "Swimming Proposal" and Dr. Anderson's cover letter is attached hereto as Exhibit A-1 & A-2)*

f.  Beginning with the 1997/98 school year, the Quincy School District agreed to entwine Sheridan in the internal personnel and policy-making procedures of the Quincy School District, on issues concerning the control, direction, and operation of the Quincy High School Swim Team Program.

g.  Prior to and during the 1997/98 school year, Sheridan was entwined in the internal school district personnel decision-making procedure to terminate a full-time Quincy school district employees as coach of the Quincy High School Swim Program at the conclusion of the 1997/98 school year. The School District acquiesced to Sheridan's demands to terminate the coaching contract of a full-time Quincy school district employee who had served as the high school swim coach for over 15 years. Sheridan also decided to terminate the coaching contract of the Sheridan Swim Team coach at the conclusion of the 1997-98 school year.

h.  Prior to and during the 1997/98 school year, senior policy-making agents of the School District held numerous private meetings with Schnack and other Sheridan officers in order to coordinate with, and entwine Sheridan in the internal school district personnel selection process of recruiting, interviewing, and hiring a new coach for the Quincy High School Swim Program and the Sheridan Swim team.

i.  During the 1997/98 school year, Sheridan officials, including Schnack, were entwined in the internal school district personnel process of recruiting, interviewing, and hiring the next Quincy High School swim coach.

j.  During the 1997/98 school year, Sheridan Board members and agents were given veto power over the internal personnel decisions of the Quincy Public School District. Quincy School Superintendent, Michael Anderson, as the senior policy-



33

        making agent of the School District acting in the course and scope of his apparent authority under color of state law, directed Quincy High School Administrators to <u>reach an agreement with Sheridan</u> regarding whom the School District would hire as the next Quincy High School swim coach.

k.      In approximately May 1998, the School District entered into a contractual relationship with Richard Powers and Sheridan, pursuant to which the School District would utilize the coaching services of Powers, the swimming pool and facilities of the Sheridan, and the equipment of the Sheridan Swim Team for the 1998-99 school year. The School District contracted with Powers in May 1998 as coach, and Sheridan also hired Powers as a coach in May 1998, in close proximity to the School District's hiring of Powers. As part of the Nexus, Powers agreed to come to Quincy under the condition that he would coach both Sheridan and the QHS swim teams.

l.      At this point in time, Richard Powers, the future coach of the Quincy High School and Sheridan Swim Programs was a 53-year-old single, white male, living and working in Anchorage, Alaska. Powers had never coached a United States high school swim team, and was not certified per the Illinois High School Association (IHSA) certification By-laws and regulations, to coach any Illinois High School athletic program. During this time period, Schnack was also acting as Powers' personal attorney, and attempting to get Powers hired as coach of both the Sheridan and QHS swim teams. During this same time period, Schnack also provided false and misleading information to other applicants for the QHS coaching position, without disclosing that he was acting in Mr. Powers' behalf. [16]

m.    In a published newspaper article, Dr. Anderson, speaking as the senior policy-making agent of the School District acting under color of state law, termed the relationship with Sheridan as an "alliance". Anderson further stated that Quincy High School would be "joining forces" with Sheridan Swim Club, because Sheridan feeds into the Quincy High School Swim teams.

**B.    The Symbiotic Relationship, Nexus, and "Alliance" Was Reaffirmed After A Federal Lawsuit Was Filed And After The IHSA Suspended Powers And Placed Quincy High School On Probation.**

97.    In December 1999, Powers resigned as coach of the Quincy High School Boys and Girls Swim Teams after the IHSA confirmed that Powers and the School District had violated IHSA Rules. The IHSA temporarily suspended Powers for his misconduct and placed

---

[16] Powers moved about frequently, across countries and continents alike. At one time or another, Powers has lived and worked in South America, Eastern Europe, Southeast Asia, and the Middle East. In addition to Anchorage, Alaska, Powers had previously held coaching jobs in at least the following locations; Kuwait, Malaysia, Israel, Singapore, Crete, Ecuador, Venezuela, and Brazil.



Quincy High School on probation. Powers also gave notice to Sheridan that he would resign as the Sheridan Swim Coach at the end of March 2000.[17]

98. In February 2000, Defendant Schnack, while allegedly speaking in his capacity as a Sheridan Board member, mailed a letter to each School District board member. Schnack termed Sheridan's relationship with the School District as a "marriage". Schnack further stated that <u>he had worked for 3 years</u> to put the "marriage" together. Schnack also offered the Sheridan facilities free of charge to the School District in return for special considerations from the School District in the hiring of the next high school swim coach who would replace Powers.

99. Between February and May 2000, in coordinated, joint action with Schnack's letter to the School Board, several Sheridan CLUB members including Defendant Robert Meyer and Judge Chet Vahle were again provided with unprecedented private access to Quincy School District Board members during an executive session of the Quincy School Board. The purpose of this meeting was to secretly coordinate with the School District, the hiring of the next Quincy High School Swim Coach who would also be hired as a Sheridan swim coach. Senior policy-making agents of the School District, <u>again</u> secretly entwined Sheridan officials and CLUB members in the internal personnel and policy-making process of recruiting, interviewing, and hiring a new coach for the Quincy High School Swim Team and the Sheridan Swim team. This joint action and entwinement occurred during the time that Sheridan and the School District were co-defendants in a Federal lawsuit which alleged a conspiracy and Nexus between the two organization, and during the time that the School Board was deliberately indifferent to the harassment and retaliation of the Plaintiffs by Sheridan members and school district employees.

---

[17] <u>The I.H.S.A. Confirmed the Violations by Power's and the Quincy School District</u>
In the fall of 1999, the Illinois High School Association (I.H.S.A.) investigated Richard Powers, Sheridan, and Quincy High School. The I.H.S.A. verified that Powers, and the High School had violated I.H.S.A. By-laws and Rules. The I.H.S.A. also confirmed the fact the Powers was not certified per I.H.S.A. bylaws to be a head coach of any Illinois High School sports program during the 1998 Girl's High School Swim Season. During the IHSA investigation, the School Board voted to take legal action against the IHSA. Based on information and belief, Powers refused to be interviewed by investigators with the Illinois State Police, and the Illinois Dept. of Children and Family Services, despite the fact that Powers was also a mandated reporter. Powers abruptly left the country for South America in March 2000, one day before his scheduled appearance for a deposition in Plaintiffs' Federal lawsuit, despite the fact the Federal Court had issued a subpoena for his appearance. Powers whereabouts are alleged to be unknown. However, based on belief, and information from eyewitnesses, Powers was seen at Sheridan Swim Club in November 2000. There have been some reports that Powers has returned to this country. Powers is still facing civil battery charges in the Federal case. It is also Plaintiffs' understanding that the Quincy School District has paid for Power's legal fees.

and during the time that former Sheridan/Quincy High school swim coach, Richard Powers, skipped the country to avoid having to testify at his deposition.

100.   In approximately May 2000, (exactly two years after the District hired Powers), the School District entered into a contractual relationship with Lori Ave and renewed the contract with Sheridan, pursuant to which the School District would utilize the coaching services of Ave, the swimming pool and facilities of the Sheridan, and the equipment of the Sheridan Swim Team, for the 2000-01 school year. The School District contracted with Ave as coach in May 2000, and Sheridan also hired Ave and her husband as coaches in May 2000 in close proximity to the School District's hiring of Ave. Prior to this time, Ave was living and working in the State of Oregon. This joint action renewed the "marriage" vows with Sheridan, and reaffirmed the symbiotic relationship and "alliance" between the School District, Sheridan Swim Club, and the Sheridan Swim Team.

101.   As part of the nexus of a quid pro quo understanding, and in part as a "marriage" dowry, Schnack gave the School District free use of Sheridan facilities and free use the Sheridan Swim Team equipment, for all Quincy High School Swim Team activities, beginning with the 2000/2001 school year. This action resulted in financial harm to Sheridan Swim Club, but benefited the personal interests of certain Sheridan Board members and Sheridan Swim Team members.

102.   Sheridan benefited from this *symbiotic relationship* and *nexus* by establishing and maintaining operational control over a traditional public function – the Quincy High School Swim Program, and operating the program for the benefit of Sheridan swim team members, while discriminating against school district students and families who were not Sheridan members, and/or members of the Sheridan Swim Team. The Sheridan Swim Team benefited from this relationship by having a public school district subsidize the operating expenses of the Sheridan Swim Team, by also employing a Sheridan Swim Coach.

103.   The School District benefited from this *symbiotic relationship* and *nexus* by receiving "advantageous" benefits from Schnack and Sheridan, and by utilizing the facilities and equipment of Sheridan at little to no cost to the District. The School District also benefited from this relationship through Sheridan's actions in aiding and abetting the District's efforts to conceal violations of IHSA regulations and breaches of School District policy occurring in the Quincy High School Swim Program, and through Sheridan's ongoing retaliation, intimidation, and


C903

harassment of the Plaintiffs, and others, who had reported Powers misconduct, and the hostile, educational environment at Sheridan Swim Club.

VI   STATE COUNTS

### COUNT I

**The Acts And Omissions Of Defendants Sheridan, Sheridan Board, And Meyer Constitutes <u>Civil Conspiracy</u> Between One Or More Sheridan Board Members. CLUB Members, And Sheridan Employees.**

**A.   Conduct Complained Of Which Occurred From May 1998 To July 1999.**

104.   Plaintiffs repeat and re-allege the allegations of paragraphs 3-80, 88-103.

105.   During the 1998/99 school year, Sheridan Board members and CLUB members aided and abetted Powers' misconduct and improper operation of the Quincy High School Swim Program through a conspiracy of fraudulent and deceptive conduct. (See ¶¶ 17 & 25-31)

105a.   The actions of these officials were in direct conflict with the written policy of the School District, and reflected deliberate indifference to school district policy and the Rules and Regulations of the IHSA, which is the State governing body of Illinois High School Athletics.

105b.   This fraudulent operation of the QHS Swim Program, represented a breach of contract between Sheridan and the School District regarding the use of Sheridan facilities, and breach of fiduciary duty and the expressed duty of good faith by the Sheridan Board.

105c.   The improper operation of the QHS and Sheridan Swim Team Program by Powers and the Sheridan Board also posed a financial liability threat to Sheridan Swim Club and the CLUB shareholders, by voiding insurance protection and exposing the CLUB and Shareholders to uninsured claims.

106.   At one or more Sheridan Board meetings during the 1998/99 school year, acting upon confidential information unlawfully provided to them by the Quincy School District and Powers, Defendant Meyer and one or more Sheridan Board members, including Board President Julie Anderson, mutually agreed to made fraudulent and misleading statements about Plaintiff Meryl Tierney's personal, student activities at Quincy High School. Anderson and Meyer also made fraudulent and misleading statements about Bob Tierney's alleged reports to the IHSA about the operation of the QHS swim program. Anderson and Meyer falsely accused Bob Tierney of filing complaints with the IHSA. These disclosures and discussions were a willful and wanton violation of 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act*

37



(FERPA), and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and caused damage and harm to the Plaintiffs.

107.   In December 1998, Powers, and Defendants (Sheridan Board President) Julie Anderson, Schnack, Bier, and Meyers conspired to retaliate against the Plaintiff and others, and mutually agreed to cover-up Powers' misconduct concerning IHSA violations and the operation of the Quincy High School Swim Team at Sheridan Swim Club, by providing fraudulent and misleading information to the School District.

108.   In December 1998, and January 1999, Defendant Julie Anderson, made false and fraudulent entries in Sheridan's financial records of the Tierneys, and also created a false and fraudulent invoice and cover letter, which was sent to the accountant who maintained the Sheridan billing records.  In breach of Sheridan By-laws, Defendants Anderson and Bier also arranged for Schnack (Powers' personal attorney) to be selected as a new Sheridan Board member.

109.   In February 1999, Bob & Ann Tierney wrote a brief letter to the Sheridan Board offering to discuss concerns held by them and other parents, regarding the operation of the Quincy High School Swim Program at Sheridan.  The Tierneys asked to be allowed to speak to the Sheridan Board at a regular monthly Board meeting.  During the February Board meeting, the Sheridan Board decided to ignore this request from the Tierneys.  This decision was made after Defendant Meyer agreed to arrange for the Sheridan Swim Team to contribute several thousand dollars to Sheridan Swim Club, as part of the nexus of a quid pro quo agreement.  In return, Defendant Anderson also agreed to support Meyer's attempts to get Powers rehired as the Quincy High School Swim Coach.  Meyers also made fraudulent and misleading statements to the Sheridan Board regarding a non-existent IHSA investigation of the Quincy High School Swim Team.  During the March Board meeting, Meyer again made fraudulent comments about the Tierney's reporting of Powers misconduct to the Quincy School District.

110.   Between March 3, and April 14, 1999, acting upon information provided to them by the School District and Gorman, Defendant Schnack, colluded and conspired with Sheridan Board member Anderson, and with Judge Chet Vahle, Bob Meyer, and other Club members, by engaging in an orchestrated, coordinated campaign of submitting false and misleading letters and oral communications to officials of the School District concerning the conduct of Powers.  The letters were intended to discredit, damage, and retaliate against the Tierneys and others, interfere



with the Tierney's' right to petition the government, suppress the School District's investigation of Powers' misconduct, intimidate other witnesses regarding Powers' misconduct, and prevent any changes to the swim program or the coaching status of Powers. No letters were sent before the "massages" were reported to the School District or after Sheridan retaliated against the Plaintiffs. (See ¶¶ 48-68)

111.   Shortly after the Tierneys reported the "massages" and Powers' misconduct, School District employee Kevin Polchowski confronted Bob Tierney at Sheridan facilities, and in retaliation for reporting the "massages", Polchowski threatened to physically batter and harm him [Tierney]. Polchowski was an employee of both the School District and Sheridan; Polchowski was acting within the course and scope of his employment and under color of state law. Polchowski was employed by the School District as a substitute teacher and as the Quincy High School Asst. Swim coach, working under the direction, control, and policy-making authority of Quincy High School coach, Richard Powers. Sheridan Swim Club also employed Polchowski as the Sheridan Swim Team Asst. swim coach, working under the direction and control authority of Sheridan Swim Team coach, Richard Powers. Polchowski was also a mandated reporter subject to the provisions of *The Illinois Abused and Neglected Child Reporting Act,* 325 ILCS 5/1 et seq., and other ILCS Statutes.

112.   On <u>March 28, 1999</u>, during the Annual Shareholder's meeting of Sheridan Swim Club, Defendant Julie Anderson, made false and fraudulent statements to the Shareholders regarding a Nexus between the School District rehiring Powers, and a " swim records board" being donated to the Quincy High School Swim Team. Anderson falsely stated that a local sign company would donate a "swim records board" to the Quincy High School Swim Team, <u>provided that Powers was rehired as the Quincy High School swim coach</u>. Although Anderson's statements were false, they did pertain to the control and operation of a traditional public function and demonstrated Sheridan's pervasive entwinement and nexus in the control and operation of the Quincy High School Swim Team. Plaintiff Bob Tierney attended this Shareholders meeting in his capacity as a Sheridan shareholder and member in "good standing", and also took part in the voting by Shareholders.

113.   On <u>March 28, 1999</u>, despite his numerous conflicts of interests, Defendant Schnack, the personal attorney of Defendant Powers, was again elevated to membership on the Board of Directors of Sheridan after a one (1) year absence from the Board. On March 29, 1999,

