**E-FILED**
Friday, 04 March, 2005  05:30:17 PM
Clerk, U.S. District Court, ILCD

THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

**FILED**

NOV 2 6 2001

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ANN S. TIERNEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 01-3179 |
| | ) |
| QUINCY PUBLIC SCHOOL DISTRICT | ) |
| NO. 172, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR ATTORNEYS' FEES**

## I.   BACKGROUND: OVER TWO YEARS OF LAWSUITS AND GRIEVANCES

The undisputed facts establish that this lawsuit was just another step in Plaintiff's two-year personal vendetta against her current employer, Quincy Public School District No. 172 ("QSD"). As set forth more fully below, this action was legally baseless, vexatious and designed to harass QSD. Under well-established principles, QSD is entitled to its reasonable attorneys' fees as the prevailing party.

### A.   Tierney I

As the Court is well aware, Ann Tierney filed suit against QSD on June 24, 1999 ("Tierney I"). Tierney I originated from the denial of the Tierneys' privileges at a local swim club. Nevertheless, Mr. and Mrs. Tierney saw fit to force no less than 18 individuals and entities to the expense of defending themselves in federal court against wide ranging accusations of conspiracy, other intentional wrongdoing, and constitutional violations. Significantly, Plaintiffs' claims against the overwhelming majority of the Defendants in Tierney I have been dismissed.

906347.1

**EXHIBIT**

**J**

Indeed, at this point in time, only QSD and Richard Powers remain as defendants. Moreover, this Court has already awarded fees to another defendant finding that Plaintiffs' action against her was frivolous. (*See* Tierney I, September 6, 2001 Order).

In their Second Amended Complaint in Tierney I, the Tierneys sought relief against QSD under 42 U.S.C. § 1983 for retaliating against Plaintiffs for exercising their First Amendment rights to free speech and to petition for redress of grievances in complaining about the actions of the high school swim coach, Richard Powers. One of the claims involved a claim of retaliation against Ann Tierney in her employment.[1] With respect to Ann Tierney's employment claim, the Second Amended Complaint included a laundry list of purported retaliatory acts including: (1) designating a school official to monitor her acts; (2) attempting to remove some of Ann Tierney's employment responsibilities as Dean of Students; (3) requiring Ann Tierney to perform duties of a higher paying job without a commensurate increase in pay; (4) preventing her from career advancement to other administrative positions; (5) refusing to provide information regarding openings in the school district; and (6) refusing to interview her for job openings within the School District for which she was qualified. (*See* Tierney I, Second Amended Complaint at ¶¶ 71(a)-71(f)).

QSD filed a motion to dismiss in Tierney I which the Court resolved in its March 19, 2001 Order. The Court dismissed the majority of claims against QSD. Significantly, the Court held that Ann Tierney's retaliation claim based on her employment failed as a matter of law.

---

[1] Plaintiffs additionally alleged in Tierney I that QSD retaliated by: (1) conspiring with Chet Vahle, Associate Judge of the Eighth Judicial Circuit of Illinois; (2) acting with the swim club by providing it information and conspiring with it to have the Tierneys expelled from it; (3) refusing to discipline or fire the high school swim coach; and (4) refusing to take action against a school district employee for making harassing phone calls to the Tierneys. (*See* Tierney II, October 23, 2001 Order at 6 (summarizing Plaintiffs' claims in Tierney I)). Tierney I also contained Title IX claims against QSD on behalf of Meryl Tierney, Plaintiff's daughter, based on hostile environment and retaliation, and a common law battery claim. (*See id.*).

The Court allowed, however, the following claims against QSD to go forward: (1) Robert and Ann Tierney's claim for retaliation against them for exercising their First Amendment rights -- the alleged retaliation consisting of providing information to, and conspiring with, the swim club to terminate the Tierney family's membership at the swim club; and (2) Meryl Tierney's retaliation claim under Title IX. Plaintiffs in Tierney I then filed a Motion for Clarification. The memorandum attached to the motion asked the Court to rule on whether Ann Tierney had a claim against QSD for retaliation under the Illinois Abused and Neglected Child Reporting Act and/or for violation of her First Amendment right of association with her husband, Robert Tierney. By Order dated May 30, 2001, however, the Court refused to do so. Construing this submission as an attempt to bring new claims, the Court reasoned that "the plaintiffs have had ample time to raise any and all claims arising from the facts set forth both in plaintiffs' original and amended complaint. The Court will not allow plaintiffs to raise any new claims at this late date." (*See* Tierney I, May 30, 2001 Order at 5).

### B.    State Labor Grievances

Ann Tierney is a member of Quincy Educational Association Local #809 (the "Union"). The relationship between the Union and QSD is governed by a collective bargaining agreement ("CBA") (a relevant part of which is attached hereto at Tab A). Significantly, the CBA provides that if an "employee files any claim or complaint in any form other than under the grievance procedure of this Agreement, then [QSD] shall not be required to process the same claim or set of facts through the grievance procedures." (*Id.* at ¶ 6.5). Nevertheless, Ann Tierney has seen fit to multiply the proceedings relating to her personal employment dispute by filing not one, but two actions in this Court based on the same conduct alleged in her grievances brought under the CBA.

3

### September 15, 2000 Grievance

On September 15, 2000 Ann Tierney filed a grievance claiming that: (1) she was provided false and misleading information concerning two administrative positions, thus denying her career advancement; (2) that QSD impermissibly refused to interview her for those positions; (3) and that QSD impermissibly filled those positions with less-qualified individuals. (*See* attached Tab B). The matter is currently pending before the Illinois Educational Labor Relations Board.

### November 21, 2000 Grievance

On November 21, 2001, Plaintiff submitted a second grievance again alleging damage to her career advancement. (*See* Attached Tab C). In this Grievance Plaintiff alleged that QSD impermissibly denied her requests to attend the Illinois State Deans Conference. Ultimately, the Union and QSD approved a settlement agreement which allowed Plaintiff to attend the Conference at QSD's expense. Even though this was her requested relief in her original grievance, Plaintiff still objected to the settlement. (See documents attached at Tab D).

### C.    Tierney II

Undaunted by the unfavorable rulings in Tierney I, and the aforementioned grievances, Ann Tierney plowed ahead in filing this action on June 11, 2001 ("Tierney II"). In Tierney II, Plaintiff again attempted to state claims for retaliation under the Illinois Abused and Neglected Child Reporting Act and based on the First Amendment right of association with her husband despite recognizing that these two claims were identical to the claims the Court previously denied her leave to assert in Tierney I. Additionally, in Tierney II, Plaintiff alleged that QSD retaliated against her for the exercise of her First Amendment right of access to the courts. Significantly, the alleged acts of retaliation were virtually identical to those alleged in Tierney I

4

(*see* Tierney II, Defendant's Memorandum in Support of Its Motion to Dismiss Plaintiff's Complaint at 5), and to those acts set forth in Plaintiff's prior and (as explained below) subsequent grievances.

By Order of the Court dated October 23, 2001, this Court dismissed Tierney II in its entirety. With respect to Ann Tierney's claim against QSD for retaliation under the Illinois Abused and Neglected Child Reporting Act and for violation of her First Amendment right of association, the Court ruled that Plaintiff improperly sought to avoid the consequences of her delay in Tierney I by asserting these claims in Tierney II. Based on well-established authority, the Court reasoned: "Ann Tierney may not make an end-run around this Court's discretionary ruling that Plaintiffs in Tierney I could not amend their Complaint to include these claims." (*See* Tierney II, October 23, 2001 Order at 11). Moreover, the Court found that Ann Tierney's claim against QSD for violating her First Amendment right to petition for redress of grievances was duplicative of the claims brought in Tierney I. (*See id.* at 12).

### D.    Later Grievances

#### September 24, 2001 Grievance

On September 24, 2001, Ann Tierney filed yet another grievance. Plaintiff claimed that QSD had impermissibly reduced her professional responsibilities and compensation for the 2001/02 school year. (*See* attached Tab E). Moreover, despite the fact that Plaintiff had just recently filed a lawsuit alleging virtually identical allegations, she alleged in the grievance that QSD had engaged in a coordinated, systematic campaign of retaliation, harassment, intimidation, and discrimination over the last three years in response to: (1) Plaintiff's complaints regarding QSD's former swim coach; (2) Plaintiff's participation as a Plaintiff in Tierney I; and

5

(3) Plaintiff's past two grievances. In the grievance, Plaintiff explicitly recognized that her federal lawsuits involved the same conduct as that complained of in her grievances.

### October 15, 2001 Grievance

On October 15, 2001, Plaintiff filed her most recent grievance. (*See* attached Tab F). Again, she alleged that QSD had impermissibly reduced her professional responsibilities and compensation for the 2001/2001 school year. Additionally, she claimed that QSD failed to compensate her for certain duties performed in September, 2000. Similar to the September 21, 2001 grievance, Plaintiff also claimed that QSD had engaged in a coordinated systematic campaign of retaliation, harassment, intimidation, and discrimination over the last three years in response to: (1) Plaintiff's complaints regarding QSD's former swim coach; (2) Plaintiff's participation as a Plaintiff in Tierney I; and (3) Plaintiff's past two grievances. Significantly, Plaintiff threatened further multiplicity of the proceedings regarding her personnel grievances with QSD -- in her own words: "Two lawsuits have been filed in Federal Court. A third will be filed upon completion of the final draft." (*Id.*).

## II.    LAW AND ANALYSIS

### A.    Standard Under 42 U.S.C. § 1988 For Fee Awards To Prevailing Defendants.

Title 42, U.S.C. § 1988(b) provides, in pertinent part, that "the Court, in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee as part of the cost." *Munson v. Milwaukee Board of School Dirs.*, 969 F.2d 266, 269 (7th Cir. 1992). "It is well-settled that the District Courts are given wide latitude to determine whether an award of fees to prevailing defendants is appropriate in a given case." *Id.* "A prevailing defendant may be entitled to attorney's fees under 42 U.S.C. § 1988 if the suit was frivolous, unreasonable, vexatious or without foundation or brought to harass or embarrass defendants." *Westfield Partners, Ltd. v.*

6

*Hogan*, 744 F.Supp. 189, 191 (N.D. Ill. 1990). A suit which lacks a sufficient basis in law is sufficient to meet the standard. *See Westfield Partners*, 744 F. Supp. at 191 (citing *Hamer v. Lake County*, 819 F.2d 1362, 1367 (7th Cir. 1987)). "Defendants are not required to show either subjective or objective bad faith on the part of plaintiff in order to recover Section 1988 attorneys' fees." *Munson*, 969 F.2d at 269. "The need for an award of attorneys' fees and costs takes on even greater importance when a baseless suit is brought solely to harass or oppress a defendant, such as forcing him to defend against a baseless suit." *Westfield Partners*, 744 F.Supp. at 191 (citing *Tarkowski v. Lake County*, 775 F.2d 173, 176 (7th Cir. 1985)).

**B.    QSD Is Entitled To Its Reasonable Attorneys' Fees In Defending This Baseless, Vexatious, and Harassing Action.**

Although a plaintiff's motivation is often difficult to discern, the legal infirmity of Plaintiff's claims reveals that Tierney II is nothing more than Plaintiff's latest attempt to harass QSD. Moreover, it is clearly vexatious. Over the last year, QSD has been forced to defend two lawsuits in this Court and four grievances all based on virtually identical allegedly impermissible conduct. To date, Plaintiff has been unable to prove that QSD has acted with discriminatory animus <u>in any proceeding</u>.

The lack of merit in Plaintiff's claims is becoming increasingly apparent. In Tierney I, for instance, the Court has already awarded a defendant her fees finding that Plaintiff's action against her was frivolous. Moreover, just recently in Tierney I, in ruling on Sheridan Swim Club's Motion for Summary Judgment, the Court found that there was "simply <u>no evidence</u> that [QSD] commanded or encouraged Sheridan to terminate the Tierney's membership because they exercised their First Amendment right." (Tierney I, October 23, 2001 Order at 12-13) (emphasis added). This ruling echoed the Court's virtually identical finding over two years earlier following the Tierneys' Preliminary Injunction hearing. (*See* June 22, 1999 Order at 13). It is

telling that in over two years Plaintiff could not point to any evidence in support of this claim. Plaintiff's claims in Tierney I are tumbling like a house of cards. Indeed, in an incredible admission, Plaintiff has recognized that based on the ruling on Sheridan's Motion for Summary Judgment in Tierney I, Plaintiff's Section 1983 retaliation claim in Tierney I against QSD (involving its purported commanding or encouraging Sheridan to terminate the Tierneys' membership at Sheridan) will be barred. (*See* Plaintiffs' purported Third Amended Complaint at 6).

Tierney II stood on equally shaky ground. Plaintiff filed Tierney II alleging the exact claims that this Court held Plaintiff could not assert in Tierney I. The Court noted: "It is clear that these two claims in [Tierney II] are simply an attempt to circumvent the Court's ruling in Tierney I." (Tierney II, October 23, 2001 Order at 9). As pointed out by QSD, and recognized by the Court, however, well-established case law precludes a party from attempting to end-run a discretionary ruling denying leave to amend. (*See* Tierney II, Defendant's Memorandum in Support of its Motion to Dismiss Plaintiff's Complaint at 10-12; Tierney II, October 23, 2001 Order at 11-12). Accordingly, the Court rejected Plaintiff's attempt to flaunt its ruling in Tierney I and dismissed Tierney II in its entirety.

Courts have awarded fees to prevailing defendants where a civil rights plaintiff "proceeds in the face of an unambiguous adverse previous ruling, or where the plaintiff is aware with some degree of certainty of the factual or legal infirmity of his claim." *EEOC v. American Federation of Teachers, Local #571*, 761 F. Supp. 536, 541 (N.D. Ill. 1991) (citing *Badillo v. Central Steel and Wire Co.*, 717 F.2d 1160, 1163-64 (7th Cir. 1983)). "An award of fees is particularly appropriate where, as here, the underlying legal principles which the plaintiff failed to recognize provide a threshold procedural bar." *American Federation of Teachers*, 761 F. Supp. at 541.

8

This is exactly what happened here.  Plaintiff chose to file Tierney II in the face of an unambiguous previous ruling in Tierney I that her retaliation claims based on the Illinois Abused and Neglected Child Reporting Act and the First Amendment right of association with her husband were barred because of her own dilatory conduct.  An award of fees is particularly appropriate here because Plaintiff failed to recognize (or at least should have recognized) the well-established jurisprudence which established a procedural bar to Plaintiff's exact conduct in filing Tierney II. *See Brodemus v. Schwartz*, No. 82 C 2578, 1983 U.S.Dist.LEXIS 12420, at *3 (N.D. Ill. October 24, 1983) ("if controlling legal principles were well established such that a plaintiff 'should have known' that his claim was infirm, an award of fees is appropriate.") (citing *Werch v. City of Berlin*, 673 F.2d 192, 195 (7th Cir. 1982)).[2]

QSD has been put to too much time and expense by Plaintiff in defending not one, but two lawsuits (and multiple state labor grievances) concerning the same series of events.  A common theme running through Plaintiff's cases has been a persistent failure to definitely state the legal bases of her claims (and a lack of evidence to support those claims).  Each time QSD has mounted a defense to claims against it, Plaintiff responds by heaping some new allegation of wrongdoing or some new theory of the case onto the pile, as she attempted to do in Tierney I (and which was rejected by the Court), or by filing duplicative actions, which resulted in Tierney II (and which was rejected by the Court).[3]  This must cease.  The compensation of

---

[2] It is of no defense that the established jurisprudence cited by the Court and QSD did not come from the Seventh Circuit Court of Appeals.  *See EEOC v. American Fed. of Teachers, Local #571*, 761 F.Supp. 536, 541 (N.D. Ill. 1991) ("a plaintiff need not necessarily be confronted with adverse binding precedent to be aware with some degree of certainty of the factual or legal infirmity of his claim.")(emphasis added).

[3] Indeed, in Tierney I, Plaintiff has now filed for leave to amend to assert additional claims in a Third Amended Complaint purporting to state additional claims.  This is the exact vexatious conduct which Plaintiff threatened in her October 15, 2001 grievance.

9

plaintiff's repeated baseless efforts to find a theory of recovery which this Court might accept must be the compensation of QSD which it improperly dragged into this litigation. *See EEOC v. American Fed. of Teachers, Local #571*, 761 F.Supp. 536, 542 (N.D. Ill. 1991).

QSD is cognizant of the role that laws protecting civil rights play in today's society and the important rights such laws vindicate. When a plaintiff such as Ann Tierney abuses these laws for purposes of harassment, however, all potential civil rights plaintiffs suffer. Here, Plaintiff has done nothing more than take advantage of her position as a public employee (and the unique rights the law affords such employees) by dressing up her personal grievances against QSD as a civil rights action. The multiplicity of the proceedings is indicative of her harassing motive. Federal litigation, however, is not to be utilized as a toy. This Court's fee shifting power under Section 1988 demands that this type of abuse be prevented. *See Bogdan*, No. 96 C 1609, 2001 U.S. Dist.LEXIS 6865, at *12 (N.D. Ill. May 24, 2001) (awarding prevailing defendant fees where plaintiff abused judicial system since 1996 and brought action to harass the defendant).

### C.    Defendant's Requested Fees Are Reasonable.

Under Section 1988, courts use the lodestar method of computing "reasonable" fees. *See Hensley v. Eckerhart,* 461 U.S. 424, 431 (1983). In accordance with this well-accepted means of computing fee awards, QSD has submitted concurrently herewith its lodestar calculation which reflects QSD's reasonable fees expended to defend this matter by QSD's lead-counsel and c0-counsel. (See Defendant's Motion for Attorneys' Fees Exhibit 1 to Tab A and Exhibit 1 to Tab B). This amount is $17,472.00 and QSD submits that the hours and rates which went into that calculation are reasonable. QSD is aware, however, that as a teacher, Plaintiff's resources are comparatively limited. Accordingly, QSD limits its request to a fee award to the amount of $10,000. QSD believes that such a reduced request would more than compensate for any

10

specific objections that Plaintiff might have (and to which pursuant to Local Rules Defendant has no opportunity to reply). Furthermore, QSD feels that a $10,000 fee award would provide a sufficient deterrent to prevent Plaintiff from further engaging in harassing and vexatious litigation.[4]

## III.   CONCLUSION

For all the foregoing reasons, this Court should grant QSD's motion and award QSD $10,000 in attorneys' fees incurred in the defense of this case.

Respectfully submitted,

By: _____
John J. Gazzoli, Jr.
**Lewis, Rice & Fingersh, L.C.**
500 North Broadway, Suite 2000
St. Louis, Missouri 63102
(314) 444-7600

and

Brett K. Gorman
**Schmiedeskamp, Robertson, Neu & Mitchell**
525 New Jersey St.
P.O. Box 1069
Quincy, Il 62306
**Attorneys for Quincy School District No. 172**

---

[4] Attorneys' fees under Section 1988 are assessed against losing parties, not counsel. "In deciding whether to assess attorney's fees against a ... plaintiff, a court should not consider ... the plaintiff's apparent lack of personal fault." *Baker v. Alderman*, 158 F.3d 516, 527 (11th Cir. 1998). To the extent the Court finds that the culpability lands squarely in the lap of counsel, QSD submits that the Court consider awarding sanctions pursuant to its inherent authority.

11

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was mailed U.S. postage prepaid this _26ᵗʰ_ day of November, 2001, to:

Richard L. Steagall
Nicoara & Steagall
416 Main Street, Suite 815
Commerce Bank Building
Peoria, IL  61602-1103
Attorneys for Plaintiff

**EXHIBIT A**

# MASTER CONTRACT

between

## DISTRICT 172

## QUINCY EDUCATION

## ASSOCIATION

LOCAL 809

IFT/AFT, AFL-CIO

and

## BOARD OF EDUCATION

## DISTRICT 172



*August - 2000*

3

PREAMBLE

This Agreement, between the Board of ........ation of Quincy School District No. 172, Adams County, Illinois, and the Quincy Education Association, Local No. 809, affiliated with the Illinois Federation of Teachers, AFL-CIO, incorporates a number of understandings which derive from the parties' commitment to establish and maintain a harmonious working relationship and the recognition by the Board and the Association that they have a common responsibility to work together toward the achievement of this goal. It is the intent of both parties that the relationship that results from this Agreement be one of good faith and mutual respect.

ARTICLE I

1.1   RECOGNITION

The Board of Education of Quincy School District No. 172, in Adams County, Illinois, hereinafter referred to as the "Board," recognizes the Quincy Education Association, Local No. 809, affiliated with the Illinois Federation of Teachers, AFL-CIO, hereinafter referred to as the "Union," as the sole and exclusive negotiating agent for all regularly employed full-time and part-time certified classroom teachers, counselors, team leaders, psychologists, social workers, non-administrative deans, librarians, media specialists, speech pathologists, visual consultants, and audiologists.

1.2   The Board agrees not to enter into contract negotiations in regard to hours, wages, and working conditions with any individual, group, or organization of teachers covered by this Agreement, other than its duly elected representatives, for the duration of this Agreement. Nothing herein shall preclude individuals or other organizations from presenting their views and recommendations to the Board or administrative staff at any time.

1.3   Definitions

As used in this Agreement the following definitions will apply:

.1     The terms "unit" or "employee unit" will mean the bargaining unit as defined in Paragraph 1.1 of this Article.

.2     The terms "teacher," "staff member," "member," and "employee" will all mean the members of the bargaining unit unless otherwise specified.

.3     The title "Superintendent" will mean the Superintendent of Schools or his designee unless otherwise specified.

.4     The term "days" will mean calendar days unless otherwise specified.

1

Building Representative is not an official member of the committee, he or she will at least be invited as a non-participating ex-          o member to gather information that may prevent misunderstandings or potential problems from developing.

## ARTICLE VI

### GRIEVANCE PROCEDURE

6.1     Definition

A grievance shall mean a written complaint by a member of the bargaining unit that there has been an alleged violation, misinterpretation, or misapplication of the specific provisions of this Agreement.

6.2     Purpose

Every employee covered by this Agreement shall have the right to present grievances in accordance with these procedures, the purpose of which is to secure, at the lowest possible administrative level, equitable solutions to valid grievances which may arise.

6.3     Representation

The grievant has the right to a representative of choice in all steps of the grievance procedure, including the informal meeting with the most immediate supervisor. The grievant shall be present at all grievance discussions unless the Board, Union, and the grievant mutually agree that the grievant's presence is not desirable or necessary. When the presence of the grievant at a grievance hearing is required by either party, illness or incapacity of the grievant shall be grounds for any necessary extension of grievance procedure time limits.

6.4     Time Limits

A grievance must be filed within ten (10) days of the occurrence of the event or within ten (10) days of when the grievant should have reasonably known of the event which gave rise to the grievance. The number of days indicated at each step in the procedure shall be considered as the maximum allowable to the parties and every effort shall be made to resolve the grievance as rapidly as possible.

6.5     Constraints

Any investigation or other handling or processing of any grievances by the grievant or the Union shall be conducted so as to result in no interference with or interruption whatsoever of the instructional program and related work activities of the grievant or of the District's employees.

Failure of a grievant or the Union to act on any grievance within the prescribed time limits will act as a bar to any further appeal and an administrator's failure to give a decision within the time limits shall permit the grievant to proceed to the next step. Time limits may be extended by mutual agreement.

6

If the Union or any employee files any claim or complaint in any form other than under the grievance procedure of this Agreem   hen the District shall not be required to process the same claim or set of facts through th.. grievance procedures.

6.6    Procedure

Step One

It is desirable for an employee and the immediate supervisor to resolve problems through free and informal communications. Therefore, before a grievance is filed, the claimant shall discuss the claim with the most immediate supervisor.

Step Two

If the complaint cannot be resolved informally, the complainant shall file the grievance in writing with the immediate supervisor, who shall certify by signature the date and hour the grievance was received. This certification shall be witnessed by the grievant. The written grievance shall state the nature of the grievance, shall note the specific clause or clauses of the Agreement which are applicable and shall state the remedy requested. The filing of the formal, written grievance must be within ten (10) days from the date of the occurrence of the event giving rise to the grievance. The supervisor shall make a decision on the grievance and communicate it in writing to the employee and the Superintendent within ten (10) days after receipt of the grievance.

Step Three

In the event a grievance has not been satisfactorily resolved at the second step, the grievant shall file, within ten (10) days of the immediate supervisor's written decision at Step Two, a copy of the grievance with the Superintendent. Within ten (10) days after receipt of the grievance, the Superintendent or his designee shall meet with the grievant to resolve the grievance. The Superintendent or his designee shall file an answer within ten (10) days of the third step grievance meeting and communicate it in writing to the grievant and the immediate supervisor.

Step Four

If the grievance is not satisfactorily resolved at Step Three, the grievance may proceed to binding arbitration. The Union may submit to the Superintendent a written request on behalf of the Union and the grievant to enter into binding arbitration. This request must be submitted within twenty (20) days of receipt of the Step Three answer.

Arbitration proceedings shall be conducted by an arbitrator to be selected by the two parties from a roster of arbitrators provided by the American Arbitration Association. Within seven (7) days after the Union requests binding arbitration, the two parties will request the American Arbitration Association provide a panel of seven (7) arbitrators. Each of the two parties will alternately strike one name at a time from the panel until only one (1) name shall remain. The remaining name shall be the Arbitrator. Expenses for the arbitrator's services shall be born equally by the School District and the Union.

7

The decision of the Arbitrator shall be final and binding on the parties. The Arbitrator, in his opinion, shall not amend, mod' nullify, ignore or add to the provisions of the Agreement. The arbitrator's authorit. ll be strictly limited to deciding only the issue or issues presented to him in writing by the School District and the Union and his decision must be based solely and only upon his interpretation of the meaning or application of the relevant language of the Agreement.

## ARTICLE VII

### EMPLOYMENT CONDITIONS

7.1   Work Year

The school calendar shall consist of a minimum of 185 days in compliance with the School Code of Illinois. The teacher work year shall not exceed 181 work days, including student attendance days, teacher institute days, teacher workshop days and a teacher work day at the end of the year.

7.2   Teacher Preparation Period

.1     Each full-time teacher at Junior and Senior High will have a preparation period within the pupil attendance day.

Preparation periods shall be the same length as other regularly scheduled classes.

Full-time teachers at Baldwin School will have the equivalent of 200 minutes of planning time in a regular five (5) day instructional week. Full-time teachers at the K-3 Schools will have the equivalent of 150 minutes of planning time in a regular five(5) day instructional week. The amount of teacher preparation time for Pre-K teachers shall remain the same as it was in the 1999-2000 school year.

.2     The primary school day will end before 3:00 p.m. or, if after 3:00 p.m., as close to 3:00 p.m. as is possible.

.3     Physical education teachers (K-6) will be compensated in accordance with the certificated salary schedule.

7.3   Transfers

.1     Information regarding positions, including extracurricular positions, which are available shall be posted for a period of at least five (5) days. Building level administrators will be involved in describing the vacancies in their buildings in order to more clearly reflect the position which is available. During the summer, the place for all postings shall be in the District's Central Administrative Offices. At the time of this posting, a letter announcing the openings will be sent by first class mail to the union president and a copy of the posting will be faxed to the Union office. Every bargaining group member will have the right to apply for any bargaining unit

8

**EXHIBIT B**

SCHMIEDESKAMP          Fax:2172231071                    Oct 19 '00  16:53    P.07
09/18/00  MON 10:42 FAX 1 217 223 7162 ____ QCY SCHOOL DIST               +++  00000

September 15, 2000                                   via facsimile & registered mail

Dr. Joseph Bocke, Superintendent
Quincy School District #17
1444 Maine Street
Quincy, IL. 62301                                   Fax # 217- 228-7162

Superintendent Bocke,

This grievance is being filed on behalf of Ann Tierney, grievant, member of the
Quincy Education Association Local #809 as per Article VI-6.6 (step three) of the
grievance procedure for the alleged violation of Articles V-5.2, VI-6.6, (steps one &
two), and VII-7.3 of the collective bargaining agreement.

The District failed to establish and properly fill the bargaining unit position per the
collective bargaining agreement.  The District failed to abide by the terms of the
bargaining agreement as defined in Article V-5.2 and Article VI-6.6. The grievant
has properly completed step one and two of the grievance procedure without
satisfaction.  In step one, the grievant was not provided with information and/or
answers to questions raised at the informal communication session.  In step two, the
building supervisor refused to accept or even sign and date the formal written
grievance.

I, Ann S. Tierney, was approached by district administrators in December, 1999, and
asked to fill the position of Building Assistant/Assistant Principal, pro/tem, as a
bargaining unit member during the 1999-2000 school term when John Todd was
moved out of the building to perform other functions. I professionally provided
full and complete performance of my duties during this period of time.  However, at
the end of the school year I was provided false and misleading information
concerning job openings at Quincy Public Schools. I sent two polite, personal letters,
one to my building supervisor and another to the district personnel director,
indicating my interest in the positions and asking for clarification of the job
descriptions.  These private letters were immediately forwarded to the Quincy
School District attorney without my knowledge or permission.  I did not receive a
proper response to my inquiries concerning the positions.  Furthermore, I was not
granted interviews for the positions in which I had expressed interest.  I have both
the qualifications and experience necessary to fill the positions.  Other applicants for
these or any positions in the district would not have been treated in this manner.

A procedure was in place for applying for open positions and obtaining clarification
of job descriptions.  I followed this procedure and expected the district would do the
same.  They have not.  Had the procedure been customarily and properly followed,
based on my experience, qualifications, and the district's demonstrated trust and
confidence in my abilities, I would have, and should have been offered one of
several positions that were subsequently filled by other school district personnel. In
addition, during this past summer, I was even asked by school administrators to

1

SCHMIEDESKAMP          Fax:2172231071          Oct 19 '00  16:53   P.08

assume heightened responsibilities and duties at Quincy Junior High School, which reaffirmed the district's trust and confidence in my abilities to handle any job assigned or requested of me.

Sprick. After I presented the issues of my grievance, she told me the matter was out of her hands. There was nothing she could do about it. There was no further discussion. Several days later, I attempted to provide the written grievance to the same individual. However, she immediately informed me she could not read, sign, or date the letters, and could not even accept them from me per orders from "1444 Maine" (address of the district Board of Education offices). She did acknowledge that she knew this was the next step in the grievance procedure but was sorry, her hands were tied. She did advised me that if I put them in her mailbox, she would at least pass them on and make an inquiry. I put 3 copies of the written grievance in a sealed envelope in her mailbox with her name on it and kept a copy for my records.

As a result of these actions by the Quincy School District, I have suffered arbitrary, capricious, and discriminatory treatment, denial of career advancement, retaliation, intimidation, damage to my professional and personal reputation, personal and professional embarrassment, emotional distress, and monetary loss.

In order to remedy this matter, I am requesting the Quincy School Board develop and propose a comprehensive, long-term solution for this situation, which will resolve this issue now and in the future. This proposal should include compensation and/or career advancement to remedy the lost job opportunities, and implement measures to strictly prevent future obstacles to my career advancement. I also ask for any other remedy that an arbitrator deems appropriate.

Sincerely,

Ann Tierney

Date September 15, 2000

2

**EXHIBIT C**

SCHMIEDESKAMP          ɟx:2172231071          Nov 22    9:31    P.07

November 21, 2000                                    via  hand delivery & U S Mail

Lynn Sprick, Principal
Quincy Junior High School
Quincy School District #172
1444 Maine Street
Quincy, IL. 62301

Principal Sprick,

This grievance is being filed on behalf of Ann Tierney, grievant, member of the Quincy Education Association Local #809 as per Article VI-6.6 (Step Two) of the grievance procedure for the alleged violations of Article V-5.2, and Article IX-9.1#1-4, of the collective bargaining agreement.   The District failed to follow the terms of Article IX-9.1/Staff Development, of the collective bargaining agreement.

During the week of October 30, 2000, I, Ann S. Tierney submitted a written request to Principal Lynn Sprick to attend the Illinois State Deans Conference in Champaign, Illinois which was scheduled for November 8-10, 2000.  This was the same procedure I followed in the preceding years when I attended the Illinois State Deans Conference.

After failing to receive a reply or response of any kind as of Tuesday, November 7, 2000, I approached Principal Sprick and asked for an answer to my written request since I was planning on leaving very early the next day November 8, for Champaign, Illinois, which is approximately 200 miles from Quincy.   Principal Sprick told me there were no funds available to pay for the conference.  I then offered to pay my own way, and Principal Sprick said she would get back to me.

At approximately mid-day on Thursday November 9, 2000, Principal Sprick told me that it had been initially decided not to allow me to attend the conference even at my own expense. However, she was just informed that I could attend the conference at my own expense only if the Union agreed this action did not set a precedence.  Of course, by this time it was too late for me to attend the Deans Conference at all.

Per the terms of 9.1, Article IX, of the collective bargaining agreement, a procedure was in place for applying for and attending professional growth activities in order to fulfill the professional growth requirement of the bargaining agreement.  I followed this procedure and expected the district would do the same.  They did not.  Had the procedure been customarily and properly followed, I should have been allowed to attend the Deans Conference, as in previous years, especially at my own expense.  At the very least, I was entitled to a timely response to afford me the opportunity to file a timely appeal with the Superintendent, per 9.1#4 of Article IX.

As a result of these actions by the Quincy School District, I have been subjected to a hostile, abusive work environment, denied opportunities for mandatory professional growth activities, and again suffered arbitrary, capricious, and discriminatory treatment, retaliation, intimidation, damage to my career advancement, damage to my professional and personal reputation, personal and professional embarrassment, and emotional distress.

To remedy this grievance, I am requesting the Quincy School Board develop and propose a comprehensive, long-term solution for this situation, which will resolve these issues now and in the future.  I also ask for any other remedy that an arbitrator deems appropriate.

Sincerely,

Ann Tierney
Dean of Students, QJHS

Date 11/21/00

**EXHIBIT D**

## QUINCY PUBLIC SCHOOL DISTRICT #172

1444 Maine Street • Quincy, Illinois 62301 • Ph: 217.223.8700 • Fax: 217.228.7162

Dr. Joe Bocke, Superintendent

October 1, 2001

**VIA FACSIMILE 222-6079
and FIRST CLASS U.S. MAIL**

Mrs. Andrea L. Baird
Field Service Director
Illinois Federation of Teachers
2903 Broadway
Quincy IL 62301

      Re:    Ann Tierney Grievance Dated November 21, 2000

Dear Andrea:

      The purpose of this letter is to propose a resolution of the above matter, now set for arbitration on October 24, 2001.

      We note the annual Dean's Conference, which is the subject matter of this grievance, is coming up again November 7, 8 and 9.

      In order to settle this matter without further proceedings, the District is willing to allow Ann to attend the Dean's Conference, subject to the following conditions:

A.    Ann pays all expenses related to the conference; and

B.    The Union agrees in writing before the trip is approved that the approval of her request would have no precedential value regarding other such requests from other employees in the future.

Please advise.

                    Very truly yours,

                    *Joe Bocke*

                    Joe Bocke, Superintendent

SCHMIEDESKAMP        Fax:2172231071        Oct 11 '01  12:10    P.02
10/10/01  WED 14:37 FAX 217 222 6079      IFT - QUINCY                      ☒002

 # ILLINOIS FEDERATION OF TEACHERS AFT- AFL-CIO

2603 Broadway
Quincy, IL 62301
217/222-6077
Fax 217/222-6079
www.ift.org

October 10, 2001

Joe Bocke, Superintendent
Quincy Public School District #172
1444 Maine Street
Quincy, IL 62301

   Re:  Ann Tierney Grievance (Attendance at the Conference)

Dr. Bocke:

   This is in response to your letter dated October 1, 2001 proposing a resolution to the grievance dated November 21, 2000.  The proposal in part A of your letter, "Ann pay all expenses related to the conference" does not adequately resolve the issue.  The Union is very interested in Ms. Tierney having the ability to attend the conference.  The Union would propose acceptance of part B of your resolution if the District allowed Ann to attend the conference at the District's expense, as it has in the past.

   Since the matter is set for arbitration on October 24, 2001 and the Dean's Conference is November 7, 8, and 9 please advise as soon as possible if this is an acceptable resolution.

Very truly yours,

Andrea L. Baird

cc. Ann Tierney
cc. Jody Steinke, President QEA Local #809

Thomas H. Reese, President      Ed Geppert, Jr., Secretary/Treasurer      General Office: 714 Enterprise Drive, Oak Brook, IL 60523      800/942-2242 (toll free in Illinois)

# QUINCY PUBLIC SCHOOL DISTRICT #172

1444 Maine Street • Quincy, Illinois 62301 • Ph: 217.223.8700 • Fax: 217.228.7162

Dr. Joe Bocke, Superintendent

October 11, 2001

**Via Facsimile  222-6079**
**and First Class U.S. Mail**

Mrs. Andrea L. Baird
Field Service Director
Illinois Federation of Teachers
2903 Broadway
Quincy IL  62301

      Re:    Ann Tierney Grievance / Conference Attendance

Dear Andrea:

This letter is in response to your fax of October 10, 2001, wherein you propose resolving this issue in accord with our letter October 1, 2001, with the modification that the District pay the expenses regarding Ann's attendance at the conference.

We accept your proposal.

We are, by copy of this letter to Attorney John Gazzoli, requesting that he advise the arbitrator the matter is settled.

Ann should contact Pat Grenda to make the arrangements for her attendance at the conference.

          Very truly yours,

          *Joe Bocke*

          Joe Bocke, Superintendent

copy   John J. Gazzoli
       Pat Grenda

RECEIVED OCT 1 5 2001

SCHMIEDESKAMP          Fax:2172231071          Oct 16 '01   15:55    P.02

October 15, 2001                                    via facsimile and U.S. mail

To:
Ms. Andrea Baird
District 172, Quincy Education Association
Local 809 IFT/AFT, AFL-CIO
2203, Broadway
Quincy IL  62301

From:
Ann Tierney
Dean of Students, QJHS
2517 Summer Creek
Quincy, IL  62305

Re:    Grievances with Quincy School District #172   & Arbitration Hearing set for
       October 24, 2001

Dear Andrea,

I am in receipt of the Quincy School District's letters of October 1 and October 11,
2001, regarding a proposed solution to my grievance scheduled for an Arbitration Hearing on
October 24, 2001. I also have your letter of October 10, 2001 responding to the School
District's proposed solution.

I am somewhat confused as to the exact position of the Union regarding the School
District's proposed solution to my grievance. So I thought it best to clearly state my position.
Under no circumstances will I ever agree to any solution that by merely allowing me to attend
the Dean's Conference in November 2001, at the School District's expense, this will thus "settle
this grievance without further proceedings", as the School District proposes. Furthermore, we
are in a new school year and I intend on filing the appropriate request to attend the upcoming
Dean's conference, regardless of the status of any grievance.

I refer you to my letter of December 8, 2000, to Superintendent Becks, wherein I
outlined the violations of the Collective Bargaining Agreement, the damages, and the remedies I
sought for this particular grievance.

This grievance is being filed on behalf of Ann Tierney, grievant, member of
the Quincy Education Association Local #809 as per Article VI-6.6 (Step
Three) of the grievance procedure for the alleged violations of Article I-1.2,
Article V-5.2, Article VI, and Article IX-9.1, of the collective bargaining
agreement. The grievant alleges the District failed to follow the terms of
Article I-1.2, Article V-5.2, Article VI-6.1 through 6.6, and Article IX-9.1/Staff
Development, of the Collective Bargaining Agreement.

As a result of these actions by the Quincy School District, I have been
subjected to a hostile, abusive work environment, denied opportunities for
mandatory professional growth activities, and again suffered arbitrary,

1

capricious, and discriminatory treatment, retaliation, intimidation, damage to my career advancement, damage to my professional and personal reputation, personal and professional embarrassment, and emotional distress.

To remedy this grievance, the Union and I are requesting the Quincy School Board, to acknowledge the violations and the damages I have suffered. The Board will therefore, develop and propose a comprehensive, long-term solution for this situation, which will resolve these issues now and in the future. The Union and I also ask for any other remedy that an arbitrator deems appropriate.

The School District's proposed solution does not come close to providing adequate remedies to my grievance, and/or ending the campaign of retaliation directed against me by the District, especially in lieu of recent events regarding the removal of my professional duties and the reduction in my compensation. Therefore, unless the School District complies fully with all the remedies I seek, I expect the Arbitration Hearing to proceed as scheduled.

Sincerely,

Ann Tierney
Dean of Students, QHS

Cc:   American Arbitration Association
      Quincy School District #172
      Gil Confield
      John Gazzoll

2

**EXHIBIT E**

SCHMIEDESKAMP    Fax:2172231005    Sep 25 '01  10:41   P.02
:35 FAX 1 217 228 7162    QCY SCHOOL DIST    →→→ GORMAN    ⧉002

September 24, 2001

via hand delivery & U.S. Mail

Dr. Joseph Bocke, Superintendent
Quincy School District #172
1444 Maine Street
Quincy, IL. 62301

Fax # (217) 228-7162

Re:    Grievance by Ann Tierney
       Application Under Protest for the LDR Coordinator Duties/Position at QJHS

Superintendent Bocke:

This grievance is being filed by Ann Tierney, grievant, member of the Quincy Education Association Local #809, per Article VI, for the alleged violations of Article V-5.2, Article VII-7.3 & 7.6, and Schedule F of the Collective Bargaining Agreement. The grievant alleges the District failed to follow the terms of Article V-5.2, Article VII-7.3 & 7.6, and Schedule F of the Collective Bargaining Agreement.

I, Ann S. Tierney, received my first paycheck for the current school year on September 14, 2001. Included with my paycheck was a letter from Superintendent Bocke dated September 13, 2001. The letter informed me of the immediate reduction in my professional responsibilities and compensation for the 2001/02 school year. The letter also erroneously described the terms and conditions under which my professional duties and compensation were determined.

Despite the existence of a hostile, abusive work environment, I professionally and competently performed all of my professional responsibilities for the 2000/01 school year. I am able and willing to again perform all of my responsibilities this school year under the terms and conditions provided for in the Collective Bargaining Agreement. I never agreed, nor was I ever told that any of my responsibilities and compensation stipends would only be for one year. Nevertheless, on September 14, 2001, the Quincy School District arbitrarily, capriciously, and improperly reduced my compensation and removed some professional responsibilities without due process, prior notice, or mutual agreement. On September 17, 2001, just 3 days after Superintendent Bocke improperly removed these professional responsibility duties and compensation from me, a notice of an opening for a position handling similar professional duties was posted at QJHS.

I protest the circumstances, terms, and conditions under which these professional responsibilities were posted. I also apply under protest for the professional responsibilities duties/position of LDR Coordinator at Quincy Junior High School.

Furthermore, I believe this recent action by the Quincy School District represents a continuation of the coordinated, systematic campaign of retaliation, harassment, intimidation, and discrimination directed against my family and I over the past 3 years for:

1.   Joining with other citizens and reporting to School District officials and law enforcement agencies, the acts of gross misconduct by a Quincy School District employee, including misconduct of a sexual nature.

2.   Initiating litigation against the School District and its Agents for their acts of retaliation directed against my family and I for reporting the misconduct.

3.   Filing 2 grievances against the School District to contest the additional acts of retaliation and discrimination, directed against me in the workplace by the District prior to and during the 2000/2001 year.

1

On July 10, 2000, I sent an appropriate letter to QJHS Principal, Lynn Sprick, requesting written job description information about all of the professional responsibilities and compensation for the position of Dean of Students for the 2000/01 school year. I also asked for job description information about a posted job opening for the newly created position of "Building Assistant" at Quincy Junior High School. At that point in time, I was serving as Asst. Principal/Athletic Director, Pro Tem at QJHS. I had professionally and competently performed all of my duties in that position since December 1999.

The Quincy School District retaliated and discriminated against me in the workplace by ignoring my legitimate request for job description information. In fact, the School District improperly forwarded my letter to the School District's attorney, Dennis Gorman, without my knowledge or permission. Furthermore, despite written assurances to the contrary from the School District's attorney, the District failed to provide a response to my requests for information.

A grievance was filed over this matter. However, the School District refused to process my grievances as required by Article VI of the Collective Bargaining Agreement. The District also refused to abide by an arbitration directive from the American Arbitration Association. In response, the Illinois Educational Labor Relations Board (IELRB) has filed an Unfair Labor Practice Complaint against the Quincy School District. A trial is set for January 2002.

In September 2000, the School District initially failed to compensate me for all my professional responsibilities. I was compelled to bring the matter to the attention of Principal Sprick. The District subsequently had to issue me a supplemental paycheck, and make the necessary adjustments to the rest of my paychecks for the 2000/01 school year. Shortly thereafter, the District singled me out for retaliation and discriminatory treatment by isolating me from regular notification and participation in some of my professional responsibilities.

In November 2000, a second grievance was filed over additional acts of retaliation and discrimination directed against me in the workplace by the School District. The District again refused to process my grievances as required by Article VI of the Collective Bargaining Agreement. An Arbitration Hearing on that grievance is scheduled for October 2001.

As a result of these recent actions by the School District, I have again been subjected to a hostile, abusive work environment. I have again suffered arbitrary, capricious, and discriminatory treatment, retaliation, intimidation, damage to my career advancement, denied career advancement, damage to my professional and personal reputation, personal and professional embarrassment, emotional distress, and monetary loss.

I intend to utilize all legal resources available to me to contest this recent action by the Quincy School District, to recover damages for all injuries sustained over the past three years, and to end the District's coordinated, systematic campaign of retaliation and discrimination directed against me.

Yours truly,

Ann Tierney
Dean of Students, QJHS

Cc:    Patrick Grenda, Principal QJHS
       EEOC/Department of Justice

2

**EXHIBIT F**

October 15, 2001,                                    via Facsimile & U.S. Mail

Dr. Joseph Bocke, Superintendent
Quincy School District #172
1444 Maine Street
Quincy, IL 62301                                     Fax # (217) 228-7182

       Re:    Grievance by Ann Tierney

Superintendent Bocke:

This grievance notice and request for arbitration is being submitted by Ann Tierney, grievant, member of the Quincy Education Association Local #809, per Article VI, for the alleged violations of Article V-5.2, Article VI-5.6, Article VII-7.3 & 7.6, and Schedule F of the Collective Bargaining Agreement. The grievant alleges the District failed to follow the terms of Article V-5.2, Article VI-5.6, Article VII-7.3 & 7.6, and Schedule F of the Collective Bargaining Agreement.

I, Ann S. Tierney, professionally and competently performed all of my professional responsibilities during the 2000/01 school year, including the duties of LDR Coordinator at Quincy Junior High School (QJHS). I performed these duties under hostile, discriminatory working conditions, which resulted in 2 grievances being filed for binding arbitration QEA Local #809. In both instances, the School District refused to process the grievances in compliance with the Collective Bargaining Agreement.

Furthermore, in September 2000, the School District failed to compensate me for all my LDR Coordinator responsibilities. I was compelled to bring the matter to the attention of Principal Sprick. The District subsequently had to issue me a supplemental paycheck, and make the necessary adjustments to the rest of my paychecks for the 2000/01 school year. Shortly thereafter, the District singled me out for retaliation and discriminatory treatment by isolating me from regular notification and participation in some of my LDR Coordinator responsibilities. Nonetheless, I was prepared to again perform all of my responsibilities this school year under the terms and conditions provided for in the Collective Bargaining Agreement.

However, on September 14, 2001, you arbitrarily reduced my compensation and removed my professional responsibilities and duties as LDR Coordinator without due process, prior notice, or mutual agreement. In addition, on September 17, 2001, just 3 days after you improperly removed these professional responsibility duties and compensation from me, a notice of an opening for a position handling similar LDR professional duties, was posted at QJHS.

I believe these recent actions by the Quincy School District represents a continuation of the coordinated, systematic campaign of retaliation, harassment, intimidation, and discrimination directed against my family and I over the past 3 years for:

1.     Joining with other citizens and reporting to School District officials and law enforcement agencies, the acts of gross misconduct by a Quincy School District employee, including misconduct of a sexual nature.

2.     Initiating litigation against the School District and its Agents for their acts of retaliation directed against my family and I for reporting the misconduct. Two lawsuits have been filed in Federal Court. A third will be filed upon completion of the final draft.

                                    1

2.    Filing 2 grievances against the School District to contest the additional acts of retaliation and discrimination, directed against me in the workplace by the District prior to and during the 2000/2001 year.

As a result of unlawful conduct by the Quincy School District, the Illinois Educational Labor Relations Board has filed an Unfair Labor Practice lawsuit against the Quincy School District. A trial is set for January 2002. In addition, the U.S. Department of Justice, Civil Rights Division, has issued a Notice of Right-to-Sue, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., against Quincy School District #172. That suit will be filed pending final drafting.

Acts of the School District Under Protest And Grievance

I received my first paycheck for the current school year on September 14, 2001. Included with my paycheck was a letter from you dated September 13, 2001. The letter informed me of your decision to immediately reduce my professional responsibility duties and compensation for the 2001/02 school year. The letter also erroneously described the terms and conditions under which my professional duties and compensation were determined. I never agreed, nor was I ever told that any of my duties and compensation stipends would only be for one year.

On September 17, 2001, just 3 days after you improperly removed the LDR professional responsibility duties and compensation from me, a notice of an opening for a position handling similar LDR professional duties, was posted at QJHS. I protested and grieved the circumstances, terms, and conditions under which these professional responsibilities were removed from me and posted. I also applied under protest for the professional responsibilities duties/position of LDR Coordinator at Quincy Junior High School.

On September 24, 2001, I filed directly with you, a written grievance and application in response to your letter of September 14, 2001. As of today, I have received no response from you regarding my grievance and application.

On September 28, 2001, in response to my grievance, the School District issued a memorandum requesting that I contact the secretary of QJHS Principal, Patrick Grenda, and schedule a meeting "to discuss the LDR extra duty position" with Mr. Grenda and QJHS Asst. Principal, Allan Hosking, on October 1, 2001. Early on the morning of October 1, before I had any contact with Mr. Grenda's secretary, Asst. Principal, Hosking, walked into my office and informed me that I was to meet with he and Mr. Grenda at 10AM that morning to discuss the LDR Coordinator position. However, my professional duty obligations as Dean of Students prevented me from attending that meeting. Later that day, I politely and appropriately filed a written request with the School District, for a "description of the nature and substance of the discussions at the requested meeting regarding the LDR position." I again pointed out the fact that I had just filed a written grievance with Superintendent Socks, which involved the LDR Coordinator position, and therefore requested Union representation at any meeting involving discussions of the LDR position. .....

On October 2, 2001, in response to my request for clarification of the nature of the meeting with Mr. Grenda and Mr. Hosking, the School District issued another memorandum. This memorandum informed me that my request for representation at a meeting to discuss the LDR position (a grievance issue) was "unsatisfactory". The memorandum reflected further orders from the District directing me to meet alone with 2 School District administrators at 2pm that

2

same day to "discuss the LDR extra duty assignment". The meeting was scheduled without my knowledge or participation. Furthermore, the District threatened me with discriminatory hiring and job selection practices unless I submitted to their improper demands. The School District's memorandum stated, *"if this is not acceptable to you, we will make our decision on the assignment based solely on the interviews conducted at that time".* This discriminatory hiring and job selection procedure is a further breach of Article VII-7.3, of the Collective Bargaining Agreement.

The terms and conditions of the proposed meeting with Mr. Grenda and Mr. Hoskins were intimidating and coercive, created a hostile and discriminatory work environment for me, was another attempt to circumvent the grievance procedure, and was a breach of the Collective Bargaining Agreement. I therefore respectfully declined to be interviewed for, or discuss, the LDR Coordinator position under coercive conditions without Union representation. However, per the terms of ArticleVII-7.3 of the Collective Bargaining Agreement, I again, under protest, respectfully requested to be considered for the LDR position based on my qualifications and experience, which are well known to School District Administrators.

The Quincy School District responded by again refusing to process my grievance(s) as required by Article VI of the Collective Bargaining Agreement, engaged in discriminatory hiring and job selection practices, and refused to reinstate my LDR Coordinator duties, responsibilities, and compensation.

As a result of these recent actions by the School District, I have again been subjected to a hostile, discriminatory work environment. I have again suffered arbitrary, discriminatory treatment, retaliation, intimidation, damage to my career advancement, denied career advancement, damage to my professional and personal reputation, personal and professional embarrassment, emotional distress, and monetary loss.

To remedy this grievance I intend to utilize all legal resources available to me to contest this recent action by the Quincy School District, to recover damages for all injuries sustained over the past three years, to end the District's coordinated, systematic campaign of retaliation and discrimination directed against me, and seek any other remedy that an arbitrator deems appropriate.

I hereby respectfully request that QEA Local #809 files a notice of request for binding arbitration.

Yours truly,

Ann Tierney
Dean of Students, QHS

Cc:    Andrea Baird, IFT
       ESCC

3

November 29, 2002

***Via Facsimile and U.S. Mail***

Brett Gorman
525 Jersey Street
Quincy, IL 62301
217-223-1071(Fax)

     RE:     J. Robert Tierney et al. V. Sheridan Swim Club, et al.
              Case No: 02-L-12 / Depositions of Non-party witnesses

Mr. Gorman:

I am in receipt of your letter of November 27, 2002. As per the documented conduct of your firm, you continue to make false, misleading, and contradictory representations in your letters to me.

As you recall, my wife and I, and our attorney of record, were present on your offices for one reason only. That was for depositions in the parallel federal court litigation. At the conclusion of those depositions in which you took no part, you arbitrarily and unilaterally insisted on discussing the issue of some subpoenas served in this State Court litigation despite my repeated requests to you to simply put something in writing and send it to me. You refused, and continued to insist on discussing this issue even in the presence of my attorney in the federal court litigation, as well as in front of several other attorneys, who as you well know, have no involvement in this state court lawsuit. So much for your comments about "general notions of common courtesy"

You then proceeded to sit down directly in front of me, flanked by another attorney, Marec Edgar, and told me that two (2) of your clients had been served with subpoenas by me. You demanded to know who else I had issued subpoenas to. In response to your demands, I asked you several questions. You confirmed the fact that both Mr. Meyer and Mr. Koch had been lawfully served with a subpoena in compliance with ISC Rules 202, 204, and 206. You also confirmed the fact that none of these individuals were parties in the State Court litigation. I then told you that I therefore expected Mr. Meyer and Mr. Koch to comply with the subpoenas. You then told me they would not appear. I then acknowledged that our conversation was over and attempted to leave your offices, and requested that in the future, you communicate in writing. As I prepared to leave the room, you persisted in your comments and even continued to yell at me like a petulant child, as I was walking down the hallway to the door. As I said, so much for your comments about "general notions of common courtesy."

Again Mr. Gorman, I remind you that you none of the persons you claim to represent are parties in this litigation. As non-parties, all of the persons you claim to represent are simply witnesses subject to ISC Rules 202 & 204, as the court directed during a prior hearing on deposition issues. Per the instructions of the Court, I coordinated the scheduling of depositions with the other party's attorney, Mr. Barnard. I then issued subpoenas to non-parties in compliance with ISC Rule 202 & 204. Mr. Barnard and I established the dates for depositions in compliance with ISC Rules 202, 204, and 206. Is it your contention that the QSD and any present or/or former QSD "affiliated" person(s) are exempt from the provisions of Rules 202 & 204?

Due to the on-going conspiracy between one or more individuals "affiliated" or previously "affiliated" with the QSD and the Defendants in this litigation, I am well aware of the fact that you are in constant contact with the Defendants' attorney, Mr. Barnard, and have been exchanging documents on a regular basis. Therefore, you and I both know that your sudden offer, per your letter of today, to produce Mr. Koch on December 2nd or the 6th is simply made in bad-faith, since you know perfectly well that depositions are

1


**EXHIBIT**

K

already scheduled for the times that Mr. Koch is allegedly available. You also know that Mr. Barnard is not available on December 6, 2002, whereas he is available on the morning of December 5, 2002. Therefore, produce Mr. Koch on December 5, 2002, per the lawfully served subpoena, or obtain relief from the court.

Your alleged willingness to produce Mr. Koch at another time is another example of your numerous false, misleading, and contradictory representations, considering the fact that you have already made it perfectly clear to me per your letter of November 15, 2002, that you have no intention of *ever* producing any documents or witnesses in this litigation, without direct Court intervention. Per your letter:

> " We are presently preparing to seek relief from the federal court concerning your activities, and I have first asked your attorney, Richard Steagall, for an agreement to a protective order that would prevent your further abuse of our court system. Enclosed is a letter I faxed to Mr. Steagall on November 11, which outlines in part the basis for our need to seek this relief.
>
> Until we have the opportunity to address this matter with the court in the Federal case, there will be no further QSD affiliated witnesses who will be presented for deposition in your state court lawsuit, and we will be filing a motion in the state court proceeding to stay your activities directed against QSD and its agents."

Obviously, both the federal court and the state court are going to have to determine who has jurisdiction over the Quincy School District and your law firm, because according to your statements, you, and only you, decides what court has jurisdiction over these issues.

This obstruction and abuse of our federal and state judicial system, by you and the law firm of Schmiedeskamp, Robertson, Neu & Mitchell, now includes your law firm's stated intentions to seek federal court intervention in state court litigation on behalf of individuals who are not parties in the state court litigation. These individuals, whom you acknowledge have been lawfully subpoenaed per ISC Rules 202, 204, and 206, are no longer individual parties in the federal court litigation. Other subpoenaed individuals have not been affiliated with the Quincy School District for over 5 years, and were never parties in any litigation relating to the case(s) at bar.

Regarding your misleading statements about issues dealing with Sheridan Swim Club, let me refresh your memory as to the undisputed facts of this case. The March 5, 1999, letter from Defendant Andrew Schnack to your father and fellow attorney, Dennis Gorman, was never disclosed by the QSD or the Defendants. The contents of Schnack's letter and the fact that it was not disclosed per Federal and State Court Discovery Rules and Court orders, is incontrovertible evidence that one or more persons "affiliated" with the Quincy School District, including Dennis Gorman, were directly involved with the retaliation against my family by Sheridan Swim Club for reporting the misconduct of a QHS coach. Furthermore, this retaliation resulted in the banishment of a QSD employee and student from QSD functions, activities, and facilities without due process as required by ILCS Statutes. The QSD refused to take any action regarding this retaliation, and other subsequent acts of retaliation by QSD "affiliated" persons and agents, per the instructions of QSD attorney, Dennis Gorman.

This retaliation was in response to the reporting of the numerous verified acts of misconduct by QHS swim coach Richard Powers, a close personal friend and client of Sheridan Board member, Andrew Schnack. This misconduct was reported directly to the QSD school board President and senior QSD officials by QSD employees, students, and other involved families, under the umbrella of confidentiality mandated by both Federal and State Statutes. An Adams County Assistant States' attorney was even directly involved with reporting Powers misconduct directly to your fellow attorney, Dennis Gorman, during a confidential meeting.

2

Dennis Gorman, the general counsel for the QSD, subsequently breached *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and to 20 U.S.C. §1232g. *The Family Educational and Privacy Rights Act (FERPA)*, by disclosing this information to members of Sheridan Swim Club, including defendant Andrew Schnack. Mr. Gorman engaged in this misconduct while concealing information and documents from QSD officials, and obstructing any investigation of the reported incidents. And, as you also well know Mr. Gorman, testimony at prior hearings and depositions has confirmed these allegations.

On a somewhat related issue concerning Schnack's letter of March 5, 2002. When this letter is viewed in conjunction with Schnack testimony, and other testimony during the Hearings of June 24th and 25th, 2002, evidence exists which supports the allegations of perjury and subornation of perjury by officers of the Court. Of course, these tangential issues will be brought to the Court's attention during up-coming Hearings.

In your letters to the Court and I, you continue to make constant reference to a "vendetta". I recognized the purpose of these statements. You are obviously hoping to influence any future Court decisions by inference and insinuation, and by playing off the unsupported suppositions reflected in the judicial comments of a recent federal court decision regarding the federal counts brought against the Honorable Judge Chet Vahle, a local associate judge in the 8th Circuit. These counts were asserted in the federal litigation involving the QSD.

Make no mistake Mr. Gorman, my family and I have learned an unforgettable lesson regarding what extraordinary lengths even federal judges will go to, in order to excuse the misconduct of fellow judges. We are now painfully aware of how the federal courts respond, when the dispute is between common private citizens, and a sitting judge and fellow officers of the court. It has been made very clear to us, and to our attorney, that ordinary citizens forfeit their free speech rights when it comes to reporting incidents between young girls and a QHS high school coach, when those incidents just happen to occur in the home of a sitting Judge who is a close friend of the coach. However, lets stick to the facts and compare the federal court decision against another decision regarding the alleged misconduct of another Illinois Judge. This comparison provides amazing insight into how inconsistent, capricious, and arbitrary judicial decisions can be, and establishes the obvious fact that there is no such thing as "blind justice".

First lets review the incident involving former Illinois Supreme Court Judge Hieple, who was allegedly involved in a traffic violation. Judge Hieple allegedly orally identified himself as a Judge during questioning by police officers, and therefore, apparently was invoking the power and prestige of his judicial office in a private, non-judicial issue. As a result, Judge Hieple was reprimanded by the Illinois Judicial Inquiry board and almost impeached by the Illinois Legislature.

Paradoxically, during the time period of an alleged investigation into the misconduct of a public high school swim coach, QSD attorney, Dennis Gorman, alerted Judge Vahle to this investigation by providing Vahle with information concerning the reports of the "massages" administered to several high school girls by the QHS swim coach, Richard Powers, who happens to be a good friend of Judge Vahle. Amazingly, Judge Vahle became such close personal friends with coach Powers in just the 3 short months that the coach was actually in town before the "massages" occurred. These "massages" occurred late at night on a pool table in Judge Vahle's basement, without parental knowledge or consent, and while the coach was alone with the girls in the Vahle basement. Gorman also disclosed this information to a local attorney who also just happened to be a "close personal friend" of the coach. Not to be forgotten is the undisputed fact that the disclosure of this information by Dennis Gorman, constituted breaches of *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and 20 U.S.C. §1232g. *The Family Educational and Privacy Rights Act (FERPA)*.

3

In response to this information, Vahle sent a letter on the letterhead of the Circuit Court of the 8th Judicial Circuit of the State Of Illinois, to the QSD officials who would normally be responsible for conducting any investigation. This included the High School Athletic Director, the Principal of the High School, and to the Superintendent of the School District. To reaffirm the official, judicial nature of his letter, Vahle emphasized that he was writing from a "partly professional viewpoint." The letter accused the Tierneys of "spreading rumors and innuendo about the coach and his program" and making "paranoid misrepresentations and falsehoods". Vahle also stated his intent was to "discourage anyone from attempting to change the program of the coach". The local attorney who had also been tipped off about the "massages" also sent a letter to the QSD, wherein he threatened to bring a lawsuit on behalf of the coach against those persons who reported the misconduct. Consequently, no investigation was ever conducted by the appropriate QSD authorities as mandated by QSD policy. And Powers was subsequently recommended for re-hire by these same QSD Administrators, without any mention of the "massages" or other acts of misconduct.

However, what kind of spin does the Federal Courts put on these undisputed facts? The federal court concluded that the Honorable Judge Vahle only used judicial stationary to engage in free speech and was merely expressing his personal support for the "coaching" skills of the coach. And no harm accrued to the family that reported the "massages". Furthermore, the federal court concluded that Vahle's letter was somehow "privileged" communication with school officials.

But that's not the end of it. The federal court descended even farther into the judicial twilight zone with this precedent setting decision. The court goes on to single out one individual for special judicial commentary. These comments concerned just one of the fathers who accompanied his wife and daughter to a meeting when the coach's misconduct was reported. The court concluded that because the father was involved in reporting what happened to his daughter, he was therefore engaging in a "vendetta" with QSD administration, and therefore forfeited his free speech rights and became a "quasi-public figure", who went "public" by being present when the misconduct of the Judge's good friend was reported to senior school district officials.

Conversely, the federal court also ruled that the wife of this father, who was also the mother of one of the girls "massaged" also forfeited her free speech rights simply because she was an employee of a school district and was therefore accorded to the court "obligated to report the things that she did". The federal court made these unsupported statements despite the undisputed fact that the misconduct of the coach was reported under the umbrella of confidentiality mandated by both Federal and State Statutes. And no Federal or State Statute exists which required the father or the mother to report anything to the QSD.

Does anybody see an irreconcilable contradiction here? What a sad commentary on the priorities and values of our federal court system. What a mockery of the First Amendment.

As you can imagine, this federal court decision has caused great concern among officials of the U. S. Dept. of Education / Office of Civil Rights who are charged with the duty to enforce Title IX regulations, since this federal court decision eviscerates the protection from retaliation provisions of Title IX. Officials of the Illinois Dept. of Children and Family Services feel a similar concern, since similar provisions are also stated in the Illinois Mandated Reporter Act.

Regarding your constant reference to a "vendetta", lets get the undisputed facts out about exactly who is engaging in a "vendetta". The only "vendetta" that has been judicially acknowledged by a Court order after an actual vetting of the facts of the case, is the vendetta by the QSD against my wife and co-Plaintiff, Ann Tierney, during the course of her employment as a QSD Dean of Students at QJHS. And as you well know, QSD general counsel, Dennis Gorman has been the moving force behind this vendetta.

Per a ruling of the IELRB Administrative Law Judge, dated July 5, 2002, the QSD was found guilty of unfair labor practices against my wife and co-plaintiff, Ann Tierney. The QSD was ordered to submit to arbitration to resolve her sustained grievances. The QSD was further ordered to post this Court order and findings of the IELRB Judge in a prominent location in every QSD building for a period of sixty (60) days, so that all QSD employees and members of the public would know about this misconduct by the QSD. This ruling by the IELRB Judge should provide conclusive evidence to any unbiased individual who reviews the facts of this case, that when a fair and unbiased Court doesn't have to be concerned about possible negative consequences to a fellow-sitting Judge, decisions are reached which are actually supported by the undisputed facts of the case. And the facts of the case support the allegation that it is the QSD and the defendants who are engaging in a "vendetta".

In addition, the Equal Employment Opportunity Commission (EEOC) has recently affirmed Ann Tierney's charges of retaliation, and age and sex discrimination against the QSD, and has therefore authorized a formal pre-hearing investigation. And last but not least, the federal court has recently allowed a count of retaliation to proceed against the QSD on behalf of my daughter, Meryl Tierney, who along with her parents and other QSD students also reported the misconduct of QHS employee, Richard Powers. And in case you have forgotten Mr. Gorman, Meryl Tierney is also a co-plaintiff in the state court litigation.

Finally, per my letter of November 15, 2002, and by this letter, I again request that you advise me in writing of the factual and legal bases for the claims and allegation made in your letters of November 15th and 27th, 2002, that my attempts to obtain the depositions of Dennis Gorman and James Citro have somehow "abused our court system". That my letter to Judge Vespa, which concerned the refusal by Dennis Gorman and James Citro to appear for depositions, somehow reflected "argumentative and improper statements to the court", and that "this form of communication to the court" was somehow improper.

Also provide the factual and legal basis why my attempts to take depositions from non-parties in compliance with ISC Rules 202, 204, and 206, can in any way sustain your allegation in your letter of November 27:

> " Your efforts to intimidate and harass my clients will not be tolerated, and you should be advised that your conduct, in my opinion, constitutes an abuse of process and malicious prosecution under Illinois law. You are now proceeding at your own peril in your continued use of the judicial process to prosecute your personal vendetta against persons associated in your mind with the termination of your Sheridan Swim Club membership."

Can you explain, Mr. Gorman, why you believe that persons who are non-parties in this litigation, feel intimidated and harassed by simply being deposed? Do they have something to hide? Are they afraid of finally having to testify under oath? We both know that Dennis Gorman, and the QSD are simply afraid of the truth finally coming out. I say this Mr. Gorman because we both know that a former school district board member as well as the former QSD Superintendent voluntarily appeared to testify during the hearings this past June. And a former school board member has impeached the testimony of Dennis Gorman. Obviously these QSD "affiliated" individuals do not feel "intimidated and harassed" in any way since they appeared voluntarily!

You and I both know, that as this matter proceeds through the judicial process, the facts and evidence will prove conclusively that Dennis Gorman, and other agents and persons "affiliated" with the Quincy School District are the ones who are engaging in a vendetta of retaliation against my family and against Ann Tierney, in the workplace. Small wonder then that the sole objective of all of your delaying tactics is simply to prevent the production of evidence at all costs, and at the expense of the citizens of this community. You're wasting your time threatening me, but hopefully your threats will eventually result in sanctions and other negative consequences for you and your firm.

5

In closing Mr. Gorman, your personal conduct in your offices the other day, and your false statements in your correspondence with me, strongly supports my belief that you are, for lack of a better description, a small town punk who couldn't hack it with a big city law firm, and then had no recourse but to crawl home and join daddy's firm. The fact that you allegedly come from the same gene pool as your father, Dennis Gorman, explains why it is self-evident that you lack any personal and professional ethics. Any profession like the educational or the legal profession that can have such a profound effect on the lives of ordinary citizens, would be far better off without you or your father in it. How unfortunate for this community that you and Dennis Gorman are so pervasively entwined with our local public educational institutions. Many people already realized how much better off the Quincy School District would be with alternative legal representation, perhaps that explains why the lead counsel in the federal court litigation is from St. Louis, Mo.

Very truly yours,

Robert Tierney

Cc:    Jonathan Barnard (via facsimile)
       All other Plaintiffs

6