**E-FILED**
Friday, 25 March, 2005  03:06:58 PM
Clerk, U.S. District Court, ILCD

## In the Circuit Court of the Eighth Judicial Circuit

### Adams County, State of Illinois

FILED

AUG 30 2002

*Glen Y Hultz*
Clerk Circuit Court 8th Judicial Circuit
ILLINOIS, ADAMS CO.

|  |  |  |
|---|---|---|
| J. ROBERT TIERNEY, | ) | |
| ANN S. TIERNEY, | ) | |
| And MERYL A. TIERNEY | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| vs | ) | No.  02-L-12 |
|  | ) | |
| SHERIDAN SWIM CLUB, INC., an Illinois | ) | |
| Corporation, ANDREW C. SCHNACK, III, | ) | |
| JULIE ANDERSON, BARNEY BIER, | ) | JURY DEMAND |
| RODERICK P. MILLER , DAVID P. DANIELS, | ) | |
| LISA BEARDEN, LORI MILES, PATRICIA CRANE, | ) | |
| DOUG OLSON, BARB SELVY, ROBERT HULTZ, and | ) | |
| TIMOTHI BETH, members of the Sheridan Swim Club | ) | |
| Board in their Official and Individual Capacities, and | ) | |
| ROBERT MEYER, member of the Sheridan Swim | ) | |
| Club Board, and Former President of the Sheridan | ) | |
| Booster Club, in His Official and Individual Capacity | ) | |
|  | ) | |
| Defendants. | ) | |

## THIRD  AMENDED COMPLAINT

1

# THIRD AMENDED COMPLAINT – TABLE OF CONTENTS

PAGE

I.    Jurisdiction and Venue ................................................................ 5

II.   The Parties ............................................................................. 5

     A.    The Plaintiffs ................................................................... 5

     B.    The Defendants ................................................................ 6

III.  Causes of Action Resulting in the Filing of Federal Complaint #99-3149

     Which are Pending Trial and Final Adjudication in Federal Court .....................

     9

IV.  Events and Causes of Action which Occurred after the Plaintiffs Filed the Initial

     Complaint in Federal Court............................................................ 26

V.   Conduct And Occurrences Complained Of In This Complaint Involving

     Defendants Sheridan Swim Club, Sheridan Board, and Robert Meyer.............. 30

     A.    Description of Sheridan Swim Club and the Genesis of the Symbiotic

           Relationship between Sheridan and the Quincy School District .............. 30

     B.    The Symbiotic Relationship and "Alliance" was Reaffirmed after a

           Federal Lawsuit was Filed and after the IHSA Suspended Powers.......... 34

VI.  STATE COUNTS

COUNT I    The Acts and Omissions of Defendants Sheridan, Sheridan Board,

          and Meyer Constitutes Civil Conspiracy Between One or More Sheridan

           Board Members. CLUB Members, and Sheridan Employees............ 37

     A.    Conduct Complained Of From May 1998 to July 1999..................... 37

     B.    Conduct And Occurrences Complained Of Which Occurred After A

          Lawsuit Was Filed In Federal Court In June 1999........................... 46

     C.    Ratification by Sheridan/Sheridan Board of Wrongful Conduct............ 58

COUNT II   The Acts and Omissions of Defendants Constitutes Breach of Contract

          and breach of express duty of operation in good faith...................... 59

COUNT III  The Acts and Omissions of Defendant Sheridan Board Constitutes

          Breach of Fiduciary Duties................................................... 59

COUNT IV  The Acts and Omissions of Defendants Sheridan and Sheridan

          Board Constitute Retaliatory Discharge of Plaintiff Meryl Tierney.......... 59

COUNT V        The Acts and Omissions of Defendants Sheridan, Sheridan Board,
               Robert Meyer, constitutes Tortuous Interference with Business Relations
               Between Plaintiff Ann Tierney's and her employer, the Quincy School
               District ...................................................................    59
COUNT VI       The Acts and Omissions of Defendants Sheridan, Sheridan Board and
               Meyer Constitutes Conversion.................................................. 60
COUNT VII      The Acts and Omissions of Defendants Board and Meyer Constitutes
               Invasion of Privacy............................................................ 60
COUNT VIII     The Acts and Omissions of Defendants Sheridan, Sheridan Board,
               and Meyer Constitutes False Light...........................................    60
COUNT IX       The Acts and Omissions of Defendants were Willful and Wanton, and
               Constitutes Intentional Infliction of Emotional Distress................    60
COUNT X        The Acts and Omissions of Defendants Sheridan, Sheridan Board, and
               Meyer Constitutes violations of The Illinois School Student Records Act
               105 ILCS 10/1-10 et seq.......................................................    60
COUNT XI       The Acts and Omissions of Defendants Constitutes violations of
               The Business Corporation Act of 1983 805 ILCS 5/2A et seq............    60
COUNT XII      The Acts and Omissions of Defendants constitutes violations of
               The Illinois Abused and Neglected Child Reporting Act, 325 ILCS 5/1
               et seq, (1998) formerly Ill. Rev. Stat. Ch. 23,  2051 et seq. (1975) eff.
               July 1, 1975................................................................... 61
COUNT XIII     The Acts and Omissions of Defendants Constitutes Violations of
               The Illinois School Code 105 ILCS 5/24-25) et seq............................ 61
COUNT XIV      The acts and omissions of Defendants Sheridan and Sheridan Board
               constitutes Constructive Fraud ..............................................    61
COUNT XV       The acts and omissions of Defendants Sheridan and Sheridan Board
               Constitutes Fraudulent Concealment..........................................    61
COUNT XVI      The acts and omissions of Defendant Schnack. Bier, and Sheridan
               Constitutes Intentional Spoliation of Evidence..............................    61
COUNT XVII     The acts and omissions of Defendants Schnack, Bier, and Sheridan

Constitutes <u>Negligent Spoliation of Evidence</u>................................. 61

XVI.   FEDERAL CLAIMS........................................................................ 61

    1.   Statutes and Constitutional Provisions Involved............................. 62

    2.   Claims under 42 U.S.C. § 1983................................................. 62

        Count I    Right of Access to the Courts without Interference or
                    Retaliation...................................................... 63

        Count II    Right to Freedom of Speech and to Petition the
                    Government for Redress of Grievances without Retaliation 63

        Count III    Right of Association without Retaliation...................... 63

        Count IV    Right to Procedural Due Process ............................. 64

        Count V    Ratification by Sheridan/Sheridan Board of Wrongful
                    Conduct alleged in ¶¶ 153-156, and160-213.................. 65

    3..   Claims under 42 U.S.C. § 1985 (2 & 3) ...................................... 66

        Count VI    42 USC §1985.  Conspiracy to Interfere with Civil Rights
                    (2) Obstructing Justice; Intimidating Party, Witness, or Juror..... 66

        Count VII    42 USC §1985.  Conspiracy to Interfere with Civil Rights
                    (3) Depriving Persons of Rights or Privileges.................. 67

XVII.  Damages and Relief Sought............................................................ 68

## THIRD AMENDED COMPLAINT

Now come the Plaintiffs, J. ROBERT TIERNEY, ANN TIERNEY, and MERYL A. TIERNEY, Pro Se, and complaining of the Defendants, SHERIDAN SWIM CLUB an Illinois Corporation, ANDREW C. SCHNACK III, JULIE ANDERSON, BARNEY BIER, RODERICK P, MILLER, DAVID P. DANIELS, LISA BEARDEN, LORI MILES, PATRICIA CRANE, DOUG OSLON, BARB SELVY, ROBERT HULTZ, and TIMOTHI BETH, members of the Sheridan Swim Club Board in their Individual and Official Capacities, and ROBERT MEYER, member of the Sheridan Swim Club Board, and President of the Sheridan Booster Club, in his Individual and Official Capacities, for a claim for relief hereby states as follows:

### I.    JURISDICTION & VENUE

1.    This Court has original jurisdiction of this action brought for State Counts per ILCS Statutes, Code of Civil Procedure and Illinois Supreme Court Rules.  This court has supplemental jurisdiction of Plaintiff's Federal claims pursuant to ILCS Statutes, Code of Civil Procedure, and Illinois Supreme Court Rules.

2.    Venue is proper in this Court in that Adams County is in the 8th Judicial Circuit where all Defendants reside and in which all of the alleged conduct occurred.

### II.    THE PARTIES

### A.    The Plaintiffs

3.    J. Robert ("Bob") Tierney, Ann S. Tierney, and Meryl A. Tierney, were, at all relevant times, residents of Adams County, Illinois, and residents in the political boundaries of the Quincy School District #172.  Meryl Tierney, born May 7, 1982, and (Case Tierney)[1], born September 27, 1990, are two of the four children of Ann and Bob Tierney.  Meryl Tierney turned 18 years of age on May 7, 2000.

4.    Bob Tierney, Ann Tierney, Meryl Tierney, and Case Tierney at all relevant times, were stockholders and members in "good standing" of the Sheridan Swim Club, Inc., in Quincy, Illinois.  As a shareholder in the Sheridan Corporation, the Plaintiff had a vested, financial interest in the operation, assets, and property of the Corporation/CLUB.   The Tierneys

---

[1] In the interest of judicial economy, Case Tierney (a minor) will be added as a Plaintiff to this Complaint via a separate Motion, after the Court determines the appropriate "Pro Se" status for Case Tierney. Specifically, the Plaintiffs will ask the Court to determine if Case Tierney can be a Pro Se plaintiff by and through his next best friend, his father, Plaintiff J. Robert Tierney, until such time as the Plaintiffs retain the services of a licensed attorney.

maintained continuous membership in the Sheridan Swim Club from 1986 until their wrongful expulsion on or about April 15, 1999.

5.    Ann Tierney was at all relevant times, employed by the Quincy School District as Senior Dean of Students at Quincy Junior High School. Mrs. Tierney was appointed to the position of Asst. Principal/Athletic Director, Pro-Tem, at Quincy Junior High School in December 1999. This appointment occurred six months after Plaintiffs filed their initial complaint in Federal Court, and over one (1) year after Plaintiffs began engaging in free speech with School District Officials over issues of public concern. Ann Tierney subsequently resumed her duties as Senior Dean of Students at Quincy Junior High School in July 2000. At no time did Ann Tierney have any control and direction authority, or supervisory responsibilities for extra-curricular activities at Quincy Senior High School. The only employment related connection Ann Tierney has with Quincy Senior High School is the common employer, Quincy School District No. 172. Ann Tierney was under no Statutory or School District regulation to report any of Powers and Sheridan's misconduct directly to the School District. Her speech with School District officials was entirely discretionary, and occurred in the company of private citizens after school hours, and out of her place of work. Ann Tierney's speech involved matters of public concern regarding employees and programs of Quincy High School. Meryl Tierney was a student at Quincy Senior High School.

6.    Meryl Tierney was, at all relevant times, a student at Quincy High School and was a member of the Quincy High School ("QHS") Girls Swim Team during the 1996-98 school years. During the 1998-99 school year she was 16 years of age. During all relevant times she was further enrolled in United States Swimming, Inc., Illinois Swimming Inc., and Sheridan Swim Team, through her membership at the Sheridan Swim Club and membership on the Sheridan Swim Team. The Tierney family has been active participants in Sheridan Swim Team activities and USA Swimming Inc. activities at Sheridan Swim Club since approximately 1986.

**B.    The Defendants**

7.    Sheridan Swim Club, Inc. ("Sheridan" or "CLUB") is a closely held, For-profit corporation, located in Adams County, Illinois, organized and obligated to be operated under the laws of the State of Illinois, including but not limited to *The Business Corporation Act of 1983* 805 ILCS 5/2A *et seq.*



7.a    As an agent of a Public School District, Sheridan is obligated to comply with *The Illinois School Code* 105 ILCS 5/24-24) et seq., and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act* (FERPA).

7.b    As a "recreational facility" Sheridan is also obligated to comply with *The Illinois Abused and Neglected Child Reporting Act,* 325 ILCS 5/1 et seq (1998) formerly Ill. Rev. Stat. Ch. 23, 2051 et seq. (1975) eff. July 1, 1975. It is sued in its individual capacity. The conduct of each of the Defendants as described in this Complaint was done under color of State law.

8.    Andrew C. Schnack, III, ("Schnack"), Julie Anderson ("Anderson"), Barney Bier ("Bier"), Roderick P. Miller ("Miller"), David P. Daniels ("Daniels"), Lisa Bearden ("Bearden"), Lori Miles ("Miles"), Patricia Crane ("Crane"), Doug Olson ("Olson"), Barb Selvy ("Selvy'), Robert Hultz ("Hultz"), and Timothi Beth ("Beth") are past or present members of the Board of Directors of the Sheridan Swim Club, Inc. (hereinafter, collectively referred to as "Sheridan Board"). All are residents of Adams County, Illinois. All are sued in their Individual and Official Capacities. Board members Miles and Crane became Board members in March 2000, and are sued for acts of misconduct, which occurred after April 1, 2000. Board members Olson and Meyer became Board members in March 2001, and are sued for acts of misconduct, which occurred after April 1, 2001. Board members Selvy, Hultz, and Beth became Board members in March 2002, and are sued for acts of misconduct, which occurred after March 26, 2002. Although Sheridan Board member, Robert Meyer ("Meyer") became a Board member in March of 2001 and is sued in his individual and official capacity as a Sheridan Board member, he is also individually liable for his other prior wrongful acts while President of the Sheridan Booster Club. Defendants Bearden and Miles are Quincy School District teachers and mandated reporters. The actions of Defendants Bearden and Miles, and Sheridan Board member, Vicki Forbes, were also committed within the course and scope of their employment and under color of state law. Although Forbes is not named as a Defendant in this complaint, her actions were also committed within the course and scope of her employment and under color of state law.

9.    Andrew C. (Drew) Schnack, III ("Schnack"), was also the personal attorney of Richard Powers ("Powers"). Schnack is also a member of the Board of Directors of Illinois Swimming Inc., and a member of the officials committee of Illinois Swimming Inc. At all times relevant herein, Schnack was also a registered and active swimming & diving official with the

7

Illinois High School Association ("IHSA"). Schnack had a duty to comply with, and uphold the Constitution, By-Laws, and Rules of the IHSA. Schnack's actions alleged herein were committed within the course and scope of his office as a Sheridan Board member, and/or as a policy-making agent/member of Sheridan Swim Club, acting at the direction of the Sheridan Board of Directors, and/or in collusion with, or at the direction of an employee of the Quincy School District.

10.    Barney Bier ("Bier") is a resident of Adams County, Illinois, and, at all times relevant herein was the Adams County States' Attorney and a member of the Sheridan Swim Club Board of Directors. Bier is a Defendant in his individual and official capacities as a Sheridan Board member, and in his individual capacity for conduct under color of state law while employed as the Adams County States' Attorney. Bier's actions alleged herein were committed under color of state law while aiding and abetting the misconduct of his fellow Defendants Andrew Schnack, Sheridan, and Sheridan Board. The actions of Bier alleged herein were committed while Bier was acting under the authority of his office conferred by state law, but were plainly outside the course and scope of his employment duties and beyond his purview, discretion, and jurisdiction per his acknowledged conflicts-of-interest.

11.    Robert Meyer ("Meyer") is a resident of Adams County, Illinois, and, at all times relevant herein was the President of the Sheridan Swim Team Booster Club ("Sheridan Booster Club") or a member of the Sheridan Board. The Sheridan Booster Club is entirely a wholly owned sub-part of Sheridan. Meyer's actions alleged herein were committed within the course and scope of his office, and/or as an agent/member of Sheridan Swim Club acting in collusion with, or at the direction of a member(s) of the Sheridan Board of Directors, and/or in collusion with, or at the direction of an employee of the Quincy School District. Meyer is a Defendant in his individual and official capacities for his actions on behalf of Sheridan.



8

### III    Causes of Action Resulting in the Filing of Federal Complaint #99-3149 Which is Pending Trial and Final Adjudication in Federal Court [2]

12.    In approximately May 1998, the School District entered into a contractual relationship with Richard Powers and Sheridan, pursuant to which the School District would utilize the coaching services of Powers, the swimming pool and facilities of the Sheridan, and the equipment of the Sheridan Swim Team, for the 1998-99 school year. The School District contracted with Powers in May 1998 as coach, and Sheridan hired Powers as a coach also in May 1998 in close proximity to the School District's hiring of Powers. There was a Nexus or linkage between Powers coaching both swim teams. Powers agreed to come to Quincy with the understanding that he coached both the Sheridan and the QHS swim teams. By these joint yet separate financial contracts, the School District agreed to financially subsidize the operating expenses of Sheridan Swim Club and the operating expenses of the Sheridan Swim Team.

13.    Since approximately May, 1998, the School District effectively delegated to Sheridan and Powers, operational control of the Quincy High School's Boys and Girls swimming

---

[2]  On October 23, 2001, per Court Order in Case #99-3149, the Federal District Court declined to recognize the existence any allegation, fact, or general notice pleading which sufficiently established any genuine issue of material fact that Sheridan was a State Actor based on the causes of actions and events which occurred only between May 1998, and June 1999, which is the time period covered by the pleadings in the Initial Complaint. Pursuant to a Preliminary Injunction Hearing on a State Count issue regarding the Tierney's membership rights at Sheridan, Court somehow surmised that there was no Symbiotic Relationship or Nexus between Sheridan and the School District, despite the absence of any testimony or evidence regarding that issue. As a result, the Court did not conduct any fact-finding inquiry on the State Actor status of Sheridan. The Court also denied the Plaintiffs' TWO Motions to Compel Discovery despite the fact that Sheridan produced only 1 sheet of paper during 2 years of litigation. The Court also refused to allow the Plaintiffs to depose all of the individual Sheridan defendants who had submitted affidavits in support of their Summary Judgment Motion. The Court only allowed the deposition of one Sheridan defendant, who was selected by Sheridan for the deposition. Furthermore, this defendant did not possess knowledge of the subject matters outlined in the Notice of Deposition. The Court also only allowed the deposition of one School District Board member, who was selected by the District. This School Board member also allegedly did not possess knowledge of the subject matters outlined in the Notice of Deposition. In the text of the written order on the Summary Judgment Motion, the Court also referred to non-existant testimony from the transcript of the Preliminary Injunction Hearing. The Court subsequently relinquished jurisdiction over any of the State Counts against Sheridan. Therefore, the Federal Claim(s) that was asserted in Federal Complaint #99-3149 against Sheridan/Sheridan Board and was adjudicated by the District Court Orders, is being preserved for Appellate Review until final judgment is entered in that case. The Plaintiffs **are not** re-alleging the Federal Claim(s) for adjudication in this Complaint, but list the causes of action only to avoid any possibility that the tender of this Complaint in State Court has waived the Federal claim(s), and because the causes of action also support the State Claims asserted in this State Court Complaint. The Federal Claims asserted in this Complaint are for causes of action, which occurred after the Federal Complaint was filed in June 1999. These claims were not asserted in the Federal Court Complaint.



programs for coordinated supervision by Powers of the Sheridan and School District programs. The School District delegated limited policy-making authority to Powers per the terms of his contract with the School District Board.

14.    The Quincy School District was negligent in the hiring and supervision of Powers. The District delegated limited policy-making authority to a part-time employee/coach (Powers) who had never coached a United States high school swim team, and was not certified per the Illinois High School Association (IHSA) By-laws and regulations to coach any Illinois High School athletic program.

15.    During the 1998/99 school year, Sheridan Board members and CLUB members, including non-school district employees, were entwined in the control, direction, and supervision of Powers during the 1998/99 school year regarding Powers' operation of the Quincy High School swim program.

16.    During the 1998/99 school year, the Sheridan Board (including a school district teacher) and CLUB members, aided and abetted Powers' misconduct and improper operation of the Quincy High School Swim Program. These actions were in direct conflict with the written policy of the School District, and reflected deliberate indifference to school district policy and the Rules and Regulations of the IHSA, which is the State governing body of Illinois High School Athletics. This improper operation also constituted a breach of contract between Sheridan and the District.

17.    During the 1998-99 school year, Powers, acting in his position as the coach for the Quincy High School Girls Swim Team, regularly breached the terms of his contract and Sheridan's contract with the School District. Powers also violated the Illinois High School Association Constitution, Bylaws, or eligibility rules concerning athletic programs. These violations included inappropriately supervised swimming practice, and inappropriately combining swimming practice activities for the Quincy High School Girls & Boys Teams and the private teams of Sheridan, and committed the following acts, which were wrongful.

    a.    Powers utilized his position as the swimming coach for the various swim teams at Quincy High School to require participation in the Sheridan Swim Team as a condition for favorable treatment or participation in swimming competitions for the Quincy High School Swim Teams. This action was taken for the benefit of Sheridan, the Sheridan Swim Team, and the benefit of Powers in improving Powers' position as a coach of the Sheridan Swim Team.

b.   During the 1998-99 school year and the Fall 1999 school year, Powers, acting in his position as the coach for the Quincy High School Girls Swim Team further regularly violated the policies of the Quincy School District concerning the rights of students to participate in high school extracurricular activities, including, but not limited to the published School District Code of Conduct.

c.   During the 1998-99 school year, Powers repeatedly directed foul, profane, and obscene language toward students and adults.

d.   During the 1998-99 school year, Powers kissed one of the High School girl swimmers on the lips at a swimming competition.

e.   During the 1998-99 school year, Powers attempted to engage high school girl swimmers in inappropriate conversations regarding sexual topics both during and after school-sponsored activities.

f.   On or about November 13, 1998, Powers told the members of the girls swimming team that they should allow him to massage them in order to prepare them for a swimming competition scheduled for the next day.

g.   On or about November 13, 1998, Powers appeared at a social gathering of the swim team at the home of Mr. & Mrs. Chet Vahle. Powers required the girls to lay prone on a pool table in the basement of the home in order to receive the so-called "massages" which were in fact a pretext to enable Powers to fondle the girls.

h.   On or about November 13, 1998, Powers placed his hands on the legs and thighs of Plaintiff Meryl Tierney, up her buttocks. He further required her to unhook the straps of her bra in order to allow him to place his hands on her bare back.

i.   On or about November 13, 1998, Powers also required several other members of the girls swimming team to allow him to touch them in a manner similar to his touching of Meryl Tierney.

j.   In November 1998, the time he touched the girls, Powers was a 53-year-old single male.

k.   At the time of his touching of the girl swimmers, Powers was the only adult present in the room.

l.   At no time prior to his touching of the girl swimmers did Powers make known to the parents of the girls that he was planning to engage in this activity, nor did Powers conduct any such activity with members of the Quincy High School Boys swim team that he also coached. [3]

---

[3] In October 1999, the District Court granted a Motion to Dismiss the federal claims against Powers regarding the "massages" with Meryl Tierney. During a Preliminary Injunction Hearing in July 1999, the Court refused to allow Meryl Tierney to give testimony about the actual nature and extent of the "massages". The Court also relied on, and cited, Illinois State Court cases in dismissing Meryl Tierney's Federal claims, which were asserted under the liberty interest clauses of the First Admendment, and under the due process clauses and of the 14th Amendment. The Court also denied a Motion to Reconsider the ruling. The Plaintiffs **are not** re-alleging those Federal Claims for adjudication in this Complaint, but list the causes of action only to avoid any possibility that the tender of this Complaint in has waived those Federal claims. However, all prior claims against the defendants were dismissed **without** prejudice.

18.    Beginning in September 1998, the Tierneys and other citizens became aware of Powers misconduct regarding possible violations of School District and Illinois High School Association rules, and violations of student rights per the Code of Conduct for extra-curricular activities. These were issues of public concern. All of the Tierneys became aware of these issues of public concern through their participation as members of the public in a traditional public function.

19.    At various times throughout the 1998-99 school year, Bob and Ann Tierney, reported improprieties that they had found concerning the Quincy High School Swim Team and Powers' sexual misconduct, to various officials of the School District, and to School Board Attorney, Dennis Gorman. The Tierney's' free speech concerned possible violations of School District and Illinois High School Association rules, violations of student rights, sexual harassment and inappropriate sexual conduct involving minors, and other matters. These were all matters of public concern. These violations and incidents were reported during what the Tierney's were led to believe were confidential, privileged conversations with senior School District policy-making officials, and Gorman. [4]

20.    At various times throughout the 1998-99 school year, the Plaintiffs accompanied several other parents of members of the Quincy High School Swim Teams and the Sheridan Swim Team. Collectively, these citizens also reported improprieties that they had found concerning the Quincy High School Swim Team to various officials of the School District, and to Gorman. The other parents' speech about the possible violations of School District and Illinois High School Association rules, violations of student rights, discrimination, sexual harassment and inappropriate sexual conduct with minors and other incidents, were all matters of public concern. These violations and incidents were reported during what these parents were led to believe were confidential, privileged conversations with senior School District policy-making officials and investigators.

21.    At various times throughout the 1998-99 school year, Ann Tierney, acting in her capacity as Dean of Students for Quincy Junior High School, and Meryl Tierney, also reported

---

[4]  The Plaintiffs' free speech did not reflect or involve opinions concerning the technical coaching abilities of Powers. In fact, the Plaintiffs considered Powers an "outstanding technical coach". The Plaintiffs' free speech concerned specific incidents and issues of public concern about Powers' misconduct and actions that had nothing to do with Powers' coaching techniques or abilities.

12

Powers misconduct. These violations and incidents were reported during what the Tierneys were led to believe were confidential conversations with senior School District policy-making officials and School District investigators. [5]

22.     Following these meetings the School District engaged in deliberate indifference and specifically refused to take any action regarding Powers misconduct. The School District turned a "blind eye" to Powers misconduct. The actions of these officials were in direct conflict with the written policy of the School District, and reflected deliberate indifference to school district policy, to the hostile, educational environment at Sheridan, and to the Rules and Regulations of the IHSA, which is the State governing body of Illinois High School Athletics. The District implemented a policy of deliberate indifference to reports of Powers' misconduct and improper operation of the high school swim program.

23.     In December 1998, school superintendent Dr. Anderson, and another school district administrator, met with Plaintiff Bob Tierney and another parent, who also had a daughter on the high school swim team. Both parents engaged in free speech on matters of public concern, and again presented evidence of Powers' improper conduct and actions regarding operation of the Quincy High Swim Team program.

24.     In December 1998, the School District retaliated against the Plaintiffs by immediately divulging the Plaintiffs' reports of Powers' misconduct to officials and members of Sheridan Swim Club including Defendant Schnack.

25.     In December 1998, Defendant Powers, and (Sheridan Board President) Julie Anderson, Schnack, and Meyers conspired to retaliate against the Plaintiff and the Tierney Family and others, and mutually agreed to cover-up Powers' misconduct concerning IHSA

---

[5] In March 2001, the District Court dismissed several of Ann Tierney's Federal Claims of retaliation for free speech brought against the School District. Although Ann Tierney's speech with the District was completely discretionary, and all of Power's misconduct had already been reported by Bob Tierney and other parents, the Court declined to recognize prevailing law on the free speech rights of public employees established by the Supreme Court in *Pickering*, and recently re-affirmed by the 7th Circuit in *Delgado v. Jones*. The Court ruled that Ann Tierney was not engaging in free speech with the School District. The Court stated that Ann Tierney was obligated "to report the things that she did", to the school district, simply because she was a school district employee. However, the Court also dismissed Ann Tierney's claim of retaliation under *Title IX*, which specifically protects students and **employees** in public educational institutions from retaliation for reporting alleged sexual harassment. The Court ruled that *Title IX* did not cover Ann Tierney since she was not a *"participant"* in a *Title IX* program. The Plaintiffs **are not** re-alleging those Federal Claims for adjudication in this Complaint, but list the causes of action only to avoid any possibility that the tender of this Complaint has waived those Federal claims. However, all prior claims against the defendants were dismissed **without** prejudice.



violations and the operation of the Quincy High School Swim Team at Sheridan Swim Club. These individuals provided false and misleading information to the School District regarding the operation of the QHS swim program at Sheridan. At this point in time, Schnack held no official office at Sheridan Swim Club.

26.    The School District knew the information from Schnack, Julie Anderson, and Powers was false and misleading, but was deliberately indifferent to the deception and did not pursue the matter. The School District turned a "blind eye" to Powers misconduct and to Sheridan's deception and breach of contract.

27.    On or about December 21, 1998, Powers, Sheridan officials, and the School District targeted the Plaintiffs for retaliation for their free speech. Powers made defamatory, false, and misleading statements to student members of the Quincy High School Boys Swim Team. Powers mentioned "Bob Tierney" by name and made false statements regarding Mr. Tierney's actions and speech with the School District Officials. Powers also stated his intentions to continue to knowingly violate IHSA and School District policy and rules regarding operation of the Quincy High School Swim Program.

28.    The parents of a member of the Quincy High School Boys swim team reported Powers' improper speech and misconduct to Powers' immediate superiors who were also senior School District Administrators. One of these parents who reported Powers' misconduct was also a teacher in the Quincy School District.

29.    Again, the School District engaged in deliberate indifference and refused to take any action regarding Powers' misconduct. The School District turned a "blind eye" to Powers misconduct and improper operation of the high school swim program, and to the hostile, educational environment at Sheridan.

30.    In January 1999, Defendant Schnack, colluded and conspired with Powers and others, in an attempt to cover-up continued IHSA violations involving the Quincy High School Boys swim team. Acting upon information from the School District, Schnack alerted Powers to a possible surprise visit from School District officials to a high school swim practice session at Sheridan Swim Club.

31.    Shortly thereafter, Schnack and Sheridan began a campaign of harassment, retaliation, and intimidation of a Quincy High School student, while the student was in the workplace at Sheridan. The student had been a member of the Quincy High School Boys swim

14

team. He and his parents had also reported Powers' misconduct to School Administrators. This retaliation included negatively impacting the student's working conditions at Sheridan Swim Club.

32.    This retaliation was also reported to the School District, and again the School District engaged in deliberate indifference and refused to take any action regarding Powers' misconduct or regarding Schnack/Sheridan's retaliation against a Quincy high school student for reporting the misconduct of a School District employee. The School District turned a "blind eye" to Powers misconduct and Sheridan's retaliation, and implemented a policy of deliberate indifference to reports of harassment and retaliation of school district students and employees by Sheridan officials, and to the hostile, educational environment at Sheridan.

33.    During the 1998/99 school year, the School District aided and abetted Sheridan's campaign of retaliation and intimidation of the Plaintiffs, and of the other students and families who reported the misconduct of Powers, by providing confidential information to Sheridan, and engaging in deliberate indifference and turning a "blind eye" to the reports of Powers' misconduct, and to Sheridan's retaliation, breach of contract, and to the hostile, educational environment at Sheridan.

34.    The School District, School Board President, James Citro, and School Board attorney, Dennis Gorman, individually and by joint action, aided and abetted Sheridan's misconduct, by improper overt and covert acts or omissions, and conspiracy.

35.    Board President Citro, arrogated to himself and to Gorman, operational control and authority over the Quincy School District, especially regarding personnel issues. Gorman relinquished his solitary, insular role as school board attorney, and became the senior policy-making agent of the Quincy School Board, whose conduct and actions occurred under color of state law. Citro unilaterally designated school board attorney Gorman, as the de-facto superintendent of schools with direction and control authority over Dr. Anderson and other school district administrators. However, Gorman did not have any of the educational degrees or certificates required by State law, to act as a Superintendent of any Illinois Public School District.

36.    Citro and Gorman, improperly and unlawfully removed school Superintendent Anderson, as the senior policy-making agent for the School District, and as the senior school official responsible for any investigation of Powers.



37.    In February 1999, per the unilateral orders of Citro, Dr. Anderson was improperly and unlawfully removed from active involvement in any investigation or supervision of Powers and the Quincy High School swim program. Citro and Gorman specifically ordered Dr. Anderson to take no action regarding the Tierney's reports of Powers' misconduct. [6]

38.    In February 1999, the Plaintiffs learned of the "massages" from a letter written by the parent of another girl who was also "massaged". On about February 26, 1999, the Tierneys, accompanied by another parent of a girl who was also "massaged", reported the massages to School Board members Citro, Kirlin, and to Deputy Superintendent, Nick Schildt ("Schildt"). At this meeting, Citro directed Schildt to conduct a "thorough and complete investigation" of Powers and the Quincy High School swim program. At the request of Schildt, both sets of parents agreed to make their daughters available for an interview.

39.    On or about February 28, 1999, Schildt and School District employee, Teri Conboy ("Conboy") conducted interviews of two QHS female swimmers who had been "massaged" and their parents. Schildt and Conboy then prepared a confidential report *("Schildt/Report")*. The *Schildt Report* was then given to School Board President, Citro, and to attorney/acting school Superintendent, Dennis Gorman.

40.    In retaliation against the Tierneys for reporting Powers misconduct, Citro unilaterally, arbitrarily, and unlawfully terminated the investigation of Powers. Citro improperly and unlawfully also removed Deputy School Superintendent Schildt, as the school official responsible for any investigation of Powers. Citro ordered Schildt to cease any further investigation of Powers, under the ruse that the Tierneys would not accept the results of any investigation of Powers. The investigation of Powers was dropped because of Citro's animosity and prejudicial attitude towards the Tierneys over the reporting of Powers misconduct.

41.    School Board President Citro, and school attorney Gorman, obstructed the investigation of Powers and of the "massages". Citro unilaterally removed the two most senior school district officials from any involvement with an investigation of Powers. Citro vested authority for the direction and control of any investigation to Gorman, who in turn agreed to

---

[6]  In May 1999, Dr. Anderson was terminated as Superintendent of the Quincy Public School District. He was paid $190,000 after agreeing to sign a confidentiality agreement, which prohibits him from making any public comments about the Quincy School Board "that could be considered negative". He subsequently left the Quincy area in June 1999.



suppress any investigation.  In joint action with Citro, Gorman withheld reports and evidence of Powers' misconduct from other School Board members and from school district administrators. Citro and Gorman agreed to initiate a campaign to cover-up Powers misconduct, intimidate witnesses, and sweep the whole matter under the rug.

42.    The School District and Gorman refused and/or failed to report the "massages" to the Illinois Department of Children and Family Services, were deliberately indifferent, and refused to conduct an investigation in the manner prescribed by written School District Policy, and by *Title IX*.[7]  However, the School District and Gorman unlawfully disclosed the Tierney's' reporting of Powers' misconduct to Sheridan board members and CLUB members.

43.    As part of a joint effort to suppress any investigation of Powers, Gorman divulged the contents of the confidential *Schildt Report* to Judge Chet Vahle.  Gorman did not seek or obtain permission to release this information from the parents or students whose personal statements were contained in the report.  These disclosures were a willful and wanton violation of 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act* (FERPA), and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq.  Gorman and the School District were keenly aware of the fact that the *Schildt/Conboy* report was confidential and subject to (FERPA) restrictions, yet they willfully and wantonly breached these Federal & State Statutes, and violated the constitutionally protected rights of the Tierneys with the intent to cause damage and harm to the Plaintiffs. The District has asserted that the *Schildt Report* was subject to *FERPA* restrictions and also obtained a protective order in State Court. [8]

---

[7]  Per the Federal Register Part VII, Department of Education, Office of Civil Rights:  / Vol 62, No. 49 / March 13, 1997,

Once a school has notice of possible sexual harassment of students – whether carried out by employees, other students, or third parties - it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take steps reasonable calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again...
In all cases the inquiry must be prompt, thorough, and impartial....
In all cases, schools should make every effort to prevent public disclosure of the names of all parties involved, except to the extent necessary to carry out an investigation.

[8]  The School District refused to turn over the *Schildt Report* during Initial Disclosure in February 2000. The District claimed that the document was subjected to *FERPA* protection.  In July 2002, the Quincy School District again acknowledged that the *Schildt Report* was a statutorily protected document.  The District sought and obtained a protective order in State Court in order to protect the contents of the *Schildt Report* from release to anyone other than the parties and attorneys of record in this litigation.

44.    Gorman unlawfully disclosed the *Schildt Report* to Judge Chet Vahle in Vahle's personal chambers at the 8th Circuit Courthouse, after Gorman obtained the *Schildt Report* from Schildt in early March 1999.  Gorman did so as the de-facto school Superintendent, and policy-making agent of the School District acting under color of state law. [9]

45.    Gorman unlawfully divulged the contents of the *Schildt Report* to Vahle in order to alert Vahle to the complaints from the parents and students about the events that occurred in Vahle's home, and in order to obtain Vahle's assistance, agreement, and support *(while acting with the power and prestige of a sitting Judge)* of Sheridan's and the School District's joint efforts to conceal the misconduct of Powers, and to violate the constitutionally protected rights of the Tierneys, by acts of defamation, retaliation, and intimidation of the Plaintiffs and others, who reported Powers' misconduct.

46.    Shortly after the Tierneys reported the "massages" and Powers' misconduct, School District employee Kevin Polchowski confronted Bob Tierney at Sheridan facilities, and in retaliation for reporting the "massages", Polchowski  threatened to physically batter and harm him [Tierney].  Polchowski was an employee of both the School District and Sheridan, acting within the course and scope of his employment and under color of state law.

47.    Polchowski was employed by the School District as a substitute teacher and as the Quincy High School Asst. Swim coach under the direction, control, and authority of Quincy High School coach, Richard Powers.  Sheridan Swim Club also employed Polchowski as the Sheridan Swim Team Asst. swim coach under the direction, control, and authority of Sheridan Swim Team coach, Richard Powers.  Polchowski was also a mandated reporter subject to the provisions of *The Illinois Abused and Neglected Child Reporting Act,* 325 ILCS 5/1 et seq., and other ILCS Statutes.

48.    Between March 3, and April 14, 1999, acting upon information provided to them by the School District and Gorman, Vahle colluded and conspired with Gorman and Defendants Schnack, Julie Anderson, Robert Meyers, and others, by engaging in an orchestrated, coordinated campaign of mailing letters to officials of the School District.  The letters dealt with

---

[9]  Chet Vahle is an Associate Judge in the 8th Judicial Circuit of the State of Illinois.  Vahle is a past President of the Sheridan Swim team Booster Club, and as stated in his letter, Vahle is heavily involved in Sheridan Swim Team affairs.   Based on information and belief, Vahle was not at home during the evening of November 13, 1998, and his daughter was not "massaged".

Powers' status as the Quincy High School Swim Team coach and conveyed false and misleading information.

49.    The letters were sent in order to discredit, damage, and retaliate against the Tierney's and others, interfere with the Tierney's' right to petition the government, suppress the School District's investigation of Powers' misconduct, to intimidate other witnesses regarding Powers' misconduct, and to prevent any changes to the high school swim program or the coaching status of Powers.

50.    In an attempt to discredit any reports of Powers' misconduct, the letters attacked the credibility and motives of any and all persons who had complained of Powers and Sheridan's misconduct. None of the letters specifically mentioned or denied any misconduct by Powers. They rebuked and criticized the people who reported any complaints about Powers. Many of the letters were from people who did not have children in Quincy High School. One letter was from the <u>grandparents</u> of a Sheridan swimmer who was only in the 7th grade.

51.    Judge Vahle took part in this campaign and conspiracy and used the power and prestige of his judicial office by writing his letter on the letterhead of the Circuit Court of the Eighth Judicial Circuit of the State of Illinois and mailing the letter to (3) three School District Administrators.

52.    The Vahle Letter states:

> "I write to offer my views on the current *status* of the Quincy High swim team and its coach, Rick Powers. . . . This letter is written from a partly personal, partly *professional* viewpoint." (Emphasis added)

53.    The Vahle Letter further states:

> <u>"I would discourage anyone from attempting to change the program or the coach</u>......
> Frankly, this letter is written with knowledge on my part that a certain misguided individual has been making rumors and innuendoes about the coach and his program. I will not honor that individual's baffling efforts with a description or a response because I believe they fall in the same class of <u>paranoid misrepresentations and falsehoods</u> about the swim team program that the same individual communicated to my wife and me in years past." (Emphasis added)

54.    The Vahle letter's reference to the "individual" as quoted in the previous paragraph was aimed at Bob Tierney and was understood by the recipients of the letter as Bob

19



Tierney. All the recipients of Judge Vahle's letter commonly knew of Bob Tierney's reporting of Powers' misconduct.

55.    Although the Vahle Letter was addressed and mailed to the Quincy High School Athletic Director, copies of the Vahle Letter were also mailed to Dr. Michael Anderson, nominal superintendent of the School District, and Mr. Paul Koscielski, the principal of Quincy Senior High School.

56.    The Vahle Letter also included a handwritten note from Vahle to Superintendent Michael Anderson stating: "Mike " for your information. Call with any questions. Chet."

57.    In his capacity as a sitting Judge, Vahle sent a copy of his letter to Dr. Anderson and Principal Koscielski, in order to specifically discredit and damage Bob Tierney and Ann Tierney, in the eyes of senior school district administrators who were Powers' direct supervisors. Vahle cast the Tierneys in the shadow of false light, in order to quash any investigation of Powers' misconduct, and to discourage and prevent any changes to the high school swim program and the coaching "status" of Powers. Vahle was well aware of Ann Tierney's position of authority with the Quincy School District, and of her reporting of Powers' misconduct.

58.    Speaking from his *"professional viewpoint"* as a sitting Judge, Vahle made false and misleading statements to the School District regarding Powers' conduct and actions. Vahle knew that Powers used a false pretext in order to engage in improper physical contact with female juveniles, while alone with them in the Vahle's basement, without parental knowledge and consent, and that the parents and students had complained about the "massages". As a Judge, Vahle also knew that Powers' fondling of minor females represented at least a prima facie case of Battery, which is both a civil and criminal offense. Vahle also knew that Powers' operation of the high school swim program at Sheridan was improper.

59.    Speaking from his *"professional viewpoint"* as a sitting Judge, Vahle implemented his threat to *"discourage anyone from attempting to change the program or the coach"*. Vahle made false and misleading statements to three (3) Public School District Administrators, regarding Powers' conduct and actions. Vahle made these false and misleading statements in order to discredit, damage, intimidate, and retaliate against the Tierneys, interfere with the Tierney's' right to petition the government, suppress the School District's investigation of Powers' misconduct, to intimidate other witnesses regarding Powers' misconduct and improper



operation of the high school swim program, and to prevent any changes to the high school swim program or the coaching "status" of Powers.

60.     The Vahle Letter, written on judicial stationary from a "professional viewpoint", was written at a time when Vahle sat as an associate judge with the power to hear disputes concerning the Tierneys, the School District, and all of the other individuals involved in this case. Vahle, a member of Sheridan, used the power and weight of his judicial office on his judicial stationary, to cover-up the misconduct of Powers and Sheridan, and to help Sheridan maintain operational control of a traditional public function.

61.     The actions of Vahle alleged herein were committed while Vahle was acting under the authority of his office conferred by state law. Vahle's conduct also establishes another symbiotic relationship between Sheridan and a State actor.

62.     While the Vahle Letter constitutes action under color of state law, it is also a breach of the ethical standards applicable to the conduct of judges in the State of Illinois and outside Vahle's judicial authority and jurisdiction. Vahle's actions represents the abuse of public office by a sitting judge in order to aid parties in a matter in which the Illinois 8th Circuit Court had no interest or standing.  No case or controversy involving the Plaintiff and the Tierney Family and the subject of the Vahle letter ever existed before Judge Vahle or any or judicial officer of the Circuit Court of the Eighth Judicial Circuit, or any other court of the State of Illinois. [10]

63.     After Gorman's meeting with Vahle, and immediately after receiving Vahle's letter, Gorman and the School District engaged in deliberate indifference by refusing to conduct any investigation of the "massages", and the other misconduct by Powers, despite the fact that Gorman and the School District knew Vahle had made false and misleading statements about

---

[10]   Illinois Supreme Court Rules / Conduct of judges
RULE 62 CANON 2
A Judge Should Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.
A Judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
A Judge should not allow the judge's family, social, or other relationships to influence the judge's judicial conduct or judgment.
A judge should not lend the prestige of judicial office to advance the private interests of others; nor should a judge convey or permit others to convey the impression that they are in a special position to influence the judge.
A judge should not testify voluntarily as a character witness.



Powers misconduct, and about the events that occurred in the Vahle home. The School District not only turned a "blind eye" to Powers misconduct, but also ratified Vahle's deception.

64. The School District and Gorman, while funneling confidential information and the *Schildt Report* to third parties at Sheridan, refused to share with the Tierneys or other parents of the girls who were massaged, any information from the *Schildt Report* or any information about the School District's mock investigation of the misconduct by Powers.

65. The District and Gorman disclosed the confidential *Schildt Report* and other confidential information concerning the Tierneys' reporting of Powers' misconduct to other third parties, including Defendant Schnack, other Sheridan Board members, and CLUB members.

66. All Sheridan Board members initially signed affidavits stating that they had personal knowledge that "Mr. and Mrs. Tierney" had reported Powers misconduct to the Quincy School Board. However, during Hearings in State Court in June 2002, at least two (2) Sheridan Board members retracted some of their statements reflected in these affidavits. [11]

67. The disclosure of this and similar information to Sheridan Board members was a willful and wanton violation of 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act* (FERPA), and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and caused damage and harm to the Plaintiffs.

68. In the space of just 25 days between March 28, 1999, and April 21, 1999, Schnack, Vahle, Meyer, Citro, and Gorman, engaged in a coordinated campaign of collusion, conspiracy, retaliation, and intimidation, by engaging in the following acts;

a. On <u>March 28</u>, 1999, Schnack (who was also Powers' personal attorney) was elevated to membership on the Sheridan Board, despite his numerous conflicts of interests.

b. On <u>March 29</u>, 1999, one day after becoming a Sheridan Board member, Schnack mailed a letter to School attorney Gorman (Gorman was also acting as the de-facto School District Superintendent per the instructions of School Board President, Citro). In response to the complaints about Powers misconduct with Meryl Tierney, Schnack made false statements about Meryl Tierney's swimming activities at Sheridan in order to discredit the Plaintiffs and suppress any investigation of Powers. Schnack also attempted to renew the School Districts

---

[11] Per the testimony of two Sheridan Board members at a Hearing in the 8th Circuit Court of Illinois on June 25, 2002. This Hearing was held in conjunction with litigation pursuant to Complaint 2002-L-12, in State Court between the Plaintiffs and Sheridan Swim Club, Inc., et al.



contracts with both Powers and Sheridan, by offering *"advantageous"* benefits and incentives to the District if the contracts could be renewed.

c.   On April 12, 1999, Vahle sent a letter to the High School Athletic Director, the Principal of the High School, and to the Superintendent of the School District, on the letterhead of the Circuit Court of the 8th Judicial Circuit of the State Of Illinois. To reaffirm the official, judicial nature of his letter, Vahle emphasized that he was writing from a "partly professional viewpoint." The letter accused the Tierneys of "spreading rumors and innuendo about the coach and his program" and making "paranoid misrepresentations and falsehoods". Vahle also stated his intent was to "discourage anyone from attempting to change the program of the coach". Vahle's letter was intended to discredit and retaliate against the Tierneys, suppress any investigation of Powers' misconduct, and intimidate witnesses to Powers misconduct.

d.   On April 14, 1999, Schnack made a motion to the Board of Directors of Sheridan to summarily *"suspend"* the Tierneys from Sheridan. Schnack made false and misleading allegations against the Tierneys. The minutes of the board meeting disclose that he made the motion after an allegation by Meyer accusing the Tierneys of "trying to get Rick Powers fired as the Quincy High swim coach." The motion was second by the Adams County States' Attorney, Barney Bier. Schnack's statements and actions were intended to discredit and retaliate against the Tierneys and suppress any investigation of Powers' misconduct. Schnack also failed to inform the Sheridan Board he was acting as Powers' personal attorney.

e.   On April 15, 1999, Sheridan sent the Tierneys a letter wherein Sheridan declared the Tierney membership was *"terminated"*, declared the Tierneys would be *"considered trespassers"* if found on Sheridan property, and barred the Tierneys from ever setting foot on the Sheridan property *"for any function whatsoever"*. This ban prevented Meryl Tierney and all members of her family from attending all swim team functions at Sheridan that were otherwise open to the public. The letter gave no reason for Sheridan's actions. Sheridan engaged in State action and retaliation against a School District Dean of Students, her family, and the Captain of the High School Girls Swim team, without providing any due process to the Tierneys.

f.   On April 18, 1999, within days of the Vahle Letter and the Sheridan Expulsion Letter, and in response to the reports of Sheridan's retaliation, the School District and school board president Citro, personally retaliated against the Tierneys, and engaged in this conduct while acting under color of state law. This retaliation consisted of, without limitation, Citro's attempt to intimidate the Tierneys by falsely telling Bob Tierney that Powers could sue the Tierneys because of the Tierney's' reporting of Powers' misconduct. Citro claimed to be describing information given to him by an "uninvolved attorney".

23



g.    On April 21, 1999, *de-facto* school Superintendent, Gorman, made a report to the School Board concerning Powers and the High School Swim Program. In response to Gorman's comments, the School Board hatched a scheme to cover-up Powers misconduct and Sheridan's retaliation, and to renew the contracts of Powers and Sheridan without a vote in public session. This action was taken to retaliate against the Tierneys and suppress any investigation of Powers' misconduct and Sheridan's retaliation.

69.    The School District, Citro, and Gorman, refused to take any action or even discuss with the Tierneys, Sheridan's expulsion of the Tierneys. Citro refused to discuss with the Tierneys the investigation of Powers. The District turned a *blind eye* to Sheridan's retaliation against the Tierneys for reporting Powers misconduct.

70.    In May 1999, the School District and Gorman refused to discuss or take any action concerning Sheridan barring the Tierneys from attending a Quincy High School Girls swim team meeting, which took place at Sheridan Swim club under the direction, control, and authority of Powers, who was acting within the course and scope of his employment and under color of state law.

71.    Citro, Gorman, and school board vice-president, Dennis Koch, retaliated against the Tierneys by refusing to conduct an investigation in the manner mandated by written School District Policy. The School Board dropped all investigation activities of Powers after the *Schildt Report* was turned over to Gorman and Citro.

72.    Citro, Koch, and Gorman, retaliated against the Tierneys by refusing to conduct an investigation of the "massages" and retaliation in the manner mandated by Illinois Statutes and *Title IX*.

73.    The School District, acting through Gorman, Citro, and other Board members Koch and Kirlin, retaliated against the Tierneys by having the School District Board consider a false evaluation of Powers.

74.    On June 9, 1999, acting in response to the encouragement, collusion, and coercion of Schnack, Vahle, Citro, Gorman, the Quincy School District retaliated against the Tierneys, and renewed Powers' employment contract during an executive session meeting of the school board. This meeting had allegedly been called in order to discuss the "massages" and other incidents of Powers misconduct as alleged in ¶ #25, and to discuss Sheridan's retaliation against the Plaintiff and the Tierney Family. At the meeting, Board vice-president Koch, specifically



24

refused to allow information from the *Schildt Report* released to the Plaintiff and other parents who were present at the meeting.

75.    On June 9, 1999, acting in response to the encouragement, collusion, and coercion of Schnack, Vahle, Citro, Gorman, the School District retaliated against the Tierneys, and secretly renewed the School District's contract with Sheridan, despite the fact that Sheridan had banned the QJHS Senior Dean of Students, her family, and the captain of the High School swim team, from attending "any function whatsoever" at Sheridan Swim Club, and despite the fact that Sheridan stated that the Tierneys would be "considered trespassers", if they attempted to attend any functions at Sheridan, or were even found on Sheridan property.

76.    During this meeting, Board vice-president Koch also specifically refused to take any action or even discuss with the Plaintiff and the other parents, Sheridan's retaliation against the Tierney Family, and the banishment of the Tierney Family from school functions and facilities at Sheridan Swim Club. [12]

77.    The School District ratified the misconduct of Powers and Sheridan. The District was deliberately indifferent to, and turned a blind eye to the misconduct of Powers and the retaliation by Sheridan, and to the hostile, educational environment at Sheridan, thus breaching the constitutionally protected rights of the Tierneys. The District also refused and/or failed to report the "massages" to the Illinois Department of Children and Family Services.

78.    No State or Federal law provides a cloak of immunity that allows School District officials "discretion" to violate the constitutionally protected rights of the Plaintiff and the Tierney Family. No State of Federal law provides a cloak of immunity that allows School District officials "discretion" to ignore their obligation to abide by Statutes such as *Title IX* and The Illinois Abused and Neglected Child Reporting Act. [13]

---

[12]    Board member Koch was subsequently elevated to the Presidency of the School Board.

[13]    Per the Federal Register Part VII, Department of Education, Office of Civil Rights:  / Vol 62, No. 49 / March 13, 1997, pg. 12043:

"Finally, a school should take steps to prevent any further harassment and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against a person who filed a complaint on behalf of a student, or against those who provide information as witnesses. At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquires to see if there have been any new incidents or any retaliation."



25

79.    On June 16, 1999, during an executive session meeting of the school board, Citro, Kirlin, and Gorman attempted to avoid the question of whether Powers should be terminated for the conduct alleged in ¶ #25, and decided without a public vote by the School District Board. The Board was prevented from doing so when another School District Board member demanded a vote in public session. A vote on the termination of Powers' employment was subsequently held during the public session meeting of the Board of Directors of the School District. The Board specifically refused to terminate Powers due to his conduct referred to in ¶ #25.

80.    On June 24, 1999, the Tierney Family filed a lawsuit in Federal Court, Springfield Division, against the Quincy School District, Richard Powers, Sheridan Swim Club, and the Sheridan Board.

**IV    Events and Causes of Action which Occurred after the Plaintiffs Filed the Initial Complaint in Federal Court [14]**

81.    After the Tierneys filed a lawsuit in Federal Court, the Plaintiffs engaged in free speech before public sessions of the Quincy School Board on issues of public concern regarding the improper operation of the Quincy high school swim program. The Tierneys also petitioned several State agencies, including the IHSA, for redress of grievances. The Tierneys also engaged in free speech on issues of public concern with the Illinois High School Association (IHSA) and investigators from the Illinois Department of Children and Family Services (DCFS). The Tierney's' free speech concerned possible violations of School District and Illinois High School Association rules, violations of student rights, sexual harassment and inappropriate sexual conduct involving minors, and other items, were all matters of public concern.

82.    After the Tierneys filed a lawsuit in Federal Court, Powers continued to violate IHSA and School District rules and regulations at the start of the 1999/00 school year. Powers was acting within the course and scope of his employment and under color of state law. The

---

[14]    After the Federal Court dismissed Sheridan as a state actor in October 2001, the Plaintiffs filed an amended Complaint in Case #99-3149 against the remaining Defendants, Quincy School District and Richard Powers, for causes of action under *Title VII, Title IX, Section 1983 & 1985*, after the EEOC/ U.S. Department of Justice issued a Notice of Right-to-Sue Letter on behalf of Ann Tierney for causes of action under *Title VII,* which occurred between August 1999 and August 2001. The Illinois Educational Labor Relations Board (IELRB) has also filed a lawsuit in State Court against the Quincy School District for Unfair Labor Practices regarding the actions taken against Ann Tierney during the 2000/2001 school year, and for breach of a collective bargaining agreement.



School District again turned a "blind eye" to Powers misconduct. The IHSA subsequently began an investigation of Powers and the Quincy High School Swim Program.

83.    Beginning with the 1999/2000 school year, the School District and School Board engaged in joint action with Sheridan and ratified the campaign of harassment and retaliation directed against the Plaintiffs by School District employees and agents (See ¶¶ 153-212). These actions reaffirmed the symbiotic relationship, nexus, and conspiracy between the School District and Sheridan Swim Club since they were actions inconsistent with non-affirmation of the misconduct of the above named Defendants and individuals. By these actions, the District accepted responsibility and liability for the acts of misconduct directed against the Tierneys by employees and agents of the District, which were performed on behalf of the District, and/or at the direction of policy-making agents of the School District. These overt and covert acts and omissions include but are not limited to the following:

a.    Engaging in deliberate indifference to the hostile educational environment at Sheridan, and to Powers' wrongful operation of the Quincy High School during the fall 1999 High School swim season;

b.    Threatening to expel a School District Board member from School Board meetings unless he "disassociated" himself from the Tierneys. This Board member had also voted against rehiring Powers;

c.    Obstructing and suppressing the IHSA investigation of the Quincy High School Swim Program by authorizing legal action against the IHSA.

d.    Disseminating false and misleading statements to the press by senior school district officials regarding the IHSA investigation of the high school swim program;

e.    Violating School District policy by unlawfully divulging information from an internal School District/IHSA investigation to Sheridan members and officials during a meeting at Sheridan;

f.    Targeting the Plaintiffs for retaliation and harassment by unlawfully divulging information about the Plaintiff's confidential conversations with the IHSA;

g.    Engaging in deliberate indifference and turning a *blind eye* to the harassing, obscene phone calls made to the Plaintiffs by Sheridan officials, members, and School District employees;

h.    Granting to Sheridan members and officials, unprecedented private access to Quincy School District Board members during an executive session of the School Board, in order to secretly coordinate with the School District, the hiring of the next Quincy High School Swim Coach who would also be hired as a Sheridan swim coach.

i.    Again, secretly *entwining* Schnack and other Sheridan officials and CLUB members in the internal School District personnel and policy-making process of recruiting, interviewing, and hiring a new coach for the Quincy High School Swim Program.

27

C894

j.    Agreeing to hire, and hiring, the next Sheridan coach as the new Quincy High School swim coach for the 2000/2001 school year in return for free use of Sheridan facilities;

k.    Renewing the contracts with Sheridan Swim Club and Sheridan Swim Team;

l.    Rewarding school district employee, Debbie Olson, with extra duties, responsibilities, and compensation, while concurrently engaging in punitive and discriminatory action against Ann Tierney in the workplace, which included denying her career advancement and reducing her professional duties and compensation;

m.    Paying for Debbie Olson's legal expenses in defending her against a civil lawsuit after the Olsons were also named as defendants in the Federal complaint #99-3149, while Sheridan in turn, paid Doug Olson's legal fees.

84.    No State or Federal law provides a cloak of immunity that allows School Boards and/or School District officials "discretion" to violate the constitutionally protected rights of the Plaintiffs and ratify, or turn a *blind eye* to criminal acts by school employees and agents. The District was deliberately indifferent to acts of retaliation by school personnel and agents, against school employees, students, and their families who reported incidents of improper conduct by a school employee. Both Federal and State laws specifically prohibits any retaliation against employees for reporting acts of sexual harassment and/or other misconduct by school district employees.

85.    The Quincy School District has subjected Ann Tierney to a relentless, systematic campaign of retaliation, harassment, and age and sex discrimination in the workplace. Prior to and during the 1999/2000 school year, these acts include but are not limited to:

a.    Designating a School District employee to monitor her activities;

b.    Attempting to remove some of her employment responsibilities as Dean of Students;

c.    Requiring Ann Tierney to perform the duties of a higher paying job (Assistant Principal/Athletic Director) without a commensurate increase in pay;

86.    Prior to and during the 2000/2001 school year, these acts include but are not limited to:

d.    Preventing Ann Tierney from career advancement to other administrative positions; confirmed by an admission by the School District that her career advancement in the School District was ended;

e.    Refusing to provide her with the customary information about job openings in the School District;

f.    Intercepting her personal letters asking to apply for job openings and diverting the letters to School attorney, Gorman;

28

g.  Refusing to interview and/or promote her to job openings in the School District for which she was qualified while promoting other School District employees with inferior credentials, work records, and experience.

h.  Removing some of her employment responsibilities as Dean of Students during the 2000/2001 school year;

i.  Isolating and ostracizing her from her assigned job responsibilities during the 2000-2001 school year;

j.  Denying her the opportunity to attend mandatory professional growth activities at staff development workshops at the 2000 Illinois Dean's Conference in the November 2000;

k.  Utilizing the grievance procedure of the collective bargaining agreement to attempt to have School District attorneys interrogate Plaintiff Ann Tierney, about the issues in the pending Federal lawsuit.

87.  Prior to and during the 2000/2001 school year, these acts include but are not limited to:

l   Reducing Ann Tierney's compensation and removing some of her professional duties for the 2001/2002 school year.

m.  Discriminating against Ann Tierney in the hiring and selection process for assigning professional responsibilities at Quincy Junior High School during the 2001-2002 school year.

n.  On Friday, January 18, 2002, at the direction of the School Board and acting under instructions from the School District's attorney of record in this lawsuit, Superintendent Joe Bocke, caused to be hand delivered to Ann Tierney during the school day, a letter directing her to appear for an interview during the next business day of January 22, 2002, before a Mr. Gerald Kretmar, an attorney from St. Louis, Mo., purportedly to cooperate in an investigation into allegations of harassment in the workplace. In fact, Mr. Kretmar was an attorney retained by the School Board at the direction of its attorney of record in the Federal lawsuit, and the "interview" was a pretext to obtain a statement from a party by extra-judicial means when the Court has yet to enter a scheduling order. There have also been prior attempts by the School District's attorneys to coerce and manipulate Ann Tierney into submitting to questioning about issues in the Federal lawsuit.

C 896

**V      Conduct And Occurrences Complained Of In This Complaint Involving Defendants Sheridan Swim Club, And Sheridan Board Members**

**A.      Description of Sheridan Swim Club and the Genesis of the Symbiotic Relationship between Sheridan and the Quincy School District, which was set in motion in January 1997.** [15]

88.      Sheridan was originally incorporated as a Not-for-profit corporation, but according to Sheridan Board minutes, at some point in time prior to April 1999, Sheridan began operating and representing itself as a For-profit corporation. Sheridan has sold shares to CLUB members under the representation that Sheridan was a For-profit Corporation. Sheridan is tinged with public stature since any member of the public can join the Sheridan Swim Team and the Sheridan Swim Team Booster Club without becoming a member of the Club. Members of the public can also take swim lessons at Sheridan and utilize CLUB facilities without even joining Sheridan Swim Team or the Club. Furthermore, according to the Sheridan Club By-Laws, any member of the public can utilized the Club facilities for year-round or summer time use, without becoming a Shareholder in the Club. Only Shareholders can vote for Board members, yet Shareholders can maintain their voting rights without paying the yearly dues required of persons who actually utilize the facilities.

89.      Sheridan Swim Club is also tinged with public stature since it is the site of, and controls a, *traditional public functions,* otherwise open to the public (as a matter of law) for participants and spectators alike. Sheridan is a member of the River Country swim league comprised of area YMCA's and municipal park district pools. In most years, Sheridan is the host site for this swim league's conference championship meet, which is open to the public. For the past several years, Sheridan has hosted an international swim meet every summer, which is

---

[15]   In February 2000, a Rule 16 Scheduling Conference was held and Discovery was authorized and the deposition of Defendant Powers was scheduled. However, Powers left the country 1 day before his deposition, and his whereabouts are unknown. After an Amended Complaint was filed, the Plaintiffs were denied any general Discovery. In March 2001, a second Rule 16 Scheduling Conference was subsequently ordered by the District Court, but the Conference was arbitrarily cancelled by the District Court on its own initiative, in order to limit the scope of Discovery the Plaintiffs could conduct regarding Sheridan's Motion for Summary Judgment. The District Court did not order a Rule 16 Scheduling Conference again until July 2002.

sanctioned by USA Swimming Inc. This swim meet is otherwise open to the public, and on occasion, even has foreign nationals in attendance. The foreign participants are not U.S. citizens.

90.     The Plaintiffs maintained year-round membership status in Sheridan Swim Club since 1986. The Plaintiffs are also shareholders in this corporation with specific shareholder property rights such as notice, fair hearing. These due process rights are further enhanced since Sheridan controls and operates a *traditional public function* whose activities and events are open to the public.

91.     Sheridan is a member Club of Illinois Swimming Inc. and USA Swimming Inc. USA Swimming Inc. is the National Governing Body for swimming in the United States of America and is the organizational body behind the US Olympic Swim Team. USA Swimming Inc. has affiliated Local Swimming Committees (LCS) and member Clubs in all 50 states. Illinois Swimming Inc. is a Local Swimming Committee for USA Swimming Inc.. Sheridan Swim Club is within the geographical boundaries of Illinois Swimming Inc. The Sheridan Swim Team is registered with, and pays dues to Illinois Swimming Inc., and USA Swimming Inc. Members of the Sheridan Swim Team register with, and pay dues to Illinois Swimming Inc. and USA Swimming Inc. in order to compete as a Sheridan Swim team member in meets which are sanctioned by USA Swimming Inc. However, the team is an organization of the CLUB under the control of the Sheridan Board of Directors, which has the power to review the activities of the Swim Team.

92.     Sheridan Swim Club also has an agency relationship with an Illinois public school district. As an agent of a Public School District, Sheridan is obligated to comply with the *Illinois School Code* 105 ILCS 5/24-24) et seq., and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act* (FERPA). Sheridan Swim Club also meets the definition of a "recreational facility" according to the provision of *The Illinois Abused and Neglected Child Reporting Act*, 325 ILCS 5/1 et seq.

93.     Two (2) School District employees have served as President of the Sheridan Board over the past 10 years. Another School District employee has simultaneously served as President of the Sheridan Swim Team Booster Club and as President of the Quincy High School Swim Team Booster Club. At least one Quincy School District employee has been on the Sheridan Board every year for the past 10 years. In some years, 2 or more School District employees have been Sheridan Board members.

31

94.     The other swim team to use Sheridan facilities is the Quincy High School swim team. Prior to the 1998/99 school year, the Quincy school district occasionally used Sheridan as the site for swim meets. High school swim team practices were held at the local YMCA and full-time Quincy School District teachers coached both the Girls and Boys high school swim teams.

95.     In 1997, the Sheridan Board began a campaign to force the Quincy School District into entering into an "alliance' and "marriage" with Sheridan. This campaign had two objectives:

    a.    Sheridan's primary goal was to gain operational control and authority over a traditional public function - the Quincy High School Swim Program, and to operate the high school swim program for the benefit of Sheridan Swim Club and/or for the benefit of the Sheridan Swim Team.

    b.    Sheridan's secondary goal was to have the Quincy Public School District financially subsidize the operating expenses of Sheridan Swim Club and/or the Sheridan Swim Team.

96.     Sheridan Board President Schnack, a local attorney, orchestrated and spearheaded this campaign while acting in his capacity as a Sheridan Board member. In the process of implementing this "marriage", the following events occurred:

    a.    In January 1997, the Sheridan Board of Directors informed the Quincy School District that unless certain changes were made regarding the Quincy school district personnel who controlled and operated the high school swim program, and unless the District also agreed to enter into a contract with Sheridan, it would be highly unlikely that Sheridan would allow the School District to use Sheridan facilities for high school swim meets and other activities, as in years past. Defendant Schnack was the Sheridan Board President at this time.

    b.    In July 1997, Defendants Schnack, Anderson, and another CLUB member, secretly approached Quincy School Superintendent, Dr. Anderson with an unauthorized proposal for a "marriage" between Sheridan and the Quincy School District. This "marriage" proposal was based on the pre-condition that the School District allow Sheridan take over the entire [QHS swim] program and release the current QHS swim coach. Schnack and Anderson made false representations that they spoke for both Sheridan Swim Club, and for the parents and students of the QHS swim team. None of these Sheridan officials had any children on the QHS swim team or even in Quincy High School.

    c.    In conjunction with this matter, Dr Anderson and several other senior school district officials also hosted a meeting with approximately a dozen other Sheridan members, QHS students, and their parents. This meeting was held to discuss the

C899

operation of the QHS Swim Program. Plaintiff, Bob Tierney was a member of this group of parents.

d.   Following these meetings, the Quincy School District entered into a *symbiotic relationship* and *nexus* with Sheridan Swim Club, prior to and during the 1997/98 school year. This symbiotic relationship and "marriage" was consummated almost one (1) year before the School District entered into any contractual agreement with Sheridan to use the Sheridan facilities, and mutually agreed to hire the same individual as the new Sheridan swim coach and as the Quincy High School swim coach.

e.   In July 1997, Quincy School Superintendent, Dr. Michael Anderson, acting as the policy-making agent of the School District in the course and scope on his apparent authority under color of state law, drafted and implemented a plan titled "Swimming Proposal", whereby the School District would entwine Sheridan in the internal control, direction, and operation of the Quincy High School Swim Program. *(A true and correct copy of this "Swimming Proposal" and Dr. Anderson's cover letter is attached hereto as Exhibit A-1 & A-2)*

f.   Beginning with the 1997/98 school year, the Quincy School District agreed to entwine Sheridan in the internal personnel and policy-making procedures of the Quincy School District, on issues concerning the control, direction, and operation of the Quincy High School Swim Team Program.

g.   Prior to and during the 1997/98 school year, Sheridan was entwined in the internal school district personnel decision-making procedure to terminate a full-time Quincy school district employees as coach of the Quincy High School Swim Program at the conclusion of the 1997/98 school year. The School District acquiesced to Sheridan's demands to terminate the coaching contract of a full-time Quincy school district employee who had served as the high school swim coach for over 15 years. Sheridan also decided to terminate the coaching contract of the Sheridan Swim Team coach at the conclusion of the 1997-98 school year.

h.   Prior to and during the 1997/98 school year, senior policy-making agents of the School District held numerous private meetings with Schnack and other Sheridan officers in order to coordinate with, and entwine Sheridan in the internal school district personnel selection process of recruiting, interviewing, and hiring a new coach for the Quincy High School Swim Program and the Sheridan Swim team.

i.   During the 1997/98 school year, Sheridan officials, including Schnack, were entwined in the internal school district personnel process of recruiting, interviewing, and hiring the next Quincy High School swim coach.

j.   During the 1997/98 school year, Sheridan Board members and agents were given veto power over the internal personnel decisions of the Quincy Public School District. Quincy School Superintendent, Michael Anderson, as the senior policy-



making agent of the School District acting in the course and scope of his apparent authority under color of state law, directed Quincy High School Administrators to reach an agreement with Sheridan regarding whom the School District would hire as the next Quincy High School swim coach.

k.    In approximately May 1998, the School District entered into a contractual relationship with Richard Powers and Sheridan, pursuant to which the School District would utilize the coaching services of Powers, the swimming pool and facilities of the Sheridan, and the equipment of the Sheridan Swim Team for the 1998-99 school year. The School District contracted with Powers in May 1998 as coach, and Sheridan also hired Powers as a coach in May 1998, in close proximity to the School District's hiring of Powers. As part of the Nexus, Powers agreed to come to Quincy under the condition that he would coach both Sheridan and the QHS swim teams.

l.    At this point in time, Richard Powers, the future coach of the Quincy High School and Sheridan Swim Programs was a 53-year-old single, white male, living and working in Anchorage, Alaska. Powers had never coached a United States high school swim team, and was not certified per the Illinois High School Association (IHSA) certification By-laws and regulations, to coach any Illinois High School athletic program. During this time period, Schnack was also acting as Powers' personal attorney, and attempting to get Powers hired as coach of both the Sheridan and QHS swim teams. During this same time period, Schnack also provided false and misleading information to other applicants for the QHS coaching position, without disclosing that he was acting in Mr. Powers' behalf. [16]

m.    In a published newspaper article, Dr. Anderson, speaking as the senior policy-making agent of the School District acting under color of state law, termed the relationship with Sheridan as an "alliance". Anderson further stated that Quincy High School would be "joining forces" with Sheridan Swim Club, because Sheridan feeds into the Quincy High School Swim teams.

**B.    The Symbiotic Relationship, Nexus, and "Alliance" Was Reaffirmed After A Federal Lawsuit Was Filed And After The IHSA Suspended Powers And Placed Quincy High School On Probation.**

97.    In December 1999, Powers resigned as coach of the Quincy High School Boys and Girls Swim Teams after the IHSA confirmed that Powers and the School District had violated IHSA Rules. The IHSA temporarily suspended Powers for his misconduct and placed

---

[16] Powers moved about frequently, across countries and continents alike. At one time or another, Powers has lived and worked in South America, Eastern Europe, Southeast Asia, and the Middle East. In addition to Anchorage, Alaska, Powers had previously held coaching jobs in at least the following locations; Kuwait, Malaysia, Israel, Singapore, Crete, Ecuador, Venezuela, and Brazil.



Quincy High School on probation. Powers also gave notice to Sheridan that he would resign as the Sheridan Swim Coach at the end of March 2000. [17]

98.     In February 2000, Defendant Schnack, while allegedly speaking in his capacity as a Sheridan Board member, mailed a letter to each School District board member. Schnack termed Sheridan's relationship with the School District as a "marriage". Schnack further stated that he had worked for 3 years to put the "marriage" together. Schnack also offered the Sheridan facilities free of charge to the School District in return for special considerations from the School District in the hiring of the next high school swim coach who would replace Powers.

99.     Between February and May 2000, in coordinated, joint action with Schnack's letter to the School Board, several Sheridan CLUB members including Defendant Robert Meyer and Judge Chet Vahle were again provided with unprecedented private access to Quincy School District Board members during an executive session of the Quincy School Board. The purpose of this meeting was to secretly coordinate with the School District, the hiring of the next Quincy High School Swim Coach who would also be hired as a Sheridan swim coach. Senior policy-making agents of the School District, again secretly entwined Sheridan officials and CLUB members in the internal personnel and policy-making process of recruiting, interviewing, and hiring a new coach for the Quincy High School Swim Team and the Sheridan Swim team. This joint action and entwinement occurred during the time that Sheridan and the School District were co-defendants in a Federal lawsuit which alleged a conspiracy and Nexus between the two organization, and during the time that the School Board was deliberately indifferent to the harassment and retaliation of the Plaintiffs by Sheridan members and school district employees,

---

[17] The I.H.S.A. Confirmed the Violations by Power's and the Quincy School District
In the fall of 1999, the Illinois High School Association (I.H.S.A.) investigated Richard Powers, Sheridan, and Quincy High School. The I.H.S.A. verified that Powers, and the High School had violated I.H.S.A. By-laws and Rules. The I.H.S.A. also confirmed the fact the Powers was not certified per I.H.S.A. bylaws to be a head coach of any Illinois High School sports program during the 1998 Girl's High School Swim Season. During the IHSA investigation, the School Board voted to take legal action against the IHSA. Based on information and belief, Powers refused to be interviewed by investigators with the Illinois State Police, and the Illinois Dept. of Children and Family Services, despite the fact that Powers was also a mandated reporter. Powers abruptly left the country for South America in March 2000, one day before his scheduled appearance for a deposition in Plaintiffs' Federal lawsuit, despite the fact the Federal Court had issued a subpoena for his appearance. Powers whereabouts are alleged to be unknown. However, based on belief, and information from eyewitnesses, Powers was seen at Sheridan Swim Club in November 2000. There have been some reports that Powers has returned to this country. Powers is still facing civil battery charges in the Federal case. It is also Plaintiffs' understanding that the Quincy School District has paid for Power's legal fees.

and during the time that former Sheridan/Quincy High school swim coach, Richard Powers, skipped the country to avoid having to testify at his deposition.

100.    In approximately May 2000, (exactly two years after the District hired Powers), the School District entered into a contractual relationship with Lori Ave and renewed the contract with Sheridan, pursuant to which the School District would utilize the coaching services of Ave, the swimming pool and facilities of the Sheridan, and the equipment of the Sheridan Swim Team, for the 2000-01 school year. The School District contracted with Ave as coach in May 2000, and Sheridan also hired Ave and her husband as coaches in May 2000 in close proximity to the School District's hiring of Ave. Prior to this time, Ave was living and working in the State of Oregon. This joint action renewed the "marriage" vows with Sheridan, and reaffirmed the symbiotic relationship and "alliance" between the School District, Sheridan Swim Club, and the Sheridan Swim Team.

101.    As part of the nexus of a quid pro quo understanding, and in part as a "marriage" dowry, Schnack gave the School District free use of Sheridan facilities and free use the Sheridan Swim Team equipment, for all Quincy High School Swim Team activities, beginning with the 2000/2001 school year. This action resulted in financial harm to Sheridan Swim Club, but benefited the personal interests of certain Sheridan Board members and Sheridan Swim Team members.

102.    Sheridan benefited from this *symbiotic relationship* and *nexus* by establishing and maintaining operational control over a traditional public function – the Quincy High School Swim Program, and operating the program for the benefit of Sheridan swim team members, while discriminating against school district students and families who were not Sheridan members, and/or members of the Sheridan Swim Team. The Sheridan Swim Team benefited from this relationship by having a public school district subsidize the operating expenses of the Sheridan Swim Team, by also employing a Sheridan Swim Coach.

103.    The School District benefited from this *symbiotic relationship* and *nexus* by receiving "advantageous" benefits from Schnack and Sheridan, and by utilizing the facilities and equipment of Sheridan at little to no cost to the District. The School District also benefited from this relationship through Sheridan's actions in aiding and abetting the District's efforts to conceal violations of IHSA regulations and breaches of School District policy occurring in the Quincy High School Swim Program, and through Sheridan's ongoing retaliation, intimidation, and

36



harassment of the Plaintiffs, and others, who had reported Powers misconduct, and the hostile, educational environment at Sheridan Swim Club.

## VI    STATE COUNTS

### COUNT I

**The Acts And Omissions Of Defendants Sheridan, Sheridan Board, And Meyer Constitutes <u>Civil Conspiracy</u> Between One Or More Sheridan Board Members. CLUB Members, And Sheridan Employees.**

**A.    Conduct Complained Of Which Occurred From May 1998 To July 1999.**

104.    Plaintiffs repeat and re-allege the allegations of paragraphs 3-80, 88-103.

105.    During the 1998/99 school year, Sheridan Board members and CLUB members aided and abetted Powers' misconduct and improper operation of the Quincy High School Swim Program through a conspiracy of fraudulent and deceptive conduct. (See ¶¶ 17 & 25-31)

105a.    The actions of these officials were in direct conflict with the written policy of the School District, and reflected deliberate indifference to school district policy and the Rules and Regulations of the IHSA, which is the State governing body of Illinois High School Athletics.

105b.    This fraudulent operation of the QHS Swim Program, represented a breach of contract between Sheridan and the School District regarding the use of Sheridan facilities, and breach of fiduciary duty and the expressed duty of good faith by the Sheridan Board.

105c.    The improper operation of the QHS and Sheridan Swim Team Program by Powers and the Sheridan Board also posed a financial liability threat to Sheridan Swim Club and the CLUB shareholders, by voiding insurance protection and exposing the CLUB and Shareholders to uninsured claims.

106.    At one or more Sheridan Board meetings during the 1998/99 school year, acting upon confidential information unlawfully provided to them by the Quincy School District and Powers, Defendant Meyer and one or more Sheridan Board members, including Board President Julie Anderson, mutually agreed to made fraudulent and misleading statements about Plaintiff Meryl Tierney's personal, student activities at Quincy High School. Anderson and Meyer also made fraudulent and misleading statements about Bob Tierney's alleged reports to the IHSA about the operation of the QHS swim program. Anderson and Meyer falsely accused Bob Tierney of filing complaints with the IHSA. These disclosures and discussions were a willful and wanton violation of 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act*



(FERPA), and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and caused damage and harm to the Plaintiffs.

107.    In December 1998, Powers, and Defendants (Sheridan Board President) Julie Anderson, Schnack, Bier, and Meyers conspired to retaliate against the Plaintiff and others, and mutually agreed to cover-up Powers' misconduct concerning IHSA violations and the operation of the Quincy High School Swim Team at Sheridan Swim Club, by providing fraudulent and misleading information to the School District.

108.    In December 1998, and January 1999, Defendant Julie Anderson, made false and fraudulent entries in Sheridan's financial records of the Tierneys, and also created a false and fraudulent invoice and cover letter, which was sent to the accountant who maintained the Sheridan billing records. In breach of Sheridan By-laws, Defendants Anderson and Bier also arranged for Schnack (Powers' personal attorney) to be selected as a new Sheridan Board member.

109.    In February 1999, Bob & Ann Tierney wrote a brief letter to the Sheridan Board offering to discuss concerns held by them and other parents, regarding the operation of the Quincy High School Swim Program at Sheridan. The Tierneys asked to be allowed to speak to the Sheridan Board at a regular monthly Board meeting. During the February Board meeting, the Sheridan Board decided to ignore this request from the Tierneys. This decision was made after Defendant Meyer agreed to arrange for the Sheridan Swim Team to contribute several thousand dollars to Sheridan Swim Club, as part of the nexus of a quid pro quo agreement. In return, Defendant Anderson also agreed to support Meyer's attempts to get Powers rehired as the Quincy High School Swim Coach. Meyers also made fraudulent and misleading statements to the Sheridan Board regarding a non-existent IHSA investigation of the Quincy High School Swim Team. During the March Board meeting, Meyer again made fraudulent comments about the Tierney's reporting of Powers misconduct to the Quincy School District.

110.    Between March 3, and April 14, 1999, acting upon information provided to them by the School District and Gorman, Defendant Schnack, colluded and conspired with Sheridan Board member Anderson, and with Judge Chet Vahle, Bob Meyer, and other Club members, by engaging in an orchestrated, coordinated campaign of submitting false and misleading letters and oral communications to officials of the School District concerning the conduct of Powers. The letters were intended to discredit, damage, and retaliate against the Tierneys and others, interfere



with the Tierney's' right to petition the government, suppress the School District's investigation of Powers' misconduct, intimidate other witnesses regarding Powers' misconduct, and prevent any changes to the swim program or the coaching status of Powers. No letters were sent before the "massages" were reported to the School District or after Sheridan retaliated against the Plaintiffs. (See ¶¶ 48-68)

111.    Shortly after the Tierneys reported the "massages" and Powers' misconduct, School District employee Kevin Polchowski confronted Bob Tierney at Sheridan facilities, and in retaliation for reporting the "massages", Polchowski threatened to physically batter and harm him [Tierney].   Polchowski was an employee of both the School District and Sheridan; Polchowski was acting within the course and scope of his employment and under color of state law. Polchowski was employed by the School District as a substitute teacher and as the Quincy High School Asst. Swim coach, working under the direction, control, and policy-making authority of Quincy High School coach, Richard Powers. Sheridan Swim Club also employed Polchowski as the Sheridan Swim Team Asst. swim coach, working under the direction and control authority of Sheridan Swim Team coach, Richard Powers. Polchowski was also a mandated reporter subject to the provisions of *The Illinois Abused and Neglected Child Reporting Act,* 325 ILCS 5/1 et seq., and other ILCS Statutes.

112.    On <u>March 28, 1999</u>, during the Annual Shareholder's meeting of Sheridan Swim Club, Defendant Julie Anderson, made false and fraudulent statements to the Shareholders regarding a Nexus between the School District rehiring Powers, and a " swim records board' being donated to the Quincy High School Swim Team. Anderson falsely stated that a local sign company would donate a "swim records board" to the Quincy High School Swim Team, <u>provided that Powers was rehired as the Quincy High School swim coach</u>. Although Anderson's statements were false, they did pertain to the control and operation of a traditional public function and demonstrated Sheridan's pervasive entwinement and nexus in the control and operation of the Quincy High School Swim Team. Plaintiff Bob Tierney attended this Shareholders meeting in his capacity as a Sheridan shareholder and member in "good standing", and also took part in the voting by Shareholders.

113.    On <u>March 28, 1999</u>, despite his numerous conflicts of interests, Defendant Schnack, the personal attorney of Defendant Powers, was again elevated to membership on the Board of Directors of Sheridan after a one (1) year absence from the Board. On March 29, 1999,



one day after becoming a Sheridan Board member, Schnack mailed a letter to Gorman, (Gorman was acting as the de-facto School District Superintendent per the instructions of School Board President, Citro- see ¶¶ 34-37).

*(A true and correct copy of Schnack's letter of March 29, 1999 is attached as Exhibit A-3)*

114.    In response to the reporting of Powers' misconduct with Meryl Tierney and other minor females, Schnack falsely stated in this letter of March 29, that Meryl Tierney was again swimming at Sheridan "under" the coaching of Powers. The letter was sent to discredit the Tierney's reporting of Powers misconduct with Meryl Tierney and other female swimmers, damage, and retaliate against the Tierney's, interfere with the Tierney's' right to petition the government, suppress the School District's investigation of Powers' misconduct, and to prevent any changes to the swim program or the coaching status of Powers. Schnack even offered "advantageous" benefits and incentives to the School District if the contracts of Powers and Sheridan could be renewed.

115.    Just prior to the April 14, 1999 Board meeting at Sheridan, Schnack colluded and conspired with Defendants Barney Bier and Bob Meyer to retaliate against the Tierneys. Bob Meyer agreed to make accusations against Plaintiff Bob Tierney, regarding the QHS Swim coach, Rick Powers, during his (Meyer's) monthly report to the Board on the operation of the Sheridan Swim Team. Barney Bier agreed to second Schnack's motion to retaliate against the Tierneys.

116.    On or about April 14, 1999, Defendant Schnack made a motion to *"suspend"* the Tierneys' membership in Sheridan, after Schnack engaged in a ten minute "diatribe" against Plaintiff Bob Tierney. Defendant Bier seconded the motion. The Sheridan Board approved the motion. This event occurred just 2 days after the Vahle letter was sent to the School District. The motion to *"suspend"* the Tierney's' membership was made after Defendant Robert Meyer (President of the Sheridan Swim Team) made the following comments:

> The manager's report was put on hold in order to hear the [Sheridan] swim team report from Bob Meyer. Bob reviewed the [Sheridan] swim team finance report and handed out copies to the board members. <u>Next Bob spoke about the problems associated with Mr. Tierney, including trying to get Rick Powers fired as the Quincy High swim coach. He spoke about Rick Powers and how valuable he [Powers] is to the Sheridan swim team and the importance of maintaining Rick Powers as the Quincy High swim coach.</u> (Emphasis added)

40



*(A true and correct replication of these Board minutes is attached hereto as Exhibit B)*

117.    The minutes of this Board meeting also reflect the following information about Schnack's *diatribe* and his actions at this Sheridan Board meeting, which consisted of the following: [18]

> "Under old business, there was a lengthy discussion about Bob Tierney and the problems he has caused Sheridan swim club and swim team. Drew [Schnack] made a motion to *suspend* Bob Tierney's membership to Sheridan swim club Barney [Bier] seconded the motion. The motion was passed unanimously." (Emphasis added)

118.    On or about April 15, 1999, the Sheridan Board and Sheridan mailed the Tierneys a letter ("Sheridan Expulsion Letter") notifying the Tierneys that:

a.    The Tierneys' membership was terminated effective immediately.
b.    The Tierneys would be considered trespassers if found on Sheridan property.
c.    The Tierneys' Sheridan Stock certificate was declared Null & Void.
d.    The Tierneys were banned from Sheridan property as a guest or for any function whatsoever.

The Sheridan Expulsion Letter gave no reason or explanation for the action taken by Sheridan and the Sheridan Board.

*(A true and correct copy of the Sheridan Expulsion Letter is attached hereto as Exhibit C)*

119.    The acts implemented by the Sheridan Board per its letter of April 15, 1999, were unlawful acts since there was no motion made or voted on, which authorized the action taken against the Tierneys.

120.    This Sheridan Board meeting was a textbook example of a Kangaroo Court and Star Chamber, and 2 attorneys (Schnack & Bier) orchestrated the entire canard. Schnack engaged in a ten-minute "diatribe" against Plaintiff Bob Tierney, and made false, fraudulent, and unsubstantiated allegations against the Plaintiffs to the Sheridan Board. Schnack cast the Tierneys in the shadow of false light, and failed to provide any evidence in support of his allegations. The Plaintiffs were not provided with any notice of the charges against them nor given any opportunity to respond.

---

[18] Per the testimony of Defendant Barney Bier during his deposition in May 2001, and during his testimony at a Hearing in State Court in July 2002, wherein Bier specifically referred to Schnack comments about Bob Tierney as a "diatribe".

41



121.   Some of these false allegations involved the Plaintiffs' free speech about issues and activities pertaining to students and employees participating in Athletic Programs of the Quincy Public School District. The Plaintiffs were involved in Athletic Programs of the Quincy School District since 1990 through the participation in those programs of Plaintiff Meryl Tierney and the other Tierney children. Two Sheridan board members have stated under oath that one of the reasons stated by Schnack for taking retaliatory action against the Tierney Family, was based on Schnack's allegation that Bob Tierney had met with Quincy School Superintendent Dr. Anderson and other school officials during the summer of 1997, to discuss the operation of the Quincy High School Swim Program (See ¶ #96)

122.   Schnack falsely accused Plaintiff Bob Tierney of interfering with his [Schnack's] attempts to have the School District utilized Sheridan facilities for the Quincy High School Swim Team, and of preventing his [Schnack] alleged attempts to obtain a donation of a "records board" for the Quincy High School Swim Team. These false accusations did not involve violations of CLUB By-laws or Rules, but did concern the operation of a traditional public function and demonstrated Sheridan's pervasive entwinement and nexus in the control and operation of the Quincy High School Swim Team.

123.   Schnack breached his fiduciary duty and duty of good faith by fraudulently concealing from the Sheridan Board, the fact that he [Schnack] had made an unauthorized proposal to the School District in July 1997,and that he [Schnack] was representing Powers regarding the Tierney's complaints about Power's misconduct and the 'massages" involving Meryl Tierney. Schnack also failed to inform the Board that he was in the process of attempting to get the School District to renew the coaching contract of his client, Powers. Schnack made the motion to suspend the Tierney's' membership to Sheridan. More importantly, by prior agreement and conspiracy, Adams County States' Attorney, Barney Bier, seconded the motion.

124.   At all relevant times, Sheridan was obligated to operate pursuant to its Constitution and By-laws ("Sheridan Bylaws"), as they were amended effective March 31, 1996. Article 7, Section 1 of the Sheridan Bylaws requires Sheridan "to carry out the provisions of these by-laws in good faith."

*(A true and correct copy of the Sheridan By-Laws is attached hereto as Exhibit D)*

125.   The Tierneys were shareholders in the CLUB, therefore per the By-laws, Sheridan and the Sheridan Board had an express duty to the Tierneys to comply with all of the terms and



conditions of the Sheridan Bylaws and Constitution. Sheridan and the Sheridan Board had a fiduciary duty to the Tierneys to comply with all the terms and conditions of the Sheridan By-laws and Constitution.

126.   Since at least 1996 the Sheridan Board has operated the CLUB in bad faith and breached their fiduciary duties by failing to establish an audit committee as mandated by Article 2, Section 2 of the By-laws, and by failing to maintain or audit the Corporation financial records as mandated by the by-laws. The Board has also breached the following Articles of the By-laws and CLUB Constitution:

a.   By-Laws- Section 1. b, Article 2, Sections 1-10; Article 5, Section 1,  2.a; Article 7, Section 1 & 2; Article 8; Article 11

b.   Constitution- Article 1, Section 2; Article 2, Section 1, Section 3; Article 3, Section 4; Article 4, Section 1, 2 & 3; Article 5, Section 6 & 7.

127.   The CLUB Constitution Sheridan states that shareholders have a financial interest in the assets of the CLUB. The Sheridan stock certificate, and Article V, Section 1 of the Sheridan Bylaws, states that a stock certificate "may be revoked for cause in accordance with such By-Laws *upon refund* of all sums paid to the corporation therefore." The Board of Directors committed conversion of the Tierney's' stock certificate without compensation. (Emphasis added)

128.   At no time did the Tierneys engage in any conduct that constituted a violation of the Constitution, Bylaws, or Rules of Sheridan. The Tierneys were members and shareholders in *good standing* prior to and on, April 14, 1999.

129.   Article 7, Section 2 of the Sheridan Bylaws requires that no member may be expelled or suspended except upon the affirmative vote of 5 directors, which action can only be taken for an infraction of the Sheridan Constitution, Bylaws, or Rules.

130.   According to the Board minutes, Sheridan Board member, Miller, was not present at this Board meeting. Therefore, there were only 6 Board members present. In addition, only 2 Board members were actually eligible to vote on the motion regarding the Tierney's membership.

131.   Sheridan Board Members, Schnack, Bier, Forbes, and Bearden had conflicts of interest and were ineligible to vote per ILCS Statutes governing Not-for-Profit, and/or For-profit Corporations.



132.    According to the Board minutes, Sheridan Board member, Forbes, resigned from the Sheridan Board immediately after voting on the Tierney motion because of a "conflict of interest". This self-acknowledged "conflict of interest" which prevented Forbes from serving as a Board member, existed prior to Forbes vote on the motion against the Tierneys, and even well before the Board meeting began.

133.    Forbes and Bearden were also school district employees and mandated reporters, subject to the provisions of *The Illinois Abused and Neglected Child Reporting Act*, 325 ILCS 5/1 et seq., as was Adams County States Attorney, Barney Bier.

134.    As mandated reporters and teachers and employees of the School District, the actions of Forbes and Bearden were committed within the course and scope of their employment and under color of state law.

135.    As of at least April 14, 1999, an illegally constituted Board of Directors has governed Sheridan Swim Club. According to the Board minutes, Schnack made a motion to have Julie Anderson serve on the Sheridan Board as a replacement for Forbes who resigned due to her self-acknowledged conflict-of-interest.

136.    Article 4, Section 2 of the Sheridan Constitution states: "No Director shall be elected to serve two (2) consecutive three-year terms, but may again serve after an absence from the Board of at least one year". (Emphasis added)

137.    Article 4, Section 1 of the Sheridan Constitution states: "The retiring President, if not elected a Director, shall become an ex-officio member of the Board for one year following such retirement." (Emphasis added)

138.    Julie Anderson had just completed a three (3) year term on the Sheridan Board of Directors and had just retired as Board President. Anderson was ineligible to *"serve"* as a Board member until March of 2000, per the Constitution and Bylaws of Sheridan Swim Club.

139.    At no time prior to their wrongful expulsion were the Tierneys notified by Sheridan of any allegations made against them, nor were the Tierneys given any notice of the proceeding against them, or had any opportunity to hear the charges against them, or any opportunity to defend themselves. Sheridan unlawfully appropriated the Tierney's stock certificate through conversion.

140.    Prior to their wrongful expulsion on approximately April 15, 1999, the Tierneys had been year-round members of Sheridan and stockholders for over 13 years.

44

141. The Plaintiffs were wrongfully expelled and banned from Sheridan property after Meyer and Schnack made false allegations and misrepresentations regarding the Tierneys' conversations with School District officials about issues and activities concerning the athletic programs and employees of the Quincy Public School District.

142. The Plaintiffs were wrongfully expelled and banished from Sheridan property in retaliation for engaging in free speech over issues of public concern involving students, employees, and athletic programs of the Quincy Public School District.

143. All Sheridan Board members initially signed affidavits stating that they had personal knowledge that" Mr. and Mrs. Tierney" had reported Powers misconduct to the Quincy School Board. However, during Hearings in State Court in June 2002, at least two (2) Sheridan Board members retracted some of their sworn statements reflected in these affidavits.

144. Sheridan/Sheridan Board engaged in acts of retaliation and intimidation of the Tierneys in an attempt to obstruct and hinder the Plaintiffs from engaging in free speech, and to obstruct and hinder the Plaintiffs from petitioning the government for redress of grievances regarding a traditional public function.

145. The Plaintiffs were wrongfully expelled from Sheridan in order to discredit them and cast them in the shadow of false light in the eyes of the School District, and to suppress any investigation of Powers' misconduct.

146. The Plaintiffs were banished from Sheridan property under the criminal threat of "trespasser" in order to obstruct and hinder the Tierneys from witnessing further acts of Powers and Sheridan's misconduct regarding the operation of the Quincy High School swim program – a traditional public function.

147. Sheridan engaged in State action when it banned the Plaintiffs from School District facilities and traditional public functions otherwise open to the public. State law requires notice, fair hearing, and due process before such action. Sheridan's action violated the constitutionally protected rights of the Tierneys guaranteed by the due process clauses of the Fourteenth Amendment regarding liberty and property interests.

148. Only a School Board, or an agent acting with state actor authority under color of State law, can bar school district students, family members, and especially a school district employee from public school district athletic facilities and events that are otherwise open to the

45



public. And, only after due process and a fair hearing is provided to those persons. Per the *Illinois School Code* 105 ILCS 5/24-25) et seq.

149.   Sheridan and the Sheridan Board have harassed and intimidated other witnesses to Powers' misconduct, and other witnesses to the Federal litigation. These actions included negatively impacting the terms and conditions of employment of Sheridan employees who were students in the Quincy School District.

150.   The actions of the Sheridan Board and Defendant Robert Meyer were performed in their individual and official capacities and for their personal benefit and were conducted intentionally, maliciously, and with willful and wanton disregard for the rights of the Tierneys.

151.   Sheridan is liable for the actions of the individual Sheridan Board members, the actions of its employees, the actions of Defendant Meyer, and for the actions of Sheridan members who acted in conspiracy with, and/or at the direction of Sheridan Board member(s) or agents of the Sheridan Board.

**B.   Causes of Action Which Occurred After the Plaintiffs Filed A Lawsuit In Federal Court In June 1999 Against Sheridan, Powers, And The Quincy School District**

152.   After the Tierneys filed a lawsuit in Federal Court, the Plaintiffs again engaged in free speech before public sessions of the Quincy School Board on issues of public concern regarding the improper operation of the Quincy high school swim program. The Tierneys also petitioned several State agencies, including the IHSA, for redress of grievances. The Tierneys also engaged in free speech on issues of public concern with the Illinois High School Association (IHSA) and investigators from the Illinois Department (DCFS) of Children and Family Services. The Tierney's' free speech concerned possible violations of School District and Illinois High School Association rules, violations of student rights, sexual harassment and inappropriate sexual conduct involving minors, and other items, were all matters of public concern.

153.   After the Tierneys filed a lawsuit in Federal Court, Powers continued to violate IHSA and School District rules and regulations at the start of the 1999/00 school year. Powers was acting within the course and scope of his employment and under color of state law. The School District again turned a "blind eye" to Powers misconduct. The IHSA subsequently began an investigation of Powers and the Quincy High School Swim Program.

154.   After the Tierneys filed a lawsuit in Federal Court, the School District and Sheridan engaged in a coordinated, joint campaign to violate the constitutionally protected rights



of the Plaintiffs. Sheridan and the School District interfered with the Tierney's' rights and attempts to petition the government and the courts for redress of grievances, intimidated, retaliated, and harassed the Plaintiffs (and other witnesses) for filing a lawsuit in Federal Court, and for engaging in free speech on issues of public concern with several State agencies.

155.   Powers and Sheridan continued their campaign of retaliation against students and families who had also reported Powers misconduct. Again, the School District was deliberately indifferent to this misconduct and to the hostile, educational environment at Sheridan and the wrongful operation of a traditional public function.

156.   After the Tierneys filed a lawsuit in Federal Court, Sheridan and the Sheridan Board harassed and intimidated other witnesses to Powers' misconduct, and other witnesses in the Federal case. These actions included negatively impacting the terms and conditions of employment of Sheridan employees who were also students in the Quincy School District.

157.   After the Tierneys filed a lawsuit in Federal Court, the School District interfered with the Tierney's' rights and attempts to petition the government and the Courts for redress of grievances, and engaged in acts of retaliation and intimidation of the Plaintiffs, and others. These acts included successful efforts to divert and limit the IHSA investigation of the High School Swim Program. The School Board voted in public session to authorize legal action against the IHSA, and fatally afflicted the Plaintiffs' attempts to petition the government for redress of grievances.

158.   The District also disseminated false and misleading information regarding the IHSA investigation, to the press and at public school board meetings. In addition, school board President Citro, threatened to expel a fellow School District Board member from School Board meetings unless he (board member) "disassociated" himself from the Tierneys. This duly elected school board member had voted to terminate Powers coaching contract and had also engaged in free speech with an IHSA investigator.

159.   After the Tierneys filed a lawsuit in Federal Court, and engaged in free speech before the Quincy School Board and other State actors and agencies, Schnack made false and misleading statements for public consumption, regarding the Plaintiff's expulsion from Sheridan. Schnack's statements were quoted in a Hannibal, Mo. newspaper.

160.   Speaking in his dual capacities as Powers' attorney and a Sheridan Board member, Schnack also stated his intentions to orchestrate and direct Sheridan's campaign of



retaliation against the Hannibal, Mo. business community, because the Hannibal newspaper reported the filing of the lawsuit.

161.    Schnack's statements to the newspaper were made in order to discredit, humiliate, and retaliate against the Tierneys and others, cast the Tierneys in the shadow of false light, interfere with the Tierney's right to petition the government and the Courts, suppress any School District investigation of Powers' misconduct, and to intimidate other persons who had knowledge of Power's and Sheridan's misconduct.

162.    During the first week of November 1999, Sheridan Swim Club hosted a meeting between members of Sheridan Swim Club and several senior School District Administrators including Superintendent Dr. Joseph Bocke. During this unprecedented meeting, Bocke and the other school officials, acting under color of state law, unlawfully divulged confidential information from an internal School District/IHSA investigation involving personnel and students of Quincy High School. In retaliation against the plaintiffs, the Tierneys were identified as the person(s) who spoke with the IHSA investigator. This action was taken in furtherance of Sheridan's and the School District's joint campaign of harassment and retaliation of the Tierneys, and was a violation of the constitutionally protected rights of the Tierneys.

163.    These disclosures and discussions were a willful and wanton violation of 20 U.S.C. Section 1232g. *Family Educational and Privacy Rights Act* (FERPA), and *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., and was perpetrated with the intent to cause damage and harm to the Plaintiffs.

164.    <u>Within a matter of days following this meeting at Sheridan,</u> the Plaintiffs began receiving obscene, harassing, anonymous phone calls, from regular phones as well as from cell phones. Brief references were made about the high school swim team program and obscene invectives were uttered and directed at the Plaintiffs. On some occasions, the Tierney children answered the phone calls. The Adams County Sheriff's Department attempted to investigate some of these phone calls after the Plaintiffs filed a report and requested an investigation.

165.    It was ultimately established that these harassing phone calls were from defendants in the Federal lawsuit, members and officials of Sheridan Swim Club, employees of the Quincy School District, and individuals associated with the Quincy High School Swim Program.

