**E-FILED**
Friday, 25 March, 2005  03:08:23 PM
Clerk, U.S. District Court, ILCD

166.    After the Tierneys filed a lawsuit in Federal Court, and engaged in free speech with the Quincy School Board and other State actors and agencies, the Tierneys received a harassing, obscene telephone call, from Defendant Schnack, and Sheridan Swim Club members Doug & Debbie Olson. A brief reference was made to the high school swim team and obscene invectives were uttered and directed at the Plaintiffs. [19]

167.    On information and belief, Plaintiffs' allege that Schnack made an anonymous, obscene, harassing phone call to the Tierneys, using Debbie Olson's cell phone, with the knowledge, permission, and agreement of the Olsons. Doug Olson was acting within the course and scope of his apparent authority as an officer of the Sheridan Booster Club, and/or at the direction of Sheridan Board member, Schnack. Debbie Olson was acting within the course and scope of her employment with the Quincy School District and/or at the direction of Sheridan Board member, Schnack.

168.    Schnack and the Olsons conspired and colluded to violate the constitutionally protected rights of the Plaintiffs, to interfere with the Tierneys' rights and attempts to petition the government and the Courts, to intimidate, retaliate, and harass the Tierneys for filing a lawsuit in Federal Court, and for engaging in free speech on issues of public concern with several State agencies.

169.    On or about December 18, 1999, Defendant Schnack conspired and colluded with the Olsons to obstruct, hinder, and impede an investigation by the Adams County Sheriff's Department of the harassing phone calls directed toward the Tierney family by Defendant Schnack and the Olsons. [20]

---

[19]   Debbie Olson is a teacher in the Quincy School District and a mandated reporter, and subject to the same reporting obligations as Ann Tierney. Olson's daughter was also a member of the 1998 through 2001 Quincy High School Girls Swim Teams and the Sheridan Swim Team. Based on information and belief, Debbie Olson witnessed the "kissing" incident involving Powers and a member of the girls' high school swim team. Olson also had knowledge of the improper "massages". Olson's daughter was in the Vahle home during the improper "massages". Debbie Olson was the President of the Quincy High School Girls Swim Team Booster Club during the 1998/99 & 1999/2000 school years. Debbie Olson also became the President of the Sheridan Swim Team Booster club in May 2000 replacing Defendant Robert Meyer. Doug Olson was the Vice-President of the Sheridan Swim team booster Club. Doug Olson, along with Defendant Robert Meyer, subsequently became a member of the Sheridan Club Board in March 2001. Doug Olson was subsequently elevated to the Presidency of the Sheridan Club Board in April 2002.

[20]   These obscene phone calls were criminal offenses according to Illinois Criminal Statute: The Harassing and Obscene Communications Act 720 ILCS 135/ et. seq.



170.   An Officer with the Adams County Sheriff's Dept. went to the Olson's home and questioned them about their knowledge of the phone call made to the Tierneys on the cell phone registered to Debbie Olson. The Olsons admitted that they were aware of the call and knew who the person was who made the phone call to the Tierneys. But the Olsons refused to divulge the name and told the Officer they wanted to call the person who made the phone call. The Officer allowed them to make a phone call.

171.   On information and belief, Plaintiffs' allege that Doug Olson called Defendant Schnack. After a conversation with Schnack, the Olsons agreed not to provide a name to the Officer. The Olsons then informed the Officer that they would not reveal the identity of the caller.

172.   The Officer warned the Olsons about the criminal consequences of obstructing justice and interfering with a criminal investigation, and warned that Olsons that both of them could be arrested for their involvement with the phone call, and for interfering with the investigation. The Olsons asked if they could make a phone call to an attorney.

173.   The Olsons called Sheridan Board member Schnack, and handed the phone to the Officer and identified the person on the phone as [Defendant] Schnack.

174.   Defendant Schnack immediately represented himself to the investigating Officer as the Olson's attorney. Schnack told the officer he had instructed the Olsons not to speak with the Officer. Schnack stated that the Olsons would contact the Officer later in the week and make arrangements to speak with him.

175.   Based on information and belief, Schnack and/or the Olsons subsequently contacted the Sheriff's department and informed them that the Olsons would not be providing any information.

176.   Schnack's misconduct, while acting in multiple capacities, gave rise to multiple conflicts of interests and misconduct as an attorney. Schnack was a Defendant in a Federal Lawsuit, a Sheridan Board member, and an attorney providing legal counsel to the Olsons and to swim coach Powers. Schnack was also a co-perpetrator of the obscene phone call made to the Tierneys on the Olson's cell phone, which was the subject of a criminal investigation by the Adams County Sheriff's Department.

177.   Schnack instructed the Olsons to interfere with, obstruct, and impede an investigation by constituted authorities of the State into a criminal incident in which he

(Schnack) was personally involved. Schnack violated the constitutionally protected rights of the Plaintiffs.

178.    Schnack instructed the Olsons to obstruct, hinder, and impede an investigation by constituted authorities of the State into the harassment and intimidation of the Plaintiffs in a Federal lawsuit and violated the constitutionally protected rights of the Plaintiffs.

179.    The Olsons agreed with Schnack's directives and refused to provide any further information to the Adams County Sheriff's Dept. The information withheld by the Olsons was crucial and essential to any investigation and/or judicial proceeding.  Withholding this information fatally afflicted the Plaintiffs attempts to pursue civil and/or criminal action against the Olsons, Schnack, and Sheridan over these incidents. Doug Olson was acting within the scope of his apparent authority as an officer of the Sheridan Booster Club, and/or at the direction of Sheridan Board member, Schnack. Debbie Olson was acting within the course and scope of her employment with the Quincy School District and/or at the direction of Sheridan Board member, Schnack.

180.    Sheridan is liable for the actions of the individual Sheridan Board members, the actions of its employees, and the actions of Doug Olson. The actions of Sheridan Board member Schnack and the actions of Sheridan Booster Club officer, Doug Olson, were performed in their individual and official capacities, and for their personal benefit, and were conducted intentionally, maliciously, and with willful and wanton disregard for the constitutionally protected rights of the Tierneys. [21]

181.    The Adams County Sheriff's Department turned over all investigation reports of the harassing phone calls to the Adams County States' Attorney, Barney Bier. (Bier is also a Sheridan Swim Club board member and Board President).

182.    After the investigation reports were turned over to Defendant Bier, the Plaintiffs petitioned the Adams County States' Attorney [Bier] for redress of grievances, by sending a letter to Defendant Bier, wherein the Plaintiffs requested an investigation and prosecution of all parties

---

[21]    Sheridan's liability and responsibility for Doug Olson's conduct in joint action with Schnack, was acknowledged and ratified by the Sheridan Board when the Board agreed to pay the legal fees of Doug Olson after the Olsons were named as a defendant in the Plaintiffs' Federal Civil lawsuit.  The School District's liability and responsibility for the conduct of Debbie Olson with Schnack was acknowledged and ratified by the School Board when the School District agreed to pay the legal fees of Debbie Olson and also rewarded her with extra duties and pay.

involved in the harassing, obscene calls made to the Plaintiffs. The Plaintiffs specifically requested a complete investigation and prosecution of all parties involved with the obscene, intimidating, harassing phone calls.

183.    On information and belief, Plaintiffs' allege that Defendant Bier, acting under color of state law as the Adams County States' Attorney reached an agreement with Schnack to violate the constitutionally protected rights of the Plaintiffs. Bier divulged to Defendant Schnack that he [Bier] would obstruct and hinder the investigation of the phone calls by removing crucial investigation reports of the harassing, obscene phone calls from the Sheriff's case file, and then forward the file to the State of Illinois Appellate Prosecutor's Office.

184.    Acting upon this information from Defendant Bier, Defendant Schnack, acting on behalf of Sheridan Swim Club, mailed a letter to each Quincy School Board member. Schnack's letter conveyed false and misleading statements concerning alleged investigations by various law enforcement agencies of individuals and incidents concerning the swim programs of Sheridan and Quincy High School.

185.    Defendant Schnack falsely asserted that the "Adams County States Attorney", the "Illinois State Police", and the "State of Illinois Appellate Prosecutors Office", and other agencies had conducted investigation and rendered conclusions.

186.    Schnack's letter conveyed false and misleading statements. Schnack's letter discredited, damaged, and retaliated against the Tierneys, cast the Tierneys in the shadow of false light, interfered with the Tierneys' rights and attempts to petition the government and the Courts, suppressed any investigation of the QHS swim program and of the harassing obscene phone calls, and intimidated other witnesses regarding Power's and Sheridan's misconduct. *(A true and correct copy of Schnack's letter of Feb. 3, 2000, is attached hereto as Exhibit E)*

187.    Schnack's letter was rife with false and misleading statements concerning the operation of the Quincy High School Swim Program during the 1998/99 & 1999/2000 school years.

188.    Schnack's letter also conveyed his offer to provide Sheridan facilities and equipment free of charge to the School District in return for special considerations from the School District in the hiring of the next Quincy high school swim coach.

189.    Defendant Bier mailed the Sheriffs' investigation reports to the State of Illinois Appellate Prosecutor's Office after he [Bier] first removed all the criminal investigation reports



of the phone call involving Schnack and the Olsons, and the reports detailing Schnack and the Olson's conversations with the investigating Officer, and the subsequent obstruction of the investigation by Schnack and the Olsons. These missing reports comprised the bulk of the file and were crucial and essential to any investigation and/or judicial proceeding. After receiving the altered file from Bier, the Illinois Appellate Prosecutor's Office took no action.

190.   Sheridan Board member Bier, acting under of color of state law as the Adams County States' Attorney, conspired with Sheridan Board member Schnack to violate the constitutionally protected rights of the Plaintiffs, to interfere with the Tierney's' rights and attempts to petition the government, to further retaliate against the Tierneys for petitioning various State Actors for redress of grievances, for filing a lawsuit in federal court, and for engaging in free speech on issues of public concern with several State actors and agencies.

191.   Defendants, Bier and Schnack interfered with and/or prevented the Plaintiffs from petitioning the State for redress of grievances. Bier and Schnack's misconduct fatally afflicted the Plaintiffs attempts to pursue civil and/or criminal action against the Olsons, Schnack, and Sheridan over these incidents. Just one month later, in March of 2000, Defendant Bier was elevated to the position of President of the Sheridan Board of Directors.

192.   Defendants Bier and Schnack obstructed, hindered, and impeded an investigation by constituted authorities of the State of the harassing phone calls directed toward the Tierney family by Schnack and the Olsons. Bier and Schnack obstructed and impeded an investigation by constituted authorities of the State into the harassment and intimidation of the Plaintiffs in a Federal lawsuit.

193.   Defendant Bier unlawfully removed, altered, or otherwise concealed, evidence of the criminal conduct of Schnack and the Olson's from the Illinois Appellate Prosecutors Office.

194.   Bier's misconduct, while acting in multiple capacities, gave rise to multiple conflicts of interests and misconduct in office by a public official. Bier was a Defendant in a Federal Lawsuit (along with Schnack and Sheridan), a Sheridan Board member, and the Adams County States' Attorney. This misconduct by Defendant Barney Bier, acting under the color of state law, represents, at least, the abuse of public office by a public official in order to aid private parties in litigation, in which the Office of the Adams County States' Attorney has no interest or standing in view of Bier's self-acknowledged conflicts-of-interest. And again establishes a symbiotic relationship between Sheridan/Sheridan Board and State Actors.



195.    Defendant Bier engaged in willful and wanton misconduct as the Adams County States' Attorney under color of state law on behalf of Schnack, the Olsons, and Sheridan Swim Club.  Bier engaged in renegade conduct far <u>outside</u> the legitimate course and scope of his employment duties.  Bier obstructed a criminal investigation by engaging in acts that were clearly beyond his purview, discretion, and jurisdiction per his acknowledged conflicts-of-interest.

196.    No State or Federal law provides a cloak of immunity that allows a States Attorney "discretion" to violate the constitutionally protected rights of the Tierneys.

197.    The Tierneys informed the Quincy School Board of the Olsons involvement with the illegal phone calls and requested an investigation of the harassing, obscene phone calls.  On information and belief, School Board President Koch, and school board attorney Gorman, told the other School Board members that the District did not have to take any action regarding the phone calls made to the Plaintiffs.  The School District again turned a "blind eye" to acts of retaliation against the Tierneys, by Sheridan officials and school district employees. [22]

198.    After receiving reports of harassing, obscene phone calls, made to a School District Administrator by another School District employee, School Board President, Koch, school Board attorney, Gorman, and the School District again violated the constitutionally protected rights of the Plaintiffs, and retaliated against the Tierneys for petitioning the government and the Courts, violated *Title IX*, and engaged in deliberate indifference by refusing to investigate or take any action regarding the harassing, obscene phone calls.

199.    In breach of fiduciary duties and the duty of operation in good faith, the Sheridan Board voted to pay the legal fees of the Olsons.  Ultimately, the School District paid for Debbie Olson's legal expenses in defending her against the same civil lawsuit, while Sheridan in turn, paid for Doug Olson's legal expenses.  These actions further demonstrate the nexus and coordinated conspiracy between Sheridan and the School District.  Per 105 ILCS 5/10-20.20 and 5/10-22.3, the School District should not have paid for Debbie Olson's legal expenses unless

---

[22] The Olsons **are not** named as individual defendants in this Complaint for their involvement with the phone calls and subsequent obstruction of the police investigation, since the Federal Court also refused to recognize the existence of any allegation or evidence which sufficiently established a genuine issue of material fact that the Olsons were state actors, and therefore dismissed the Olsons as defendants in the Federal litigation.

Debbie Olson was acting within the course and scope of her employment, or at the direction of the School Board.

200.    The District also rewarded Debbie Olson with extra professional duties, responsibilities, and compensation, while at the same time engaging in punitive, discriminatory action against Ann Tierney in the workplace, including but not limited to denying her career advancement, removing some professional duties, and reducing her compensation.  (See ¶¶ 85-87)

201.    In furtherance of the School District's nexus with Sheridan, and in ratification of the campaign of retaliation against the Plaintiffs, and of the misconduct of school District employees and agents, the School District subsequently hired the next Sheridan Swim coach as the Quincy High School swim coach.  Sheridan thus maintained operational control of the Quincy High School Swim Program.

202.    In July 1999, during a Hearing in Federal Court, Sheridan's attorney, Paul Bown, made oral representations to the Court.  Bown stated that in the future Meryl Tierney would be allowed to participate in activities at Sheridan as a member of the Quincy High School and Sheridan Swim Teams.  These representations mislead the Court in order to divert immediate judicial intervention.

203.    The Court accepted these representations without reservation, stating in a Court Order that Sheridan's attorney made the statement in his capacity as an "Officer of the Court".  No evidence or testimony was submitted to substantiate or corroborate these representations.  Nor did the Court inquire into the existence of any corroborating evidence to establish a foundation for Bown's representations.

204.    In breach of representations made by an Officer of the Court in Federal Court, Sheridan Swim Team officials subsequently terminated Meryl Tierney's membership on the Sheridan/USA Swimming Swim Team without notice, fair hearing, or due process.  Meryl Tierney was barred from any participation in swimming activities as a member of the Sheridan Swim Team in order to further retaliate against the Plaintiffs for petitioning various State Actors for redress of grievances, for filing a lawsuit in federal court, and for engaging in free speech on issues of public concern.  Defendant Meyer was still the President of the Sheridan Swim Team Booster Club at this time.



55

205.    In July 2000, Sheridan engaged in further acts of retaliation and intimidation when a Sheridan employee approached Plaintiff Bob Tierney at the edge of the Tierney property. In the presence of the Tierney children and other witnesses, and while acting on behalf of Sheridan Swim Club, the employee informed Mr. Tierney that no member of the Tierney family was allowed on any Sheridan property "for any function whatsoever" per orders from several Sheridan Board members. The employee stated that this ban included Meryl Tierney and all other Tierney family members.

206.    The Sheridan employee was acting within the course and scope of his employment, and/or at the direction of the Sheridan Board. The Sheridan employee referred to Sheridan's letter [April 15, 1999] sent to the Plaintiffs, and to his recent conversations with Sheridan Board member, Schnack, and Board President, Bier.

207.    Sheridan again engaged in State action when it reaffirmed and re-implemented Sheridan's banning of the Plaintiffs from School District facilities and functions otherwise open to the public. State law requires notice, fair hearing, and due process before such action. Sheridan's action violated the constitutionally protected rights of the Tierneys guaranteed by the due process clauses of the Fourteenth Amendment regarding liberty and property interests. This action was also a breach of representation made by an Officer of the Court in Federal Court.

208.    In furtherance of the Nexus with the School District and the conspiracy between Sheridan Board members and various CLUB members, the Sheridan Board has systematically recycled and selected certain Club members for membership on the Sheridan Board, who were entwined in Sheridan's campaign to establish and maintain operational control of the Quincy High School Swim Program. Some of these CLUB members were already defendants in the Federal lawsuit as a result of their participation in prior acts of misconduct directed against the Plaintiffs. In addition, these new Board members were subsequently elevated to positions as Sheridan Board officers thereby giving them control and direction authority over the Sheridan Board. The Sheridan Board selected these individuals in order to sustain Sheridan's campaign of retaliation against the Plaintiffs and to maintain the cover-up of the misconduct of the Sheridan Board.

209.    In March 2000, Defendant Bier was elevated to the position of President of the Sheridan Board and Defendant Patricia Crane was selected to become a Board member. In March 2001, Doug Olson and Robert Meyer, who were already defendants in the Federal



lawsuit, were selected for the only two open positions on the Sheridan Board of Directors. In March 2002, Barb Selvy and Robert Hultz were selected to become Sheridan Board members. On information and belief, in April 2002, the Sheridan Board immediately elevated Olson, Meyer, and Selvy to the positions of President, Vice-President, and Secretary (respectively) of the Sheridan Board of Directors. [23]

210.    During 2+ years of litigation between June 1999, and October 2001, Sheridan Swim Club only produced one (1) sheet of paper pursuant to Initial Disclosure, Request to Produce Documents at Depositions, and two (2) Motions to Compel Disclosure. This document was the Sheridan Board minutes from April 1999, which was produced at Initial Disclosure in March 2000. No other Board minutes or documents of any kind were ever produced by Sheridan, despite the fact that the Sheridan Board held numerous discussions from at least September 1998 through June 1999, regarding the QHS personal, student activities of Meryl Tierney, and regarding the Tierney's complaints to the Quincy School District about Powers misconduct. After the Federal lawsuit was filed, Defendants Schnack and Bier (who are also attorneys) assumed control and responsibility for Sheridan Corporate records and Board minutes from past years, and refused to produce these relevant Board minutes and records during the period of time that Sheridan was under Federal Court jurisdiction.

211.    In furtherance of a conspiracy between Sheridan Board members and various CLUB members, the Sheridan Board fraudulently operated the CLUB by misusing the facilities of the CLUB, and misappropriating the financial assets of the CLUB. Sheridan gave the School District free use of Sheridan facilities and free use the Sheridan Swim Team equipment, for all Quincy High School Swim Team activities, beginning with the 2000/2001 school year. The Sheridan Board also voted to pay the legal fees of the Olsons.

212.    This action was a breach of the Board's fiduciary duty and the duty of operation in good faith, and resulted in financial harm to Sheridan Swim Club, while aiding the personal self-interests of certain Board members and Sheridan Swim Team members.

---

[23]  Barb Selvy is a past officer of the Sheridan Swim Team Booster Club. Both Selvy and Patricia Crane were heavily involved in Sheridan Swim Team and Quincy High School swim team activities when Richard Powers coached those swim teams. In addition, the Selvy family has kept in personal contact with Powers after Powers skipped the country in March 2000, in order to avoid testifying at his deposition in the Plaintiffs' Federal lawsuit. Robert Hultz is a former Sheridan Board member and board president who served from 1995-98. Hultz was Board President and was also entwined in Sheridan's campaign to enter into a "marriage" with the Quincy School District during the 1997-98 school year.

213.    Sheridan is liable for the actions of the Board, and the actions of individual Sheridan Board members, Schnack and Bier, the actions of Sheridan employees, and for the actions of CLUB members who acted in conspiracy with Board members. The actions of the Sheridan Board and Defendant Robert Meyer were performed in their individual and official capacities and for their personal benefit, and were conducted intentionally, maliciously, and with willful and wanton disregard for the rights of the Tierneys. These actions by Sheridan, Schnack, and the Sheridan Board also constituted breach of an expressed duty of good faith and breach of fiduciary duty resulting in damage and harm to the Plaintiffs.

**C.    Ratification by Sheridan/Sheridan Board of Wrongful Conduct Complained of in ¶¶ 152-212.**

214.    After the Tierneys filed a lawsuit in Federal Court, Sheridan and the Sheridan Board ratified the campaign of retaliation against the Tierneys, and the misconduct of Bier, Schnack, Meyer, and Doug and Debbie Olson, and others, by engaging in acts and omissions that are inconsistent with non-affirmation of the misconduct of the individual defendants and the wrongful actions and policy of the Sheridan Board. By these actions, Sheridan accepted responsibility for, and affirmed the acts of misconduct directed against the Tierneys by Schnack, Bier, Meyer, the Olsons, and others, which were performed on behalf of Sheridan and/or at the request, or direction of Sheridan Board member(s). These acts of ratification include but are not limited to the following:

a.    Aiding and abetting Powers' continued improper operation of the high school swim program at Sheridan at the beginning of the 1999-2000 school year prior to the IHSA intervention and investigation;

b.    Engaging in acts of retaliation, intimidation, and harassment directed against the Tierneys and others, by Sheridan Board members, Club members, and employees, after the Tierneys filed a Federal lawsuit, petitioned various State Actors for redress of grievances, and engaged in free speech on issues of public concern with various State actors;

c.    Reaffirming and sustaining the punitive actions taken the Tierneys by the actions of the Sheridan employee taken against the Tierneys in July 2000; (See ¶¶ 204-213)

d.    Elevating Defendant Bier to the position of President of the Sheridan Board in March 2000;

e.    Selecting Defendant Patricia Crane to be a Sheridan Board member in March 2000;

f.    Selecting Defendant Meyer to be a Sheridan Board member in March 2001;

g.    Selecting Defendant Doug Olson to be a Sheridan Board member in March 2001;



h.   Agreeing to pay the legal fees of Club members, Doug and Debbie Olson *(resulting in financial harm to the Club)*;
i.   Providing the Sheridan facilities and equipment free of charge to the School District*(resulting in financial harm to the Club)*;
j.   Elevating Doug Olson to the Presidency of the Sheridan Board in April 2002;
k.   Elevating Defendant Robert Meyer to the Vice-Presidency of the Sheridan Board in April 2002;
l.   Selecting Barb Selvy to be a Sheridan Board member and subsequently elevating her to the position of Secretary of the Board in April 2002;

## COUNT II

215.   The acts and omissions of Defendants Constitutes <u>Breach of Contract</u> and breach of the expressed duty of operation in Good Faith and Fair Dealing by violating numerous provisions of the CLUB Constitution and By-Laws, and by denying all Plaintiffs proper notice, fair hearing, and due process. Plaintiffs repeat and re-allege the allegations of paragraphs 104-151 & 210. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT III

216.   The acts and omissions of Defendant Sheridan Board constitute a <u>Breach of Fiduciary Duties</u>, by violating numerous provisions of the CLUB Constitution and By-Laws, and by denying all Plaintiffs proper notice, fair hearing, and due process. Plaintiffs repeat and re-allege the allegations of paragraphs 104-156, 160-161, 184-196, and 205-214. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT IV

217.   The acts and omissions of Defendants Sheridan and Sheridan Board constitute <u>Retaliatory Discharge</u>, proximately damaging Plaintiff Meryl Tierney in an amount to be specifically determined at trial. Plaintiffs repeat and re-allege the allegations of paragraphs 104-151. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT V

218.   The acts and omissions of Defendants Sheridan, Sheridan Board, Robert Meyer, constitutes <u>Tortuous Interference with Business Relations</u> between Plaintiff Ann Tierney's and her employer, the Quincy School District. Plaintiffs repeat and re-allege the allegations of

paragraphs 85-87, 104-156, 160-161, 184-196, and 205-214. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT VI

219.    The acts and omissions of Defendants Board and Meyer constitutes Conversion. Plaintiffs repeat and re-allege the allegations of paragraphs 104-151. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT VII

220.    The acts and omissions of Defendants Board and Meyer constitutes Invasion of Privacy. Plaintiffs repeat and re-allege the allegations of paragraphs 104-151, 152-199. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT VIII

221.    The acts and omissions of Defendants Sheridan, Sheridan Board, and Meyer constitutes False Light. Plaintiffs repeat and re-allege the allegations of paragraphs 104-151, 152-163. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT IX

222.    The acts and omissions of Defendants were willful and wanton, and constitutes Intentional Infliction of Emotional Distress. Plaintiffs repeat and re-allege the allegations of paragraphs 85-87, 104-214. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250

## COUNT X

223.    The acts and omissions of Defendants Sheridan, Schnack, Bier, and Sheridan Board constitute Constructive Fraud. Plaintiffs repeat and re-allege the allegations of paragraphs 104-156, 160-161, 184-196, and 205-214. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT XI

224.    The acts and omissions of Defendants Sheridan, Schnack, Bier, and Sheridan Board constitute Fraudulent Concealment. Plaintiffs repeat and re-allege the allegations of paragraphs 104-214. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT XII

225.   The acts and omissions of Defendants Sheridan, Schnack, and Bier constitutes Intentional Spoliation of Evidence.  Plaintiffs repeat and re-allege the allegations of paragraphs 104–151, 181-196.  For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 242-248.

## COUNT XIII

226.   The acts and omissions of Defendants Sheridan, Schnack, and Bier constitutes Negligent Spoliation of Evidence.  Plaintiffs repeat and re-allege the allegations of paragraphs 104–151, 181-196.  For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 242-248.allegations of paragraphs 244-250.

## COUNT XIV

227.   The acts and omissions of Defendants Sheridan, Sheridan Board, and Meyer constitutes violations of *The Illinois School Student Records Act* 105 ILCS 10/1-10 et seq., were willful and wanton, and were perpetrated with the intent to cause damage and harm to the Plaintiffs.  Plaintiffs repeat and re-allege the allegations of paragraphs 104-196. For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT XV

228.   The acts and omission of Defendants constitutes violations of *The Illinois Abused and Neglected Child Reporting Act*, 325 ILCS 5/1 et seq, (1998) formerly Ill. Rev. Stat. Ch. 23, 2051 et seq. (1975) eff. July 1, 1975.  Plaintiffs repeat and re-allege the allegations of paragraphs 104-151, 152-214.  For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## COUNT XVI

229.   The acts and omission of Defendants constitutes violations of *The Illinois School Code* 105 ILCS 5/24-25) et seq.  Plaintiffs repeat and re-allege the allegations of paragraphs 104-151, 204-207.  For damages and relief sought, the Plaintiffs repeat and re-allege the allegations of paragraphs 244-250.

## XVI.   FEDERAL CLAIMS

230.   Plaintiffs repeat and re-allege the allegations of paragraphs 1-11 & 85-103 for all Federal Claims asserted herein.

*C 928*

1.    **Statutes and Constitutional Provisions Involved**

231.    At all times material, there was in full force and effect in the United States of America, a certain statute known as the Civil Rights Act of 1871, 42 U.S.C. § 1983 which provides:

> Section 1983
> Every person who under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other property proceeding for redress....

232.    At all times material there was in full force and effect in the United States of America, certain provisions of the Constitution of the United States, namely the First and Fourteenth Amendments which provides:

**Article IV**

> §2.    Privileges and Immunities
> Section 2.    The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

**Amendment [I]**

> Congress shall make no law.... Abridging freedom of speech, or of the press, or of the right of people to peaceably assemble, and to petition their government for redress of grievances.

**Amendment [XIV]**

> Section 1.    ... nor shall any State deprive any person of life, liberty, or property without due process of law;

2.    **Claims under 42 U.S.C. 1983**

233.    Defendants Sheridan Board and Sheridan:    Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein. The Complaint also states claims under 42 U.S.C. § 1983 for causes of action which occurred after the Tierneys filed a lawsuit in Federal Court after July 1, 1999 through the conduct alleged in ¶¶ 152-196, 199-214. Sheridan is liable to the Plaintiffs for the retaliation against the Plaintiffs by Sheridan Board members, officials, and members who acted in collusion with and/or at the direction of Sheridan Board members and/or policy-making agents of the Sheridan Board, and/or in collusion with others who were acting while under color of State law.



**Count I        Right of Access to the Courts without Interference or Retaliation**

234.    Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein.  Defendants Sheridan, Sheridan Board, Schnack, Bier, and Meyer intentionally deprived and interfered with the Plaintiffs' right of access to the courts.  One source of the right the right of access to the courts is found in the privilege and immunities of citizenship guaranteed by Article IV, Section 2 of the Constitution.  A second source of the right of access to the courts is the procedural and substantive components of the guaranty of due process of law of the Fourteenth Amendment to be free from intentional retaliation by state actors as alleged in ¶¶ 152-196, 199-214, for Plaintiffs' filing of the action in Federal Court (¶ 80, Case No. 99-3149) against the Sheridan, Sheridan Board, Meyer, and others named as Defendants in the Complaint, and per the actions and free speech of the Plaintiffs as alleged in ¶¶ 152, 164, 182, 197, and others; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.

**Count II        Right to Freedom of Speech and to Petition the Government for Redress of Grievances without Interference or Retaliation**

235.    Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein.  Defendants Sheridan, Sheridan Board, Schnack, Bier, and Meyer intentionally deprived Plaintiffs of their rights to Freedom of speech guaranteed them as part of the First Amendment to be protected from retaliation by state actors by the acts of conspiracy and retaliation specifically alleged in ¶¶ 152-196, 199-214, for engaging in free speech on issues of public concern with several State Agencies after filing a lawsuit in Federal Court, and for Plaintiffs petitioning the Government for redress of grievances as alleged in ¶¶ 152, 164, 182, 197, and others; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.

**Count III        Right of Association without Retaliation**

236.    Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein.  Defendants Sheridan, Sheridan Board, Schnack, Bier, and Meyer intentionally deprived plaintiff Meryl Tierney of her right of association with her parents, Robert (Bob) Tierney and Ann Tierney, by acts of conspiracy and retaliation specifically alleged in ¶¶ 152-196, 199-214, for the speech of Robert Tierney and Ann Tierney on issues of public concern with several State Agencies after filing a lawsuit in Federal Court, and for their



petitioning the Government for redress of grievances as alleged in ¶¶ 152, 164, 182, 197, and others; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.

237.    Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein. Defendants Sheridan, Sheridan Board, Schnack, Bier, and Meyer intentionally deprived plaintiffs Robert (Bob) Tierney and Ann Tierney of their right of association with their daughter, Meryl Tierney, by acts of conspiracy and retaliation specifically alleged in ¶¶ 152-196, 199-214, for the speech of Meryl Tierney on issues of public concern alleged in ¶¶ 152, 164, 182, 197, and others; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.

238.    Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein. Defendants Sheridan, Sheridan Board, Schnack, Bier, and Meyer intentionally deprived plaintiffs Robert (Bob) Tierney, Ann Tierney, and Meryl Tierney of their right of association with elected public officials (Quincy School Board member(s)), by acts of conspiracy and retaliation specifically alleged in ¶¶ 152-196, 199-214, for the speech of Robert Tierney, Ann Tierney, and Meryl Tierney on issues of public concern, for petitioning the government for redress of grievances, and for filing a lawsuit in federal court as alleged in ¶¶ 152, 164, 182, 197, and others; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.

### Count IV    Right to Procedural Due Process

239.    Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein. The Complaint also states a claim under the Fourteenth Amendment's due process clause. Defendants Sheridan, Sheridan Board, Schnack, Bier, and Meyer intentionally deprived Plaintiffs of their rights to due process in protection of their property and liberty interests, per their [Defendants] actions specifically alleged in ¶¶ 152-196, 199-214, in retaliation for the Tierneys engaging in free speech on issues of public concern with several State Agencies, for filing a lawsuit in Federal Court, and for Plaintiffs petitioning the Government for redress of grievances as alleged in ¶¶ 152, 164, 182, 197, and others; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.



**Count V**      **Ratification by Sheridan/Sheridan Board of Wrongful Conduct and Actions of Sheridan Board Members, Meyers, Club Members, and Employees**

240.   <u>Defendants Sheridan and Sheridan Board</u>. Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein. The Complaint also states a claim of Ratification for causes of action, which occurred after July 1999. Sheridan and the Sheridan Board has engaged in acts and omissions, and sustained policies that are inconsistent with non-affirmation of the misconduct of the above named defendants and individuals, and the wrongful actions and policy of the Sheridan Board. By these actions, Sheridan accepted responsibility for, and affirmed the acts of misconduct directed against the Tierneys by Schnack, Bier, Meyer, the Olsons, and others, which were performed on behalf of Sheridan and/or at the request, or direction of Sheridan Board member(s). These acts include but are not limited to the following:

  a. Aiding and abetting Powers' continued improper operation of the high school swim program at Sheridan at the beginning of the 1999-2000 school year prior to the IHSA intervention and investigation;

  b. Engaging in acts of retaliation, intimidation, and harassment against the Tierneys and others, by Sheridan Board members, Club members, and employees, after the Tierneys filed a Federal lawsuit, petitioned various State Actors for redress of grievances, and engaged in free speech on issues of public concern with various State actors;

  c. Reaffirming and sustaining the punitive actions taken the Tierneys by the actions of the Sheridan employee taken against the Tierneys in July 2000;  (See ¶¶ 215-217)

  d. Elevating Defendant Bier to the position of President of the Sheridan Board in March 2000;

  e. Selecting Defendant Patricia Crane to be a Sheridan Board member in March 2000;

  f. Selecting Defendant Meyer to be a Sheridan Board member in March 2001;

  g. Selecting Defendant Doug Olson to be a Sheridan Board member in March 2001;

  h. Paying the legal fees of Club member, Doug Olson *(resulting in financial harm to the Club);*

  i. Providing the Sheridan facilities to the School District at no cost *(resulting in financial harm to the Club);*

  j. Elevating Doug Olson to the Presidency of the Sheridan Board in April 2002;

  k. Elevating Defendant Robert Meyer to the Vice-Presidency of the Sheridan Board in April 2002;

  l. Selecting Barb Selvy to be a Sheridan Board member and subsequently elevating her to the position of Secretary of the Board in April 2002;

65



constitutes ratification by Sheridan/Sheridan Board of the misconduct and actions detailed in ¶¶ 152-196, 199-214, and others; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.

### 3.   Claims Under 42 U.S.C. § 1985(2 & 3)

### Count VI

241.   Defendants Sheridan, Schnack, and Bier conspired to intentionally deprived the Plaintiffs of their right of access to the courts and to petition the Government for redress of grievances: Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein. A third source of the right of access of the courts asserted in the complaint is the statutory right of protection from retaliation extended to plaintiffs and witnesses in federal civil rights suits of <u>42 U.S.C. § 1985 (2)</u>. The complaint also states a claim for causes of action which occurred after filing a lawsuit in Federal Court for a private civil rights conspiracy actionable without state action under 42 U.S.C. §1985 (2). Private conspirators are directly liable under § 1985(2) for attempts to harass parties or witnesses in Federal litigation without the requirements of state action or class-based animus. <u>However, in the alternative, Defendant Barney Bier, is clearly a State Actor, acting under color of law in conspiracy and joint action with Sheridan Board members, thus making State Actors of Schnack, Sheridan, and Sheridan Board</u>. The Defendants conspired to retaliate against the Plaintiffs for petitioning various State Actors for redress of grievances and for filing a lawsuit in federal court through the conduct of the Plaintiffs alleged in ¶¶ 152-196, 199-214, and others. Schnack retaliated against, interfered with, and/or prevented the Plaintiffs from petitioning the State for redress of grievances. Schnack obstructed, hindered, and impeded an investigation by constituted authorities of the State of the harassing phone calls directed toward the Tierney family by Schnack and the Olsons through the conduct alleged in ¶¶ 164-196, 204-211. Bier and Schnack obstructed, hindered, and impeded an investigation by constituted authorities of the State into the harassment and intimidation of the Plaintiffs in a Federal lawsuit through the conduct alleged in ¶¶ 181-196, 204-212. Sheridan is liable to the Plaintiffs for the conspiracy and actions of its Board members, officials, and members who acted in collusion with and/or at the direction of Sheridan Board members, and/or policy-making agents of the Sheridan Board, and/or in collusion with others who were acting while under color of State law; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 243-250.



a.    **42 U.S.C. §1985. Conspiracy to Interfere with Civil Rights.**

**(2) Obstructing justice; intimidating party, witness, or juror.**

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified,....... or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

### Count VII

242.    Defendants Sheridan, Schnack, and Bier conspired to intentionally deprived the Plaintiffs of their constitutionally protected rights and privileges: Plaintiffs repeat and re-allege the allegations referred to in paragraph 230 for the Federal Claims asserted herein. The complaint also states a claim for causes of action which occurred after filing a lawsuit in Federal Court for a private civil rights conspiracy actionable without state action under 42 U.S.C. §1985 (3) without the requirements of state action or class-based animus. Private conspirators are directly liable under § 1985(3) for conspiring for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws. However, in the alternative, Defendant Barney Bier, is clearly a State Actor, acting under color of law in conspiracy and joint action with Sheridan Board members, thus making State Actors of Schnack, Sheridan, and the Sheridan Board. Sheridan Board member Bier, acting under of color of state law as the Adams County States' Attorney, conspired with Sheridan Board member Schnack to retaliate against and interfere with the Tierney's' rights and attempts to petition the government and the courts per the Plaintiffs actions as alleged in ¶¶ 152, 164, 182, 197. Bier interfered with and/or prevented the Plaintiffs from petitioning the State for redress of grievances. Bier and Schnack obstructed, hindered, and impeded an investigation by constituted authorities of the State of the obscene, harassing phone calls directed toward the Tierney family by Schnack and the Olsons. Bier and

67



Schnack obstructed, hindered, and impeded an investigation by constituted authorities of the State into the harassment and intimidation of the Plaintiffs in a Federal lawsuit through the conduct alleged in ¶¶ 169-196, 204-214.   Sheridan is liable to the Plaintiffs for the conspiracy and actions of its Board members, officials, and members who acted in collusion with and/or at the direction of Sheridan Board members and/or policy-making agents of the Sheridan Board, and/or in collusion with others who were acting while under color of State law; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial per ¶¶ 244-250.

**b.    42 U.S.C. §1985.  Conspiracy to Interfere with Civil Rights.**

**(3) Depriving persons of rights or privileges**

> If two or more persons in any State or Territory conspire......, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;.... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

## XVI   Damages and Relief Sought

243.    Sheridan's retaliatory and wrongful expulsion of the Tierneys was wrenching to the entire family.  Sheridan was a significant source of family recreational and social contact for the Plaintiffs, which is lost as a result of the termination and banishment from Sheridan property. In particular, the recreational lives of the Tierney children revolved around the Sheridan Swim club, as it was the center of their spring and summer neighborhood activities.  Plaintiffs' residence is adjacent to Club property and directly behind the swimming pools.

244.    As a consequence of one or more of the foregoing wrongful acts and omissions of Defendants, Plaintiffs are now forced to observe Club members enjoying club benefits and facilities that Plaintiffs paid for and utilized since 1986. Plaintiff's youngest child, Case Tierney, was an 8-year-old child who has enjoyed the use of the Sheridan pools, pond, and expansive



grounds as the primary source of his summer activities since birth. The recreational lives of the Tierney children revolved around the Sheridan Swim club, as it was the center of their spring and summer neighborhood activities. Plaintiffs' residence is adjacent to Club property and directly behind the swimming pools. As a result of Defendants' intentionally wrongful and malicious conduct, Case Tierney, who is almost 12 years old, has been forced to watch from his backyard for the past 4 summers, as his neighborhood friends play in and enjoy the Sheridan pools and grounds. During the summer months, hardly a day goes by without Case asking when he can go to Sheridan. As a young boy, he has little comprehension of the adult world and his parents are unable to explain, not would never attempt to explain to him, the vindictiveness of Sheridan and its Board of Directors. These conditions impose irreparable hardship on the Plaintiffs as well as incalculable mental and emotional distress and harm to a totally innocent party to this litigation, who is currently suffering through his fourth summer of distress. These painful memories can never be erased; proximately damaging each individual Plaintiff in an amount to be specifically determined at trial.

245.    As a consequence of one or more of the foregoing wrongful acts and omissions of Defendants, the Tierneys have been stigmatized by the wrongful actions of Sheridan and its Board. As the only family ever to have been expelled from Sheridan, the Tierneys are the focus of suspicions of wrongdoing. Ann Tierney was born and raised in Quincy and is well aware of how rumors circulate in the community. The ostracism from their family recreational and social life, and the stigma of expulsion, has cast a pall over the entire household.

246.    As a consequence of one or more of the foregoing wrongful acts and omissions of Defendants, the Tierneys have been subjected to obscene, harassing, and retaliatory phone calls. During a criminal investigation, these phone calls were ultimately tracked to Sheridan officials, members, and a school district employee. Thus, the Plaintiffs have suffered public humiliation, embarrassment, retaliation, harassment, and intimidation, due to the implication of some kind of wrongdoing on their part for which they have not had an opportunity to respond, and have otherwise lost the benefits and incidents of their membership in Sheridan together with the monetary value of their purchase of a membership certificate, and have been wrongfully banned from Sheridan property, "for any function whatsoever", including activities otherwise open to the public at large, proximately damaging each individual Plaintiff in an amount to be specifically determined at trial.



WHEREFORE, the Plaintiffs seek relief in the form of:

1.    A judgment reinstating the Tierney's Sheridan Family Membership and Stock certificate with all commensurate benefits, rights, and privileges thereof, and a judgment against Sheridan and the individual defendants for the 3 1/2 year long retaliation and harassment of the Tierney family.

2.    Money damages for each individual plaintiff and jointly and severally against Defendants SHERIDAN SWIM CLUB, INC., ANDREW C. SCHNACK III, BARNEY BIER, JULIE ANDERSON, LISA BEARDEN, DAVID P. DANIELS, RODERICK P. MILLER, ROBERT MEYER, PATRICIA CRANE, LORI MILES, DOUG OLSON, BARB SELVY, ROBERT HULTZ, and TIMOTHI BETH, for damages in excess of $50,000, for each individual plaintiff, for punitive damages for each individual plaintiff in such amounts as a jury may determine in order to punish and deter Defendants from future abusive, unlawful conduct, for Plaintiffs' court costs and attorney's fees herein, per 105 ILCS 10/9 (c) et seq, and as the prevailing party in an action to vindicate civil rights under 42 U.S.C. §1988, and for such other relief as this court deems just and equitable.

PLAINTIFFS DEMAND A TRIAL BY JURY

J. Robert Tierney, Pro Se

Ann S. Tierney, Pro Se

Meryl A. Tierney, Pro Se

### PROOF OF SERVICE

Service of the foregoing instrument was made by faxing a copy of same to the fax number of such attorneys of record of the parties to the above cause or, by hand delivering same in an envelope addressed to such attorney/parties at their business address as disclosed by the pleadings of record herein; or, by enclosing the same in an envelope addressed to same attorneys/parties, with postage thereon fully prepaid, addressed to the individuals set forth below and by depositing the same in the United States Mail from the Office on this 27 day of _AUGUST_ 2002.

C938

Jonathan Barnard
Attorney-at-Law
316 North Sixth Street
Quincy, IL 62301


Bob Tierney, Ann Tierney, Meryl Tierney
2517 Summer Creek
Quincy , IL 62305
217-223-4849

C939

**Illinois Compiled Statutes**

**Schools/Illinois School Student Records Act**

(105 ILCS 10/1)
Sec. 1. This Act shall be known and may be cited as the Illinois School Student Records Act.
(Source: P.A. 79-1108.)
(105 ILCS 10/2)

Sec. 2. As used in this Act,
(a)    "Student" means any person enrolled or previously enrolled in a school.
(d)    "School Student Record" means any writing or other recorded information concerning a student and by which a student may be individually identified, maintained by a school or at its direction or by an employee of a school, regardless of how or where the information is stored. The following shall not be deemed school student records under this Act: writings or other recorded information maintained by an employee of a school or other person at the direction of a school for his or her exclusive use; provided that all such writings and other recorded information are destroyed not later than the student's graduation or permanent withdrawal from the school; and provided further that no such records or recorded information may be released or disclosed to any person except a person designated by the school as a substitute unless they are first incorporated in a school student record and made subject to all of the provisions of this Act. School student records shall not include information maintained by law enforcement professionals working in the school.
(Source: P.A. 90-590, eff. 1-1-00.)

 (105 ILCS 10/9)
Sec. 9.
(a)    Any person aggrieved by any violation of this Act may institute an action for injunctive relief in the Circuit Court of the County in which the violation has occurred or the Circuit Court of the County in which the school is located.
(b)    Any person injured by a willful or negligent violation of this Act may institute an action for damages in the Circuit Court of the County in which the violation has occurred or the Circuit Court of the County in which the school is located.
(c)    In the case of any successful action under paragraph (a) or (b) of this Section, any person or school found to have willfully or negligently violated any provision of this Act is liable to the plaintiff for the plaintiff's damages, the costs of the action and reasonable attorneys' fees, as determined by the Court.



**Illinois Department of Children and Family Services**

Section 300.10    Purpose
The purpose of this Part is to describe how the Department of Children and Family Services (Department) administers and provides child protective services through a State Central Register and local child protective service units.  This Part governs how child abuse and neglect is reported and how such reports are handled and investigated.
(Source:  Added at 11 Ill. Reg. 12619, effective July 20, 1987)

**325 ILCS 5/4]**

C)    Employers shall not discriminate in any manner against employees who make good faith reports of suspected child abuse or neglect or who act as witnesses or testify in an investigation or proceeding concerning a report of suspected child abuse or neglect. [325 ILCS 5/9.1]

C 941

JUL-22-1997  15:25     217  8834
                       CL... RY CO. ADAMS          217 222 8834    P.01

Post-It® Fax Note 7671  Date 7/22/97  # of pages ▶ 2
To Drew)  From Bob Hultz
Co./Dept.  Co.
Phone #  Phone # 228-2886
Fax # 224-8565  Fax #

## SWIMMING PROPOSAL
July 16, 1997

On Tuesday July 15, 1997 Nick, Lee and I met with several "other" representatives of the Sheridan Swim club. I say "other" because we had met earlier with three other people from Sheridan. The first group made a proposal to Lee, Paul and I that we thought was a legitimate offer from the Board of the Club. The second group has told us that the first group did not have the authority to make any offer at all. Also, the second group was supportive of Ms. Pryor, whereas the first group was not. The second group did say there was some room for improvement in the training and conditioning, but that as far as teambuilding goes, Ms. Pryor was great. The first group just wanted to take over the entire program and release Ms. Pryor. After discussion with Nick and Lee, I am making the following recommendation.

1.  The Boys and Girls Varsity Swimming Coach positions would be vacated after the 1997-98 seasons. Ms. Pryor would be encouraged to apply. The job listing would be sent across the Midwest with the hope of finding the best possible swimming coach available.

2.  Ms. Pryor stays in the position for the 1997-98 swimming seasons.

3.  Mr. Pappas, QHS Athletic Director, will spend time this summer trying to locate another pool in a nearby community. We may find ourselves needing a new place to hold meets if Sheridan refuses to cooperate and bars us from using their facility for our home meets. (approximately 8 per season).

4.  Continue the partnership with the YMCA and use their facility for practices.

5.  Form a five member selection committee to recruit, interview and recommend for hiring a new swimming coach for both boys and girls teams. The committee's recommendation would then go to the Superintendent for formal recommendation to the Board of Education.
    * One member – Lee Pappas, Athletic Director
    * Two members – selected by Paul Koscielski, Principal of QHS
    * One member – selected by President of the Board of Directors of Sheridan Swim Club
    * One member - selected by the Executive Director of the YMCA

6.  Review with Ms. Pryor the newest trends in swimming training techniques and practices so that she has the latest information. This will help insure all our students have the best possible chance to excel.

7.  Continue to use Ms. Terry Rodgers as the diving coach for both teams.

Lee Pappas 224-3771 / 221-2488   Exhibit A-1

JUL-22-1997  15:25          C   TRY CO. ADAMS                    217 222 8834    P.02

# Quincy Public School District #172

1444 Maine Street • Quincy, Illinois 62301 • Ph: 217.223.8700 • Fax: 217.228.7162

Dr. Michael Anderson, Superintendent

July 17, 1997

Robert Hultz
126 N. 30th St.
Quincy, IL 63201

Dear Mr. Hultz:

I am writing to you, as I understand you are currently the President of the Board of Directors of the Sheridan Swim Club. Previous to this, I was invited to tour your facilities. I was able to do this on my own one afternoon, and received a thorough tour from Mr. Greg Howe. Needless to say, I am impressed. Quincy is fortunate to have such an outstanding facility dedicated to swimming.

I am aware that there has been some history between the school district and your club. Disputes have arisen regarding the High school coach and program and how they work with the coach and program at Sheridan. Being new to town and the position, I found that having two distinct points of view coming from the same organization to be confusing and puzzling. To help us in the communications between the two organizations, you have my promise that I will only deal with you as president of the organization or your designee, and hopefully this will help clarify any inconsistencies.

Enclosed you will find a copy of the proposal that was approved last night by the Board of Education. I am sending it to you so that you may see the direction we are heading. Of particular importance to you and your organization are numbers 3 and 5.

The third recommendation is there as a possibility. It was implied in the conversation with Mr. Schnaak, Ms. Anderson and Dr. Johnson that if Ms. Pryor was not released from her position that Sheridan Swim Club was not interested in being a partner with the high school and allowing us to use its facilities for our home meets. I understand this position and realize that you have a different customer base than I do. You must do what is in the best interest of all your members, not just those in the high school.

The fifth recommendation is an attempt to allow for the "swimming community" to have input into the hiring of the new coach.

We probably should discuss this matter. I await your call and hope that we can work together in the future for the benefit of those children served by both our organizations.

Sincerely,

Dr. Michael Anderson
Superintendent

C943

Exhibit A-2

**LAW OFFICES**

**SCHNACK, SCHNACK & CASHMAN**

ANDREW C. SCHNACK III
KENT R. SCHNACK
J. DEVIN CASHMAN

510 VERMONT STREET
QUINCY, ILLINOIS
62301-2902

TELEPHONE 217-224-4000
FAX 224-8565

March 29, 1999

Fu

Mr. Dennis Gorman
Attorney at Law
525 Jersey Street
Quincy, IL 62301

Dear Dennis:

I just thought you would like to know that as of Thursday, March 25, 1999, Meryl Tierney is now swimming with Sheridan Swim Team under Coach Rick Powers.   I don't know what affect this would have on his previous complaints but would dearly love to get Rick's contract signed and get the contract signed between the school district and Sheridan.   I have a couple of thoughts on that that I think would be advantageous to the school district, especially if we can get this done on a long term basis.

If you get a chance, give me a call.

Sincerely yours,

SCHNACK, SCHNACK & CASHMAN

By:  Andrew C. Schnack, III

ACSIIIpjb

c944

**Exhibit A-3**

Sheridan Swim Club Board Meeting
April 14,1999

The meeting was called to order at 6: 15 by Phil. Present at this meeting were Phil, Julie, Drew, Vickie, Lisa, Barney, Dave and Bill.

Drew presented the treasurers report. Julie is looking into increasing the insurance coverage according to the total low due to last year's tornado. The treasurer's report was approved without objection on a motion from Vickie and a second from Barney.

The next item was the manager's report given by Bill. He filled the board members in on the progress of the 50-meter pool as well as other projects scheduled outside barring inclement weather.

The manager's report was put on hold in order to hear the swim team report from Bob Meyer. Bob reviewed the swim team finance report and handed out copies to the board members. Next Bob spoke about the problems associated with Mr. Tierney, including trying to get Rick Powers fired as the Quincy High swim coach. He spoke about Rick Powers and how valuable he is to the Sheridan swim team and the importance of maintaining Rick Powers as the Quincy High swim coach. Bob asked for permission to hang a "welcome" banner above the scoreboard during swim meets. No one objected.

Bill continued with his report. St. Francis and St. Dominic have requested passes to be auctioned off. Bill recommended giving each church four passes. Drew made a motion to accept bill's recommendation and Barney seconded it. Bill asked the board about giving a refund to a member who, due to health problems, will not be able to use the facilities this year. Bill is to check on how much she has paid and then give her a refund Bill questioned the board about the pool hours and how to staff the pools. It was determined that there will be a guard at each of the three main posts (minimum) at all times, including the 50 meter after 6 P.M. Bill asked permission to use the assistant swim coach, Kevin, 15 - 20 hrs. per week for various jobs. Next, there was some discussion about staffing the front desk. Bill is to take cm of hiring someone who is personable yet efficient in monitoring the rules of members and guests Bill asked if some of the board members would help with the interviewing of potential employees. Barney, Drew and Lisa agreed to help with interviews. Julie mentioned a policy manual, which should be available before hiring new staff. There was discussion on implementing a surcharge to non-members for use of the facility. Bill is to outline the specifics.

Under old business, there was a lengthy discussion about Bob Tierney and the problems he has caused Sheridan swim club and swim team. Drew made a motion to suspend Bob Tierney's membership to Sheridan swim club Barney seconded the motion. The motion was passed unanimously. Next was discussion about how the early morning swimmers could possibly continue their routine while maintaining insurance coverage for the club. No solution was found. Phil is to notify those people involved that they cannot continue unless the insurance company says otherwise. Julie is working with Cheryl Loatsch on what equipment to buy for the weight room. We are waiting for more information concerning the installation of an alarm system. Kiddie Korner day care requested we of the pool, same as past years, at $3 per person.

Vickie Forbes resigned due to conflict of interest. Her resignation was accepted on a motion from Barney and a second from Phil. Drew made a motion to replace Vickie with Julie for the remainder of her term (1-year), Lisa seconded the motion.

The May meeting will be held at 6 P.M. an Wednesday, May 12th.

Drew made a motion to adjourn, seconded by Phil.



Exhibit _B_

# SHERIDAN SWIM CLUB

PHONE (217) 224-1051

*4000 SOUTH TWENTY FOURTH STREET, QUINCY, ILLINOIS 62301*

April 15, 1999

Mr. & Mrs. Bob Tierney
#4 Laura Drive
Quincy, IL 62301

Dear Mr. & Mrs. Tierney:

After due consideration, the Board of Directors at Sheridan Swim Club has decided to terminate your membership effective immediately. As of this day your privileges with regard to Sheridan Swim Club will no longer exist. If you are found on Sheridan property you will be considered a trespasser. According to the By-laws your stock certificate is now null and void.

Please do not contact Bill Forbes or any other employees of Sheridan Swim Club concerning this issue as they have no authority to do anything about it and have been instructed by the Board not to engage in conversation with you about this. If you have any property at the Sheridan Swim club it can be picked up by simply making arrangements which are convenient for both you and manager, Bill Forbes. You are no longer to be on Sheridan property as a guest or for any function whatsoever. Your continued burning of debris on our property will also no longer be tolerated. Enclosed is your $100. check for dues.

Sheridan Swim Club
Board of Directors

C946

EXHIBIT C

# BY-LAWS

of

Sheridan Swim Club, Inc.  Quincy, Illinois

Date Effective: 3-31-96

Superseding any Previous By-Laws

## ARTICLE 1    Directors

Section 1.    (a)  This section shall govern the nomination of Directors elected to terms beginning March 1973, and each annual election thereafter.

(b)  At a regular meeting of the Board of Directors, at least thirty days preceding the Annual election, the President shall appoint a Nominating Committee of three to nominate members for election of the Board of Directors.  This Committee shall consist of three members of the Board of Directors whose terms of office do not expire at the immediate election.  At least fifteen days before the election to the Nominating Committee shall post conspicuously in the CLUB building a copy of this section of the By-Laws, together with the names of the persons they nominate.  Three percent of the voting members of the CLUB may be present in writing to the Nominating Committee not later than ten days before the Annual election the name of any Regular Member for nomination.  Such names shall be posted immediately by the Nominating Committee.  No person shall be eligible for election as Director unless his name shall thus have been submitted to, or nominated by said Nominating Committee.

(c)  Election of Directors shall be by affirmative vote of a majority of the members of the CLUB in attendance, as provided in Article 6,

1

C947

EXHIBIT D

Meeting of the Membership.  The Nominating Committee shall have charge of the election, shall count the ballots, and shall certify the returns to the Board of Directors.

(d)   If the number of persons nominated does not exceed the number of Directors whose terms expire at the immediate election, then the Nominating Committee may dispense with voting by ballot and the election may be by acclamation.

(e)   Board of Directors Succession Chart
         1996 - Edgar, Forbes, Dewell
         1997 - Koester, Kroeger
         1998 - Hultz, Schnack

Section 2.          Each Director and Officer whether or not then in office shall be indemnified and held harmless by the CLUB against all costs and expenses reasonably incurred by or imposed upon him in connection with or resulting from any action, suit or proceeding to which he may be made a party by reason of his being or having been a Director or Officer of the CLUB except in relation to matters as to which a recovery shall be had against him by reasons of his having been finally adjudged in such action, suit or proceeding to have been derelict in the performance of his duties as a Director of Officer, and the foregoing right of indemnifications shall not be exclusive of other rights to which he may be entitled as a matter of law.

Section 3.          Except as provided in the Constitution, the Board of Directors shall have the authority to borrow such sums of money as it may deem necessary for operation of the CLUB, maintenance, improvement or expansion of CLUB facilities, not to exceed an unpaid balance of $10,000; loans that would result in an unpaid balance greater than $10,000 require approval by a majority of the membership in attendance at the Annual Meeting or at a special meeting called for this purpose.

2

C 948

Exhibit ___ D
___ibit ___

Section 4.         All contracts authorized by the Board of Directors
                   shall be executed by the President or Vice-
                   President and counter-signed by the Secretary.

## ARTICLE 2    Committees

Section 1.         Following the first meeting of the Board of
                   Directors, the President shall appoint from the
                   list of membership, standing committees to be
                   known as the Auditing Committee, the House and
                   Grounds Committee, the Membership Committee, the
                   Social Committee, the Budget Committee, Insurance
                   Committee and such other committees as shall be
                   deemed necessary by the Board of Directors.

Section 2.         Auditing Committee - This Committee shall consist
                   of three, and it shall be their duty to audit the
                   accounts and books of the Treasurer and membership
                   records and they shall make their report at the
                   annual meeting of the Association.

Section 3.         House and Grounds Committee - This committee shall
                   have control of the CLUB facilities; it shall have
                   authority to make all small improvements and
                   repairs costing $250.00 or less, provided such
                   expenditures are maintained within the limits of
                   the CLUB's established Budget; it shall supervise
                   the manager and other employees; and it shall have
                   authority to enter into contracts regarding the
                   clubhouse and employees thereof as may be
                   necessary for its proper operation, maintenance
                   and improvement, but such contract shall be
                   ratified by the Board of Directors.

Section 4.         Budget Committee - The Budget Committee shall meet
                   throughout the year at such times and places as
                   such Committee shall provide and said Committee
                   shall prepare the annual budget, maintain a watch
                   over the fiscal affairs and policies of the CLUB,
                   advise the Board of Directors concerning any and
                   all expenditures and the relation of the same to
                   the budget.

Section 5.         Insurance Committee - The Insurance Committee
                   shall make recommendations to the Board of
                   Directors concerning all types of insurance for

3

C 949

Exhibit

the CLUB and shall have referred to it claims made by members or third persons and shall plan the insurance program for the CLUB.

Section 6.    Membership Committee - The Membership Committee shall conduct membership campaigns from time to time, as authorized by the Board. They shall investigate prospective members, as a basis for recommending approval of applicants for membership, in accordance with Article 4 of these By-Laws.

Section 7.    Other Committees - The President and Board of Directors shall have power to appoint any other committee for any purpose deemed expedient and advisable and to hold office not longer than until the next annual meeting of the CLUB.

Section 8.    At least one member of the Board of Directors shall always be a member of each of the aforesaid Standing Committees, except the Auditing Committee, and shall report to the Board of Directors concerning the meetings and activities of said Committees.

Section 9.    Each standing committee shall keep minutes of its meetings and file the same with the Secretary. It shall submit to the Board of Directors a monthly report of work done. It shall not enter into any contract or incur any indebtedness or financial obligation of the Board of Directors and except as provided in Section 3 hereof. It shall have power to appoint such sub-committees for carrying on the work under its direction as it may deem necessary.

Section 10.    Subject to the approval of the Board of Directors, each committee shall have power to adopt such rules as may be necessary for the conduct of the work entrusted to it.

## ARTICLE 3    Organizations

Section 1.    No organization shall be effected within or in connection with the CLUB except with the approval of the Board of Directors, and all such

4

*c 950*

Exhibit ___ *D*

organizations shall be under control of the Board of Directors, and their constitution, by-laws, and rules shall be subject to approval by the Board of Directors. The Board of Directors shall also have power to review their activities.

Section 2.    The President and Secretary shall be ex officio members of any and all such organizations.

## ARTICLE 4    Membership

Section 1.    Any person of acceptable moral stability, general character and temperament, reputation and financial status shall be eligible for membership in the CLUB.

Section 2.    All applications for membership in any class shall be made in writing by the applicant on blanks prepared by the CLUB and such applicant shall be vouched for and sponsored by one member of the CLUB. The application shall give the name, address and occupation of the applicant and state the class in which membership is desired. Such application shall be submitted to the Chairman of the Membership Committee and shall be reviewed and approved by him and then submitted to the Board of Directors for final approval, which shall be by majority vote of a Board quorum.

Section 3.    If an application for membership is rejected, the sponsoring member is to be notified immediately by the Chairman of the Membership Committee, and the sponsoring member shall determine whether a hearing before the Board is to be held to appeal the rejection, or whether the rejection is to stand. Upon such hearing, the Board shall consider any matters that may properly come before it and shall make the final decision concerning the application.

Section 4.    When an applicant for membership is elected and has paid the full fee, the Secretary shall deliver a membership certificate issued to the member so elected.

5

C951

**Exhibit __** *D*

## ARTICLE 5    Certificates of Membership

Section 1.    The form of the Certificate of Membership shall be as follows:

FRONT

No.........................

Incorporated under the Laws of the State of Illinois.

THE SHERIDAN SWIM CLUB, INC., Quincy, Il.
CERTIFICATE OF MEMBERSHIP

This is to certify that _____
has been duly elected and enrolled as a Regular Member Class A- of the Sheridan Swim Club, a corporation, not for pecuniary profit. This Certificate is issued and accepted subject to the Constitution, By-Laws and Rules of the Sheridan Swim Club as they now or as they shall hereafter be amended. This Certificate is transferable only in accordance with the provision of the By-Laws and Rules of said corporation and may be revoked for cause in accordance with such By-Laws upon refund of all sums paid to the corporation therefor.

In WITNESS WHEREOF, the said corporation has caused this Certificate to be signed by its duty authorized officers and sealed with the seal of the corporation this _____ day of
_____ A.D. 19_____.

Attest:

_____     _____

Reverse Side

ASSIGNMENT

FOR VALUE RECEIVED, I, the owner and holder of the within Certificate of Membership, do hereby

6

Exhibit __

assign this Certificate to The Sheridan Swim Club
and deposit the same with the Secretary of the
corporation this _____ day of
_____ A.D. 19_____.

Upon deposit of this Certificate I agree to accept
the sum of _____ Dollars ($_____)
which is the amount paid by me for this
Certificate, less any indebtedness owing by the
undersigned to the corporation, in full of my
right, title and interest in and to said
Membership Certificate.

Dated this _____ day of
_____ A.D. 19___.

_____

In presence of:

_____

_____

Section 2. (a) In the event of termination of membership, for
whatever reason, a holder of a Certificate of
Membership may request the Board of Directors to
refund the holder the original price such
certificate, and the Board at its discretion may
do so.  If the Board decides not to make such
refund immediately, the refund, at a time to be
determined by the Board, shall be made from funds
received for new membership elections, provided,
however, that the terminating member must assign
his certificate to the CLUB, as provided herein,
and the Treasurer shall make such refunds in the
order that such assigned certificates are
deposited with the CLUB.

(b) However, a holder of a Certificate of Membership
shall have the right to transfer his certificate
to another individual provided that individual
makes application for membership, and is elected
as provided herein.  In such case the terminating
member shall assign his certificate to the CLUB
and the CLUB shall issue a new certificate to the
newly elected member.

7

C953

Exhibit ___

Section 3.        Should the holder of a Certificate of Membership
                  cease to be a member of the CLUB by reason of
                  expulsion, such Certificate of Membership shall
                  immediately become null and void.

## ARTICLE 6    Dues and Privileges

Section 1.        Annual dues for CLUB privileges shall be
                  reviewed/revised by the Board of Directors as
                  required.  All changes shall be approved by the
                  membership at the Annual Meeting or at a Special
                  Meeting.  Summer Season is defined as the period
                  from Memorial Day through Labor Day, inclusive.

Section 2.        Dues are payable in full by May 1 of each year.  A
                  Regular Member elected after May 31 shall pay a
                  pro rata portion of the applicable annual dues
                  rate, or after June 15 shall pay a pro rata
                  portion of the applicable Summer Season rate,
                  whichever applies.

Section 3.        In the event of membership termination after May
                  31, such member shall not be entitled to a refund
                  of any or all of his dues payment.

Section 4.        In the event that a member shall fail to pay or
                  make arrangements to pay the full amount of dues
                  payable by May 31, his CLUB privilege shall be
                  suspended.

Section 5.        A Regular Membership or Non-voting Membership held
                  by the head of the family shall entitle the
                  member's immediate family who reside with him to
                  the privileges of the CLUB.  "Immediate family" is
                  defined as wife and husband and unmarried
                  daughters who reside with such member and
                  unmarried sons not over twenty-five (25) years of
                  age who reside with such member and are not self-
                  supporting.  Deviations from the provisions of
                  this Section may be made at the discretion of the
                  Board provided such deviations are set forth in
                  the minutes of a Board meeting; such minutes shall
                  state what member or members are properly
                  considered the head of the family and who are

8

C954

Exhibit ___

members of the "immediate family" and reside with such and are entitled to the privilege of the CLUB.

Section 6.    A Regular Membership or Non-voting Membership held by a single person shall entitle only such unmarried person to the privileges of the CLUB. Upon becoming married the membership shall be considered for all purposes as a regular membership held by the "head of a family" and pay dues accordingly.

## ARTICLE 7    Termination of Membership

Section 1.    Termination of membership from any cause whatever shall operate as a release of all right, or title to, or interest in, the property or assets of the CLUB. The CLUB assumes no obligation under or by reason of having issued such Membership Certificate, except the sole obligation to carry out the provisions of these by-laws in good faith.

Section 2.    Action fo the Board of Directors, by an affirmative vote of five (5) Directors, shall be required to suspend or expel any member, and such action shall be based on infraction of the CLUB Constitution, By-Laws, or Rules.

## ARTICLE 8    Rules and Regulations

Rules and regulations for the government, management and control of the CLUB may be adopted and promulgated by an affirmative vote of four members of the Board of Directors at any regular or special meeting of said Board. A copy of such rules shall be furnished to each member of the CLUB and, also, shall be posted in conspicuous places in the clubhouse. Any rule so promulgated by the Board of Directors may be rescinded at any annual or special meeting of the members of the CLUB by an affirmative vote of two-thirds of the members in attendance at any such meeting.

9

0955

Exhibit _D_

**ARTICLE 9**     The order of business at meetings of the CLUB shall be as follows:

1) Roll call and reading of minutes of previous meeting.

2) Reports to Secretary-Treasurer.

3) Reports to other officers.

4) Reports of Committees.

5) Unfinished business.

6) New Business.

7) Adjournment.

**ARTICLE 10**   Amendments

Section 1.     The By-Laws of the CLUB may be amended by a two-thirds vote of the members in attendance, whether in person or by proxy, at any annual or special meeting of the CLUB. Each member shall be notified by the Secretary of any proposed changes or amendments to the By-Laws at least three days prior to the meeting.

Section 2.     These By-Laws may also be amended by the Board of Directors at any regular or special meeting of the Board by an affirmative vote of five (5) members of the Board, provided a notice stating the object of the meeting and giving a copy of the proposed amendment is mailed to each member of the Board at least five days prior to date of the meeting at which said proposed amendment is to be voted upon; provided however, that the Board of Directors shall have no power or authority to make any amendment to the By-Laws which either rescind or amend Article 10, Section 1 of these By-Laws, and provided further that no amendment of these By-Laws made by the Board of Directors shall become effective until 16 days after such amendment has

10

C956

Exhibit ____ D

been mailed to each member of the CLUB, and the adoption thereof has not been objected to in writing addressed to the Secretary of the CLUB by 25 or more of the members within 15 days.

Section 3.   Any Amendment to the By-Laws proposed by the Board of Directors and rejected by objection of 25 members or more shall not become effective until adopted in accordance with Article 10, Section 1 hereof.

**ARTICLE 11**   Guests

Section 1.   Members entertaining guests on the club grounds shall upon entering the grounds register their names and the names and addresses of their guests in the club register at the clubhouse or other place of registration designated by the Board of Directors and pay the fees required (if any) in accordance with the schedule as fixed by the Board of Directors.

Section 2.   No guest shall be admitted to the grounds unless the entertaining member or one of his immediate family is on the grounds, nor shall the guest remain on the grounds after the departure of the entertaining member.

Section 3.   Guests cannot introduce other guests to the grounds.

Section 4.   On request of a member, a guest card may be issued to the Secretary to Non-Residents, which are defined as persons visiting a member and residing more than 100 miles distance from Quincy, for a period not exceeding two (2) weeks, upon payment of fees established by the Board of Directors.

**ARTICLE 12**   Amendment of Article of Incorporation

The Article of Incorporation shall not be amended except by two-thirds vote of the members in attendance at any annual or special meeting of the CLUB, provided however that each member shall be

notified by the Secretary at least three days prior to the meeting.

C957

Exhibit _____

**SCHNACK LAW OFFICES**

510 VERMONT STREET
QUINCY, ILLINOIS 62301-2902
E-MAIL drewsch@adams.net
krsquire@bci.net

ANDREW C. SCHNACK III
KENT R. SCHNACK

TELEPHONE 217-224-4000
FAX 224-8565

LOREN SCHNACK, OF COUNSEL

February 3, 2000

Dear Board Members:

I am sorry that I cannot be here personally to address you and answer any concerns that you may have but hopefully this letter will serve in my place.

Upon examination it would seem that cooperation between the Quincy School District and Sheridan Swim Club for purposes of the boys and girls highschool swim program would be a perfect match. Sheridan has a swimming facility that is second to none and is under utilized. The Quincy School system does not have a pool or the equipment necessary to run a highschool program but does have the swimmers and publicity and contacts associated with the sport. AS a current member of the Board of Directors and the one charged with the responsibility of trying to put this marriage together, I am authorized to make the following observations and suggestions, strongly pointing out that these are only suggestions:

  1. We would welcome the opportunity to continue our cooperation with the school district. As far as the girls program is concerned, the swimmers are welcome to start swimming in August in the outdoor pool and can then move to the indoor pool. There is no problem with time or space. As in this passed year, all rules and regulations concerning IHSA will be complied with, especially, the idea of having two coaches on deck, one for Sheridan and one for QHS and having no co-mingling of responsibilities or practices. When the girls program is over, the boys program would commence under the same rules and regulations and guidance. It is our understanding that there is a possibility that there will not be enough swimmers for a boys program and we would not expect to have a firm answer or commitment on that until the season has started; but if the school district wants to use our facility they are certainly welcome to do so.

We are also cognizant of the fact that the school district needs to cut spending. In that light, the Club Board has authorized me to offer you both the facility at no cost, this would include not only the use of the pools, weight training, sauna, hot tub and locker rooms but would also include the use of approximately $50,000. worth of equipment owned by the swim team, including computers, touch pads, timing harnesses and the score board.

The only thing that we ask is that you give fair consideration to all candidates for the job and that anyone who is remotely associated with Sheridan not be penalized for that association. The question continues to arise is whether Sheridan trying to control the highschool program. Speaking for myself and the Board of Directors at Sheridan, we do not want to control the program. We do not want to run the program. All we want is a good quality program for as many swimmers as possible. In the past, you did not need to be a member of Sheridan to swim

C958

*EXHIBIT E*

on the Sheridan Team, you did not need to be a member of Sheridan to swim on the Quincy High swim team and that policy has been in place for at least as long as I have been involved in swimming and I can assure you that it will continue to be the policy for the foreseeable future. We want more people involved in swimming regardless of their abilities, not fewer.

In spite of the attack by one or two disgruntled families, I would make the following observations. The swimming program at Quincy High School has never been better. This past year the schedule was improved, giving the swimmers greater visibility to college coaches and improved programs. The girls team placed second in the Western Big Six in spite of having no diving. They finished second in Sectionals. They had three swimmers named individual all conference and five swimmers named all conference for participation in relays or individual events. The conference meets consist of them winning seven of 11 swimming events. At Sectionals, three individuals qualified for the state meet along with two relays. At the state meet, one individual placed ninth in the 500 free and 12th in the 200 free and earned honorable mention all state. The girls swim program has a booster club that is in place that has purchased swim bags for the girls, new suits, a new versamack trainer for the program, a new record board donated and in place, recently hosted a soup supper prior the East Moline v. QHS basketball game that generated $1,400. in additional funds for the girls and has almost $3,000 in the bank for purposes of boosting the program.

As far as participation is concerned, at every meet that both varsity and junior varsity was offered, the entire team participated/every girl. Additionally, as opposed to basketball, baseball, football or other sports, swimming is a very objective sport, the swimmer with the best or fastest time swims. This has nothing to do with who is a member of Sheridan or who is not a member of Sheridan. The workouts are the same for all swimmers and any claim of favoritism to Sheridan swimmers would have to fall on deaf ears. I challenge anyone to find any meet anywhere at anytime in the last two years that a Sheridan swimmer was given preference over a non-Sheridan swimmer. To that end, I know the booster club is aware of this criticism and has bent over backwards to include all parents and all swimmers for everything. I think a check of any parents associated with the program for the last two years would support that.

In addition, we are attempting to include adaptive swimming in our program and would like to see that spill over into the highschool program. Adaptive swimming, for those of you who are not aware, could also be referred to competitive swimming for the handicapped or challenged. Swimming has designed a special set of rules and regulations to ensure that they can compete in all meets and we are very proud of this new frontier.

As far as compliance with new rules are concerned. In spite of the fact that no one from Quincy High School or Sheridan was invited to the meeting at Tiramisu with the IHSA nor were we given the opportunity to defend the program after a complete examination of the facts, it is obvious that the Quincy program was in compliance with all IHSA rules and regulations for the swimming year 1999 and I can assure you that the program is well aware of the scrutiny it is under and will continue to operate well within those rules. As far as 1998, inspite of complete and absolute scrutiny, the only problems we had was the division of swimmers which was changed after it was finally pointed out that there was such a rule and the safety certificate that

0959

**Exhibit** _E_

the coach did not receive at the start of the season. Certainly you are aware that he was not informed of this prior to the start of the season. The swim program has been investigated by the Quincy High School Athletic Director, Quincy Board of Education, the Superintendant of Quincy Public Schools, Illinois Swimming, Inc., USA Swimming, Illinois State Police, Adams County States Attorney and the State of Illinois Appellate Prosecutors Office. All charges rendered against the program have been found to be baseless with the exception of the two violations in 1998 for which the 1999 team was punished. Four of the five counts in the federal lawsuit were dismissed on motion with a motion to dismiss the fifth count pending.

The only thing we ask is for the best candidate for the coaching position get the job and that the most qualified individual for coaching get the job. The long and the short of it is I think we have proven ourselves and the dedication to the girls and the sport. I can assure you that Sheridan is willing to give the same support to the boys program should you chose to put one in place.

I realize that some of you are not familiar with me and may question my knowledge or credentials of what is going on. Just so that there is no doubt, I have been involved in competitive swimming almost my entire life. I have been involved with my children in competitive swimming since 1992. I am currently one of ten members of the Illinois Swimming, Inc. Board of Directors. Illinois Swimming is comprised of over 12,000 swimmers and 110 teams. I am a member of the officials committee for Illinois Swimming and am also an official licensed by the IHSA and have been so for the past three years. I have officiated at all Quincy High meets for the past two years and donated back to the team all funds paid to me for officiating. I have been involved with Quincy High School and the attempts to coordinate Sheridan and Quincy High School for over three years. I was recently asked by Pat Lunsford, head of all USA Swimming officials to officiate at the Junior National meet in Florida in the next three weeks. USA Swimming is the entity that organizes the Olympics. I attended as a delegate USA Swimmings national convention in San Diego last year where I attended the committee meetings for the OIOC, Olympic International Organizing Committee. I have a daughter who is a freshman at Quincy High School and a son who is a seventh grader at Quincy Junior High School and I thoroughly believe in the concept of competing swimming.

Respectfully submitted,

Andrew C. Schnack, III

ACSIIIpjb

Exhibit _E_