E-FILED
Friday, 22 ... 34 PM
Clerk ... ILCD



**In the Circuit Court of the Eighth Judicial Circuit**

**Adams County, State of Illinois**

| | |
|---|---|
| J. ROBERT TIERNEY,<br>ANN S. TIERNEY,<br>And MERYL A. TIERNEY | ) )<br>) )<br>) ) |
| Plaintiffs, | ) ) |
| vs | )<br>) |
| SHERIDAN SWIM CLUB, INC., an Illinois<br>Corporation, et al. | ) )<br>) ) |
| Defendants. | ) |

No.    02-L-12

Jury Demand

<u>**PLAINTIFF'S COMBINED MOTION FOR SANCTIONS FOR BAD FAITH NON-COMPLIANCE WITH THE RULES OF CIVIL PROCEDURE ON DISCOVERY, FOR SANCTIONS FOR FAILURE TO PRODUCE DOCUMENTS AS ORDERED BY THE COURT AT A PRELIMINARY INJUNCTION HEARING,  FOR AN INJUNCTION, FOR A PROTECTIVE ORDER, AND TO COMPEL DISCOVERY**</u>

COMES NOW Plaintiff J. Robert Tierney, (hereinafter "Plaintiff") and pursuant to Illinois Supreme Court Rules on Civil Procedure, and respectfully moves this Honorable Court for sanctions for premeditated, bad faith, non-compliance with the Rules of Discovery, for refusal to produce documents in compliance with Court order at a Preliminary Injunction Hearing, for injunctive relief, for a protective order to prevent further abuse of public office by public officials in order to aid private parties in litigation, in which the Office of the Adams County States' Attorney has no interest or standing., for an order to compel discovery and the production of documents from the Defendants, and the Quincy School District #172, and in support thereof, states:

1.  That this Motion combines and replaces all other Motions filed to date regarding these issues, and the Plaintiff withdraws all the other Motions regarding these issues and considers them moot upon consent and order of the Court.

2.  That during the Preliminary Injunction Hearing regarding this litigation the Court order the Defendants and the QSD to produce documents relevant to the Hearing.

3.  That pursuant to this Court order, the Defendants allegedly produced all relevant documents, except for the interview report dated February 28, 1999, regarding the "massages" of several QHS students in November 1998 by QHS swim coach Richard Powers.

4.  That when the Plaintiff notified the Court of the existence of this report, the Court ordered it produced by the QSD, and it was in fact produced. This document and its contents are subject to FERPA restrictions, and to a Protective Order issued by this Court during the aforementioned Preliminary Injunction Hearing. *(This Interview Report is attached as Exhibit J & J-1)*

5.  That in fact, neither the Defendants, nor the QSD produced all the relevant documents that were in fact ordered produced by this Court.

6.  That there is no reasonable doubt that attorneys Andrew Schnack and Dennis Gorman were aware of the existence and relevance of Schnack's letter of March 5, 1999. *(This letter is attached as Exhibit A).*

7.  That during depositions in parallel Federal Court litigation taken on October 16 & 17, 2002, the attorney for former QHS/Sheridan swim coach, Richard Powers (Megan Paisley-Guenther), handed Plaintiff Robert Tierney the letter authored by Schnack dated March 5, 1999, and asked Mr. Tierney if he recognized the letter.

8.  That Plaintiff Robert Tierney replied that he had never seen the letter before.

9.  That Attorney Guenther stated, "I'm surprised to hear that".

10. That Plaintiff Robert Tierney immediately checked with both his present and former attorney in the Federal Court litigation, and confirmed the fact that Schnack's letter of March 5, 1999, was never produced at any time. *(See letter from attorney Draper dated October 18, 2002, attached as Exhibit G)*

2

11.   That the Plaintiff respectfully moves this Court for Sanctions against the following individuals for failure to produce relevant and material document(s) that were ordered produced by the Court at the Preliminary Injunction Hearing. However, the Plaintiff is not requesting sanctions against Defendants' attorney, Jon Barnard, because at this point in time, the Plaintiff does not believe that Mr. Barnard was aware of the existence of Schnack's letter of March 5, 1999.

a.    Sanctions against defendant, Andrew Schnack, for failure to produce a relevant and material document, which is the letter dated March 5, 1999, sent by Schnack to QSD attorney, Dennis Gorman. *(This letter is attached as Exhibit A).*

b.    Sanctions against Dennis Gorman, attorney for the QSD, for failure to produce a relevant and material document, which is the letter dated March 5, 1999, sent by Schnack to Gorman.

c.    Schnack also sent a letter dated March 29, 1999, to Dennis Gorman. This letter was produce in the Federal Court litigation and at the aforementioned P. I. Hearing. *(This letter of March 29, 1999, is attached as Exhibit B)*

d.    Although Schnack's letter of March 29, 1999, makes reference to complaints concerning Plaintiff Meryl Tierney and swim coach Richard Powers, the letter did not specifically mention the "massages", or mention Schnack's and Powers' intentions to retaliate over the reporting of the "massages".

e.    Therefore, Mr. Gorman felt safe in producing this March 29 1999, letter and other documents, during both initial disclosure in the Federal litigation, as well as for the Preliminary Injunction Hearing in this litigation. However, the March 5, 1999, letter was not produced at any time by Mr. Gorman. *(Refer to ¶68 & 69 of the current complaint attached as Exhibit C)*

f.    Schnack's letter of March 5, 1999, specifically dealt with the reporting of the "massages" of several members of the QHS girls swim team in November 1998, involving former QHS/Sheridan swim coach, Richard Powers, and also reflected Schnack's and Powers' intentions to engage in retaliation over the reporting of the "massages". Therefore, this letter was never produced by Schnack, Richard Powers, Dennis Gorman, Sheridan, or the QSD during the time period when they were all defendants in parallel litigation in Federal Court.

3

g.   The Schnack letter of March 5, 1999, was not produced during initial disclosure, or in response to two (2) Motions to compel discovery in response to Sheridan's Motion for Summary Judgment, and Mr. Schnack was not produced for a deposition in conjunction with that Motion.

h.   The Schnack letter of March 5, 1999, was crucial and relevant to Sheridan's Motion for Summary Judgment, and the refusal to produce this letter and/or Mr. Schnack for a deposition, fatally afflicted Plaintiffs' attempts to respond to that Motion.

i.   The Schnack letter of March 5, 1999, was crucial and relevant to Chet Vahle's Motion to Dismiss the Counts against him, and fatally afflicted the Plaintiff's attempts to respond to that Motion.

j.   The Schnack letter of March 5, 1999, was crucial and relevant to the QSD's Motion to Dismiss the Counts against Dennis Gorman and James Citro, and fatally afflicted the Plaintiffs' attempts to respond to that Motion.

k.   Defendants Schnack, Bier, and Meyer have all testified that Schnack discussed his plans to take action against the entire Tierney family prior to the April 1999, Sheridan Board meeting. *(See transcript of Schnack's testimony at P.I. Hearing on June 25, 2002, attached as Exhibit D, page 28)*

l.   Sheridan Board member, and Adams County State's Attorney, Defendant Bier, has testified at his deposition in March 2001, regarding Sheridan's Motion for Summary Judgment, and at the Preliminary Injunction Hearing in June 2002, that he had no knowledge of the "massages" until he was served with the Federal Complaint in June 1999.

m.   Defendant Bier further testified that he did "nothing" after learning of the "massages".

n.   Schnack states in his letter of March 5, 1999, that:
"it has come to my attention that accusations are being made about improper contact with girl swimmers last fall. I have talked personally with Rick [Powers] about this and he categorically denies it. I have also talked with Judge Chet and Barb Vahle concerning the alleged incident...... At the suggestion of the Vahles, the team went downstairs and anyone who wanted a *massage* or rub down was given one." (Emphasis added)

4

o.    Defendant Schnack, by his own admission in his letter of March 5, 1999, states that he is:
"a close personal friend and attorney for Rick Powers, coach of the boys and girls swimming teams at Quincy High School....... I have advised him [Powers] that if these statements are being made, they could form the basis for a lawsuit. Rick has authorized me to request from you any documents or complaints in writing that you or the schoolboard has concerning this matter so that we may be properly informed and properly respond to it."

p.    Schnack's letter of March 5, 1999, was crucial and relevant to impeaching the testimony of Schnack given during the Preliminary Injunction Hearing on June 24 & 25, 2002.

q.    Schnack's letter of March 5, 1999, was never produced because of the ongoing conspiracy between Schnack, Gorman, and some of the other Defendants.

r.    Schnack knew this letter was never produced and would not be produced by Gorman or the QSD. Therefore, Schnack, an attorney and officer of the Court, *repeatedly* testified falsely during the Preliminary Injunction Hearing that he had no knowledge of the reporting of the "massages" until late May or early June of 1999. *(See transcript/Exhibit D, page 34-43, 45-46)*

s.    This time period was well after the Sheridan Board meeting of April 1999, during which Schnack made a motion to suspend/terminate the Plaintiffs' Sheridan membership, and subsequently seized the Plaintiffs' Sheridan stock, and banned the Plaintiffs from "attending any function" whatsoever at Sheridan Swim Club.

t.    In addition to his other false testimony on other issues, Schnack gave this false testimony in response to numerous questions by Plaintiff, Robert Tierney on the subject of the reporting of the "massages". *(See transcript/Exhibit D, pages 34-43)*

u.    Schnack gave this false testimony in response to additional questions on the same subject from his own attorney, Mr. Barnard. *(See transcript/Exhibit D, pages 45-46)*

v.    Schnack gave this false testimony even in response to a question on the same subject, which was asked by the trial judge.

w.    The trial judge asked the following question of Schnack:
"... didn't you say that you didn't know about the massage complaint until after the termination?"
Schnack testified, "I didn't know anything about it until after the termination...." *(See transcript/Exhibit D, page 40)*

x.    Schnack's letter of March 5, 1999, provides incontrovertible evidence that Schnack **_repeatedly_** gave categorically false testimony on a relevant and material issue during the P. I Hearing on June 25, 2002.

y.    That pursuant to the "Himmel" doctrine or principle, the false testimony of Defendant Andrew Schnack, who is an Officer of the Court, is being brought to the Court's attention.

### Other Incidents And Issues Regarding The Misconduct of the Defendants And Their Attorney of Record

12.    That on or about May 28, 2002, pursuant to a Preliminary Injunction Hearing on this litigation, the Plaintiff had subpoenas and requests to produce, served on 5 of the individual defendants (parties) and a witness.

13.    That on May, 31, 2002, during a Hearing before this Court, the Defendant's attorney, Jon Barnard, informed the Court and the Plaintiff that he [Barnard] had instructed his clients (parties), and the witness who was not Barnard client, that they did not have to appear and/or produce since they did not receive a "witness fee".

14.    That neither the Defendants nor the witness filed a Motion to Quash the Subpoenas on any alleged procedural and/or substantive grounds.

15.    That in response to questioning by the Court, Barnard admitted that he made no attempt to contact the Plaintiff regarding any alleged defect in the Subpoenas.

16.    That none of the individuals who were subpoenaed, ever contacted the Plaintiff regarding any "witness fee".

17.    That the practice of paying the "witness fee", if and when the witnesses appear and produce, is well recognized in the 8th Circuit Court, and well known to Mr. Barnard.

18.    That the Plaintiff immediately informed the Court that he had lawfully served subpoenas upon defendants/parties by the Adam County Sheriff's Dept., and that

6

he was willing and able to provide the witness fees and mileage fee, if and when the subpoenaed individuals appeared and produced the requested documents if the Court so required it. The Plaintiff did not know in advance what if any mileage fee would be needed.

19.   That the Plaintiff was subsequently prevented from calling any witness to the stand during his presentation on the Motion for Preliminary Injunction

20.   That the Plaintiff subsequently filed the appropriate Notice to Appear upon the Defendants requiring the appearance of the Defendants and the production of the same documents as previously requested, for a Hearing set for June 17, 2002.

21.   That the Plaintiff also lawfully served another Subpoena (with a "witness fee") and Request to produce upon one of the Defendants (Bob Meyer) who had also previously been subpoenaed.

22.   That the Defendants filed a Motion to Quash The Notice to Appear and a Motion for Protective Order, but did not file a Motion to Quash the subpoena lawfully served on defendant, Bob Meyer.

23.   That on June 17, 2002, only 2 of the Defendants appeared and both failed to produce any of the requested documents.

24.   That the Defendant (Bob Meyer) who had been subpoenaed to appear and produce at 1:15 pm on June 17, 2002 did not appear in the courtroom until well after 4pm, did not produce any documents, and did not return the witness fee.

25.   That the Plaintiff was only able to call rebuttal witnesses during the Preliminary Injunction Hearing, whose testimony was strictly limited to rebutting the testimony of the witnesses called by the Defendants, as verified by the numerous, sustained objections of the Defendants' attorney in response to Plaintiff's attempts to question any witness called by the Defendants, as well as any rebuttal witness called by the Plaintiff.

26.   That out of a total of seven (7) witnesses who were lawfully served with a subpoena, only one witness appeared at the time and place as listed on the subpoenas, and it required 2 subpoenas in order to secure his appearance at a Hearing on the Plaintiff's Motion for Preliminary Injunction.

27. That prior to the Hearing scheduled for June 24, 2002, Defendant, Barney Bier, using the power and weight of his office as the Adams County States Attorney, contacted or had an employee of his office, contact the Adams County Sheriff's Dept., in successful attempts to find out what individuals were being served with subpoenas by Plaintiff, Bob Tierney, to appear as witnesses at a Hearing scheduled for 9:15am on Monday, June 24, 2002.

28. That this misconduct by Defendant Barney Bier, and/or one or more of the employees of the Office of the Adams County States Attorney, acting upon Bier's orders, represents, at least, the abuse of public office by a public official in order to aid private parties in litigation, in which the Office of the Adams County States' Attorney has no interest or standing.

29. That one or more persons servings these subpoenas on behalf of the Plaintiff, subsequently instructed one or more of the witnesses who were being lawfully served with a subpoena, to contact attorney, "Jon Barnard" at the time these witnesses were being served with the subpoenas. However, Mr. Barnard's name does not appear anywhere on the subpoena.

30. That the attorney for the Defendants, Jon Barnard, is also an Adams County Assistant States' Attorney.

31. That after July 1, 2002, on one or more occasions, Mr. Barnard used the power and weight of his office as an Adams County State's Attorney to gain access to criminal investigation reports maintained by the Adams County Sheriff's Department regarding some of the allegation described in the current complaint.

32. That this misconduct by Mr. Barnard, represents, at least, the abuse of public office by a public official in order to aid private parties in litigation, in which the Office of the Adams County States' Attorney has no interest or standing.

33. That in June of 2002, the Plaintiff lawfully filed and served upon the Defendants' attorney of record, Jon Barnard, a Request For Production Of Documents in accordance with the Illinois Supreme Court Rule 201 General Discovery Provisions.

34. That on July 9, 2002, Mr. Barnard responded in writing that the Plaintiff could view the documents at 10:00 am on Friday, July 12, 2002 at his [Barnard} office. However, Mr. Barnard also stated that would be filing an objection by July 12, 2002, regarding producing some of the requested documents.

35. That the Plaintiff responded in writing to Mr. Barnard agreeing to Mr. Barnard's timetable and conditions for viewing the requested documents.

36. That as of Friday, July 12, 2002, Mr. Barnard had failed to file any objections to the scope of the Request For Production Of Documents.

37. That at 9:03am on Friday, July 12, 2002, Mr. Barnard phoned Plaintiff's residence and informed Plaintiff's wife, Ann Tierney, that he did not have the documents available, and that he was allegedly unable to contact the person who was allegedly supposed to deliver the documents to his office. *(See affidavit of Ann Tierney, attached as Exhibit Q*

38. That at 9:33am on Friday, July 12, 2002, the Plaintiff phoned Mr. Barnard to discuss the matter. After listening to Mr. Barnard's disingenuous explanation, the Plaintiff advised Mr. Barnard that the failure to produce the requested documents as mutually agreed upon, was due to the bad faith conduct on the part of his clients. However, in a good faith effort to resolve the issue pursuant to Illinois Supreme Court Rule 201(k)-General Discovery Provisions, the Plaintiff further advised Mr. Barnard that he would give Mr. Barnard until 1:00pm of that day to produce the documents as agreed. *(See letter of Plaintiff dated July 12, 2002, attached as Exhibit H)*

39. That Mr. Barnard did not produce, and refused to produce the documents by 1:00pm on Friday, July 12, 2002, but in a faxed letter of July 12, 2002, Mr. Barnard suggested producing the documents at a later date. *(See letter of Mr. Barbard dated July 12, 2002, attached as Exhibit I)*

40. That the requested documents were in fact delivered to Mr. Barnard's office by approximately 1:00 that very day of July 12.

41.   That in conjunction with this event, Mr. Barnard submitted an affidavit to the Court, which reflects false and misleading statements regarding these events. *(See affidavit of Mr. Barnard, dated July 17, 2002, attached as Exhibit L)*

42.   That based on information and belief, the Plaintiff reasonably believes that the failure of the Defendants to produce the requested documents as mutually agreed upon, was based upon the premeditated, bad faith conduct of one or more of the Defendants, including, but not limited to Defendant, Barney Bier.

43.   That on July 18, the Court ordered the Defendants to various documents for the Plaintiff to inspect on July 23, 2002.

44.   That on July 23, 2002, the Plaintiffs went to Mr. Barnard's office to review and inspect the documents.

45.   That all of the documents ordered produced by the Court were in fact not produced.

46.   That on July 23, 2002, Mr. Barnard filed an Affidavit of Compliance, falsely asserting that the documents approved by the Court for production had in fact been produced. *(See affidavit of Mr. Barnard, dated July, 2002, attached as Exhibit N)*

47.   That on July 25, 2002, the Plaintiff sent a letter to Mr. Barnard requesting the production of the missing documents. *(See the letter dated July 25. 2002, attached as Exhibit O)*

48.   That Mr. Barnard did not respond to this letter requesting the production of the missing documents until October 1, 2002, when Mr. Barnard produced a document allegedly from V & R Accounting. *(This document is attached as Exhibit R )*

49.   That this document from V & R Accounting allegedly represents incomplete Sheridan financial records of the Plaintiffs, but is in fact inconsistent with similar financial records entered as evidence by the Defendants during the Preliminary Injunction Hearing.

50.   That Mr. Barnard and the Defendants continue to refuse to produce the documents that were in fact ordered produced by the Court.

**Other Incidents And Issues Regarding The Misconduct of the Quincy School District And Their Attorney(s) of Record**

51. That attorneys for the QSD who were not parties in this litigation have filed at least 2 frivolous "Motion to Quash Subpoenas and to Enjoin the Unauthorized Practice of Law" in an attempt to prevent witnesses from lawfully testifying at Hearings, and to avoid producing documents at a Preliminary Injunction Hearing on June 17, 2002.

52. That the court ordered the QSD to produce documents pursuant to the Preliminary Injunction Hearing in this litigation.

53. That pursuant to Court order, the QSD produced numerous documents including a letter dated <u>March 29, 1999</u>, which was sent by defendant Schnack to QSD attorney, Dennis Gorman. This letter had also been produced by the QSD during initial disclosure in parallel Federal litigation, and dealt with Richard Powers and complaints regarding Power conduct with the QHS swim teams.

54. That a letter dated <u>March 5, 1999</u>, which had also been sent by defendant Schnack to QSD attorney, Dennis Gorman, and also dealt with complaints about Richard Powers and the QHS swim teams. However, this letter was not produced by the QSD or Dennis Gorman at the P. I. Hearing, or during initial disclosure in the Federal litigation.

55. That on or about July 13, 2002, the Plaintiffs lawfully served a subpoena and Request for Production of Documents upon Joseph Bocke and the Quincy School District #172. Whereby the School District was required to produce various documents on July 25, 2002.

56. That the QSD did not respond to the request, and on or about July 25, 2002, the School District refused to appear and/or produce the requested documents, and <u>again</u> filed a frivolous Motion to Quash Subpoena, To Enjoin The Unauthorized Practice Of Law, And For Protective Order.

57. That this Motion by the QSD is a dilatory, stonewalling tactic since it is based on the same facts and circumstances as a similar Motion that has previously been denied by the Court.

11

58.    That the QSD made false and misleading statements in the Motion.

59.    That the QSD submitted false and misleading documents with the Motion.

60.    That the QSD made no good faith effort to cure any alleged procedural defects in the subpoena served upon Bocke.

61.    That during a Hearing on or about October 8, 2002, the attorneys for the QSD continued to deny the allegations of ¶¶ 54 & 55, and again made false and misleading statements to the Court.

62.    That during a 201k conference on October 9, 2002, the attorneys for the QSD refused to acknowledge that they had made false and misleading statements in their frivolous Motion of July 25, 2002, and refused to acknowledge that they had submitted false and misleading documents with this Motion, and they continued to refuse to produce any documents, or to produce Bocke as required by a lawfully served subpoena.

63.    That during a tele-conference Hearing before the Court on October 21, 2002, at virtually the 11th hour prior to a Hearing in open court, the QSD attorneys finally admitted to the allegations of ¶¶ 55 & 56, and acknowledged that a lawful subpoena had served upon the QSD.

64.    That during the Hearing before the Court on October 21, 2002, the Court denied for "the third time" the QSD's frivolous Motion To Enjoin The Unauthorized Practice Of Law.

65.    That the QSD continues to refuse to produce documents in compliance with the Rules of Discovery.


**Wherefore,** The misconduct of the Defendants and the QSD fatally afflicted Plaintiff's attempts to petition the Courts for redress of grievances, and for a Motion for Preliminary Injunction, resulting in continued harm and damage to the Plaintiff, his family, and to the orderly process of justice.

In view of the documented history of the Defendants' and the Quincy School District's unlawful, dilatory, scorched-earth tactics, represented by their failure to appear and produce at the Preliminary Injunction Hearing, failing to appear in response to subpoenas without filing

Motions to Quash, interfering with the serving of subpoenas upon witnesses, giving false testimony at the Hearing, filing frivolous, duplicative Motions which have been repeatedly denied by this Court, and in view of the abuse of public office by the defendants and their attorney of record, and the blatant attempts to circumvent and obstruct the orderly process of justice, and the successful efforts of the Defendants to interfere with the Plaintiff's constitutionally protected right to petition the Courts for redress of grievances without interference, Plaintiff prays that this Court order the Defendants and all other parties to produce all of the requested documents forthwith, and that this Court grant injunctive relief and/or a Protective Order to prohibit any further interference and/or misconduct on the part of the Defendants.

Plaintiff also hereby respectfully requests the Court to impose significant financial sanctions upon the Defendants, upon defendant Schnack, and upon Dennis Gorman and the Quincy School District, in order to punish and deter the Defendants and the Quincy School District from any future dilatory, bad faith conduct and refusal to produce.

Plaintiff also hereby respectfully requests the Court to grant sanctions which at least require the Defendants to reimburse the Plaintiffs for all costs incurred by the Plaintiffs to date, regarding litigation between the Plaintiffs and the Defendants over the issues described in the current complaint, as well as for all Court costs incurred to date regarding this litigation.

Dated *October 30* 2002

By: _Robert T_____

Robert Tierney, One of the Plaintiffs

---

**PROOF OF SERVICE**

Service of the foregoing instrument was made by faxing and sending a copy thereof, in a sealed envelope, postage thereon fully prepaid, addressed to all other Plaintiffs and Defendant's attorney of record; Jonathan Barnard 316 North Sixth Street, Quincy, IL 62301 by depositing the same in the United States Mail from the Office of the undersigned this *30* day of *October* 2002. _____

Cc.    Marec Edgar, an attorney for the QSD

Robert Tierney, Ann Tierney, Meryl Tierney, Plaintiffs
2517 Summer Creek
Quincy Il 62305
217-223-4849

13

# List Of Exhibits Attached To This Motion

A. Letter of Andrew Schnack, dated March 5, 1999.

B. Letter of Andrew Schnack dated March 29, 1999.

C. Paragraphs # 68 & 69 of the Third Amended Complaint.

D. Transcript of Court Proceedings of June 25, 2002 in Case 2002-L-12.

E. Letter of Defendant's attorney (Barnard) to Plaintiff dated October 18, 2002, regarding Schnack's letter of March 5, 1999.

F. Letter of Defendant's attorney (Barnard) to Plaintiff dated October 21, 2002.

G. Letter from attorney Carl Draper to Plaintiff dated October 18, 2002, regarding the non-production of Schnack's letter of March 5, 1999.

H. Letter from Plaintiff to Defendant's attorney (Barnard) dated July 12, 2002, regarding Request to Produce.

I. Letter from Defendant's attorney (Barnard) to Plaintiff dated July 12, 2002, regarding Request to Produce.

J. Interview report of the "massages"

K. Letter from Plaintiff to Defendant's attorney (Barnard) dated July 12, 2002, regarding Request to Produce.

L. Affidavit of Defendant's attorney (Barnard) dated July 17, 2002.

M. Letter from Plaintiff to Honorable Judge Vespa dated July 17, 2002.

N. Affidavit of Defendant's attorney (Barnard) dated July 23, 2002.

O. Letter from Plaintiff to Defendant's attorney (Barnard) dated July 25, 2002, regarding failure to produce.

P. Letter from Plaintiff to Honorable Judge Vespa dated July 27, 2002.

Q. Affidavit of Ann Tierney dated July 30, 2002.

LAW OFFICES

SCHNACK, SCHNACK & CASHMAN

ANDREW C. SCHNACK III
KENT R. SCHNACK
J. DEVIN CASHMAN

510 VERMONT STREET
QUINCY, ILLINOIS
62301-2902

TELEPHONE 217-224-4000
FAX 224-8565

March 5, 1999

Mr. Dennis Gorman
Schmiedeskamp, Robertson, Neu & Mitchell
525 Jersey
Quincy IL 62301

Dear Dennis:

As a close personal friend and attorney for Rick Powers, coach of the boys and girls swimming team at Quincy High School, it has come to my attention that accusations are being made about improper contact with girl swimmers last fall. I have talked personally to Rick about this and he categorically denies it. I have also talked with Judge Chet and Barb Vahle concerning the alleged incident. The fact of the matter is that prior to the Western Big Six conference meet, a get together was held at the Vahle home. Chet and Barb Vahle were present, their family was present and in-laws were present. In addition, other parents of members of the girls' swim team were present. The suggestion was made that the girls receive rub downs to loosen up for the meet. This is done on a regular basis at every big meet I have ever attended and is common practice in swimming. At the suggestion of the Vahles, the team went downstairs and anyone who wanted a massage or rub down was given one. It was voluntary, it was totally in keeping with good swimming coaching practices and absolutely nothing was wrong with this. Apparently this is being used now to somehow attack Rick. As Rick's attorney, I have advised him that if these statements are being made, they could form the basis for a lawsuit. Rick has authorized me to request from you any documentation or complaints in writing that you or the schoolboard has concerning this matter so that we can be properly informed and properly respond to it. Obviously, if this is untrue, I apologize for taking your time. If it is true, we consider it exceptionally serious and would like to get to the bottom of it.

Sincerely yours,

Andrew C. Schnack, III

ACSIIIpkj

LAW OFFICES
SCHNACK, SCHNACK & CASHMAN
510 VERMONT STREET
QUINCY, ILLINOIS
62301-2902

ANDREW C. SCHNACK III
KENT R. SCHNACK
J. DEVIN CASHMAN

TELEPHONE 217-224-4000
FAX 224-6565

March 29, 1999

Mr. Dennis Gorman
Attorney at Law
525 Jersey Street
Quincy, IL 62301

Dear Dennis:

I just thought you would like to know that as of Thursday, March 25, 1999, Meryl Tierney is now swimming with Sheridan Swim Team under Coach Rick Powers. I don't know what affect this would have on his previous complaints but would dearly love to get Rick's contract signed and get the contract signed between the school district and Sheridan. I have a couple of thoughts on that that I think would be advantageous to the school district, especially if we can get this done on a long term basis.

If you get a chance, give me a call.

Sincerely yours,

SCHNACK, SCHNACK & CASHMAN

By: Andrew C. Schnack, III

ACSIIIpjb

Exhibit B

68.    In the space of just 25 days between March 28, 1999, and April 21, 1999, Schnack, Vahle, Meyer, Citro, and Gorman, engaged in a coordinated campaign of collusion, conspiracy, retaliation, and intimidation, by engaging in the following acts;

a.    On <u>March 28</u>, 1999, Schnack (who was also Powers' personal attorney) was elevated to membership on the Sheridan Board, despite his numerous conflicts of interests.

b.    On <u>March 29</u>, 1999, one day after becoming a Sheridan Board member, Schnack mailed a letter to School attorney Gorman (Gorman was also acting as the de-facto School District Superintendent per the instructions of School Board President, Citro). In response to the complaints about Powers misconduct with Meryl Tierney, Schnack made false statements about Meryl Tierney's swimming activities at Sheridan in order to discredit the Plaintiffs and suppress any investigation of Powers. Schnack also attempted to renew the School Districts contracts with both Powers and Sheridan, by offering *"advantageous"* benefits and incentives to the District if the contracts could be renewed.

c.    On <u>April 12</u>, 1999, Vahle sent a letter to the High School Athletic Director, the Principal of the High School, and to the Superintendent of the School District, on the letterhead of the Circuit Court of the 8th Judicial Circuit of the State Of Illinois. To reaffirm the official, judicial nature of his letter, Vahle emphasized that he was writing from a "partly professional viewpoint." The letter accused the Tierneys of "spreading rumors and innuendo about the coach and his program" and making "paranoid misrepresentations and falsehoods". Vahle also stated his intent was to "discourage anyone from attempting to change the program of the coach". Vahle's letter was intended to discredit and retaliate against the Tierneys, suppress any investigation of Powers' misconduct, and intimidate witnesses to Powers misconduct.

d.    On <u>April 14</u>, 1999, Schnack made a motion to the Board of Directors of Sheridan to summarily *"suspend"* the Tierneys from Sheridan. Schnack made false and misleading allegations against the Tierneys. The minutes of the board meeting disclose that he made the motion after an allegation by Meyer accusing the Tierneys of "trying to get Rick Powers fired as the Quincy High swim coach." The motion was second by the Adams County States' Attorney, Barney Bier. Schnack's statements and actions were intended to discredit and retaliate against the Tierneys and suppress any investigation of Powers' misconduct. Schnack also failed to inform the Sheridan Board he was acting as Powers' personal attorney.

e.    On <u>April 15</u>, 1999, Sheridan sent the Tierneys a letter wherein Sheridan declared the Tierney membership was *"terminated"*, declared the Tierneys would be *"considered trespassers"* if found on Sheridan property, and barred the Tierneys from ever setting foot on the Sheridan property *"for any function whatsoever"*. This ban prevented Meryl Tierney and all members of her family from attending

Exhibit *C*

all swim team functions at Sheridan that were otherwise open to the public. The letter gave no reason for Sheridan's actions. Sheridan engaged in State action and retaliation against a School District Dean of Students, her family, and the Captain of the High School Girls Swim team, without providing any due process to the Tierneys.

f.  On April 18, 1999, within days of the Vahle Letter and the Sheridan Expulsion Letter, and in response to the reports of Sheridan's retaliation, the School District and school board president Citro, personally retaliated against the Tierneys, and engaged in this conduct while acting under color of state law. This retaliation consisted of, without limitation, Citro's attempt to intimidate the Tierneys by falsely telling Bob Tierney that Powers could sue the Tierneys because of the Tierney's' reporting of Powers' misconduct. Citro claimed to be describing information given to him by an "uninvolved attorney".

g.  On April 21, 1999, *de-facto* school Superintendent, Gorman, made a report to the School Board concerning Powers and the High School Swim Program. In response to Gorman's comments, the School Board hatched a scheme to cover-up Powers misconduct and Sheridan's retaliation, and to renew the contracts of Powers and Sheridan without a vote in public session. This action was taken to retaliate against the Tierneys and suppress any investigation of Powers' misconduct and Sheridan's retaliation.

69.  The School District, Citro, and Gorman, refused to take any action or even discuss with the Tierneys, Sheridan's expulsion of the Tierneys. Citro refused to discuss with the Tierneys the investigation of Powers. The District turned a *blind eye* to Sheridan's retaliation against the Tierneys for reporting Powers misconduct.

Exhibit C-2

1          IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT

2                    ADAMS COUNTY, ILLINOIS

3

4   ROBERT TIERNEY, ANN S. TIERNEY,        )
    and MERYL A. TIERNEY,                  )
5                          Plaintiffs,)
                                           )
6           -vs-                           )    NO.   02-L-12
                                           )
7   SHERIDAN SWIM CLUB,INC., an Illinois   )
    Corporation, ANDREW C. SCHNACK, III,   )
8   JULIE ANDERSON, BARNEY BIER, RODERICK  )
    P. MILLER, DAVID P. DANIELS, LISA      )
9   BEARDEN, LORI MILES, PATRICIA CRANE,   )
    DOUG OLSON, BARB SELVY, ROBERT HULTS,  )
10  and TIMOTHYI BETH, members of Sheridan )
    Swim club Board in their Official and  )
11  Individual Capacities, and ROBERT MEYER)
    member of the Sheridan Swim club Board )
12  and Former President of the Sheridan   )
    Booster Club, in his Official and      )
13  Individual Capacity,                   )
                            Defendants.)
14  . . . . . . . . . . . . . . . .  )

15      EXCERPT OF REPORT OF PROCEEDINGS from the hearing held on
    the 25th day of June,2002, before the HONORABLE JOE R. VESPA.

16

        APPEARANCES:
17      Mr. J. ROBERT TIERNEY

18          Pro se,

19

        MR. JONATHAN BARNARD
20      Attorney at Law

21          On behalf of the Defendant.

22  LUCINDA E. WAIBEL, CSR, RPR
    License No. 084-002296
23  Official Court Reporter
    Menard County Courthouse
24  P.O. Box 496
    Petersburg, IL 62675

                                                              1

*EXHIBIT D*

1                           INDEX

2    WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS

3    Drew Schnack                    4        45        47

4

5

6

7

8

9

10   EXHIBITS:            MARKED  RECEIVED

11   None.

12

13

14

15

16

17

18

19

20

21

22

23

24

2

1  point you owed the club $1,200 and the first time that you were

2  finally current was when we finally had gotten your money, the

3  year was up and it was time to eliminate that problem of

4  collection from you.

5       Q.    What year was that?

6       A.    1999.

7       THE COURT:   Okay I have heard enough about that.

8       MR. TIERNEY: Did you reveal to the Sheridan board that you

9  were representing Powers, trying to get his contract renewed?

10      A.    No.

11      Q.    Did you reveal to the Sheridan board that you had

12 sent a letter to the school district talking about Meryl Tierney

13 and complaints about Rick Powers?

14      MR. BARNARD: Objection.  If he's referring to the letter

15 with regard to this previous testimony on cross 50 findings ago,

16 the letter speaks for itself and I do not believe it contains

17 that characterization or language.

18      Q.    Well let me change the question then.  Did you tell

19 the board about plans before your letter?

20      A.    No.

21      Q.    Why not?

22      A.    It didn't seem to have any relevance.  I was simply

23 asking that Powers be rehired.  There wasn't a person on that

24 board that didn't know I was a supporter of Power.

33

1    Q.    And now Mr. Schnack according to this letter you

2  also addressed complaints dealing with Mr. -- with Meryl

3  Tierney and Rick Powers so the letter was a little bit more

4  broad then what you just testified to?

5    A.    The letter speaks for itself sir.

6    Q.    And so your prior ---

7    THE COURT:    Excuse me.  Let me remind you you can ask

8  questions.  You should answer questions to the extent you can

9  and that's the way we do this okay?

10    Q.    Did you reveal to the board that the complaint had

11  been made to the Quincy School District about Powers and

12  massaging some high school girls?

13    A.    At that point I don't believe I even had that

14  knowledge.

15    Q.    Did Powers ever talk to you about the massages?  The

16  complaints about the massages?

17    MR. BARNARD: Objection.  Attorney client privilege.  This

18  man had made a major point of establishing that Mr. Powers was

19  the client of Mr. Schnack.

20    THE COURT:    Mr. Schnack has made a major point that maybe

21  he was not during the periods of time and particularly any

22  communication I would respect Mr. Schnack's claiming of the

23  privilege for his client.

24    MR. BARNARD: I'll withdraw the objection.  I apologize.

34

1      THE COURT:   Can you answer that?  Remember the question?

2      A.     Not particularly, no.  I remember the question but I

3  would appreciate it being repeated.

4      THE COURT:   Can you repeat the question.

5      Q.     Do you recall when Mr. Powers talked to you about

6  the complaint about him massaging high school female swimmers?

7      A.     To the best of my knowledge it would have come up

8  when I received the request from the school district to come to

9  that June 9 meeting.

10     Q.     Do you recall when the complaints were first filed

11 by some families with the school district?

12     A.     I didn't even know that complaints were filed.

13     Q.     Well?

14     A.     The school district didn't tell me.

15     Q.     As you sit here today after three years of reading

16 all of the documents when were the complaints first filed to

17 your knowledge with the Quincy School District?

18     MR. BARNARD: Objection relevance.  Whether or not they were

19 filed 5 minutes after the alleged occurrence or evidently two

20 months thereafter, this witness's knowledge did not -- that

21 event did not occur until after the termination as undisputed.

22 Why is that then relevant?  That's my objection.

23     THE COURT:   Mr. Tierney's testing that.  Go ahead.

24     A.     As I sat here in court yesterday I learned more

35

1  information about that then I had had up until this point. I

2  learned some from pleading in cases you filed in federal court.

3  It's my understanding based upon what I heard yesterday that you

4  went to the school board and in January or February and that

5  Nick Schildt had that meeting with yourself and your daughter

6  and other people on a Sunday.

7      Q.    And when was that meeting?  Sunday when?

8      A.    I don't know. What I heard yesterday, some Sunday in

9  January or February of 1999.

10     Q.    So based on what you heard yesterday you have reason

11  to believe the complaints were made in January or February?

12     A.    Yeah.

13     Q.    Okay and is it your testimony that Mr. Powers, your

14  client never talked to you about this complaint until when?

15     A.    It would have been when someone from the school

16  district asked that three people from Sheridan and three people

17  from basically your side, if you will, for lack of a better word

18  come to a board meeting and talked about allegations that had

19  been made to the best of my knowledge that would have been two

20  to three weeks before the meeting at best.

21     Q.    And to the best of your knowledge and that's the

22  first time Mr. Powers talked to you about the massages?

23     A.    Quite frankly Barb Vahle talked to me about it and

24  Chet Vahle talked to me about it and then I talked to Mr. Powers

36

1  about it.

2      Q.    When did Barb Vahle talk to you about it?

3      THE COURT:    Let's move on.  I have heard enough about

4  that.

5      Q.    What part of Sheridan by laws, constitution or rules

6  did -- were Tierneys in violation of let's say in 1999?

7      MR. BARNARD: Objection.  Calls for legal conclusion.

8      Q.    To your knowledge did the Tierneys violate any

9  Constitution or by laws or rules of the Sheridan Swim Club?

10     MR. BARNARD: Same objection.

11     THE COURT:  Well anytime during 1999 I think the question

12  was.

13     MR. TIERNEY: Any time from January 1 let's say to the time

14  we were expelled.

15     THE COURT:    All right, well if you know or if you recall

16  you may answer.

17     A.    Well I know that there was a list for lockers and as

18  trivial as it sounds you just went down and took a locker in the

19  men's and women's locker room and didn't pay for it.  We heard a

20  lot of grief over that from people who did have their names on

21  the lockers. The long and the short of it is, during that period

22  of time as far as you know, the by laws contain I think for good

23  cause or being a good member.  You're just a lousy member.

24     Q.    When you say list do you mean a waiting list?

37

1    A.    Yes.

2    Q.    And what's your testimony again about the lockers?

3    A.    You ---

4    MR. BARNARD: Objection.  Asked and answered.  I believe he

5    just testified to it and I heard it.

6    THE COURT:    Sustained.

7    Q.    Could you expound a little bit on what you just said

8    about the lockers?

9    A.    We have a limited number of lockers for members and

10    limited number of lockers for men and women.

11    THE COURT:  We have heard enough about lockers.

12    MR. TIERNEY: I'd like to get clear for the record exactly

13    what he is saying that I did.

14    THE COURT:    He just said that.

15    Q.    Regarding the lockers?

16    A.    I didn't hear his response.

17    THE COURT:    I know.  Would you move on?

18    Q.    To your knowledge were the Tierneys ever given any

19    notice that any action was being taken against them?

20    MR. BARNARD: Objection.

21    Q.    At the April board meeting?

22    MR. BARNARD: Excuse me Judge.  We stipulated that they did

23    not.

24    THE COURT:    Okay.

38

1    Q.    Were they ever given a chance to respond?

2    MR. BARNARD: We stipulate that they did not.

3    Q.    Are you aware that there is a clause in the by laws

4  a duty -- operation of good faith?

5    MR. BARNARD: Objection.  Relevance.

6    THE COURT:    Sustained.

7    MR. TIERNEY: Were you aware there is a clause of duty of

8  operation of good faith on the part of the board members towards

9  Sheridan share holders.

10    MR. BARNARD: Same objection.

11    THE COURT:    Sustained.  Mr. Tierney if you and I read that

12  and find that there is such a duty of good faith what do I care

13  if this guy knows about it?  Excuse me.  Mr. Schnack knows about

14  it?

15    Q.    The reason I think it's relevant he knows about it

16  because he was a board member at the time taking action against

17  the Sheridan?

18    THE COURT:    If I find he didn't act in good faith I don't

19  care if he knew about it or not.  If that is in fact the rule.

20    Q.    When you began representing Powers, the massages,

21  did you ever tell him not to give an interview to the Illinois

22  State Police?

23    MR. BARNARD: Objection.  Relevance.  This occurred

24  following, if I understand the time frame correctly, following

39

1  the termination.

2      THE COURT:  What's the relevance.

3      MR. TIERNEY: Just a question.  He said he provided legal

4  representation.  The relevance is did he ask him not to

5  cooperate in the investigation.

6      THE COURT:   Sustained.  And this is obvious that if he did

7  tell him that it's attorney client.

8      Q.     Were you ever contacted by anybody from the Quincy

9  School District who was investigating the massage complaints?

10     MR. BARNARD: Objection.  Vague time frame.  Judge, again if

11  it's post termination --

12     THE COURT:   I should -- didn't you say that you didn't

13  know about the massage complaint until after the termination?

14     A.     I didn't know anything about it until after the

15  termination when I was asked to ---

16     THE COURT:   All right, thank you.  Sustained.

17     Q.     To your knowledge prior to the termination, correct.

18  Prior to the filing of federal lawsuit were you aware of any

19  investigation conducted by the school district regarding the

20  massages and members of the Quincy High School swim team?

21     A.     Just what I previously testified to.  That I got my

22  knowledge when I was informed by the school district to come to

23  the meeting on, and again it's been testified June 9.  If that

24  was the day, that was the day.

                                                              40

1     Q.      Okay.  Well then so based on that series of events

2   is the only investigation that you know about consisted of you

3   and some people going to talk to the board?

4     A.      At some point in time.  And I have no idea when but

5   it was after your termination I believe, the state police, but I

6   really don't know too much about that. I know that you sent

7   letters to Illinois Swimming in July of 19 -- or not Illinois

8   Swimming excuse me. U.S.A. Swimming in July of 1999.

9     Q.      I'm talking about prior to the filing of the lawsuit

10  in June, prior to the June 9 meeting, we're not going beyond --

11  the Court has already established June is the cut off. I'm

12  talking about events prior to June 9 when you met with the

13  school board?

14    A.      I think I have answered that yes, I did.  When the

15  school board -- when the representatives of the school district

16  asked three representatives or people from Sheridan to come to

17  that June 9 meeting, that's when I started finding out about

18  things.

19    Q.      Are you as of the June 9 meeting, are you aware if

20  anybody ever talked from the school district, ever talked to

21  Mr. Powers about the massages?

22    A.      I'm aware of it from what I heard in court

23  yesterday.

24    Q.      And who talked to Mr. Powers from what you heard in

41

1  court yesterday?

2      A.      I think Mr. Schildt said he did.

3      MR. BARNARD: Objection Judge it's based on what he heard in

4  court yesterday.  It's in the record.

5      THE COURT:    Sustained.

6      Q.      Is it your testimony that you heard Mr. Schildt

7  testify that he talked to Mr. Powers?

8      A.      I thought that's what he said.

9      Q.      And didn't Mr. Schildt say that after he turned over

10 the Shield report early in March he took no further action and

11 the Shield report consisted of nothing more than interviewing

12 some of the girls and their families who  were massaged?

13     MR. BARNARD: Objection.   Relevance?

14     THE COURT:    Sustained.

15     Q.      So to be clear here you don't know for a fact if

16 anybody from the Quincy School District actually interviewed

17 Mr. Powers prior to June 9, 1999 about the massages and the

18 complaint?

19     THE COURT:    You mean direct knowledge on his part?

20     Q.      Well yes Your Honor, direct knowledge?

21     A.      I know what I heard in court yesterday. I cannot ---

22     THE COURT:   Do you know anything besides that?

23     A.      I'm certain that I talked with Barb Vahle and Chet

24 Vahle and Rick Powers at the spaghetti dinner at the Vahle's

42

1  house prior to the meeting with the school board. Certainly I

2  talked with them about that.  They talked with me about it.

3      Q.    Would you please repeat the -- can Your Honor --

4  would you please ask the court reporter to repeat my question to

5  Mr. Schnack?

6      A.    I know what I heard in court yesterday. I know that

7  I talked with Rick Powers, Barb and Chet Vahle prior to the

8  meeting with the school district and again I think we've

9  established that was June 9.

10     Q.    Then based on those conversations what do you know

11  in regard to that question?

12     THE COURT:    Okay, we spent plenty of time on this subject.

13  What do you know?  We can be here for I assume for a while.

14     Q.    Prior to November 1998 did a coach ever give your

15  daughter a massage on the pool table the night before a swim

16  meet?

17     MR. BARNARD: Objection, relevance.

18     THE COURT:    Sustained.

19     Q.    Regarding the letter sent to the Tierneys in

20  response to the action taken at the April 14, 1999 board meeting

21  who wrote that letter?

22     A.    It was the board wrote the letter.  I brought a

23  proposed letter I believe and Barney made some suggestions.  I

24  think Julie or Phil or other people made suggestions and it was

                                                              43

1  | -- that's how it came about.

2  |     Q.     So who wrote the letter?

3  |     A.     Who typed the letter?

4  |     Q.     Who wrote the letter?

5  |     THE COURT:    What's the relevance of who wrote the letter?

6  |     Q.     I believe we have testimony in the record about

7  | Julie Anderson's, knowledge of this was trying to establish who

8  | wrote the letter?

9  |     THE COURT:    I understand that was clear from -- your

10 | question was?

11 |     Q.     Your Honor the letter wasn't signed by anybody?

12 |     THE COURT:    Before you interrupted my question what's the

13 | relevance of who wrote the letter?

14 |     Q.     The letter wasn't signed.

15 |     THE COURT:    There is none I take it from your answer and

16 | from my own conclusion.  So move on.  There is no relevance.

17 |     Q.     This goes to Sheridan's status as a corporation.

18 | Isn't it a fact that Sheridan was originally incorporated as a

19 | for profit corporation?

20 |     A.     I have no idea.

21 |     Q.     Isn't it a fact that atleast in April of 1999 they

22 | were a for profit corporation?

23 |     A.     I have no idea.

24 |     Q.     Isn't it a fact that that issue was discussed at the

44

1 | June Sheridan board meeting?

2 |       MR. BARNARD: Objection, relevance.

3 |       THE COURT:    Sustained.   I think we're getting beyond the

4 | scope too.

5 |       Q.    Your Honor just for the record the relevance is that

6 | they were identified as not for profit corporation in the suit

7 | and there is going to be some amendment made on evidence I just

8 | discovered.   That's why I asked the question.   It's not relevant

9 | at this point in time.   I'll move on.   I need to move on then

10 | Your Honor.

11 |       THE COURT:    Yes.

12 |       MR. TIERNEY: I have no further questions.

13 |       THE COURT:    Mr. Barnard have you any questions?

14 |       MR. BARNARD: I believe I have two or atleast two subjects.

15 |             REDIRECT EXAMINATION

16 |             BY MR. BARNARD:

17 |       Q.    First of all, you mentioned that your first

18 | knowledge of this massage thing was from Chet and Barb Vahle

19 | correct?

20 |       A.    I believe so yes.

21 |       Q.    Just so that we're clear on exactly or approximately

22 | as best you can tell when that was.   That was you said within a

23 | week or so of the June 1999 school board meeting at which they

24 | called?

45

1       A.      No.   I think I said it would have been two to three

2    weeks at most before the June 9 meeting and they wanted us to

3    bring somebody to talk about that evening and Chet and Barb, it

4    was at their house and so I think I talked with one of the two

5    of them and Barb was the most upset about the allegations.

6       Q.      On cross examination Mr. Tierney asked you about

7    U.S.A. Swimming and massages and investigation?

8       A.      Yes.

9       Q.      By U.S.A. Swimming?

10      A.      Yes.

11      MR. TIERNEY: Objection Your Honor.   I did not ask that

12   question.   I asked him about his knowledge, if he was familiar

13   with U.S.A. guidelines on precompetition massages.

14      THE COURT:   Let him finish the question.

15      MR. BARNARD: My question to you is, are you aware that an

16   investigation was done by U.S.A. Swimming with regard to or in

17   response to the allegations made by Mr. Tierney that these

18   massages were inappropriate?

19      A.      Yes.

20      MR. TIERNEY: Objection, relevance.

21      MR. BARNARD: May I respond?

22      THE COURT:   I'm going to -- pursuant to the objection I'm

23   going to strike the preface to the question.   I'm going to allow

24   the question and the answer.

46

Oct 18 02 04:21p        BARNARD                    21?  3 6072              p.1

*The Law Offices Of*
# JONATHAN H. BARNARD
*316 North Sixth Street*
*Quincy, Illinois 62301*

*Telephone: 217-223-6000*
*Fax: 217-223-6072*

*E-mail: jblaw@adams.net*
*A.R.D.N. 37-1336463*

October 18, 2002

**Sent Via Fax Transmission**

Mr. Robert Tierney
2517 Summer Creek
Quincy, IL 62301

   RE: Tierney v. Sheridan

Mr. Tierney:

   I received the attached letter dated March 5, 1999, from Andrew C. Schnack, III to Dennis Gorman on today's date from the office of Schmiedeskamp, Robertson, Neu & Mitchell.  In conjunction with the continuing duty of disclosure under the rules of discovery, I forward it to you at this time.

   Should you have any questions, please let me know.

       Sincerely,

       *Jon*

       Jonathan H. Barnard *msb*

JHB:msb

Enclosure

Exhibit 

*The Law Offices Of*

# JONATHAN H. BARNARD

*316 North Sixth Street*
*Quincy, Illinois 62301*

*Telephone: 217-223-6000*
*Fax: 217-223-6072*

*E-mail: jhbarn@adams.net*

October 21, 2002

***Sent Via Fax Transmission***

Mr. Robert Tierney
2517 Summer Creek
Quincy, IL 62301

     RE:   Tierney v. Sheridan

Mr. Tierney:

     I received your Amended Notice regarding the hearing scheduled for Wednesday, October 23, 2002. Unfortunately, I do have objections to the Amended Notice, particularly insofar as it requires the presence of four new individuals. Those individuals are Andrew C. Schnack, III, Robert Meyer, Dave Daniels and Doug Olson.

     As I understand it, there are two Motions for "Sanctions" scheduled for hearing, both of which relate to my alleged failure to produce documents in my possession or that of my clients, interference with process, etc.

     I have made appropriate arrangements for Barney Bier, Julie Anderson and Bill Forbes to be present on Wednesday at the hearing on the Motions (at considerable inconvenience to them), although I must say that your purpose in requiring their presence is unclear at best. However, the addition of Mr. Schnack, Mr. Meyer, Mr. Daniels and Mr. Olson is untimely and inappropriate.

     Mr. Tierney, these individuals have professional responsibilities, employers to whom they need to report, and schedules that have been filled long in advance. I have not yet even had the opportunity to contact these individuals, and even if I were able to do so by the telephone conference this afternoon, they and any other individual in this litigation are entitled to reasonable notice so that appropriate arrangements can be made. In other words, they are not required, even under the language of Rule 237, to drop everything they are doing at a moment's notice for your convenience.

     With the history of this litigation, I can certainly envision that the information I received and passed along to you on Friday, October 18, 2002, might be the subject of another series of Motions on your part, but for the life of me cannot see the relevance of that issue to the subject of your pending Motions. Again, I may be missing something here and I suppose that we can sort this out with the judge this afternoon.

     However, I do want to put you on notice that I do object to the Amended Rule 237 Notice, insofar as it pertains to Mr. Meyer, Mr. Schnack, Mr. Daniels and Mr. Olson.

Exhibit *E*

Should you have any questions, please let me know.

Sincerely,

*Jon*

Jonathan H. Barnard *msb*

JHB:msb



Exhibit

# FELDMAN, WASSER, DRAPER & BENSON

ATTORNEYS AND COUNSELORS AT LAW

HOWARD W. FELDMAN
STANLEY N. WASSER
CARL R. DRAPER
FREDRIC BENSON
J. RANDALL COX

KELLI E. GORDON
MICHELLE L. BLACKBURN

THOMAS J. IMMEL,
OF COUNSEL

October 18, 2002

J. Robert Tierney
2517 Summer Creek
Quincy, IL 62301
Fax: 223-4849

RE:   Tierney v. Powers, et al.
      Our File No. 993877

Dear Bob:

I have looked through my files very carefully and do not find the March 5, 1999 letter you were inquiring about. This must not have been produced while I was representing you. Should you have any questions or need anything further, please do not hesitate to contact me.

Very truly yours,

Carl R. Draper

CRD:akd

Exhibit  G

1307 South Seventh Street  •  P.O. Box 2418  •  Springfield, Illinois 62705  •  217/544-3403

Facsimile: 217/544-1593                              http://www.feldwass.com

July 12, 2002

*Via Fax and U.S. Mail*

Jonathan Barnard
316 North Sixth Street
Quincy, IL 62301

    RE: Tierney v. Sheridan Swim Club, Inc., et al
       Production of Documents

Dear Mr. Barnard,

   Pursuant to the Request for Production of Documents filed on June 6th and on June 11th, 2002, I contacted your office via a faxed letter on July 8, 2002, and requested that you contact me by the end of the day on July 8, 2002, regarding the time and place when I could review the requested documents and make copies. I received no reply to this request until your fax of June 9, 2002, a copy of which is attached. I agreed to the terms of your letter and agreed to meet with you at 10:00am on Friday, July 12, 2002, to review the documents. You also failed to file any objections to the Request for Production of Documents within the 28-day period allowed by law for you to produce the documents and/or file an objection.

   At 9:03 am on Friday, July 12, 2002, my wife received a phone call from you advising her that the requested documents were not available and attempts were being made to contact Bill Forbes. At 9:32 am on the same day, I returned your phone call. You also advised me that the documents were not available because one of your clients, Defendant Barney Bier, had been unable to contact Bill Forbes, an employee of Sheridan Swim Club to have him produce the documents. You requested that we postpone the production of documents until a later date. I informed you that solution was unacceptable and that your clients had made no good faith effort to produce the documents as agreed to by both parties. I further advised you that I would wait until 1:00 pm of the same day for you to produce the documents as previously agreed to.

   Therefore, pursuant to Illinois Supreme Court Rule 201 (k) General Discovery Provisions, If I do not hear from your office **and** the requested documents are not produced by 1:00pm today, I will assume that your clients will not provide the documents under the mutually agreed upon conditions, and I will file the appropriate Motions with the Court. I can be reached at 316-0836.

   Thank you for your attention to this matter.

              Sincerely,

              Bob Tierney

                       Exhibit H

Jul 12-02 11:22a    JON BARNARD    217-223 6072    P.1

*The Law Offices Of*
### JONATHAN H. BARNARD
*316 North Sixth Street*
*Quincy, Illinois 62301*

*Telephone: 217-223-6000*
*Fax: 217-223-6072*

*E-mail: jblaw@adams.net*
*F.E.I.N. 37-1336463*

July 12, 2002

Mr. Robert Tierney
2517 Summer Creek
Quincy, IL 62301

     RE:   Tierney v. Sheridan

Mr. Tierney:

First, let me apologize for the confusion that caused me to call you earlier this morning to advise you that the documents that I had asked that my clients produce at my office in response to your discovery requests were not, in fact, delivered. As I indicated to you over the telephone, or should I say, attempted to indicate to you over the telephone, I had instructed one of my clients to contact the manager of Sheridan Swim Club to have those documents here and available for me to review and organize first thing this morning in order to facilitate your review of those records.

For whatever reason, that message was evidently not delivered to Mr. Forbes when I made that request for delivery earlier this week. Again, I apologize for any inconvenience to you in that regard.

More important, in order to reasonably accommodate your review of those documents, I can be available either at 10:00am on Wednesday, July 17, 2002, (five days from now), or 10:00am on Friday, July 19, 2002, (seven days from now), for your review of those records. Unfortunately, my schedule is such that I would not be available at 1:00pm this afternoon for your review of the documents, and in any event, it would not provide me the opportunity to review and organize the documents in order to expedite your review of them, given that they still haven't arrived as of this time. As you know, the records are voluminous and you will be allowed sufficient time to give you the reasonable opportunity to review them.

I believe that the above proposal makes the best of an unfortunate situation, but I must add that I do not believe that a five or seven day delay in the arrangements that you and I had previously discussed and agreed upon is an unreasonable delay, particularly in the light of the fact that it has not yet even been determined which of your theories for recovery will advance. Rather than taking the position that you are not entitled to review the documents you had requested until such time as your theory or theories of recovery have been solidified (thereby giving some clarity to the parameters of relevance of the documents requested), I have made arrangements to have those documents available for your review, (but for the above described miscommunication between myself and my clients), because I believe that good faith compliance with the rules of discovery require me to do so.

Exhibit I

I want to personally assure you that neither I nor my clients are attempting to prevent your reasonable opportunity to review the documents you requested. When you have been in the practice of law for a number of years, you come to realize that events such as this unfortunately can and do happen, but again, in the big picture the inconvenience is not something that we can't work around if we make reasonable efforts to do so. Mr. Tierney, not every bump in the road that occurs in the discovery process is the result of some sinister plot against you. In short, while your ultimatum that the documents be produced by 1:00pm today seems to reflect that belief, the ultimatum is not necessary for us to resolve the problem.

Finally, while I do not appreciate you hanging up on me in the middle of my attempt to resolve your concerns, I would add that if in fact it is your intent to file a Motion for Sanctions, the reality of the situation is that by the time such Motion would normally be heard, the documents will have already been made available for your review and inspection, making the issue largely, if not completely, moot by that time. It is my hope that we can avoid needless appearances or hearings before the Court regarding discovery issues, particularly when those are the result simply of an innocent mistake in communication, as it has been my experience that courts are not fond of babysitting discovery disputes which are avoidable with reasonable efforts.

Accordingly, I respectfully request that you reconsider your position and contact me concerning one of the above alternative proposals for a time and date for your review of the documents.

Sincerely,


Jonathan H. Barnard

JHB:msb

P.S.    Attached is the list of policies that I normally require when client documents, particularly voluminous client documents, are inspected either at my office or at the office of the client. Should you have any questions regarding this procedure or any concerns regarding them, please let me know so that we can discuss those concerns.

Enclosure

Exhibit I-2

Interview Report
2-28-99
4:00 p.m.
Present: Nick Schildt
        Jeri Conboy
        Bob Tierney
        Ann Tierney
        Meryl Tierney


Meryl states that the night before sectional swim meet, which was in the fall, the high school girls swim team, met for dinner at Christine Vahle's house. She states approximately 9 girls were present, as well as Coach Powers and Christine's mother. Meryl's mother and Mrs. Johnson were also there for a short time. The girls ate dinner, opened gifts from their secret swimmer, watched inspirational films for the Coach's other meets, then went downstairs to watch a movie. The coach and the swim team went downstairs.

Meryl states that a couple of days before this date, the coach talked about giving the team a massage at the dinner in order to loosen their muscles to help their swimming at sectionals. He suggested they bring lotion and wear shorts and a T-shirt to get a massage. Meryl states that the girls changed into their shorts and shirt before they went downstairs. According to Meryl, some girls watched the movie and others received a massage. A towel and pillow was place on the pool table for the massages and the girls laid on their stomachs. Meryl states that Andrea Hitt, Melissa Failor and herself received a massage. Meryl states that at first she felt hesitant about getting a massage but after the first girl did, then others decided to get one. She describes much laughing while the girls received a massage.

According to Meryl, Coach Powers massaged the back of her legs from her feet to her "butt - but not the butt." She states the coach asked her to undo her bra. She did so, pulling her T- shirt up to her shoulders and the coach massaged her back. She states she thinks she pulled her shirt down and then the coach massaged her arms. She states she was laying on her stomach during the massage and massage oil was used. She estimated that the massage lasted about 10 minutes. Meryl states that other girls were waiting for a massage but it was getting late. According to Meryl, no adults came downstairs during this time and no one expressed concern that an adult might come downstairs. All the girls, but one, went upstairs to shave their legs. One girl, she thinks Melissa Failor, stayed downstairs longer than the rest. Meryl states that the coach has never given her a massage prior to this night. She stated that last year at sectionals, the coach gave her a massage on deck. She states that some teams receive massages from their coach or trainers.


*Jeri A. Conboy, LCSW*

/D-/7-02
R. TIERNEY DEP.
EX. No. 59

Exhibit J

Interview Report
2-28-99
2:10 p.m.
Present:  Nick Schildt
          Jeri Conboy
          Steve Failor
          Jill Failor
          Melissa Failor

Melissa states that the night before the sectional swimming meet, which was sometime in the winter, the high school girls swim team went to dinner at Christine Vahle's house for dinner. Present were approximately 13 girls from the swim team, Coach Powers, Christine's mother and grandparents. Melissa states that they ate, watch a video for about 15 minutes from meets Mr. Powers coached in Europe and then the coach and team went downstairs to watch a movie.

Melissa reports that 4 girls received massages from the coach while they were downstairs. The girls were herself, Merle Tierney, Andrea Hitt and Missy Sibbing. Melissa states that Christine Vahle got a towel to put on the pool table where the girls laid on their stomach during the massage. According to Melissa, the coach had told them at a practice before this date to bring lotion so they could receive a massage. She states that the coach told them that a massage would help them swim better at the sectional meet.

Melissa states she had on shorts and a shirt. According to Melissa, the coach massaged the back of her legs from her feet to the bottom of her shorts; her arms from her wrists to her shoulders; and her lower back from her waist to the bottom of her bra. She states some of the girls took off or unfastened their bras but she did not see this occur because she was watching the movie. Melissa said the massage lasted between 5 and 10 minutes. Melissa states that no other adult came downstairs during this time and no one was concerned that an adult might come downstairs. She stated that other girls were waiting for a massage but it got late so they did not receive one. The girls went upstairs when Christine suggested they go upstairs to shave their legs. Melissa states that no other adult came downstairs while the coach and team were downstairs. She states that the coach has not given her a massage prior to this night and this was not part of the usual swimming routine. She states that on the way home she told Meryl Tierney that she did not feel good about the massage.

Jeri A. Conboy, LCSW
School Social Worker

July 12, 2002

*Via Fax and U.S. Mail*

Jonathan Barnard
316 North Sixth Street
Quincy, IL 62301

>RE: Tierney v. Sheridan Swim Club, Inc., et al
>Production of Documents

Mr. Barnard:

I am in receipt of your Fax of July 12, 2002.

With all due respect and absent any personal rancor, I find your response to my earlier letter to be at the very least disingenuous, self-serving, and misleading. As you are well aware, we had previously agreed to meet today at your offices at 10:00am. You have known since June 6, 2002, that these documents needed to be produced. In addition, the vast majority of these documents were in your personal possession during the Hearings on June 24th & 25th, of last month. I consider receiving a phone call less than an hour before this prearranged meeting advising me that the documents are unavailable, to be far more than an "unfortunate situation", and is in fact premeditated, bad faith non-compliance with the Rules of Discovery.

In view of the documented history of your client's unlawful, dilatory, scorched-earth tactics represented by their failure to appear and produce at the recent hearings, interfering with the serving of subpoenas upon witnesses, and in view of other incidents regarding the production of subpoenaed documents, which are even now before the Court via a Motion For Sanctions, Injunction and Protective Order, I intend to also bring this issue, and others, to the Court's attention via the appropriate Filings, Motions, and Requests for Hearings in a timely and comprehensive manner.

Your reference to a "sinister plot" was very prescient considering this lawsuit involves the ongoing conspiracy between your clients, especially pertaining to the conduct of attorneys Bier and Schnack. And now we have the very same Mr. Bier failing to produce the request documents because of an alleged "miscommunication".

Furthermore, I terminated our phone conversation after patiently listening to you refuse to inform me of the nature of the conversations you allegedly had with your clients and others, regarding attempts to have the documents produced. I therefore politely advised you that your proposal was unacceptable due to the bad faith conduct of your clients, and I reiterated my position that the documents be made available for my review by 1:00pm today. I reasonably believed there was no further need to continue our conversation and was also pressed for time.

Since it is now your stated intention not to produce the documents today as previously agreed upon, pursuant to Illinois Supreme Court Rule 201 (k) General Discovery Provisions, I intend to file the appropriate Motions with the Court regarding the failure of your clients to comply with the Requests For The Production Of Documents. Furthermore, in lieu of your stated intentions to challenge the scope of the Request for Production of Documents, by bringing all these issues before the Court in a comprehensive and timely manner, it will in fact promote judicial economy and the interests of justice, hopefully penalized your clients, and therefore discourage any future dilatory conduct on their part.

Sincerely,

Robert Tierney

Exhibit K

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT

ADAMS COUNTY, ILLINOIS

| | | |
|---|---|---|
| JAMES R. TIERNEY, ANN S. TIERNEY and MERYL A. TIERNEY, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| SHERIDAN SWIM CLUB, an Illinois Corporation, ANDREW C. SCHNACK, III, JULIE ANDERSON, BARNEY BIER, RODERICK P. MILLER, DAVID P. DANIELS, LISA BEARDEN, LORI MILES, PATRICIA CRANE, DOUG OLSON, BARB SELVY, ROBERT HULTZ and TIMOTHI BETH, members of Sheridan Swim Club Board in their Official and Individual Capacities, and ROBERT MEYER, member of the Sheridan Swim Club Board and Former President of the Sheridan Booster Club, in his Official and Individual Capacity, | ) ) ) ) ) ) ) ) ) ) ) ) | No. 02-L-12 |
| Defendants. | ) ) | |

## AFFIDAVIT

| | |
|---|---|
| State of ILLINOIS | ) |
| | )    SS |
| County of ADAMS | ) |

1. I, Jonathan H. Barnard, having been first duly sworn, state that on or about Tuesday, July 9, 2002, arrangements were made by agreement for inspection of certain documents which were the subject of a Request for Production filed by Plaintiffs. Those documents, pursuant to the agreement, were to be produced at my offices at 316 North Sixth Street, Quincy, Illinois, at 10:00am, Friday, July 12, 2002.

2. Upon arrival at my office at 8:30am on Friday, July 12, 2002, I learned that the documents had not been delivered to my office, at which point I attempted to contact Barney Bier, one of my clients, and Bill Forbes, the Manager at Sheridan Swim Club, to determine why the documents had not been delivered to my office. I learned that, through mis-communication, my client had believed that I was to have contacted Bill

Exhibit ⟋

Forbes to arrange for delivery of the documents to my office, when it had been my understanding that Barney Bier would make such arrangements. As a result, Bill Forbes was not contacted and the documents were not delivered.

3.      Not having reached Bill Forbes by 9:00am on Friday, July 12, 2002, to discuss and arrange for delivery of the documents, I contacted Plaintiff to advise him of the above problem. I apologized to Plaintiff for the mis-communication and attempted to discuss with Plaintiff reasonable alternative arrangements to make the documents available for his inspection. However, in the course of my attempts to discuss those alternative arrangements, Plaintiff advised me that the documents "will be produced at 1:00pm at your offices today (July 12, 2002) or I will file a Motion for Sanctions", at which time Plaintiff hung up on me before I could complete my discussions with him.

4.      Following the interrupted telephone conversation described above, I dictated and sent to Plaintiff a letter that same day, again suggesting reasonable alternative arrangements to solve the delay in production of the documents. I have not received any response from Plaintiff to the proposed alternative times and dates for inspection of the documents since July 12, 2002. On July 16, 2002, I sent another letter to Plaintiff advising him of the availability of the documents and again proposing alternative dates for inspection, and have received no response to that letter.

Further Affiant sayeth not.

_____
Jonathan H. Barnard

Subscribed and sworn to before me on ___July 17___, 2002.

_____
Notary Public

"OFFICIAL SEAL"
DREW T. ERWIN
Notary Public, State of Illinois
My Commission Expires 10/16/03

Exhibit ∠-2

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause by faxing a copy of same to the fax number of such attorneys; or, by hand delivering same in an envelope addressed to such attorneys at their business addresses as disclosed by the pleadings of record herein; or, by enclosing the same in an envelope addressed to such attorneys at their business addresses as disclosed by the pleadings of record herein, with postage fully prepaid, and by depositing said envelope in a U.S. Post Office Mail Box in Quincy, Illinois, on July 17, 2002.

*Maria S. Baker*

Attorneys for Defendant:

JONATHAN H. BARNARD
316 North Sixth Street
Quincy, Illinois  62301
Telephone: 217-223-6000
Fax: 217-223-6072

Exhibit *2-3*

July 17, 2002

*Sent Via Fax Transmission & U.S. Mail*

The Honorable Joe R. Vespa
Peoria County Courthouse
324 Main Street
Peoria, IL. 61602-1363

> RE:   Tierney v. Sheridan Swim Club et al., Adams County Number 2002-L-12
>        Conference Call Scheduled for 11:30am, Friday, July 19, 2002, For Case
>        Management Conference and Proposed Hearing on One or More Motions Pending
>        Before the Court

Dear Judge Vespa:

Pursuant to a phone conversation today with your court personnel, Carol, I am outlining in writing my understanding of the issues that will be addressed during the conference call scheduled for this Friday at 11:30 am, and further respectfully outlining the parameters under which I will be able to participate in this teleconference.

By way of background, it is my understanding that there are numerous Motions that have been filed and are now pending before the Court. These include but may not be limited to the following:

1.   Plaintiff's Motion for Partial Summary Judgment.
2.   Defendants' Motion to Dismiss First Amended Complaint.
3.   Defendants' Motion to Amend Defendants' Response to Plaintiffs' Second Amended Complaint.
4.   Plaintiff's Motion for Expedited Production of Documents.
5.   Plaintiff's Motion for Sanctions, Injunction, and Protective Order.
6.   Plaintiff's Motion to Compel Discovery and for Sanctions for Bad faith, Non-Compliance with the Rules of Discovery.
7.   Various Motions by Plaintiff to Set for Hearing the above listed Motions.

Based on my conversation with your court personnel, it is my understanding the Court wished to conduct a Case Management Hearing and a Hearing on one or more of the Motions regarding Discovery.

A review of the history of this litigation confirms the 11th hour, dilatory, bad faith conduct of the Defendants regarding responding to Filings, responding to subpoenas and requests for the production of documents, and other incidents related to the appearance of witnesses and production of documents at prior Hearings. Furthermore, the Defendants' Response to Plaintiff's Motion to Compel Discovery and for Sanctions for Bad Faith, Non-Compliance with the Rules of Discovery, which was recently faxed to the Court and to the Plaintiff, is consistent with the

1

Exhibit *M*

Defendants prior deceptive representations to the Court. The Response by the Defendants is not only factually inaccurate, but only includes the letters from the Defendants and none of the letters from the Plaintiff, and therefore is deceptively favorable to the Defendants. Although the Defendants' Response does not accurately frame the issues of the dispute, it does provide evidence in support of the allegations against the Defendants of bad faith conduct and worse.

The Plaintiff anticipated such deceptive conduct by the Defendants, and therefore when he filed the Motion to Compel Discovery, the Plaintiff deliberately refrained from attaching all or any of the correspondence between the parties regarding this dispute. As such, now that the Defendants have shown their hand, the Plaintiff flatly disputes and rejects the veracity of the statements in the Response, and in the affidavit of Mr. Barnard. And since the Plaintiff disputes this Response by the Defendants, but has not had an opportunity to respond, and will respond at a Hearing and produce evidence, witnesses, and affidavits from 3rd parties in rebuttal of Defendants' Response, Exhibits, and perjurious affidavit, the Plaintiff respectfully declines to participate in any Hearings regarding this issue, either by phone or in closed Court chambers.

Hopefully the Court is cognizant of the fact that this dispute over the production of documents has now grown exponentially since the Court is now, or will soon be, faced with the issue of allegations of perjurious statements under oath by an Officer of the Court while providing legal representation on behalf of his clients.

The Plaintiff respectfully requires that all future Hearings be held in open court, which provides for the production of evidence, the examination of witnesses, and the recording of the arguments and testimony before the Court. The Plaintiff is well aware of the possibility that this will prolong this litigation and requires travel by the trial Judge, and is therefore making the Court aware of this situation so that he may plan his calendar accordingly.

However, in a good faith attempt to resolve as many disputed issues as possible without a Hearing, the Plaintiff agrees to withdraw item #4 - Plaintiff's Motion for Expedited Production of Documents, since this is probably a moot issue by now due to the time lapse. The Plaintiff further agrees to discuss the portion of item #6 - Plaintiff's Motion to Compel Discovery and for Sanctions for Bad faith, Non-Compliance with the Rules of Discovery, which only deals with the issue of compelling the Defendants to produce various documents. The Plaintiff requires that the remaining issue(s) of this Motion be addressed in open Court, along with the other Motions.

Finally, the Plaintiff also wishes to inform the Court that due to previously scheduled events, he [Plaintiff] will be unavailable for any Hearings or phone conferences from Monday, July 29, 2002, through and including Monday, August 19, 2002.

Thank you for your consideration.

Sincerely,

Robert Tierney, Plaintiff, Pro Se

2

Exhibit III-2

Enclosures:
All other Plaintiffs
Jonathan Barnard, attorney for Defendants


### PROOF OF SERVICE

Service of the foregoing instrument was made by sending
a copy thereof, in a sealed envelope, postage thereon
fully prepaid, addressed to Defendant's attorney of
record; Jonathan Barnard 316 North Sixth Street, Quincy,
IL 62301 by depositing the same in the United States
Mail from the Office of the undersigned this _17_ day of _
_July_ _____ 2002.



Bob Tierney, Ann Tierney, Meryl Tierney
2517 Summer Creek
Quincy , IL 62305
217-223-4849

3

Exhibit /// -3

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
ADAMS COUNTY, ILLINOIS

| | | |
|---|---|---|
| JAMES R. TIERNEY, ANN S. TIERNEY and MERYL A. TIERNEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SHERIDAN SWIM CLUB, an Illinois Corporation, ANDREW C. SCHNACK, III, JULIE ANDERSON, BARNEY BIER, RODERICK P. MILLER, DAVID P. DANIELS, LISA BEARDEN, LORI MILES, PATRICIA CRANE, DOUG OLSON, BARB SELVY, ROBERT HULTZ and TIMOTHI BETH, members of Sheridan Swim Club Board in their Official and Individual Capacities, and ROBERT MEYER, member of the Sheridan Swim Club Board and Former President of the Sheridan Booster Club, in his Official and Individual Capacity, | ) | No. 02-L-12 |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF COMPLIANCE**

State of ILLINOIS )
)  SS
County of ADAMS )

I, Jonathan H. Barnard, being first duly sworn, states that production of documents contained in Plaintiffs' Request for Production of Documents, with the exception of those to which an objection has been made, is complete in accordance with said request.

Jonathan H. Barnard

Subscribed and sworn to be me on July 23, 2002.

Melinda Moore
Notary Public

OFFICIAL SEAL
MELINDA MOORE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 12/02/02

Attorneys for Defendant:

JONATHAN H. BARNARD
316 North Sixth Street
Quincy, Illinois 62301
Telephone: 217-223-6000

**PROOF OF SERVICE**          Exhibit N

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause by faxing a copy of same to the fax number of such attorneys; or, by hand delivering same in an envelope addressed to such attorneys at their business addresses as disclosed by the pleadings of record herein; or, by enclosing the same in an envelope addressed to such attorneys at their business addresses as disclosed by the pleadings of record herein, with postage fully prepaid, and by depositing said envelope in a U.S. Post Office Mail Box in Quincy, Illinois, on July 16, 2002.

July 25, 2002

*Via Fax and U.S. Mail*

Jonathan Barnard
316 North Sixth Street
Quincy, IL 62301

RE:    Tierney v. Sheridan Swim Club, Inc., et al
       Production of Documents

Dear Mr. Barnard;

Pursuant to the Request for Production of Documents filed on June 6th and on June 11th, 2002, and the Court Order of July 18, 2002, I reviewed documents at your office on July 23, 2002, at 10:00am.

The following documents were not produced and should have been produced per Judge Vespa's order.  These missing documents include <u>but are not limited</u> to the following:

1.    The Sheridan Swim Club Board minutes for Board meetings from September 1998 through and including January 1999, and the Annual Shareholders meeting and the follow-up Board meeting from March 1999.

2.    The Sheridan Swim <u>Team</u> Board meeting minutes from September 1998 through June, September, November, and December of 1999.

3.    The Sheridan Swim <u>Team</u> Board meeting minutes for all months of 2000 except for February.

4.    The Sheridan Financial records of the Tierney's Sheridan membership.
      {I did obtain a comprehensive "Sheridan Swim Club Customer Aged Receivable" accounting report that was apparently produced in October 1998.  A copy of the front page of this report is attached for your reference.  Please produce or have Sue Voth at V & R accounting produce a similar comprehensive year-end (December) report for the years 1996,1997,1998, and 1999.}

As you know, the September 1998 – June 1999 is the critical time period for many of the events, which are the subject of the pending litigation.   These documents were also subpoenaed for Hearings in Court in June 2002, and were not produced.  During the inspection of the documents at your office, I found and obtained copies of Sheridan Board minutes for nearly all the months of 1995, 1996, 1997, and the first 8 months of 1998, as well as for most of the months in years 1999 & 2000.   Nearly all the minutes for Sheridan Swim Team Board meetings during these prior years were also found.  So it is self-evident that these missing documents should exist, and did exist at some point in time.

Furthermore, as an Illinois Corporation, Sheridan, the Sheridan Board, and Defendants Schnack and Bier in particular, have an expressed duty of good faith and a fiduciary duty to maintain, preserve, and control corporate records as a matter of law, as well as a duty of care under the law to preserve evidence.  Both Schnack and Bier have had prior access to and

1

Exhibit  O

control of these documents.  Bier is also the Defendant who was allegedly responsible for the failure to have these documents produced on July 12, 2002.     As attorneys, Defendants Schnack and Bier are well aware of these obligations, especially considering the fact that the only document ever disclosed or produced by Sheridan during the Federal litigation was the lone Sheridan Board Minutes from April 1999.

Therefore, pursuant to Illinois Supreme Court Rule 201 (k) General Discovery Provisions, if I do not hear from your office **and** the requested documents are not produced by 4:00pm Friday, July 26, 2002, it is established prima facie that your clients will not provide the documents, and/or that these documents and other relevant evidence were fraudulently, destroyed, altered, or otherwise concealed. I will of course file the appropriate Motions and other Actions with the Court of appropriate venue and jurisdiction.

By way of information, as of 9:00am today, the Quincy School District also refused to appear and/or produce documents regarding this litigation, despite the issuance of a subpoena and a similar Request for Production of Documents, therefore the appropriate action will also be initiated against the District.

Thank you for your attention to this matter.  All communications regarding this issue needs to be in writing.  I will not discuss it over the phone, or in person without the presence of a neutral witness.

Sincerely,

Bob Tierney

2

Exhibit O-2

In conjunction with this request, the Plaintiff again renews his offer to travel to Peoria for hearings on the aforementioned issues.

Thank you for your consideration.

Sincerely,

Robert Tierney, One of the Plaintiffs

Enclosures:
All other Plaintiffs
Jonathan Barnard, attorney for Defendants

### PROOF OF SERVICE

Service of the foregoing instrument was made by sending a copy thereof, in a sealed envelope, postage thereon fully prepaid, addressed to Defendant's attorney of record; Jonathan Barnard 316 North Sixth Street, Quincy, IL 62301 by depositing the same in the United States Mail from the Office of the undersigned this 21 day of ___ JULY ___ 2002.

Bob Tierney, Ann Tierney, Meryl Tierney
2517 Summer Creek
Quincy , IL 62305
217-223-4849

2

Exhibit P-2

## AFFIDAVIT

STATE OF ILLINOIS        }
                         } SS.
COUNTY OF ADAMS          }

I, ANN S. TIERNEY, being first duly sworn upon oath depose and say that I am competent to testify and that, if called, could state in open Court on my own knowledge as follows:

1.  I reside with my husband J. Robert Tierney and family at 2517 Summer Creek Quincy, IL. 62305. We have maintained continuous residency here since 1987. I am over the age of 21.

2.  On Friday, July 12, 2002, at approximately 9:03 a.m. I answered a phone call from Jonathan Barnard, as identified on our caller ID device. A male voice identified himself as "Jon Barnard" and asked if Bob Tierney was there. I replied that he [Bob Tierney] could not come to the phone at the moment.

3.  Mr. Barnard stated that he needed to talk with Bob because some documents were not available for review. Mr. Barnard went on to state that he was unable to contact Bill Forbes, and he wanted to talk with Bob about scheduling another time for Bob to review some documents.

4.  Several minutes later I told my husband about my conversation with Mr. Barnard.

5.  My husband said he was going to call Bill Forbes and find out what was going on.

6.  A short time later my husband placed a phone call to Bill Forbes and engaged in a short conversation with him.

7.  After the phone conversation with Bill Forbes, my husband told me that Forbes said he was home all morning and no one has called him during the morning. My husband also told me Bill Forbes said no one has contacted him about delivering any documents to Barnard.

8.  A short time later my husband place a phone call to Mr. Barnard. My husband asked my to listen to the conversation on another phone and I followed his

1

Exhibit Q

request.

9.    During this phone conversation, Mr. Barnard told my husband that Barney Bier was supposed to have contacted Bill Forbes several days ago and make arrangements for the documents to be delivered to Mr. Barnard's office.

10.    Mr. Barnard also told my husband that he [Barnard] had been unable to contact Bill Forbes that morning.

11.    Mr. Barnard refused to answer some questions my husband asked him about what attempts were made to get the documents.

12.    My husband then told Mr. Barnard that he [my husband] had reason to believe that the matter involved bad faith conduct, and that he would give Mr. Barnard until 1:00 p.m. that day to have the documents available for review.

13.    During this phone conversation, my husband never mentioned the phrase "Motion for Sanctions" or even mentioned the word "sanctions" at any time during the phone conversation. Mr. Barnard used the word 'sanctions' during the conversation.

Further Affiant sayeth not.

*Ann S. Tierney*

Subscribed and sworn to before me this ___30___ day of *July*, 2002.

*Lois J. Knapp*
Notary Public

> "OFFICIAL SEAL"
> LOIS J. KNAPP
> Notary Public, State of Illinois
> My Commission Expires 12/02/03

2

Exhibit Q-2

*The Law Offices Of*
# JONATHAN H. BARNARD
*316 North Sixth Street*
*Quincy, Illinois 62301*

lephone: 217-223-6000
ux: 217-223-6072

E-mail: jblaw@ada
F.E.I.N. 37-13

October 1, 2002

Mr. Robert Tierney
2517 Summer Creek
Quincy, IL 62301

     RE:   Tierney v. Sheridan

Mr. Tierney:

    Enclosed is a letter that I received from V & R Accounting in response to my request that they produce any information in their possession regarding your dues payments to Sheridan Swim Club. In addition to the enclosed letter, I received some supporting documents from the accountant. However, that information contains payment records from a number of other members at Sheridan which I am reluctant to turn over, as it is my position, subject to Court Order, that the latter information is not relevant and / or privileged information regarding those other members.

    Should you want to bring that issue to the attention of Court, it is your right to do so.

            Sincerely,

            Jonathan H. Barnard

JHB:msb

Enclosure

Exhibit R

**V & R ACCOUNTING, INC**
**130 NORTH 8TH**
**QUINCY IL  62301**
**217-222-6568**
**217-222-8671 (fax)**
**suevoth@adams.net**

September 24, 2002

Mr. Jonathan Barnard
316 North Sixth Street
Quincy IL  62301

Dear Mr. Barnard:

We do not keep hard copies of invoices for Sheridan.  Unfortunately, the program that I used to produce the invoices back in 1997-2000 is no longer in use and I have switched accounting programs, so I am unable to reproduce the actual invoices to the Tierneys.  However, I can copy the accounting records showing the transactions involving their account.  The history is as follows:

| | |
|---|---|
| As of 12-31-97 their balance due was | $518.00 |
| In January 1998 they were billed | $605.00 |
| For May 98 – Apr 99 annual dues | |
| Giving them a balance of | $873.00 |
| In March 1998 they paid | ($100.00) |
| Giving them a balance of | $773.00 |
| In June 1998 they paid | ($168.00) |
| In June 1998 they paid | ($332.00) |
| Giving them a balance of | $273.00 |
| In Dec. 1998 they paid | ($273.00) |
| Giving them a balance of | -0- |
| In January 1999 they were billed | $655.00 |
| For dues of May 99 – Apr 2000 plus 2 lockers | |

In April 1999 their account was written off
Giving them a zero balance.

Exhibit *R-2*

**V & R ACCOUNTING, INC**
**130 NORTH 8TH**
**QUINCY IL  62301**
**217-222-6568**
**217-222-8671 (fax)**
**suevoth@adams.net**

I hope this information is helpful.  If I can be of further assistance, please let me know.

Sincerely,

Sue Voth, EA

Exhibit R-3



Exhibit S

IN THE NAME OF THE PEOPLE OF THE STATE OF ILLINOIS

# IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL
## CIRCUIT OF ILLINOIS, ADAMS COUNTY

J. Robert Tierney et al

v.

Sheridan Swim Club, Inc.,
et al

No. _2002-L-12_

### SUBPOENA    _1444 Maine St. Quincy_

TO: _Quincy School District #172 / Joseph Rocke_

YOU ARE COMMANDED to appear to testify before the Honorable _See Attached instructions_

_____ in room _TBA_ at the Adams County Courthouse, 521 Vermont Street,

Quincy, Illinois, on _July 25_____, 20_02_, at _9:00_____ A. m.

YOU ARE COMMANDED ALSO to bring the following: _(See the Request For_
_production sent to you on July 10, 2002. You may produce_
in your possession or control. _The Documents & Avoid A personal Appearance_

YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR
CONTEMPT OF THIS COURT.

Name _Robert Tierney_          Witness, _July 13_____, 20_02_

Attorney for

Address _2511 Summer Creek_                              _____
                                                          Clerk of Court.

City _Quincy, Il. 62301_      By _____

Telephone _217-223-4849_                                  Deputy

_____

I have served the within Writ, by reading the same to the within named _____

_____

this _____ day of _____ 20 _____ .

_____ Sheriff, A. C., Ill.

By _____Deputy.

I cannot in my County find the within named _____

this _____ day of _____ 20 _____ .

_____ Sheriff, A. C., Ill.

SHERIFF'S FEES

Service of Subpoena  $ _____          By _____ Deputy.

Returning Subpoena  $ _____

_____ Miles' Travel  $ _____

Total Amount  $ _____          Exhibit _I_

_____
Sheriff, A. C., Ill.