E-FILED
Friday, 2[...] [...]:57 PM
Cler[...] [...] District [...] [...] CD



In the Circuit Court of the Eighth Judicial Circuit

Adams County, State of Illinois

OCT 30 2002

COPY

Clerk Circuit Court 8th Judicial Circuit
ILLINOIS, ADAMS CO.

| | |
|---|---|
| J. ROBERT TIERNEY, ANN S. TIERNEY, And MERYL A. TIERNEY ) ) ) ) | |
| Plaintiffs, ) ) ) | |
| vs ) ) | No.    02-L-12 |
| SHERIDAN SWIM CLUB, INC., an Illinois Corporation, et al. ) ) ) ) | Jury Demand |
| Defendants. ) | |

## PLAINTIFF'S COMBINED MOTION FOR SANCTIONS FOR BAD FAITH NON-COMPLIANCE WITH THE RULES OF CIVIL PROCEDURE ON DISCOVERY, FOR SANCTIONS FOR FAILURE TO PRODUCE DOCUMENTS AS ORDERED BY THE COURT AT A PRELIMINARY INJUNCTION HEARING, FOR AN INJUNCTION, FOR A PROTECTIVE ORDER, AND TO COMPEL DISCOVERY

COMES NOW Plaintiff J. Robert Tierney, (hereinafter "Plaintiff") and pursuant to Illinois Supreme Court Rules on Civil Procedure, and respectfully moves this Honorable Court for sanctions for premeditated, bad faith, non-compliance with the Rules of Discovery, for refusal to produce documents in compliance with Court order at a Preliminary Injunction Hearing, for injunctive relief, for a protective order to prevent further abuse of public office by public officials in order to aid private parties in litigation, in which the Office of the Adams County States' Attorney has no interest or standing., for an order to compel discovery and the production of documents from the Defendants, and the Quincy School District #172, and in support thereof, states:

1

EXHIBIT

F

1. That this Motion combines and replaces all other Motions filed to date regarding these issues, and the Plaintiff withdraws all the other Motions regarding these issues and considers them moot upon consent and order of the Court.

2. That during the Preliminary Injunction Hearing regarding this litigation the Court order the Defendants and the QSD to produce documents relevant to the Hearing.

3. That pursuant to this Court order, the Defendants allegedly produced all relevant documents, except for the interview report dated February 28, 1999, regarding the "massages" of several QHS students in November 1998 by QHS swim coach Richard Powers.

4. That when the Plaintiff notified the Court of the existence of this report, the Court ordered it produced by the QSD, and it was in fact produced. This document and its contents are subject to FERPA restrictions, and to a Protective Order issued by this Court during the aforementioned Preliminary Injunction Hearing. *(This Interview Report is attached as Exhibit J & J-1)*

5. That in fact, neither the Defendants, nor the QSD produced all the relevant documents that were in fact ordered produced by this Court.

6. That there is no reasonable doubt that attorneys Andrew Schnack and Dennis Gorman were aware of the existence and relevance of Schnack's letter of March 5, 1999. *(This letter is attached as Exhibit A).*

7. That during depositions in parallel Federal Court litigation taken on October 16 & 17, 2002, the attorney for former QHS/Sheridan swim coach, Richard Powers (Megan Paisley-Guenther), handed Plaintiff Robert Tierney the letter authored by Schnack dated March 5, 1999, and asked Mr. Tierney if he recognized the letter.

8. That Plaintiff Robert Tierney replied that he had never seen the letter before.

9. That Attorney Guenther stated, "I'm surprised to hear that".

10. That Plaintiff Robert Tierney immediately checked with both his present and former attorney in the Federal Court litigation, and confirmed the fact that Schnack's letter of March 5, 1999, was never produced at any time. *(See letter from attorney Draper dated October 18, 2002, attached as Exhibit G)*

11.  That the Plaintiff respectfully moves this Court for Sanctions against the following individuals for failure to produce relevant and material document(s) that were ordered produced by the Court at the Preliminary Injunction Hearing. However, the Plaintiff <u>is not</u> requesting sanctions against Defendants' attorney, Jon Barnard, because at this point in time, the Plaintiff <u>does not believe</u> that Mr. Barnard was aware of the existence of Schnack's letter of March 5, 1999.

   a.  Sanctions against defendant, Andrew Schnack, for failure to produce a relevant and material document, which is the letter dated March 5, 1999, sent by Schnack to QSD attorney, Dennis Gorman. *(This letter is attached as Exhibit A).*

   b.  Sanctions against Dennis Gorman, attorney for the QSD, for failure to produce a relevant and material document, which is the letter dated March 5, 1999, sent by Schnack to Gorman.

   c.  Schnack also sent a letter dated March 29, 1999, to Dennis Gorman. This letter was produce in the Federal Court litigation and at the aforementioned P. I. Hearing. *(This letter of March 29, 1999, is attached as Exhibit B)*

   d.  Although Schnack's letter of March 29, 1999, makes reference to complaints concerning Plaintiff Meryl Tierney and swim coach Richard Powers, the letter did not specifically mention the "massages", or mention Schnack's and Powers' intentions to retaliate over the reporting of the "massages".

   e.  Therefore, Mr. Gorman felt safe in producing this March 29 1999, letter and other documents, during both initial disclosure in the Federal litigation, as well as for the Preliminary Injunction Hearing in this litigation. However, the March 5, 1999, letter was not produced at any time by Mr. Gorman. *(Refer to ¶68 & 69 of the current complaint attached as Exhibit C)*

   f.  Schnack's letter of March 5, 1999, specifically dealt with the reporting of the "massages" of several members of the QHS girls swim team in November 1998, involving former QHS/Sheridan swim coach, Richard Powers, and also reflected Schnack's and Powers' intentions to engage in retaliation over the reporting of the "massages". Therefore, this letter was never produced by Schnack, Richard Powers, Dennis Gorman, Sheridan, or the QSD during the time period when they were all defendants in parallel litigation in Federal Court.

3

g. The Schnack letter of March 5, 1999, was not produced during initial disclosure, or in response to two (2) Motions to compel discovery in response to Sheridan's Motion for Summary Judgment, and Mr. Schnack was not produced for a deposition in conjunction with that Motion.

h. The Schnack letter of March 5, 1999, was crucial and relevant to Sheridan's Motion for Summary Judgment, and the refusal to produce this letter and/or Mr. Schnack for a deposition, fatally afflicted Plaintiffs' attempts to respond to that Motion.

i. The Schnack letter of March 5, 1999, was crucial and relevant to Chet Vahle's Motion to Dismiss the Counts against him, and fatally afflicted the Plaintiff's attempts to respond to that Motion.

j. The Schnack letter of March 5, 1999, was crucial and relevant to the QSD's Motion to Dismiss the Counts against Dennis Gorman and James Citro, and fatally afflicted the Plaintiffs' attempts to respond to that Motion.

k. Defendants Schnack, Bier, and Meyer have all testified that Schnack discussed his plans to take action against the entire Tierney family prior to the April 1999, Sheridan Board meeting. *(See transcript of Schnack's testimony at P.I. Hearing on June 25, 2002, attached as Exhibit D, page 28)*

l. Sheridan Board member, and Adams County State's Attorney, Defendant Bier, has testified at his deposition in March 2001, regarding Sheridan's Motion for Summary Judgment, and at the Preliminary Injunction Hearing in June 2002, that he had no knowledge of the "massages" until he was served with the Federal Complaint in June 1999.

m. Defendant Bier further testified that he did "nothing" after learning of the "massages".

n. Schnack states in his letter of March 5, 1999, that:
"it has come to my attention that accusations are being made about improper contact with girl swimmers last fall. I have talked personally with Rick [Powers] about this and he categorically denies it. I have also talked with Judge Chet and Barb Vahle concerning the alleged incident...... At the suggestion of the Vahles, the team went downstairs and anyone who wanted a *massage* or rub down was given one." (Emphasis added)

4

o.  Defendant Schnack, by his own admission in his letter of March 5, 1999, states that he is:
    "a close personal friend and attorney for Rick Powers, coach of the boys and girls swimming teams at Quincy High School....... I have advised him [Powers] that if these statements are being made, they could form the basis for a lawsuit. Rick has authorized me to request from you any documents or complaints in writing that you or the schoolboard has concerning this matter so that we may be properly informed and properly respond to it."

p.  Schnack's letter of March 5, 1999, was crucial and relevant to impeaching the testimony of Schnack given during the Preliminary Injunction Hearing on June 24 & 25, 2002.

q.  Schnack's letter of March 5, 1999, was never produced because of the ongoing conspiracy between Schnack, Gorman, and some of the other Defendants.

r.  Schnack knew this letter was never produced and would not be produced by Gorman or the QSD. Therefore, Schnack, an attorney and officer of the Court, _repeatedly_ testified falsely during the Preliminary Injunction Hearing that he had no knowledge of the reporting of the "massages" until late May or early June of 1999. *(See transcript/Exhibit D, page 34-43, 45-46)*

s.  This time period was well after the Sheridan Board meeting of April 1999, during which Schnack made a motion to suspend/terminate the Plaintiffs' Sheridan membership, and subsequently seized the Plaintiffs' Sheridan stock, and banned the Plaintiffs from "attending any function" whatsoever at Sheridan Swim Club.

t.  In addition to his other false testimony on other issues, Schnack gave this false testimony in response to numerous questions by Plaintiff, Robert Tierney on the subject of the reporting of the "massages". *(See transcript/Exhibit D, pages 34-43)*

u.  Schnack gave this false testimony in response to additional questions on the same subject from his own attorney, Mr. Barnard. *(See transcript/Exhibit D, pages 45-46)*

v.  Schnack gave this false testimony even in response to a question on the same subject, which was asked by the trial judge.

w.  The trial judge asked the following question of Schnack:
"... didn't you say that you didn't know about the massage complaint until after the termination?"
Schnack testified, "I didn't know anything about it after the termination...." *(See transcript/Exhibit D, page 40)*

x.  Schnack's letter of March 5, 1999, provides incontrovertible evidence that Schnack **_repeatedly_** gave categorically false testimony on a relevant and material issue during the P. I Hearing on June 25, 2002.

y.  That pursuant to the "Himmel" doctrine or principle, the false testimony of Defendant Andrew Schnack, who is an Officer of the Court, is being brought to the Court's attention.

## <u>Other Incidents And Issues Regarding The Misconduct of the Defendants</u><br><u>And Their Attorney of Record</u>

12.  That on or about May 28, 2002, pursuant to a Preliminary Injunction Hearing on this litigation, the Plaintiff had subpoenas and requests to produce, served on 5 of the individual defendants (parties) and a witness.

13.  That on May, 31, 2002, during a Hearing before this Court, the Defendant's attorney, Jon Barnard, informed the Court and the Plaintiff that he [Barnard] had instructed his clients (parties), <u>and</u> the witness who was not Barnard client, that they did not have to appear and/or produce since they did not receive a "witness fee".

14.  That neither the Defendants nor the witness filed a Motion to Quash the Subpoenas on any alleged procedural and/or substantive grounds.

15.  That in response to questioning by the Court, Barnard admitted that he made no attempt to contact the Plaintiff regarding any alleged defect in the Subpoenas.

16.  That none of the individuals who were subpoenaed, ever contacted the Plaintiff regarding any "witness fee".

17.  That the practice of paying the "witness fee", if and when the witnesses appear and produce, is well recognized in the 8th Circuit Court, and well known to Mr. Barnard.

18.  That the Plaintiff immediately informed the Court that he had lawfully served subpoenas upon defendants/parties by the Adam County Sheriff's Dept., and that

6

he was willing and able to provide the witness fees and mileage fee, if and when the subpoenaed individuals appeared and produced the requested documents if the Court so required it. The Plaintiff did not know in advance what if any mileage fee would be needed.

19.  That the Plaintiff was subsequently prevented from calling any witness to the stand during his presentation on the Motion for Preliminary Injunction

20.  That the Plaintiff subsequently filed the appropriate Notice to Appear upon the Defendants requiring the appearance of the Defendants and the production of the same documents as previously requested, for a Hearing set for June 17, 2002.

21.  That the Plaintiff also lawfully served another Subpoena (with a "witness fee") and Request to produce upon one of the Defendants (Bob Meyer) who had also previously been subpoenaed.

22.  That the Defendants filed a Motion to Quash The Notice to Appear and a Motion for Protective Order, but did not file a Motion to Quash the subpoena lawfully served on defendant, Bob Meyer.

23.  That on June 17, 2002, only 2 of the Defendants appeared and both failed to produce any of the requested documents.

24.  That the Defendant (Bob Meyer) who had been subpoenaed to appear and produce at 1:15 pm on June 17, 2002 did not appear in the courtroom until well after 4pm, did not produce any documents, and did not return the witness fee.

25.  That the Plaintiff was only able to call rebuttal witnesses during the Preliminary Injunction Hearing, whose testimony was strictly limited to rebutting the testimony of the witnesses called by the Defendants, as verified by the numerous, sustained objections of the Defendants' attorney in response to Plaintiff's attempts to question any witness called by the Defendants, as well as any rebuttal witness called by the Plaintiff.

26.  That out of a total of seven (7) witnesses who were lawfully served with a subpoena, only one witness appeared at the time and place as listed on the subpoenas, and it required 2 subpoenas in order to secure his appearance at a Hearing on the Plaintiff's Motion for Preliminary Injunction.

27. That prior to the Hearing scheduled for June 24, 2002, Defendant, Barney Bier, using the power and weight of his office as the Adams County States Attorney, contacted or had an employee of his office, contact the Adams County Sheriff's Dept., in successful attempts to find out what individuals were being served with subpoenas by Plaintiff, Bob Tierney, to appear as witnesses at a Hearing scheduled for 9:15am on Monday, June 24, 2002.

28. That this misconduct by Defendant Barney Bier, and/or one or more of the employees of the Office of the Adams County States Attorney, acting upon Bier's orders, represents, at least, the abuse of public office by a public official in order to aid private parties in litigation, in which the Office of the Adams County States' Attorney has no interest or standing.

29. That one or more persons servings these subpoenas on behalf of the Plaintiff, subsequently instructed one or more of the witnesses who were being lawfully served with a subpoena, to contact attorney, "Jon Barnard" at the time these witnesses were being served with the subpoenas. However, Mr. Barnard's name does not appear anywhere on the subpoena.

30. That the attorney for the Defendants, Jon Barnard, is also an Adams County Assistant States' Attorney.

31. That after July 1, 2002, on one or more occasions, Mr. Barnard used the power and weight of his office as an Adams County State's Attorney to gain access to criminal investigation reports maintained by the Adams County Sheriff's Department regarding some of the allegation described in the current complaint.

32. That this misconduct by Mr. Barnard, represents, at least, the abuse of public office by a public official in order to aid private parties in litigation, in which the Office of the Adams County States' Attorney has no interest or standing.

33. That in June of 2002, the Plaintiff lawfully filed and served upon the Defendants' attorney of record, Jon Barnard, a Request For Production Of Documents in accordance with the Illinois Supreme Court Rule 201 General Discovery Provisions.

8

34. That on July 9, 2002, Mr. Barnard responded in writing that the Plaintiff could view the documents at 10:00 am on Friday, July 12, 2002 at his [Barnard} office. However, Mr. Barnard also stated that would be filing an objection by July 12, 2002, regarding producing some of the requested documents.

35. That the Plaintiff responded in writing to Mr. Barnard agreeing to Mr. Barnard's timetable and conditions for viewing the requested documents.

36. That as of Friday, July 12, 2002, Mr. Barnard had failed to file any objections to the scope of the Request For Production Of Documents.

37. That at 9:03am on Friday, July 12, 2002, Mr. Barnard phoned Plaintiff's residence and informed Plaintiff's wife, Ann Tierney, that he did not have the documents available, and that he was allegedly unable to contact the person who was allegedly supposed to deliver the documents to his office. *(See affidavit of Ann Tierney, attached as Exhibit Q)*

38. That at 9:33am on Friday, July 12, 2002, the Plaintiff phoned Mr. Barnard to discuss the matter. After listening to Mr. Barnard's disingenuous explanation, the Plaintiff advised Mr. Barnard that the failure to produce the requested documents as mutually agreed upon, was due to the bad faith conduct on the part of his clients. However, in a good faith effort to resolve the issue pursuant to Illinois Supreme Court Rule 201(k)-General Discovery Provisions, the Plaintiff further advised Mr. Barnard that he would give Mr. Barnard until 1:00pm of that day to produce the documents as agreed. *(See letter of Plaintiff dated July 12, 2002, attached as Exhibit H)*

39. That Mr. Barnard did not produce, and refused to produce the documents by 1:00pm on Friday, July 12, 2002, but in a faxed letter of July 12, 2002, Mr. Barnard suggested producing the documents at a later date. *(See letter of Mr. Barbard dated July 12, 2002, attached as Exhibit I)*

40. That the requested documents were in fact delivered to Mr. Barnard's office by approximately 1:00 that very day of July 12.

41.  That in conjunction with this event, Mr. Barnard submitted an affidavit to the Court, which reflects false and misleading statements regarding these events. *(See affidavit of Mr. Barnard, dated July 17, 2002, attached as Exhibit L)*

42.  That based on information and belief, the Plaintiff reasonably believes that the failure of the Defendants to produce the requested documents as mutually agreed upon, was based upon the premeditated, bad faith conduct of one or more of the Defendants, including, but not limited to Defendant, Barney Bier.

43.  That on July 18, the Court ordered the Defendants to various documents for the Plaintiff to inspect on July 23, 2002.

44.  That on July 23, 2002, the Plaintiffs went to Mr. Barnard's office to review and inspect the documents.

45.  That all of the documents ordered produced by the Court were in fact not produced.

46.  That on July 23, 2002, Mr. Barnard filed an Affidavit of Compliance, falsely asserting that the documents approved by the Court for production had in fact been produced. *(See affidavit of Mr. Barnard, dated July, 2002, attached as Exhibit N)*

47.  That on July 25, 2002, the Plaintiff sent a letter to Mr. Barnard requesting the production of the missing documents. *(See the letter dated July 25. 2002, attached as Exhibit O)*

48.  That Mr. Barnard did not respond to this letter requesting the production of the missing documents until October 1, 2002, when Mr. Barnard produced a document allegedly from V & R Accounting. *(This document is attached as Exhibit R )*

49.  That this document from V & R Accounting allegedly represents incomplete Sheridan financial records of the Plaintiffs, but is in fact inconsistent with similar financial records entered as evidence by the Defendants during the Preliminary Injunction Hearing.

50.  That Mr. Barnard and the Defendants continue to refuse to produce the documents that were in fact ordered produced by the Court.

## Other Incidents And Issues Regarding The Misconduct of the Quincy School District And Their Attorney(s) of Record

51.    That attorneys for the QSD who were not parties in this litigation have filed at least 2 frivolous "Motion to Quash Subpoenas and to Enjoin the Unauthorized Practice of Law" in an attempt to prevent witnesses from lawfully testifying at Hearings, and to avoid producing documents at a Preliminary Injunction Hearing on June 17, 2002.

52.    That the court ordered the QSD to produce documents pursuant to the Preliminary Injunction Hearing in this litigation.

53.    That pursuant to Court order, the QSD produced numerous documents including a letter dated March 29, 1999, which was sent by defendant Schnack to QSD attorney, Dennis Gorman.  This letter had also been produced by the QSD during initial disclosure in parallel Federal litigation, and dealt with Richard Powers and complaints regarding Power conduct with the QHS swim teams.

54.    That a letter dated March 5, 1999, which had also been sent by defendant Schnack to QSD attorney, Dennis Gorman, and also dealt with complaints about Richard Powers and the QHS swim teams.  However, this letter was not produced by the QSD or Dennis Gorman at the P. I. Hearing, or during initial disclosure in the Federal litigation.

55.    That on or about July 13, 2002, the Plaintiffs lawfully served a subpoena and Request for Production of Documents upon Joseph Bocke and the Quincy School District #172.  Whereby the School District was required to produce various documents on July 25, 2002.

56.    That the QSD did not respond to the request, and on or about July 25, 2002, the School District refused to appear and/or produce the requested documents, and again filed a frivolous Motion to Quash Subpoena, To Enjoin The Unauthorized Practice Of Law, And For Protective Order.

57.    That this Motion by the QSD is a dilatory, stonewalling tactic since it is based on the same facts and circumstances as a similar Motion that has previously been denied by the Court.

58.   That the QSD made false and misleading statements in the Motion.

59.   That the QSD submitted false and misleading documents with the Motion.

60.   That the QSD made no good faith effort to cure any alleged procedural defects in the subpoena served upon Bocke.

61.   That during a Hearing on or about October 8, 2002, the attorneys for the QSD continued to deny the allegations of ¶¶ 54 & 55, and again made false and misleading statements to the Court.

62.   That during a 201k conference on October 9, 2002, the attorneys for the QSD refused to acknowledge that they had made false and misleading statements in their frivolous Motion of July 25, 2002, and refused to acknowledge that they had submitted false and misleading documents with this Motion, and they continued to refuse to produce any documents, or to produce Bocke as required by a lawfully served subpoena.

63.   That during a tele-conference Hearing before the Court on October 21, 2002, at virtually the 11th hour prior to a Hearing in open court, the QSD attorneys finally admitted to the allegations of ¶¶ 55 & 56, and acknowledged that a lawful subpoena had served upon the QSD.

64.   That during the Hearing before the Court on October 21, 2002, the Court denied for "the third time" the QSD's frivolous Motion To Enjoin The Unauthorized Practice Of Law.

65.   That the QSD continues to refuse to produce documents in compliance with the Rules of Discovery.


**Wherefore,** The misconduct of the Defendants and the QSD fatally afflicted Plaintiff's attempts to petition the Courts for redress of grievances, and for a Motion for Preliminary Injunction, resulting in continued harm and damage to the Plaintiff, his family, and to the orderly process of justice.

In view of the documented history of the Defendants' and the Quincy School District's unlawful, dilatory, scorched-earth tactics, represented by their failure to appear and produce at the Preliminary Injunction Hearing, failing to appear in response to subpoenas without filing

Motions to Quash, interfering with the serving of subpoenas upon witnesses, giving false testimony at the Hearing, filing frivolous, duplicative Motions which have been repeatedly denied by this Court, and in view of the abuse of public office by the defendants and their attorney of record, and the blatant attempts to circumvent and obstruct the orderly process of justice, and the successful efforts of the Defendants to interfere with the Plaintiff's constitutionally protected right to petition the Courts for redress of grievances without interference, Plaintiff prays that this Court order the Defendants and all other parties to produce all of the requested documents <u>forthwith</u>, and that this Court grant injunctive relief and/or a Protective Order to prohibit any further interference and/or misconduct on the part of the Defendants.

Plaintiff also hereby respectfully requests the Court to impose significant financial sanctions upon the Defendants, upon defendant Schnack, and upon Dennis Gorman and the Quincy School District, in order to punish and deter the Defendants and the Quincy School District from any future dilatory, bad faith conduct and refusal to produce.

Plaintiff also hereby respectfully requests the Court to grant sanctions which at least require the Defendants to reimburse the Plaintiffs for all costs incurred by the Plaintiffs to date, regarding litigation between the Plaintiffs and the Defendants over the issues described in the current complaint, as well as for all Court costs incurred to date regarding this litigation.

Dated _OcTOBeR 30_ 2002

By: _Robert V_

Robert Tierney, One of the Plaintiffs

### PROOF OF SERVICE

Service of the foregoing instrument was made by faxing and sending a copy thereof, in a sealed envelope, postage thereon fully prepaid, addressed to all other Plaintiffs and Defendant's attorney of record; Jonathan Barnard 316 North Sixth Street, Quincy, IL 62301 by depositing the same in the United States Mail from the Office of the undersigned this _30_ day of _OcTOBeR_ 2002. _Robert V_

Cc.    Marec Edgar, an attorney for the QSD

Robert Tierney, Ann Tierney, Meryl Tierney, Plaintiffs
2517 Summer Creek
Quincy Il 62305
217-223-4849

13

## List Of Exhibits Attached To This Motion

A. Letter of Andrew Schnack, dated March 5, 1999.

B. Letter of Andrew Schnack dated March 29, 1999.

C. Paragraphs # 68 & 69 of the Third Amended Complaint.

D. Transcript of Court Proceedings of June 25, 2002 in Case 2002-L-12.

E. Letter of Defendant's attorney (Barnard) to Plaintiff dated October 18, 2002, regarding Schnack's letter of March 5, 1999.

F. Letter of Defendant's attorney (Barnard) to Plaintiff dated October 21, 2002.

G. Letter from attorney Carl Draper to Plaintiff dated October 18, 2002, regarding the non-production of Schnack's letter of March 5, 1999.

H. Letter from Plaintiff to Defendant's attorney (Barnard) dated July 12, 2002, regarding Request to Produce.

I. Letter from Defendant's attorney (Barnard) to Plaintiff dated July 12, 2002, regarding Request to Produce.

J. Interview report of the "massages"

K. Letter from Plaintiff to Defendant's attorney (Barnard) dated July 12, 2002, regarding Request to Produce.

L. Affidavit of Defendant's attorney (Barnard) dated July 17, 2002.

M. Letter from Plaintiff to Honorable Judge Vespa dated July 17, 2002.

N. Affidavit of Defendant's attorney (Barnard) dated July 23, 2002.

O. Letter from Plaintiff to Defendant's attorney (Barnard) dated July 25, 2002, regarding failure to produce.

P. Letter from Plaintiff to Honorable Judge Vespa dated July 27, 2002.

Q. Affidavit of Ann Tierney dated July 30, 2002.

LAW OFFICES

SCHNACK, SCHNACK & CASHMAN

ANDREW C. SCHNACK III
KENT R. SCHNACK
J. DEVIN CASHMAN

510 VERMONT STREET
QUINCY, ILLINOIS
62301-2902

TELEPHONE 217-224-4000
FAX 224-8565

March 5, 1999

Mr. Dennis Gorman
Schmiedeskamp, Robertson, Neu & Mitchell
525 Jersey
Quincy IL 62301

Dear Dennis:

As a close personal friend and attorney for Rick Powers, coach of the boys and girls swimming team at Quincy High School, it has come to my attention that accusations are being made about improper contact with girl swimmers last fall. I have talked personally to Rick about this and he categorically denies it. I have also talked with Judge Chet and Barb Vahle concerning the alleged incident. The fact of the matter is that prior to the Western Big Six conference meet, a get together was held at the Vahle home. Chet and Barb Vahle were present, their family was present and in-laws were present. In addition, other parents of members of the girls' swim team were present. The suggestion was made that the girls receive rub downs to loosen up for the meet. This is done on a regular basis at every big meet I have ever attended and is common practice in swimming. At the suggestion of the Vahles, the team went downstairs and anyone who wanted a massage or rub down was given one. It was voluntary, it was totally in keeping with good swimming coaching practices and absolutely nothing was wrong with this. Apparently this is being used now to somehow attack Rick. As Rick's attorney, I have advised him that if these statements are being made, they could form the basis for a lawsuit. Rick has authorized me to request from you any documentation or complaints in writing that you or the schoolboard has concerning this matter so that we can be properly informed and properly respond to it. Obviously, if this is untrue, I apologize for taking your time. If it is true, we consider it exceptionally serious and would like to get to the bottom of it.

Sincerely yours,

Andrew C. Schnack, III

ACSIII:pkj

LAW OFFICES

**SCHNACK, SCHNACK & CASHMAN**

ANDREW C. SCHNACK III
KENT R. SCHNACK
J. DEVIN CASHMAN

510 VERMONT STREET
**QUINCY, ILLINOIS**
62301-2902

TELEPHONE 217-224-4000
FAX 224-8565

*File*

March 29, 1999

Mr. Dennis Gorman
Attorney at Law
525 Jersey Street
Quincy, IL 62301

Dear Dennis:

I just thought you would like to know that as of Thursday, March 25, 1999, Meryl Tierney is now swimming with Sheridan Swim Team under Coach Rick Powers.   I don't know what affect this would have on his previous complaints but would dearly love to get Rick's contract signed and get the contract signed between the school district and Sheridan.   I have a couple of thoughts on that that I think would be advantageous to the school district, especially if we can get this done on a long term basis.

If you get a chance, give me a call.

Sincerely yours,

SCHNACK, SCHNACK & CASHMAN

By:  Andrew C. Schnack, III

ACSIIIpjb

Exhibit *B*

68.    In the space of just 25 days between March 28, 1999, and April 21, 1999, Schnack, Vahle, Meyer, Citro, and Gorman, engaged in a coordinated campaign of collusion, conspiracy, retaliation, and intimidation, by engaging in the following acts;

a.    On <u>March 28</u>, 1999, Schnack (who was also Powers' personal attorney) was elevated to membership on the Sheridan Board, despite his numerous conflicts of interests.

b.    On <u>March 29</u>, 1999, one day after becoming a Sheridan Board member, Schnack mailed a letter to School attorney Gorman (Gorman was also acting as the de-facto School District Superintendent per the instructions of School Board President, Citro). In response to the complaints about Powers misconduct with Meryl Tierney, Schnack made false statements about Meryl Tierney's swimming activities at Sheridan in order to discredit the Plaintiffs and suppress any investigation of Powers. Schnack also attempted to renew the School Districts contracts with both Powers and Sheridan, by offering *"advantageous"* benefits and incentives to the District if the contracts could be renewed.

c.    On <u>April 12</u>, 1999, Vahle sent a letter to the High School Athletic Director, the Principal of the High School, and to the Superintendent of the School District, on the letterhead of the Circuit Court of the 8th Judicial Circuit of the State Of Illinois. To reaffirm the official, judicial nature of his letter, Vahle emphasized that he was writing from a "partly professional viewpoint." The letter accused the Tierneys of "spreading rumors and innuendo about the coach and his program" and making "paranoid misrepresentations and falsehoods". Vahle also stated his intent was to "discourage anyone from attempting to change the program of the coach". Vahle's letter was intended to discredit and retaliate against the Tierneys, suppress any investigation of Powers' misconduct, and intimidate witnesses to Powers misconduct.

d.    On <u>April 14</u>, 1999, Schnack made a motion to the Board of Directors of Sheridan to summarily *"suspend"* the Tierneys from Sheridan. Schnack made false and misleading allegations against the Tierneys. The minutes of the board meeting disclose that he made the motion after an allegation by Meyer accusing the Tierneys of "trying to get Rick Powers fired as the Quincy High swim coach." The motion was second by the Adams County States' Attorney, Barney Bier. Schnack's statements and actions were intended to discredit and retaliate against the Tierneys and suppress any investigation of Powers' misconduct. Schnack also failed to inform the Sheridan Board he was acting as Powers' personal attorney.

e.    On <u>April 15</u>, 1999, Sheridan sent the Tierneys a letter wherein Sheridan declared the Tierney membership was *"terminated"*, declared the Tierneys would be *"considered trespassers"* if found on Sheridan property, and barred the Tierneys from ever setting foot on the Sheridan property *"for any function whatsoever"*. This ban prevented Meryl Tierney and all members of her family from attending

Exhibit *C*

all swim team functions at Sheridan that were otherwise open to the public. The letter gave no reason for Sheridan's actions. Sheridan engaged in State action and retaliation against a School District Dean of Students, her family, and the Captain of the High School Girls Swim team, without providing any due process to the Tierneys.

f.    On April 18, 1999, within days of the Vahle Letter and the Sheridan Expulsion Letter, and in response to the reports of Sheridan's retaliation, the School District and school board president Citro, personally retaliated against the Tierneys, and engaged in this conduct while acting under color of state law. This retaliation consisted of, without limitation, Citro's attempt to intimidate the Tierneys by falsely telling Bob Tierney that Powers could sue the Tierneys because of the Tierney's' reporting of Powers' misconduct. Citro claimed to be describing information given to him by an "uninvolved attorney".

g.    On April 21, 1999, *de-facto* school Superintendent, Gorman, made a report to the School Board concerning Powers and the High School Swim Program. In response to Gorman's comments, the School Board hatched a scheme to cover-up Powers misconduct and Sheridan's retaliation, and to renew the contracts of Powers and Sheridan without a vote in public session. This action was taken to retaliate against the Tierneys and suppress any investigation of Powers' misconduct and Sheridan's retaliation.

69.    The School District, Citro, and Gorman, refused to take any action or even discuss with the Tierneys, Sheridan's expulsion of the Tierneys. Citro refused to discuss with the Tierneys the investigation of Powers. The District turned a *blind eye* to Sheridan's retaliation against the Tierneys for reporting Powers misconduct.

Exhibit C-2

1          IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT

2                        ADAMS COUNTY, ILLINOIS

3

4    ROBERT TIERNEY, ANN S. TIERNEY,        )
     and MERYL A. TIERNEY,                  )
5                             Plaintiffs,)
                                            )
6              -vs-                         )    NO.  02-L-12
                                            )
7    SHERIDAN SWIM CLUB,INC., an Illinois   )
     Corporation, ANDREW C. SCHNACK, III,   )
8    JULIE ANDERSON, BARNEY BIER, RODERICK  )
     P. MILLER, DAVID P. DANIELS, LISA      )
9    BEARDEN, LORI MILES, PATRICIA CRANE,   )
     DOUG OLSON, BARB SELVY, ROBERT HULTS,  )
10   and TIMOTHYI BETH, members of Sheridan )
     Swim club Board in their Official and  )
11   Individual Capacities, and ROBERT MEYER)
     member of the Sheridan Swim club Board )
12   and Former President of the Sheridan   )
     Booster Club, in his Official and      )
13   Individual Capacity,                   )
                              Defendants.)
14   . . . . . . . . . . . . . . . .        )

15        EXCERPT OF REPORT OF PROCEEDINGS from the hearing held on
     the 25th day of June,2002, before the HONORABLE JOE R. VESPA.

16

          APPEARANCES:
17        Mr. J. ROBERT TIERNEY

18           Pro se,

19

          MR. JONATHAN BARNARD
20        Attorney at Law

21           On behalf of the Defendant.

22   LUCINDA E. WAIBEL, CSR, RPR
     License No. 084-002296
23   Official Court Reporter
     Menard County Courthouse
24   P.O. Box 496
     Petersburg, IL 62675

                                                              1

                                             *EXHIBIT D*

<pre>
 1                        INDEX

 2   WITNESSES:          DIRECT   CROSS   REDIRECT   RECROSS

 3   Drew Schnack                   4       45        47

 4

 5

 6

 7

 8

 9

10   EXHIBITS:          MARKED   RECEIVED

11   None.

12

13

14

15

16

17

18

19

20

21

22

23

24
</pre>

2

1  point you owed the club $1,200 and the first time that you were

2  finally current was when we finally had gotten your money, the

3  year was up and it was time to eliminate that problem of

4  collection from you.

5      Q.     What year was that?

6      A.     1999.

7      THE COURT:   Okay I have heard enough about that.

8      MR. TIERNEY: Did you reveal to the Sheridan board that you

9  were representing Powers, trying to get his contract renewed?

10     A.     No.

11     Q.     Did you reveal to the Sheridan board that you had

12 sent a letter to the school district talking about Meryl Tierney

13 and complaints about Rick Powers?

14     MR. BARNARD: Objection.  If he's referring to the letter

15 with regard to this previous testimony on cross 50 findings ago,

16 the letter speaks for itself and I do not believe it contains

17 that characterization or language.

18     Q.     Well let me change the question then.  Did you tell

19 the board about plans before your letter?

20     A.     No.

21     Q.     Why not?

22     A.     It didn't seem to have any relevance.  I was simply

23 asking that Powers be rehired.  There wasn't a person on that

24 board that didn't know I was a supporter of Power.

1    Q.    And now Mr. Schnack according to this letter you

2  also addressed complaints dealing with Mr. --  with Meryl

3  Tierney and Rick Powers so the letter was a little bit more

4  broad then what you just testified to?

5    A.    The letter speaks for itself sir.

6    Q.    And so your prior ---

7    THE COURT:    Excuse me.  Let me remind you you can ask

8  questions.  You should answer questions to the extent you can

9  and that's the way we do this okay?

10    Q.    Did you reveal to the board that the complaint had

11  been made to the Quincy School District about Powers and

12  massaging some high school girls?

13    A.    At that point I don't believe I even had that

14  knowledge.

15    Q.    Did Powers ever talk to you about the massages?  The

16  complaints about the massages?

17    MR. BARNARD: Objection.  Attorney client privilege.  This

18  man had made a major point of establishing that Mr. Powers was

19  the client of Mr. Schnack.

20    THE COURT:    Mr. Schnack has made a major point that maybe

21  he was not during the periods of time and particularly any

22  communication I would respect Mr. Schnack's claiming of the

23  privilege for his client.

24    MR. BARNARD: I'll withdraw the objection.  I apologize.

34

1       THE COURT:    Can you answer that?  Remember the question?

2       A.      Not particularly, no.  I remember the question but I

3  would appreciate it being repeated.

4       THE COURT:    Can you repeat the question.

5       Q.      Do you recall when Mr. Powers talked to you about

6  the complaint about him massaging high school female swimmers?

7       A.      To the best of my knowledge it would have come up

8  when I received the request from the school district to come to

9  that June 9 meeting.

10       Q.      Do you recall when the complaints were first filed

11  by some families with the school district?

12       A.      I didn't even know that complaints were filed.

13       Q.      Well?

14       A.      The school district didn't tell me.

15       Q.      As you sit here today after three years of reading

16  all of the documents when were the complaints first filed to

17  your knowledge with the Quincy School District?

18       MR. BARNARD: Objection relevance.  Whether or not they were

19  filed 5 minutes after the alleged occurrence or evidently two

20  months thereafter, this witness's knowledge did not -- that

21  event did not occur until after the termination as undisputed.

22  Why is that then relevant?  That's my objection.

23       THE COURT:    Mr. Tierney's testing that.  Go ahead.

24       A.      As I sat here in court yesterday I learned more

35

1  information about that then I had had up until this point. I

2  learned some from pleading in cases you filed in federal court.

3  It's my understanding based upon what I heard yesterday that you

4  went to the school board and in January or February and that

5  Nick Schildt had that meeting with yourself and your daughter

6  and other people on a Sunday.

7      Q.      And when was that meeting?  Sunday when?

8      A.      I don't know. What I heard yesterday, some Sunday in

9  January or February of 1999.

10     Q.      So based on what you heard yesterday you have reason

11 to believe the complaints were made in January or February?

12     A.      Yeah.

13     Q.      Okay and is it your testimony that Mr. Powers, your

14 client never talked to you about this complaint until when?

15     A.      It would have been when someone from the school

16 district asked that three people from Sheridan and three people

17 from basically your side, if you will, for lack of a better word

18 come to a board meeting and talked about allegations that had

19 been made to the best of my knowledge that would have been two

20 to three weeks before the meeting at best.

21     Q.      And to the best of your knowledge and that's the

22 first time Mr. Powers talked to you about the massages?

23     A.      Quite frankly Barb Vahle talked to me about it and

24 Chet Vahle talked to me about it and then I talked to Mr. Powers

36

1  about it.

2      Q.     When did Barb Vahle talk to you about it?

3      THE COURT:   Let's move on.  I have heard enough about

4  that.

5      Q.     What part of Sheridan by laws, constitution or rules

6  did -- were Tierneys in violation of let's say in 1999?

7      MR. BARNARD: Objection.  Calls for legal conclusion.

8      Q.     To your knowledge did the Tierneys violate any

9  Constitution or by laws or rules of the Sheridan Swim Club?

10     MR. BARNARD: Same objection.

11     THE COURT:  Well anytime during 1999 I think the question

12  was.

13     MR. TIERNEY: Any time from January 1 let's say to the time

14  we were expelled.

15     THE COURT:   All right, well if you know or if you recall

16  you may answer.

17     A.     Well I know that there was a list for lockers and as

18  trivial as it sounds you just went down and took a locker in the

19  men's and women's locker room and didn't pay for it.  We heard a

20  lot of grief over that from people who did have their names on

21  the lockers. The long and the short of it is, during that period

22  of time as far as you know, the by laws contain I think for good

23  cause or being a good member.  You're just a lousy member.

24     Q.     When you say list do you mean a waiting list?

                                                              37

1    A.    Yes.

2    Q.    And what's your testimony again about the lockers?

3    A.    You ---

4    MR. BARNARD: Objection.  Asked and answered.  I believe he

5 just testified to it and I heard it.

6    THE COURT:    Sustained.

7    Q.    Could you expound a little bit on what you just said

8 about the lockers?

9    A.    We have a limited number of lockers for members and

10 limited number of lockers for men and women.

11    THE COURT:  We have heard enough about lockers.

12    MR. TIERNEY: I'd like to get clear for the record exactly

13 what he is saying that I did.

14    THE COURT:    He just said that.

15    Q.    Regarding the lockers?

16    A.    I didn't hear his response.

17    THE COURT:    I know.  Would you move on?

18    Q.    To your knowledge were the Tierneys ever given any

19 notice that any action was being taken against them?

20    MR. BARNARD: Objection.

21    Q.    At the April board meeting?

22    MR. BARNARD: Excuse me Judge.  We stipulated that they did

23 not.

24    THE COURT:    Okay.

38

1    Q.    Were they ever given a chance to respond?

2    MR. BARNARD: We stipulate that they did not.

3    Q.    Are you aware that there is a clause in the by laws

4    a duty -- operation of good faith?

5    MR. BARNARD: Objection.   Relevance.

6    THE COURT:    Sustained.

7    MR. TIERNEY: Were you aware there is a clause of duty of

8    operation of good faith on the part of the board members towards

9    Sheridan share holders.

10    MR. BARNARD: Same objection.

11    THE COURT:    Sustained.   Mr. Tierney if you and I read that

12    and find that there is such a duty of good faith what do I care

13    if this guy knows about it?   Excuse me.   Mr. Schnack knows about

14    it?

15    Q.    The reason I think it's relevant he knows about it

16    because he was a board member at the time taking action against

17    the Sheridan?

18    THE COURT:    If I find he didn't act in good faith I don't

19    care if he knew about it or not.   If that is in fact the rule.

20    Q.    When you began representing Powers, the massages,

21    did you ever tell him not to give an interview to the Illinois

22    State Police?

23    MR. BARNARD: Objection.   Relevance.   This occurred

24    following, if I understand the time frame correctly, following

39

1  the termination.

2      THE COURT:  What's the relevance.

3      MR. TIERNEY: Just a question.  He said he provided legal

4  representation.  The relevance is did he ask him not to

5  cooperate in the investigation.

6      THE COURT:  Sustained.  And this is obvious that if he did

7  tell him that it's attorney client.

8      Q.    Were you ever contacted by anybody from the Quincy

9  School District who was investigating the massage complaints?

10     MR. BARNARD: Objection.  Vague time frame.  Judge, again if

11  it's post termination --

12     THE COURT:  I should -- didn't you say that you didn't

13  know about the massage complaint until after the termination?

14     A.    I didn't know anything about it until after the

15  termination when I was asked to ---

16     THE COURT:  All right, thank you.  Sustained.

17     Q.    To your knowledge prior to the termination, correct.

18  Prior to the filing of federal lawsuit were you aware of any

19  investigation conducted by the school district regarding the

20  massages and members of the Quincy High School swim team?

21     A.    Just what I previously testified to.  That I got my

22  knowledge when I was informed by the school district to come to

23  the meeting on, and again it's been testified June 9.  If that

24  was the day, that was the day.

40

1    Q.    Okay.  Well then so based on that series of events
2  is the only investigation that you know about consisted of you
3  and some people going to talk to the board?
4    A.    At some point in time.  And I have no idea when but
5  it was after your termination I believe, the state police, but I
6  really don't know too much about that. I know that you sent
7  letters to Illinois Swimming in July of 19 -- or not Illinois
8  Swimming excuse me. U.S.A. Swimming in July of 1999.
9    Q.    I'm talking about prior to the filing of the lawsuit
10 in June, prior to the June 9 meeting, we're not going beyond --
11 the Court has already established June is the cut off. I'm
12 talking about events prior to June 9 when you met with the
13 school board?
14   A.    I think I have answered that yes, I did.  When the
15 school board -- when the representatives of the school district
16 asked three representatives or people from Sheridan to come to
17 that June 9 meeting, that's when I started finding out about
18 things.
19   Q.    Are you as of the June 9 meeting, are you aware if
20 anybody ever talked from the school district, ever talked to
21 Mr. Powers about the massages?
22   A.    I'm aware of it from what I heard in court
23 yesterday.
24   Q.    And who talked to Mr. Powers from what you heard in

41

1  court yesterday?

2      A.    I think Mr. Schildt said he did.

3      MR. BARNARD: Objection Judge it's based on what he heard in

4  court yesterday.   It's in the record.

5      THE COURT:   Sustained.

6      Q.    Is it your testimony that you heard Mr. Schildt

7  testify that he talked to Mr. Powers?

8      A.    I thought that's what he said.

9      Q.    And didn't Mr. Schildt say that after he turned over

10 the Shield report early in March he took no further action and

11 the Shield report consisted of nothing more than interviewing

12 some of the girls and their families who  were massaged?

13     MR. BARNARD: Objection.   Relevance?

14     THE COURT:   Sustained.

15     Q.    So to be clear here you don't know for a fact if

16 anybody from the Quincy School District actually interviewed

17 Mr. Powers prior to June 9, 1999 about the massages and the

18 complaint?

19     THE COURT:   You mean direct knowledge on his part?

20     Q.    Well yes Your Honor, direct knowledge?

21     A.    I know what I heard in court yesterday. I cannot ---

22     THE COURT:   Do you know anything besides that?

23     A.    I'm certain that I talked with Barb Vahle and Chet

24 Vahle and Rick Powers at the spaghetti dinner at the Vahle's

42